UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MMAS RESEARCH, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>BOSTON CHILDREN'S HOSPITAL, et al.,<br><br>    Defendants | Civ. A. No. 1:24-cv-12108-DJC |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF THE
CHILDREN'S HOSPITAL CORPORATION, HANNAH PALFREY,
JACOB HARTZ, AND SARAH D. DE FERRANTI**

Theodore J. Folkman (BBO No. 647642)
Steven DiCairano (BBO No. 694228)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
sdicairano@rubinrudman.com

<u>TABLE OF CONTENTS</u>

Table of Authorities..................................................................................................................... ii

Preliminary Statement ............................................................................................................... 1

Facts .............................................................................................................................................. 3

    A.   The MMAS, the Widget, and the Fight Between Dr. Morisky and Trubow. ...................... 3

    B.   The Hospital Gets Dragged In. ........................................................................................ 6

Argument ..................................................................................................................................... 9

    A.   The Court Should Dismiss All Claims Against Dr. de Ferranti and Palfrey, Because
MMAS Research Makes No Allegations Against Them. ................................................... 9

    B.   The Court Should Dismiss the Contract Claim Against Dr. Hartz. .................................. 9

    C.   The Copyright Infringement Claim Fails, Because MMAS Research Does Not Have a
Copyright in the MMAS Version that the Hospital Used. ................................................. 9

    D.   The Copyright Infringement and Contract Claims Are Barred by the Copyright Misuse
Doctrine..........................................................................................................................11

    E.   The DMCA Claim Fails, Because the Hospital Never Provided False CMI or Removed
or Altered CMI. .............................................................................................................. 14

    F.   There Was No Trade Secret. ........................................................................................... 16

    G.   This Is the Rare Case Where the Complaint Itself Shows That Any Infringement Could
Not Have Been Willful..................................................................................................... 18

    H.   The Contract Claim Fails, Because There Is No Plausible Allegation of Damage........... 19

Conclusion ................................................................................................................................. 20

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alcatel USA, Inc. v. DGI Techs., Inc.* 166 F.3d 772 (5th Cir. 1999)........................................ 13, 14

*Apple Inc. v. Psystar Corp.*, 658 F.3d 1150 (9th Cir. 2011) ............................................................ 12

*Assessment Techs. of Wis., LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003)...................... 12

*Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004)...................... 12

*Computer Assocs. Int'l v. Am. Fundware*, 831 F. Supp. 1516 (D. Colo. 1993) ........................... 18

*DeCastro v. Abrams,* 2023 U.S. Dist. LEXIS 118575 (D. Mass. Jul. 11, 2023)............................. 3

*Edward B. Marks Music v. Colorado Magnetics,* 497 F.2d 285 (10th Cir. 1974)........................ 12

*Gamma Audio & Video, Inc. v. Ean-Chea,* 11 F.3d 1106 (1st Cir. 1993)..................................... 10

*Greene v. Ablon,* 794 F.3d 133 (1st Cir. 2015) ............................................................................... 10

*Hurry Fam. Revocable Trust v. Frankel,* 2023 U.S. Dist. LEXIS 534
    (M.D. Fla. Jan. 3, 2023) .............................................................................................................. 5

*Iconics, Inc. v. Massaro,* 192 F. Supp. 3d 254 (D. Mass. 2016) .................................................. 16

*Ingrassia v. Bailey,* 341 P.2d 370 (Cal. Dist. Ct. App. 1959) ...................................................... 18

*Island Software & Computer Serv. v. Microsoft Corp.,* 413 F.3d 257 (2d Cir. 2005) ................... 3

*Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990) .................................................. 12

*LoConte v. Forest Labs., Inc.,* 2015 U.S. Dist. LEXIS 77698 (D. Mass. Jun. 15, 2015) ............. 5

*Medina-Padilla v. U.S. Aviation Underwriters, Inc.,* 815 F.3d 83 (1st Cir. 2016)...................... 14

*Newt v. Twentieth Century Fox Film Corp.,* 2016 U.S. Dist. LEXIS 98308
    (C.D. Cal. Jul. 27, 2016) .............................................................................................................. 4

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,* 121 F.3d 516 (9th Cir. 1997)............................ 13

*Rife v. One W. Bank,* 873 F.3d 17 (1st Cir. 2017).......................................................................... 14

*Rombola v. Cosindas,* 351 Mass. 382 (1966)................................................................................. 19

*Shirokov v. Dunlap, Grubb & Weaver PLLC,* 2012 U.S. Dist. LEXIS 42787 .......................11, 14

*Singarella v. Boston,* 342 Mass. 385 (1961) .................................................................................. 19

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory,* 689 F.3d 29 (1st Cir. 2012)........11

*Sony BMG Music Entm't v. Tenenbaum,* 660 F.3d 487 (1st Cir. 2011) ........................................ 18

*Splunk Inc. v. Cribl, Inc.,* 2024 U.S. Dist. LEXIS 93732 (N.D. Cal. May 24, 2024) ..................11

*Union Mut. Life Ins. v. Chrysler Corp.,* 793 F.2d 1 (1st Cir. 1986) ............................................... 9

*United Tel. Co. v. Johnson Publ'g Co.,* 855 F.2d 604 (8th Cir. 1988) ......................................... 12

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191 (3d Cir. 2003)...................... 12

*Watterson v. Page,* 987 F.2d 1 (1st Cir. 1993)................................................................................. 3

<u>Statutes</u>

17 U.S.C. § 101.................................................................................................................................. 9

17 U.S.C. § 102(a) ........................................................................................................................... 10

17 U.S.C. § 103(a) ........................................................................................................................... 10

17 U.S.C. § 103(b) ........................................................................................................................... 10

17 U.S.C. § 106..................................................................................................................................11

17 U.S.C. § 1202(a) ......................................................................................................................... 15

17 U.S.C. § 1202(b) ......................................................................................................................... 15

17 U.S.C. § 1202(c) ........................................................................................................ 15

18 U.S.C. § 1839 ............................................................................................................. 16

18 U.S.C. § 1839(3)(A) .................................................................................................. 16

18 U.S.C. § 1839(3)(B) .................................................................................................. 16

<u>Constitutional Provisions</u>

U.S. Const. art. 1, § 8 .................................................................................................... 12

<u>Other Authorities</u>

*Restatement (Third) of the Law of Agency* § 6.01(2) (2006) .......................................... 9

<u>PRELIMINARY STATEMENT</u>

Clinical questionnaires and assessments are usually available for researchers to use without charge. But two men, Dr. Donald Morisky and Steven Trubow, have devoted themselves for years to collecting licensing fees from researchers who use one such assessment, the Morisky Medication Adherence Scale. And in recent years, the two have squabbled about who owns the copyrights to which versions of the MMAS and who can go after researchers for the licensing fees. Boston Children's Hospital and three of its staff now find themselves entangled in the Trubow/Morisky feud.

The Hospital respects copyright. One of its researchers, Dr. Jacob Hartz, acting on the Hospital's behalf, licensed the MMAS from an entity controlled by Trubow: the plaintiff, MMAS Research, LLC. Dr. Hartz wanted the license for use in one of his studies, and the Hospital paid a $5,000 licensing fee. Dr. Hartz administered the assessment four times. Then he began to receive competing demands from entities controlled by Dr. Morisky and entities controlled by Trubow. The Hospital did its best to comply with the demands and to credit the MMAS appropriately in documents made available to the public on the clinicaltrials.gov website. It even offered to stop using the assessment altogether once it became clear that it had stepped into an absurd minefield. But Trubow's company sued, asserting willful copyright infringement, Digital Millennium Copyright Act violations, trade secret misappropriation under the federal trade secret statute, and breach of contract.

The claims lack merit.

- There was no copyright infringement, because MMAS Research does not own the copyright in the version of the MMAS Dr. Hartz administered, the 2006 MMAS-8. MMAS Research alleges that it owns the copyright of the "Morisky Widget," a

1

software program written years afterward, that allegedly contains the text of the MMAS-8 in its source code, but owning the copyright in a derivative work does not mean owning the copyright in the underlying work.

- There was no DMCA violation, because the Hospital did not remove copyright management information accompanying a copy of the copyrighted work. Instead, at most, the Hospital identified Dr. Morisky rather than MMAS Research as a collaborator on a document filed on the clinicaltrials.gov website. But the DMCA is concerned with the removal of copyright management information from copies of copyrighted works, not with claims of academic misattribution.

- There was no trade secret misappropriation, because there was no secret. Everything MMAS Research claims as a trade secret was known to the public long ago or is trivial.

- The contract forbids the Hospital from using the 2006 version of the MMAS-8 as a condition of licensing the Morisky Widget, even though MMAS Research doesn't own the copyright in the older MMAS-8. That is the kind of restrictive licensing agreement that courts refuse to enforce under the doctrine of copyright misuse.

- In any event, the contract claim lacks any allegation that MMAS Research has suffered an actual injury, and there is no plausible theory of injury on the facts alleged.

The Court should dismiss all claims against the Hospital, Dr. Hartz, and the two other Hospital employees caught up in this suit, Dr. Sarah D. de Ferranti and Hannah Palfrey.

FACTS

For purposes of this motion, the Court should take the well-pleaded facts alleged in the complaint as true and draw all reasonable inferences in MMAS Research's favor. *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993). The Court may consider documents attached to the complaint or expressly incorporated in it. *See id.* The Court can also consider "official public records," "documents central to plaintiffs' claim," or "documents sufficiently referred to in the complaint." *Id.*

A.  The MMAS, the Widget, and the Fight Between Dr. Morisky and Trubow.

Dr. Donald Morisky's business was called MMAS Research LLC. (Compl. ¶ 15). He, Steven Trubow, and Dustin Machi "collaborated" to create software called the "Morisky Widget." (¶ 17). The Morisky Widget is an "electronic diagnostic assessment protocol" used to measure a patient's adherence to a doctor's prescription for medications. It uses two widely known scales, the "Morisky Medication Adherence Scale (8-item)" and the "Morisky Medication Adherence Scale (4-item)," also known as the "MMAS-8" and "MMAS-4" tests. (¶ 3). The MMAS-8 dates from 2006. (¶ 42). The Widget dates from 2017. (¶ 17). MMAS Research does not allege that it owns the copyright to the MMAS-8 or to the MMAS-4. The copyright to both assessments was registered to Dr. Morisky.[1]

The Complaint alleges that the text of the MMAS-8 and the MMAS-4 is incorporated into the Widget's source code. (¶ 3). But the Complaint then claims that the differences between

---

[1] True copies of certificates of registration for the "Morisky Medication Adherence Scale (8-item)," Registration No. TX 8-632-533, and the "Morisky Medication Adherence Scale (4-item)," No. TX 8-285-390, are attached as Exhibit 1. The Court may take judicial notice of the copyright registrations. *See DeCastro v. Abrams,* 2023 U.S. Dist. LEXIS 118575, at *8 n.4 (D. Mass. Jul. 11, 2023) (citing *Island Software & Computer Serv. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir. 2005)). We understand through discussions with counsel for Dr. Morisky that these trademarks were later assigned to an entity Dr. Morisky controls. But that fact is not alleged and is immaterial to this motion.

the MMAS-8 created in 2006 and the MMAS-8 used in the Widget are "night and day." (Compl. before ¶ 40). Why? Because Dr. Morisky's paper on the 2006 MMAS-8 was retracted in 2023 (¶ 40), but the retraction had no bearing on the Widget, since "unlike the never changing static 8 questions of the MMAS-8, the Morisky Widget MMAS-8 assessment is dynamic with constantly changing MMAS-8 questions that are condition and medication specific." (¶ 41). But as the Complaint itself alleges (¶ 72), and as the 2006 MMAS text that Dr. Morisky deposited with the Copyright Office when he registered his copyright confirms,[2] the version of the questionnaire Dr. Hartz used asked the questions from the 2006 MMAS-8, with only minor changes.

The MMAS-8 test has eight simple questions. Seven are yes/no questions, for example, "Do you sometimes forget to take your <health condition> pills?" and "Did you take all your <health condition> medicine yesterday?" (Compl. ¶ 72). The eighth question asks, "How often do you have difficulty remembering to take all your medications?" and has several possible answers, from "Never/rarely" to "All the time" (Id.).

The idea behind the MMAS-8 is that patients are often motivated to answer "yes" to any question their doctors ask. (Compl. ¶ 65). So if asked, "Are you taking your medicine?" a patient might answer "yes" even if the honest answer is no. The MMAS-8 is designed to remove "the tendency to give overly positive responses" that threatens the validity of the assessment. (Compl. ¶ 64). It reverses the wording in the questions, so that—for all the questions but one— answering "no" means that the patient is taking his or her medicine as prescribed. (Compl. ¶¶ 66-67). MMAS Research calls this a "trade secret" (Compl. ¶¶ 64, 67). But it is obvious to anyone looking at the questions. If it weren't obvious enough, Dr. Morisky explained the "secret" in a

---

[2] A true copy of the deposit is attached as Exhibit 2. The Court can take judicial notice of the deposit copy of a copyrighted work. *See Newt v. Twentieth Century Fox Film Corp.,* 2016 U.S. Dist. LEXIS 98308, at *5 (C.D. Cal. Jul. 27, 2016).

4

published article more than fifteen years ago. *See* Donald E. Morisky et al., *Predictive Validity of a Medication Adherence Measure in an Outpatient Setting,* 10 J. Clinical Hypertension 348 (2008), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2562622/.[3] And if the "secret" ever had value on account of its secrecy, it does not have value anymore. MMAS Research has disclosed the secret to the public—and not inadvertently—in its Complaint. *See Hurry Fam. Revocable Trust v. Frankel,* 2023 U.S. Dist. LEXIS 534, at *23-25 (M.D. Fla. Jan. 3, 2023) ("intentional publication of material will destroy its trade secret status," and while publication during court proceedings is not "automatically fatal," the court will consider "whether the court file disclosure was intentional" in deciding whether the trade secret survives).

In 2019, MMAS Research registered its copyright in the Morisky Widget. (Compl. ¶ 24 & Ex. 5). Also in 2019, Dr. Morisky left MMAS Research voluntarily and gave up his ownership stake in the Morisky Widget software. (Compl. ¶ 20 & Ex. 3). But afterward, Dr. Morisky and Trubow started suing each other. Trubow and MMAS Research sued Dr. Morisky in King County (Washington) Superior Court, and Dr. Morisky sued Trubow and MMAS Research in the District of Nevada. (Compl. Ex. 4). The two were fighting about who had the rights to the Morisky Widget. There is no allegation that anyone told BCH about the fight, and in fact, no one did.

The complaint alleges that the lawsuits settled in 2020. (Compl. ¶ 23 & Ex. 4). But Dr. Morisky sued MMAS Research again in 2021, this time in the Western District of Washington. (Compl. ¶ 28). That year, Trubow's entity, MMAS Research, sued a German hospital and others

---

[3] "The questions are phrased to avoid the 'yes-saying' bias by reversing the wording of the questions about the way patients might experience failure in following their medication regimen, since there is a tendency for patients to give their physicians or other health care providers positive answers." The Complaint refers to the Morisky paper (Compl. ¶¶ 39-40, 49), and in any event it is a publicly available document whose contents cannot be disputed. The Court can take judicial notice of it. *See LoConte v. Forest Labs., Inc.,* 2015 U.S. Dist. LEXIS 77698, at *11-13 (D. Mass. Jun. 15, 2015) (taking judicial notice, on a motion to dismiss, of the fact that medical publications were published, the dates of publication, and the existence of their contents, but not the truth of what they assert).

alleging copyright infringement. The German hospital argued that MMAS Research lacked standing because in the 2020 settlement, it had transferred the copyright in the Morisky Widget to Dr. Morisky. But in an unpublished decision earlier this year, the Ninth Circuit held that the 2020 settlement had not settled anything because it was never finalized, and thus that MMAS Research had not transferred its copyright in the Morisky Widget to Dr. Morisky. (Compl. Ex. 6). BCH was not a party to the case or bound by the decision.

   B.  <u>The Hospital Gets Dragged In.</u>

      In 2019, Dr. Jacob Hartz, the director of the preventive cardiology clinic at BCH and an instructor in pediatrics at Harvard Medical School, signed a perpetual license agreement with MMAS Research for using the Morisky Widget for $5,000. (Compl. ¶ 45 & Ex. 8). The Complaint does not explain why Dr. Hartz wanted to use the MMAS. But it references and provides a hyperlink to Dr. Hartz's description of his clinical study (Compl. ¶ 59), which he posted on the NIH website, clinicaltrials.gov. As the description explains, Dr. Hartz wanted to study ways to improve adolescents' adherence to a doctor's prescription for cholesterol-fighting drugs by providing monetary incentives to patients who checked in with an app and proved that they were taking their medicine.

      The study description explains that the investigators planned to use "the Morisky Medication Adherence Scale" and other tools to "test the subject's adherence prior to the use of incentives" and "during the 60 days following discontinuation of the incentives." It does not include the text of the MMAS-8 or any of its questions. It describes the MMAS as "validated." And it states that the "inclusion criteria," that is, the criteria used to determine whether someone could participate in the study, included a "Morisky Medication Adherence Scale score of ≤ 6." *See https://clinicaltrials.gov/study/NCT04458766?tab=history&a=5#Stud*. The Complaint does not allege that this criterion was included in the Morisky Widget source code, and in fact, Dr.

Hartz himself, not MMAS Research, decided on the inclusion criteria for his study, as one would expect.

In April 2022, Dr. Morisky's lawyer wrote a letter to Morisky Widget licensees, including the Hospital,[4] asserting that Dr. Morisky owned the Widget copyright and implicitly threatening legal action against anyone who dealt with Trubow. (Compl. ¶ 54 & Ex. 16). This was a source of "confusion for Morisky Widget licensees" (Compl. ¶ 55), evidently including the Hospital.

On July 3, 2022, Trubow wrote to Dr. Hartz, pointing out that the Hospital had omitted the acknowledgment required by the license agreement on the study description posted on clinicaltrials.gov. Dr. Hartz satisfied Trubow's demand immediately by adding a reference to MMAS Research LLC as a "collaborator." (Compl. ¶¶ 58-59). But the study description contains no statements about the ownership of the MMAS copyright, does not contain all or any part of the text of the MMAS, and does not even specify what version of the MMAS the study will use.

Trubow was not done. He asked Dr. Hartz how the Hospital planned to administer the MMAS-8 and told him that "if you administer MMAS-8 tests outside of the Morisky Widget, it requires Licensor approval, to use MMAS paper or electronic questionnaires." (Compl. ¶ 61). In response, Dr. Hartz sent Trubow a PDF showing the MMAS-8 that he planned to administer. (Compl. ¶¶ 62-63 & Ex. 19). At the bottom, the document had the following text, which restated, in different words, the inclusion criterion Dr. Hartz had posted on clinicaltrials.gov:

How many answers did they give that are in **BOLD UPPERCASE?** ___ ($\geq 2 \rightarrow$ **ELIGIBLE**).

The Complaint alleges (¶ 135) that the Hospital gave this document to patients, including the quoted text. That is false, and a little common sense shows that the physician or other person

---

[4] The complaint is silent about who received the letter, but it was addressed to Dr. Morisky's "colleagues" (Compl. Ex. 16) and in fact went to Dr. Hartz.

administering the assessment had the sheet and marked down the patient's answers without giving the sheet to the patient. But for now, the Court is stuck assuming the truth of this false allegation.

Dr. Hartz had begun to see that he had walked into a minefield. He wrote to Trubow that the Hospital had only administered the MMAS-8 four times, and that "if any of this is a serious breach of contract and you feel it necessary to end our agreement, we would understand." (Compl. Ex. 20). He continued: "We certainly did not mean to do anything incorrectly and it was always our intention to follow our contract entirely. It would be a tremendous loss to our study, but we want to respect our agreement and your organization." (Id.). The Complaint does not allege any response to this message.

In January 2023, the Complaint alleges that the Hospital removed the Trubow/MMAS Research copyright notice on the clinicaltrials.gov website post and replaced it with a notice that favored Dr. Morisky. (Compl. ¶¶ 70-71). The Complaint alleges nothing about the communications the Hospital received from Dr. Morisky before it made the change. But it does accuse Dr. Morisky and his entity, MMAR, LLC, of tortious interference in the contract between MMAS Research and the Hospital (Compl. Count 3), and it alleges that Dr. Morisky "replaced" the Hospital's license with MMAS Research "with his own MMAR LLC MMAS-8 license in January 2023" (Compl. ¶ 118), just at the time when the Hospital made the change. The inference is obvious: the Hospital made the change because of Dr. Morisky's supposedly tortious interference.

<u>ARGUMENT</u>

A.  <u>The Court Should Dismiss All Claims Against Dr. de Ferranti and Palfrey, Because</u>
    <u>MMAS Research Makes No Allegations Against Them.</u>

The Complaint says that Dr. de Ferranti is a Hospital employee. (Compl. ¶ 9). That is all

it says about her. The Complaint says that Palfrey is also a Hospital employee (Compl. ¶ 8) and

that she was copied on correspondence between Dr. Hartz and Trubow. (Compl. ¶¶ 58-59). That

is all it says about her. MMAS Research makes no allegations that either did anything wrong or

failed to do anything she should have done. The Court should dismiss all claims against them

without delay.

B.  <u>The Court Should Dismiss the Contract Claim Against Dr. Hartz.</u>

MMAS Research had a contract with the Hospital itself, not with Dr. Hartz or any other

Hospital employee. (Compl. ¶ 76). "When an agent acting with actual or apparent authority

makes a contract on behalf of a disclosed principal, … the agent is not a party to the contract

unless the agent and the third party agree otherwise." *Restatement (Third) of the Law of Agency*

§ 6.01(2) (2006). MMAS Research does not allege such an agreement.

The only party that had a contractual duty to MMAS Research was the Hospital. Dr.

Hartz, who merely signed for the Hospital, cannot be liable for any alleged breach. *See Union*

*Mut. Life Ins. v. Chrysler Corp.,* 793 F.2d 1, 11 (1st Cir. 1986) (high corporate officer may be

liable for the corporation's torts in some cases but ordinarily is not liable for its breach of

contract).

C.  <u>The Copyright Infringement Claim Fails, Because MMAS Research Does Not Have a</u>
    <u>Copyright in the MMAS Version that the Hospital Used.</u>

Under the Copyright Act, a work "based upon one or more pre-existing works" is a

"derivative work." 17 U.S.C. § 101. An author has a copyright in "original works of authorship,"

9

*id.* § 102(a), including derivative works, provided that the preexisting material has not been "used unlawfully." *Id.* § 103(a). "A derivative work is simply an infringing work made non-infringing through the acquisition of permission to use the underlying preexisting expression." *Greene v. Ablon,* 794 F.3d 133, 158 (1st Cir. 2015).

The Complaint alleges that the source code in the Morisky Widget contains the text of the MMAS-4 and MMAS-8. The MMAS-4 and the MMAS-8 are preexisting works created years before the Morisky Widget. Thus the Morisky Widget is a derivative work.

Copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). That is, the author of the derivative work has a copyright in the derivative work, but not in the preexisting work. If I write a novel and quote a poem in full in the text of the novel, and if you distribute copies of the poem, you infringe the poet's copyright, not mine, even if you tell others that the poem is reprinted from my novel. *See Gamma Audio & Video, Inc. v. Ean-Chea,* 11 F.3d 1106, 1112 (1st Cir. 1993) ("the copyright in a derivative work only protects the original elements contributed by the author of the derivative work …. Any elements that the author of the derivative work borrowed from the underlying work … remain protected by the copyrights in the underlying work").

The claim in the complaint isn't that the Hospital used or misused the Morisky Widget, that is, the software. MMAS Research does not allege that the Hospital reproduced the source code, created derivative works based on anything in the source code other than the text of the MMAS-8 itself, distributed copies of the source code, or committed any other act of infringement that regards any part of the source code aside from the text of the MMAS-8. *See* 17

U.S.C. § 106 (listing acts of infringement). To the contrary. The claim is that that the Hospital breached the license agreement by *failing* to use the Morisky Widget, using the questions in the 2006 version of the MMAS-8 instead and scoring them without using the Widget. (Compl. ¶¶ 77-79). If the Hospital infringed any copyright, it infringed the copyright in the older, paper-based MMAS-8—the copyright that MMAS Research does not allege it owns.

The Hospital has no interest in the dispute between Trubow and Dr. Morisky and does not care one way or the other which of them owns which copyright. But it does care about being accused of infringing a copyright by one of the two combatants, Trubow, when the only work that the Hospital is alleged to have copied or distributed is the work whose copyright belongs to Dr. Morisky.

D. The Copyright Infringement and Contract Claims Are Barred by the Copyright Misuse Doctrine.

The Complaint exemplifies copyright misuse. That doctrine, which the First Circuit has referred to but not yet adopted, applies when the copyright holder seeks to "illegally extend[] its monopoly or violate[] the public policies underlying the copyright laws." *See Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory,* 689 F.3d 29, 65 (1st Cir. 2012) (citation and internal quotation marks omitted).[5] The doctrine, when it applies, bars not just claims for copyright infringement but claims for breaches of restrictive copyright license agreements, since "[i]ncorporating unduly restrictive language into a licensing agreement is how copyright holders generally secure an exclusive right or limited monopoly not granted by the Copyright Office." *Splunk Inc. v. Cribl, Inc.*, 2024 U.S. Dist. LEXIS 93732, at *6-7 (N.D. Cal. May 24, 2024).

---

[5] This Court has also referred to the doctrine, though it has not yet applied it. *See Shirokov v. Dunlap, Grubb & Weaver PLLC,* 2012 U.S. Dist. LEXIS 42787, at *97-100 (D. Mass. Mar. 1, 2012) (holding copyright misuse can only be asserted as a defense and not as a claim for relief).

Every circuit that has decided the issue has adopted or signaled it would adopt the doctrine, and no circuit has rejected it.  *See, e.g., Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011); *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 973 (4th Cir. 1990); *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1201 (Fed. Cir. 2004); *United Tel. Co. v. Johnson Publ'g Co.,* 855 F.2d 604, 610-12 (8th Cir. 1988); *Edward B. Marks Music v. Colorado Magnetics,* 497 F.2d 285, 290-91 (10th Cir. 1974); *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 203-04 (3d Cir. 2003).[6]

This case cries out for application of the copyright misuse doctrine, because the facts that MMAS Research pleads, if true, show that MMAS Research is using its copyright in the Morisky Widget to try to prevent the Hospital from using the earlier version of the MMAS-8, even though it doesn't claim to own the copyright to it. That is contrary to the Copyright Act's purpose, which is to "promote the Progress of Science and useful Arts, by securing for limited times to Authors … the exclusive Right to their … Writings," U.S. Const. art. 1, § 8, not to stifle competition. While "copyright law [seeks] to increase the store of human knowledge and arts by rewarding … authors with the exclusive rights to their works for a limited time …, the granted monopoly power does not extend to property not covered by the … copyright." *Lasercomb,* 911 F.2d at 976.

The contract between the Hospital and MMAS Research provides:

> With Licensor approval, BCH can use MMAS paper or electronic questionnaires but all scoring and coding must be done in the Morisky Widget.

(Compl. Ex. 8). That provision has two effects. First, MMAS Research claims the power to tell the Hospital whether it can use the paper MMAS-8, even though MMAS Research does not own

---

[6] The Seventh Circuit has considered the issue but left it open. *See Assessment Techs. of Wis., LLC v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003).

the copyright to the paper MMAS-8. Second, MMAS Research says that if the Hospital does use

the paper MMAS-8, it still must use the Morisky Widget to code and score the data. That is, it

forbids the Hospital from using the MMAS-8 unless it also uses the Widget.

> A restrictive software license like this is textbook copyright misuse. In *Practice*
>
> *Management Information Corp. v. American Medical Association,* 121 F.3d 516 (9th Cir. 1997),

the AMA licensed the Physician's Current Procedural Terminology, a medical coding system, to

the Health Care Financing Administration. In the agreement, the HCFA agreed not to use any

other system for reporting physician's services. A publisher, Practice Management, bought a

copy of the PCPT from the AMA and then sued for a declaration that the AMA's copyright was

invalid because the AMA had misused the copyright by entering into an agreement that

prevented the HCFA from using any other coding system. The Court held that the AMA was

guilty of copyright misuse:

> The controlling fact is that HCFA is prohibited from using any other coding system by
> virtue of the binding commitment it made to the AMA to use the AMA' s copyrighted
> material exclusively. The absence of the agreement would not preclude HCFA from doing
> what the AMA suggests would be proper—deciding on its own to use only the AMA's
> system. What offends the copyright misuse doctrine is not HCFA's decision to use the
> AMA's coding system exclusively, but the limitation imposed by the AMA licensing
> agreement on HCFA's rights to decide whether or not to use other forms as well.
> Conditioning the license on HCFA's promise not to use competitors' products constituted
> a misuse of the copyright by the AMA.

*Id.* at 521. This is precisely what happened here. MMAS Research used its copyright of the

Morisky Widget to try to prohibit the Hospital from using the paper MMAS-8 without its

permission.

> Even if it gave permission to use the MMAS-8 (there is no allegation that it did), MMAS

Research was trying to tie the use of the paper MMAS-8 to use of the Morisky Widget. That

prohibition runs afoul of the rule in *Alcatel USA, Inc. v. DGI Technologies, Inc.* 166 F.3d 772

(5th Cir. 1999). There, DSC sold equipment for telephone switching systems to telephone

companies, and it licensed its software to its customers. The license agreement allowed customers to use the software only on DSC equipment. The effect was to give DSC a monopoly on the equipment customers could use, even though it had no copyright in the equipment but only in the code. This, the court said, was copyright misuse. *Id.* at 793-94 The same is true here. MMAS Research has no monopoly on how users of the paper MMAS-8 should code or score the assessments. But through its licensing agreement, it tries to arrogate such a monopoly to itself.

Copyright misuse is ordinarily treated as an affirmative defense. *See Shirokov, supra* at *98. The Court can nonetheless address it on a motion to dismiss, because the Complaint itself demonstrates that the defense will succeed. *See, e.g., Rife v. One W. Bank,* 873 F.3d 17 (1st Cir. 2017) (affirming dismissal of complaint where it showed that the claim was barred by the statute of limitations); *Medina-Padilla v. U.S. Aviation Underwriters, Inc.,* 815 F.3d 83, 85–87 (1st Cir. 2016) (same, where the complaint showed that the claim was barred by claim preclusion). The text of the license agreement, which is an exhibit to the complaint, and the copyright registrations, of which the Court can take judicial notice, leave no room to doubt that MMAS Research is trying to do just what the doctrine forbids: leverage its ownership of the Morisky Widget copyright to prevent the Hospital from using the older MMAS-8 or doing business with Dr. Morisky.

E. The DMCA Claim Fails, Because the Hospital Never Provided False CMI or Removed or Altered CMI.

The Digital Millennium Copyright Act provides:

**(a) False copyright management information.** No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—
   **(1)** provide copyright management information that is false, or
   **(2)** distribute or import for distribution copyright management information that is false.
**(b) Removal or alteration of copyright management information.** No person shall, without the authority of the copyright owner or the law—
   **(1)** intentionally remove or alter any copyright management information,

14

**(2)** distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

**(3)** distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(a). "Copyright management information," or CMI, means certain information, such as the name of the copyright owner, **if "conveyed in connection with copies … of a work … including in digital form."** 17 U.S.C. § 1202(c) (emphasis supplied).

MMAS's claim is that the Hospital violated 17 U.S.C. § 1202(a) because it "misattributed and otherwise changed the attribution of the Morisky Widget copyrighted work in web postings on the United States National Institute of Health website." (Compl. ¶ 96).[7] It is unclear whether MMAS Research is claiming that the Hospital also violated § 1202(b), which it mentions in passing. (Compl. ¶ 94). But assuming that the attribution that the Hospital put on the clinicaltrials.gov website was wrong or even intentionally wrong, the claim must fail under either prong of the statute, because the copyright notice was not conveyed "in connection with copies" of the copyrighted work, as the statute requires. The point of the statute is to keep people from modifying or removing copyright notices attached to copyrighted works, not to allow copyright owners to police mistakes in how researchers cite or acknowledge the copyrighted works.

As this Court has noted, courts "have been concerned" with the problem of "defining as CMI blanket assertions of copyright that are not linked to the individual works or items in

---

[7] The Complaint also alleges on information and belief that the Hospital violated the statute by using the Morisky Widget "contrary to the limited-use licenses granted in the License Agreement," by using it in the course of Dr. Hartz's study, and by using it in unspecified "medical literature." (Compl. ¶¶ 97-99). But these allegations do not involve the use of false CMI or the removal or alteration of true CMI and thus cannot support a claim under the statute.

circulation." *Iconics, Inc. v. Massaro,* 192 F. Supp. 3d 254, 272 (D. Mass. 2016). There is no plausible reading of the statutory definition of CMI that permits a court to find liability when no copy of the work is involved. MMAS Research misconstrues the statute.

F. <u>There Was No Trade Secret.</u>

MMAS Research's trade secret claim is a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1839 *et seq*. The DTSA defines a trade secret to be information that "the owner thereof has taken reasonable measures to keep … secret," 18 U.S.C. § 1839(3)(A), and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information," *id.* § 1839(3)(B).

The Complaint is remarkably open about the supposed trade secret. The trade secret is the "wording, phrasing, or scoring" of the Widget, "which are designed to remove socially desirable responses" that "threaten the validity of the MMAS 8 and 4 assessments." (Compl. ¶ 133).

Dr. Morisky's 2008 article, to which the Complaint provides a link, contains the text of the MMAS-8, which is nearly identical to the questions Dr. Hartz used on his form (Compl. Ex. 19). *See* Donald E. Morisky *et al., Predictive Validity of a Medication Adherence Measure in an Outpatient Setting,* 10 J. Clinical Hypertension 348 (2008).[8] Anyone reading the questions can see that they are phrased so that a "no" answer, rather than a "yes" answer, means the patient is taking his medicine. And if that were not clear enough the article explains the "secret":

> The questions are phrased to avoid the "yes-saying" bias by reversing the wording of the questions about the way patients might experience failure in following their medication regimen, since there is a tendency for patients to give their physicians or other health care providers positive answers.

---

[8] The main difference is the substitution of references to cholesterol levels and cholesterol medication, which were the subjects of Dr. Hartz's study, for high blood pressure and high blood pressure medication.

*Id.* The version of the questions in the 2008 paper, the version registered with the Copyright Office, and the version Dr. Hartz used all reverse that rule for Question 5. That is no secret. Anyone looking at the questions can see that one of the questions is phrased differently from the others.

MMAS Research claims that the "scoring" of the assessment is a secret, too. The version of the MMAS-8 that Dr. Hartz used states on the bottom that anyone who answered more than two questions affirmatively (or answered one question "yes" and answered Question 5 "no") would be eligible, that is, eligible to participate in his study.[9] But there is no allegation that Dr. Hartz's inclusion criteria come from Dr. Morisky, Trubow, MMAS Research, or anyone else, and in fact, they do not. And if all the Widget does is add up the number of answers suggesting the patient is not taking his medicine and spit out that number, calling the Widget's "scoring" a trade secret is like trying to patent counting on one's fingers. If the Widget does something other than what Dr. Hartz's document says, then Dr. Hartz's document did not disclose it.

In short, none of the claimed trade secrets are secret.

MMAS Research points to its contract with the Hospital, which states:

> Coding and scoring criteria of the MMAS are trade secrets of MMAS and as such can never be divulged in any publication, presentation, or website without written permission from MMAS.

(Compl. Ex. 8). The contract does not state that the questions, or the special way they are phrased, is a trade secret, even though the phrasing is, according to the Complaint, "**the** MMAS trade secret," the key to the whole claim. (Compl. ¶ 66) (emphasis supplied). Regardless, parties to a contract cannot, by contract, declare that information is a trade secret in a way that binds or estops the party who supposedly disclosed the "secret" from challenging its status as a true trade

---

[9] In fact, according to the Complaint, Dr. Hartz regarded anyone who answered *one* question affirmatively as eligible. (Compl. ¶ 69).

secret. *See, e.g., Computer Assocs. Int'l v. Am. Fundware,* 831 F. Supp. 1516, 1530 (D. Colo. 1993). "An agreement between the parties that something is a trade secret will not make of it a trade secret if in fact it is not." *Ingrassia v. Bailey,* 341 P.2d 370, 375 (Cal. Dist. Ct. App. 1959).

There is no trade secret here, so there can be no claim for violation of the trade secret statute.

G. This Is the Rare Case Where the Complaint Itself Shows That Any Infringement Could Not Have Been Willful.

Usually it is impossible to resolve a claim of willfulness on the pleadings. This case is unusual, because the Complaint itself explains how licensees such as the Hospital were confused by Trubow and Dr. Morisky's squabbling. The Complaint tells the story of Clermont Ferrand Hospital, like Boston Children's Hospital an MMAS Research licensee. Clermont Ferrand received a letter from Dr. Morisky's lawyer implicitly threatening litigation for copyright infringement. (Compl. ¶¶ 54-56 & Ex. 16). It was "confused" by the letter's "negativity" and "threats." (Compl. ¶ 56). According to the Complaint, Clermont Ferrand, when faced with competing demands, thought that it should do as Trubow asked and not as Dr. Morisky asked. There is no hint in the Complaint about whether Dr. Morisky followed through on his threat of suit. Boston Children's Hospital was in precisely the same situation. It faced competing claims. The Complaint makes it clear the Hospital wanted to comply with its license from MMAS Research and was confused about what to do. Whatever else is true, the Hospital's alleged conduct cannot be *willful* infringement. *See Sony BMG Music Entm't v. Tenenbaum,* 660 F.3d 487, 507-8 (1st Cir. 2011) (holding an infringer acts willfully if he knew that his actions constituted infringement). That is so especially because there is no plausible motivation on the facts alleged for the Hospital to infringe on purpose: no money to be made, no competitive advantage to be won, just a lawsuit to be avoided, or as this case shows, not avoided.

18

H.   <u>The Contract Claim Fails, Because There Is No Plausible Allegation of Damage.</u>

For the sake of argument, the Court should assume that MMAS Research has alleged a breach of the contract. But breach is just one element of a contract claim. To prove a breach of contract, a plaintiff has to prove that it suffered damage. *Singarella v. Boston,* 342 Mass. 385, 387 (1961). Once the Court disposes of all the statutory claims, how has MMAS Research been injured?

It hasn't. The Complaint alleges that the Hospital scored and coded the MMAS-8 without using the Widget (¶¶ 77-79), but it does not allege that this act had any monetary or non-monetary effect on MMAS Research. The Complaint alleges that the Hospital "published the scoring and coding of the MMAS-8 on the National Institutes of Health website" (¶ 81). It alleges that the Hospital improperly put the "correct" answers to the MMAS-8 in boldface type on the form it used (¶ 82) and thus disclosed confidential information to the people who saw the form—presumably the adolescent patients. But it does not allege that the publication had any monetary or non-monetary consequence or that anyone read or did anything with the document posted on the website or the paper MMAS-8 assessments. It alleges that the Hospital administered an MMAS-8 paper test without permission (¶ 85), but it does not explain how that harms MMAS Research.[10] The Complaint alleges that the Hospital misattributed the MMAS (¶ 87-89), but there is no allegation that anyone read or cared about the alleged misattribution, and no plausible reason to suppose that anyone except Morisky would care.

If MMAS Research had pursued a breach of contract claim for nominal damages, *see Rombola v. Cosindas,* 351 Mass. 382, 384 (1966), the Hospital would not seek dismissal for

---

[10] Perhaps the theory is that the Hospital would have had to pay MMAS Research more money if it had used the Widget, but the contract (Ex. 8) had a flat $5,000 fee for the first 10,000 tests administered, and the Complaint alleges at most four administrations.

failure to state a claim. But the Complaint specifically seeks "actual" damages, not nominal damages (Compl. at p. 50). As it stands, the contract claim should be dismissed.

<u>CONCLUSION</u>

For these reasons, the Court should dismiss all claims against the Hospital, Dr. Hartz, Dr. de Ferranti, and Palfrey.

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION, DR. JACOB HARTZ,
DR. SARAH D. DE FERRANTI, and
HANNAH PALFREY

By their attorneys:

*/s/ Theodore J. Folkman*

Theodore J. Folkman (BBO No. 647642)
Steven DiCairano (BBO No. 694228)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
sdicairano@rubinrudman.com

Dated: October 1, 2024