UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MMAS RESEARCH, LLC, | |
| Plaintiff, | Civ. A. No. 1:24-cv-12108-DJC |
| vs. | |
| THE CHILDREN'S HOSPITAL CORPORATION, et al., | |
| Defendants | |

**MEMORANDUM IN SUPPORT OF THE HOSPITAL DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Theodore J. Folkman (BBO No. 647642)
Steven DiCairano (BBO No. 694228)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
sdicairano@rubinrudman.com

## TABLE OF CONTENTS

Table of Authorities.................................................................................................................. ii

Preliminary Statement............................................................................................................. 1

Facts ........................................................................................................................................ 2

    A.   The MMAS and the Widget. ......................................................................................... 3

    B.   The Morisky-Trubow feud............................................................................................ 4

    C.   The Hospital gets dragged in. ...................................................................................... 5

Argument ................................................................................................................................ 8

    A.   The Hospital did not infringe the Widget copyright. ..................................................... 8

        1.    MMAS Research owns the copyright to a derivative work but does not own the copyright to the 2006 version of the MMAS-8. ................................................... 8

        2.    The amended complaint does not allege an act of copyright infringement........... 9

    B.   The DMCA claim fails, because MMAS Research has not alleged that the Hospital Defendants removed or altered any copyright management information.........................11

    C.   The trade secret claim fails, because MMAS Research does not allege a misappropriation and because there is no secret to be protected. ................................................................. 12

    D.   Only the Hospital, not Hartz or Palfrey, had a contract with MMAS Research. .............. 15

    E.   The infringement and breach of contract claims are barred by the doctrine of copyright misuse. ....................................................................................................................... 16

    F.   The contract claims fails, because there is no plausible allegation of damage................. 19

Conclusion ............................................................................................................................ 20

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alcatel USA, Inc. v. DGI Technologies, Inc.* 166 F.3d 772 (5th Cir. 1999).................................. 18

*Apple Inc. v. Psystar Corp.*, 658 F.3d 1150 (9th Cir. 2011) ....................................................... 16

*Assessment Techs. of Wis., L.L.C. v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003)................... 16

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) ......................... 16

*DeCastro v. Abrams*, 2023 U.S. Dist. LEXIS 118575 (D. Mass. July 11, 2023).......................... 3

*Douglas v. Hirshon*, 63 F.4th 49 (1st Cir. 2023) ........................................................................... 3

*Edward B. Marks Music v. Colo. Magnetics*, 497 F.2d 285 (10th Cir. 1974) .............................. 16

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ................................................ 10

*Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1062 (1st Cir. 1993)..................................... 9

*Greene v. Ablon*, 794 F.3d 133 (1st Cir. 2015)............................................................................. 9

*Hunt v. Wylie Labs. Inc.,* 997 F. Supp. 84 (D. Mass. 1997) ...................................................... 10

*Iconics, Inc. v. Massaro*, 192 F. Supp. 3d 254 (D. Mass. 2016) ................................................ 12

*Island Software & Comput. Serv. v. Microsoft Corp.*, 413 F.3d 257 (2d Cir. 2005) ..................... 3

*Kowalski v. Gagne*, 914 F.2d 299 (1st Cir. 1990) ......................................................................... 5

*Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990)............................................. 16, 17

*LoConte v. Forest Lab'ys, Inc.,* 2015 U.S. Dist. LEXIS 77698 (D. Mass. June 15, 2015) ........... 13

*Medina-Padilla v. U.S. Aviation Underwriters, Inc.*, 815 F.3d 83 (1st Cir. 2016)....................... 19

*Practice Management Information Corp. v. American Medical Association,*
   121 F.3d 516 (9th Cir. 1997) ................................................................................................ 17, 18

*Rife v. One W. Bank, F.S.B.*, 873 F.3d 17 (1st Cir. 2017) .......................................................... 19

*Rombola v. Cosindas*, 351 Mass. 382 (1966)............................................................................... 20

*Shirokov v. Dunlap, Grubb & Weaver P.L.L.C.*, 2012 U.S. Dist. LEXIS 42787
   (D. Mass. Mar. 1, 2012).................................................................................................... 16, 18

*Singarella v. Boston*, 342 Mass. 385 (1961) ............................................................................... 19

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012)........ 16

*Splunk Inc. v. Cribl, Inc.*, 2024 U.S. Dist. LEXIS 93732 (N.D. Cal. May 24, 2024) ................. 16

*Sysco Mach. Corp. v. Cymtek Sols., Inc.*, 2022 U.S. Dist. LEXIS 228448 (D. Mass.
   Dec. 20, 2022)...................................................................................................................11

*Union Mut. Life Ins. v. Chrysler Corp.*, 793 F.2d 1 (1st Cir. 1986) ............................................ 16

*United Tel. Co. v. Johnson Publ'g Co.*, 855 F.2d 604 (8th Cir. 1988) ......................................... 16

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191 (3d Cir. 2003)...................... 16

*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993)............................................................................. 3

<u>Statutes</u>

17 U.S.C. § 101 ............................................................................................................................. 8

17 U.S.C. § 102(a) ......................................................................................................................... 9

17 U.S.C. § 103(a) ......................................................................................................................... 9

17 U.S.C. § 103(b) ...................................................................................................................... 9, 18

17 U.S.C. § 106 ............................................................................................................................ 10

17 U.S.C. § 106(4) ....................................................................................................................... 10

17 U.S.C. § 106(6) ................................................................................................ 10
17 U.S.C. § 501(a) ................................................................................................ 10
17 U.S.C. § 1202(b) ...............................................................................................11
17 U.S.C. § 1202(c) ...........................................................................................11, 12
17 U.S.C. § 1203 ....................................................................................................11
18 U.S.C. § 1836(b)(1) ......................................................................................... 14
18 U.S.C. § 1839(5)(A).......................................................................................... 14
18 U.S.C. § 1839(5)(B).......................................................................................... 14

Treatises

*Restatement (Third) of the Law of Agency* § 6.01(2) (2006)......................................... 15

Constitutional Provisions

U.S. Const. art. I, § 8............................................................................................. 17

Other Authorities

Alain Li-Wan-Po & Gregory M. Peterson, *Drug Compliance and the Morisky Adherence Scale: An Expression of Concern and a Warning,* J. Clin. Pharm. & Ther. 2021, 46:1, *available at* https://onlinelibrary.wiley.com/doi/epdf/10.1111/jcpt.13325?msockid=00c5fb60859067913b19 ee4084976613 ................................................................................................ 1

Univ. of Penn. Office of Research Services, *Consider Alternatives to the Morisky Medication Adherence Scale (MMAS-4 and MMAS-8), available at* https://researchservices.upenn.edu/2020/02/24/consider-alternatives-to-the-morisky-medication-adherence-scale-mmas-4-and-mmas-8/ (Feb. 24, 2020).......................................... 1

4078860_2

PRELIMINARY STATEMENT

Clinical questionnaires and assessments are usually available for researchers to use without charge. But two men, Dr. Donald Morisky and Steven Trubow, have devoted themselves for years to collecting licensing fees from researchers who use one such assessment, the Morisky Medication Adherence Scale. And in recent years, the two have squabbled about who owns the copyrights to which versions of the MMAS and who can go after researchers for the licensing fees. Their litigiousness and infighting have led to warnings in the Journal of Clinical Pharmacy and Therapeutics[1] and by research institutions[2] against using the MMAS. Boston Children's Hospital and two of its staff, Dr. Jacob Hartz and Hannah Palfrey ("the Hospital Defendants") now find themselves entangled in the Trubow/Morisky feud.

The Hospital respects copyright. One of its researchers, Dr. Hartz, acting on the Hospital's behalf, licensed the MMAS from an entity controlled by Trubow: the plaintiff, MMAS Research, LLC. Hartz wanted the license for use in one of his studies, and the Hospital paid a $5,000 licensing fee. Hartz administered the assessment four times. Then he began to receive competing demands from entities controlled by Morisky and entities controlled by Trubow. The Hospital did its best to comply with the demands and to credit the MMAS appropriately in documents made available to the public on the clinicaltrials.gov website. It even offered to stop using the assessment altogether once it became clear that it had stepped into a minefield. But Trubow's company sued, asserting willful copyright infringement, trade secret misappropriation

---

[1] *See* Alain Li-Wan-Po & Gregory M. Peterson, *Drug Compliance and the Morisky Adherence Scale: An Expression of Concern and a Warning,* J. Clin. Pharm. & Ther. 2021, 46:1, *available at* https://onlinelibrary.wiley.com/doi/epdf/10.1111/jcpt.13325?msockid=00c5fb60859067913b19ee4084976613

[2] *See* Univ. of Penn. Office of Research Services, *Consider Alternatives to the Morisky Medication Adherence Scale (MMAS-4 and MMAS-8), available at* https://researchservices.upenn.edu/2020/02/24/consider-alternatives-to-the-morisky-medication-adherence-scale-mmas-4-and-mmas-8/ (Feb. 24, 2020).

under the federal trade secret statute, violations of the Digital Millennium Copyrightt Act, and breach of contract.

The claims lack merit.

• The copyright and DMCA claims lack any basis. MMAS Research's infringement claim is that the Hospital Defendants infringed its copyright by administering an older version of the assessment whose copyright MMAS Research doesn't own instead of the newer, supposedly better, copyrighted version. MMAS Research does not even allege any act of infringement of its own copyright. And its DMCA claim does not even allege that the Hospital removed or altered copyright management information from a copy of the Widget, which is what the statute is about.

• There was no trade secret misappropriation, because there was no secret. Everything MMAS Research claims as a trade secret was known to the public long ago or is trivial. Nor does MMAS Research allege any misappropriation. At most it alleges a *failure to use* the supposed trade secret, which is not actionable.

• The contract forbids the Hospital to use the 2006 version of the MMAS-8 as a condition of licensing the Morisky Widget, even though MMAS Research doesn't own the copyright in the older MMAS-8. That is the kind of restrictive licensing agreement that courts refuse to enforce under the doctrine of copyright misuse.

• In any event, the contract claim lacks any allegation that MMAS Research has suffered an actual injury, and there is no plausible theory of injury on the facts alleged.

The Court should dismiss all claims without leave to amend.

<u>FACTS</u>

For purposes of this motion, the Court should take the well-pleaded facts alleged in the complaint as true and draw all reasonable inferences in MMAS Research's favor. *Watterson v.*

*Page*, 987 F.2d 1, 3 (1st Cir. 1993). The Court may consider documents attached to the complaint or expressly incorporated in it. *See id.*   The Court can also consider "official public records," "documents central to plaintiffs' claim," or "documents sufficiently referred to in the complaint." *Id.*  The Court should disregard "conclusory legal allegations [or] factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Douglas v. Hirshon,* 63 F.4th 49, 55 (1st Cir. 2023).

A.  The MMAS and the Widget.

Dr. Donald Morisky was the principal of MMAS Research LLC, the plaintiff. (Am. Compl. ¶ 21). He, Steven Trubow, and Dustin Malachi "collaborated" to create a software program called the "Morisky Widget" in 2016 and 2017 (Am. Compl. ¶ 23). The Morisky Widget is a "diagnostic assessment of medication taking behavior," with "the ability to not only measure raw medication adherence, but able to identify WHY the patient was non-adherent to their medication regimen for their specific health condition." (Id. ¶ 56).

The Widget's source code includes the text of the MMAS-4 and MMAS-8 assessments. (Id. ¶ 31). The MMAS-4 and MMAS-8 are older versions of the Widget assessment. The MMAS-8 was published in a journal article in 2008. (Id. ¶ 53). In fact, Morisky created the MMAS-8 in 2006 and registered his copyright in it in 2018.[3] The amended complaint does not allege that MMAS Research owns the copyright in either the MMAS-4 or the MMAS-8.

The amended complaint goes to great lengths to try to differentiate the 2006 version of the MMAS-8, a "static" eight-question assessment that can be given on paper (Am. Compl. ¶ 57), from the Widget. The Widget has an interface called a "test editor" that allows the user to

---

[3] A true copy of the certificate of registration for the "Morisky Medication Adherence Scale (8-item)," registration no. TX 8-623-533, is attached as Exhibit 1. The Court may take judicial notice of the copyright registration. *See DeCastro v. Abrams*, No. 1:22-cv-11421-ABD, 2023 U.S. Dist. LEXIS 118575, at *8 n.4 (D. Mass. July 11, 2023) (citing *Island Software & Comput. Serv. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005)).

input a health condition, a medication, and dosing information. The Widget then uses an algorithm to output eight questions to be asked. (Am. Compl. ¶ 60). The text of the questions that the Widget outputs are not found in the source code of the Widget. Rather, the Widget is "dynamic" and provides "constantly changing" questions. (¶ 54). Common sense shows that the source code could not contain the text of all the possible questions it could output, because there must be an almost infinite number of combinations of medications, conditions for which they are prescribed, and dosages.

The Amended Complaint also refers to the supposed trade secrets the Widget contains, though it is less detailed than the original on that point. In the original complaint, "The MMAS trade secret" was defined as the way the MMAS-8 reverses the typical yes/no format of most of the questions, so that a patient answering "yes" to a question is indicating that he or she is not taking a drug as prescribed. The idea was to remove the human tendency to say "yes" when one's doctor asks a question. (Compl. ¶¶ 65-66). That "secret" doesn't explicitly appear in the amended complaint. Instead, according to the amended complaint, the Widget has "trade secret scoring and coding algorithms" and a "trade secret editor translator," which is the interface described above. (Am. Compl. ¶ 65). It also has "trade secret scoring, and coding, algorithms that determine[] whether a patient's nonadherence is intentional or unintentional." (Am. Compl. ¶ 66; see also ¶ 86).

B.  The Morisky-Trubow feud.

The amended complaint says nothing about what led to the split between Trubow and Morisky. They began suing each other in 2019. The details about the lawsuits alleged in the amended complaint (E.g., Am. Compl. ¶¶ 28-29, 34-36) are mostly immaterial. In March 2024, the Ninth Circuit, reviewing a decision from the Western District of Washington, held that MMAS Research had standing to sue for infringement of the Widget copyright because a 2020

settlement agreement, which supposedly transferred ownership of the Widget copyright from MMAS Research to Morisky, was "never finalized." (Am. Compl. ¶ 36).[4]

Morisky "began a public campaign" to terminate all Widget license agreements between MMAS Research and licensees including the Hospital. (Am. Compl. ¶ 70). He told the public that he had "phased out" the Widget. (Am. Compl. ¶ 72). This was "pernicious," "in bad faith," and "deceitful[]," and it "progressed into treachery and tortious interference." (Am. Compl. ¶¶ 73-74). In April 2022, Morisky's lawyer wrote to all licensees that

> ANY PERSON THAT USES OR LICENSES THE <u>MORISKY WIDGET, MMAS-4 SCALE OR MMAS-8 SCALE</u> WITHOUT THE EXPRESS WRITTEN AUTHORIZATION OF DR. MORISKY WILL BE IN VIOLATION OF U.S. FEDERAL COPYRIGHT LAW.

(Am. Compl. ¶ 75 & Ex. 10).

C. <u>The Hospital gets dragged in.</u>

In 2019, Dr. Jacob Hartz, the director of the preventive cardiology clinic at BCH and an instructor in pediatrics at Harvard Medical School, signed a perpetual license agreement with MMAS Research for using the Morisky Widget for $5,000. (Am. Compl. ¶ 42 & Ex. 8). The contract required including certain "citations and licensing statements" in all "web postings or other publication containing Morisky Widget MMAS descriptions or results." (Am. Compl. Ex. 8). It forbade the use of "MMAS paper or electronic questionnaires" without "Licensor

---

[4] We assume for purposes of this motion that MMAS Research does own the Widget copyright. But that is still an open question after a remand from the Ninth Circuit, and things do not look good for MMAS Research. The most recent decision, dated October 17, 2024, denied MMAS Research's motion to reconsider an earlier sanctions order. That order held that due to its failure to provide discovery and Trubow's spoliation of evidence, MMAS Research's counterclaim for infringement was dismissed with prejudice and its defenses to Morisky's copyright claims limited as a sanction. The sanctions order is on appeal. In any event, the Ninth Circuit's March 2024 decision is not binding on the Hospital Defendants, which were not parties to the case. True copies of the report and recommendation granting the motion for sanctions, the order adopting the report and recommendation, and the order denying reconsideration are attached as Exhibits 2-4, respectively. The Court can take judicial notice of these documents, , because given the amended complaint's references to it, the Washington case has "relevance to the matters at hand." *Kowalski v. Gagne,* 914 F.2d 299, 305-06 (1st Cir. 1990).

approval." (Id.). Even if MMAS Research did approve the use of a paper questionnaire, the contract required that "all scoring and coding must be done in the Morisky Widget." (Id.).

Hartz was studying ways to improve medication adherence in adolescents with familial hypercholesterolemia and wanted to use the MMAS-8 to identify patients for his study. (Am. Compl. ¶ 44). According to a description of the study Hartz posted on the clinicaltrials.gov website (the Amended Complaint provides a hyperlink to the study description in ¶ 83),[5] Hartz's idea was that providing monetary incentives to patients might make it more likely that they would take their medicine. Hartz explained, in the study description, he planned to use "the Morisky Medication Adherence Scale" and other tools to "test the subject's adherence prior to the use of incentives" and "during the 60 days following discontinuation of the incentives." He described the MMAS as "validated" and stated that the "inclusion criteria," that is, the criteria used to determine whether someone could participate in the study, included a "Morisky Medication Adherence Scale score of ≤ 6." But he did not include the text of all or any part of any version of the MMAS. The amended complaint does not allege that the criterion Hartz mentioned (a score of 6 or more) was included in the Widget source code, and in fact, Hartz himself decided on the inclusion criteria for his study, as one would expect.

Hartz administered a paper version of the MMAS-8 to patients. (Am. Compl. ¶ 91). Paragraph 105 of the amended complaint gives the text of the version of the assessment the Hospital administered and the version Morisky created in 2006 and published in 2008. The Court can see for itself that the questions are essentially identical. For example, Morisky's question 1 was: "Do you sometimes forget to take your <health condition> pills?" The Hospital's question 1

---

[5] The URL to which the Amended Complaint links is
https://clinicaltrials.gov/study/NCT04458766?tab=history&a=5#StudyPageTop.

was: "Do you sometimes forget to take your prescription cholesterol medication?" (Am. Compl. ¶ 105). A table showing all the differences in the text of the questions is attached as Exhibit 5.

The Hospital received the threatening letter from Morisky's lawyers in April 2022. (Am. Compl. ¶ 77). A few months later, Trubow wrote to Hartz, pointing out that the Hospital had omitted the acknowledgment required by the license agreement on the study description posted on clinicaltrials.gov. Hartz responded to Trubow's demand by adding a reference to MMAS Research LLC as a "collaborator." (Am. Compl. ¶¶ 82-83). The study description at the URL given in paragraph 83 of the amended complaint makes no statements about the ownership of the MMAS copyright, does not contain all or any part of the text of the MMAS, and does not even specify what version of the MMAS the study would use.

Trubow next wrote to Hartz to ask how the Hospital planned to administer the MMAS-8, and he wrote that "if you administer MMAS-8 tests outside of the Morisky Widget, it requires Licensor approval, to use MMAS paper or electronic questionnaires." (Am. Compl. Ex. 11). Hartz responded that the Hospital had administered the test four times, "from memory." (Id. Ex. 20). He and Palfrey sent MMAS Research a copy of the test they had administered. (Am. Compl. ¶ 89 & Ex. 24). At the bottom, the document had the following text, which restated, in different words, the inclusion criterion Hartz has posted on clinicaltrials.gov:

> How many answers did they give that are in **BOLD UPPERCASE ___ (≥2 → ELIGIBLE)**

The original complaint falsely alleged that the Hospital had given this document to patients. (Compl. ¶ 135). The amended complaint omits that false allegation, saying instead that the Hospital "administered" the MMAS-8 test on the document to patients without permission from MMAS Research. (Am. Compl. ¶ 113).

Hartz, sensing that he had walked into a minefield, told Trubow that "if any of this is a serious breach of contract and you feel it necessary to end our agreement, we would understand." (Am. Compl. Ex. 20). He continued: "We certainly did not mean to do anything incorrectly and it was always our intention to follow our contract entirely. It would be a tremendous loss to our study, but we want to respect our agreement and your organization." (Id.). The amended complaint does not allege any response.

In January 2023, the Hospital removed the "MMAS Research notification" from the clinicaltrials.gov website. (Am. Compl. ¶ 95). It replaced it with a notice that favored Morisky's claims to copyright. (Am. Compl. ¶¶ 95, 98 & Ex. 18). The amended complaint is silent about communications the Hospital received from Morisky before it made the change. It accuses Morisky and his new entity, MMAR, LLC, of tortious interference in the contract between MMAS Research and the Hospital (Am. Compl. Count 4). Morisky could, under his alleged new relationship with the Hospital, "compel" the Hospital "to place false copyright and licensing information on the Clinical Trials.gov website." (Am. Compl. ¶ 99).

<u>ARGUMENT</u>

A.  <u>The Hospital did not infringe the Widget copyright.</u>

The amended complaint omits counts for copyright infringement and willful copyright infringement, which were the centerpiece of the original complaint. But the amended complaint does allege willful copyright infringement (Am. Compl. ¶ 105), and so we address the issues despite the unexplained deletion of the counts in the amended complaint.

1.  <u>MMAS Research owns the copyright to a derivative work but does not own the copyright to the 2006 version of the MMAS-8.</u>

Under the Copyright Act, a work "based upon one or more preexisting works" is a "derivative work." 17 U.S.C. § 101. An author has a copyright in "original works of authorship,"

17 U.S.C. § 102(a), including derivative works, provided that the preexisting material has not been "used unlawfully." *Id.* § 103(a). "A derivative work is simply an infringing work made non-infringing through the acquisition of permission to use the underlying preexisting expression." *Greene v. Ablon*, 794 F.3d 133, 158 (1st Cir. 2015).

The Complaint alleges that the source code in the Morisky Widget contains the text of the MMAS-8. The MMAS-8 is a preexisting work created years before the Morisky Widget. Thus the Morisky Widget is a derivative work. Copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). That is, the author of the derivative work has a copyright in the derivative work, but not in the preexisting work. If I write a novel and quote a poem in full in the text of the novel, and if you distribute copies of the poem, you infringe the poet's copyright, not mine, even if you tell others that the poem is reprinted from my novel. *See Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1112 (1st Cir. 1993) ("the copyright in a derivative work only protects the original elements contributed by the author of the derivative work …. Any elements that the author of the derivative work borrowed from the underlying work … remain protected by the copyrights in the underlying work").

2.   The amended complaint does not allege an act of copyright infringement.

A copyright owner's exclusive rights are making a copy of the copyrighted work, preparing a derivative work based on the copyrighted work, distributing copies of the copyrighted work to the public by sale, rental, lease, or lending, or displaying the copyrighted

work publicly. *See* 17 U.S.C. § 106.[6] Copyright infringement means violation of those exclusive

rights. *See id.* § 501(a).

The amended complaint is clear about the act of infringement alleged:

The replacement of BCH licensed and copyrighted Morisky Widget MMAS-8 medication specific tests with Morisky's 2006 copyrighted generic condition tests as published on the ClinicalTrials.gov website constitutes willful infringement of MMAS Research LLC registered Morisky Widget copyright.

(Am. Compl. ¶ 105). In other words, MMAS Research concedes what anyone can see by

looking. The questions the Hospital Defendants allegedly put on the clinicaltrials.gov website are

essentially the same as the questions from the 2006 version of the MMAS-8. (Am. Compl. ¶

105).[7] MMAS Research is saying that by copying or distributing those questions instead of the

output of the Morisky Widget, the Hospital Defendants infringed the copyright in the work that

they did not use. The amended complaint reiterates this point:

By creating, distributing, and using their version of the Morisky Widget MMAS-8 Test, BCH, Hartz, and Palfrey has infringed upon Plaintiff's exclusive rights under the Copyright Act, 17 U.S.C. § 106, including but not limited to the rights to reproduce, prepare derivative works, distribute copies, and display the work publicly.

(Am. Compl. ¶ 122).

This claim has no basis. "[C]opying of constituent elements" of the copyrighted work

"that are original" is an element of an infringement claim. *Feist Publ'ns, Inc. v. Rural Tel. Serv.*

*Co.*, 499 U.S. 340, 361 (1991). A "failure to provide even a scintilla of evidence of copying … is

sufficient to knock out" a copyright infringement claim. *Hunt v. Wylie Labs. Inc.,* 997 F. Supp.

84, 89 (D. Mass. 1997) (citation omitted). MMAS has not even alleged copying of its

---

[6] The statute defines other exclusive rights for literary, musical, dramatic, and other similar works and for sound recordings, which are not relevant here. *See* 17 U.S.C. § 106(4), (6).

[7] In fact, as the Court can see for itself by reading the materials from the clinicaltrials.gov website to which the amended complaint links, the Hospital wrote about the assessment but did put a copy of al lor any part of the questions on the website.

copyrighted work and has instead alleged a failure or refusal to copy.[8] At most, it has alleged

copying of the 2006 MMAS-8, which it does not own. The copyright law does not grant authors

who license their works the exclusive right to *require* the licensee to use the licensed work.

Failure to use the work might be a breach of contract, but it does not violate one of the exclusive

rights of copyright owners.

B. The DMCA claim fails, because MMAS Research has not alleged that the Hospital Defendants removed or altered any copyright management information.

MMAS Research brings a claim under 17 U.S.C. § 1202(b), a provision in the Digital

Millennium Copyright Act that provides:

> No person shall, without the authority of the copyright owner or the law—
> **(1)** intentionally remove or alter any copyright management information,"
> **(2)** distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
> **(3)** distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b). "Copyright management information," or CMI, means certain information,

such as the name of the copyright owner, if "conveyed in connection with copies … of a work …

including in digital form." 17 U.S.C. § 1202(c).

MMAS's claim is that the Hospital and Hartz violated 17 U.S.C. § 1202(b) because they

"created and utilized a version of the Morisky Widget MMAS-8 Test for the BCH Clinical Trial

Study," and therefore "reproduced, distributed, and displayed a derivative work that incorporates

---

[8] The problem is deeper than that. The heart of the claim is not about copying. It is about failure to *use* the version of the assessment MMAS Research wants the Hospital to use. But use without permission is not an act of a copyright infringement. *See Sysco Mach. Corp. v. Cymtek Sols., Inc.*, 2022 U.S. Dist. LEXIS 228448, at *5-6 (D. Mass. Dec. 20, 2022). A fortiori, *failure* to use is not an act of copyright infringement.

substantial and original elements of the copyrighted Morisky Widget MMAS-8 Test." (Am. Compl. ¶ 121). This claim, like the copyright infringement claim, has no basis. MMAS Research does not allege that the Hospital Defendants removed or altered copyright management information. It does allege that Morisky and MMAR LLC altered CMI. (Am. Compl. ¶ 131). And it alleges that Morisky induced the Hospital "to alter the CMI in the BCH Clinical Trials Report, changing the attribution from MMAS Research's copyrighted Morisky Widget MMAS-8 Test to Defendant Morisky's original MMAS-8 Test." (Am. Compl. ¶ 133). But that allegation, which in any case is not directed at the Hospital Defendants, misunderstands what CMI is. CMI is a copyright notice "conveyed in connection with copies" of a work. 17 U.S.C. § 1202(c). MMAR Research does not allege that anyone put a copy of the assessment on the clinicaltrials.gov website or displayed or published it anywhere else.

Courts "have been concerned" with the problem of "defining as CMI blanket assertions of copyright that are not linked to the individual works or items in circulation." *Iconics, Inc. v. Massaro*, 192 F. Supp. 3d 254, 272 (D. Mass. 2016). There is no plausible reading of the statutory definition of CMI that permits a court to find liability when no copy of the work is involved. MMAS Research misconstrues the statute.

C.   The trade secret claim fails, because MMAS Research does not allege a misappropriation and because there is no secret to be protected.

MMAS Research claims that the Hospital Defendants "misappropriated" its trade secrets, including "the copyrighted Morisky Widget source code scoring and coding as well as the trade secret editing and translation algorithms." (Am. Compl. ¶ 149). The claim arises under the Defend Trade Secrets Act. (Id. ¶¶ 18, 148). There is no allegation that the Hospital Defendants ever saw or had access to the Morisky Widget source code, and in fact they did not, so the claim cannot be that they wrongfully disclosed the source code itself to anyone or otherwise

misappropriated it. There might well be something in the source code that is truly secret, but if so, that is not what this case is about.

Patients have a tendency to say "yes" to whatever question their doctors ask them. (Compl. ¶ 65). So in the original complaint "[t]he MMAS trade secret is to remove the social desirability influence by making a patients YES answers to questions 1,2,3,4,6, and 7 a negative response, meaning that they are non-adherent to their prescribed medications." (Compl. ¶ 66). And a separate trade secret was that on one of the eight questions, the yes and no answers are *not* reversed. (Compl. ¶ 67). These "secrets" are not secrets at all. Anyone could see them by looking at the questions, and in any event Morisky had explained the "secret" in an article published years ago. *See* Donald E. Morisky et al., *Predictive Validity of a Medication Adherence Measure in an Outpatient Setting,* 10 J. Clinical Hypertension 348 (2008), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2562622/.[9]

The amended complaint is silent about what was formerly the key to the trade secret case. Now the trade secret is "the Morisky Widget trade secret scoring and coding algorithm and test editor/translation algorithm." (Am. Compl. ¶ 51). These trade secrets supposedly "determine[] whether a patient's nonadherence is intentional or unintentional." (Am. Compl. ¶ 66; see also ¶ 86).

But the amended complaint's section on trade secret misappropriation (¶¶ 84-92) makes it clear that this description of the trade secret is really just a restatement, in less explicit terms, of

---

[9] "The questions are phrased to avoid the 'yes-saying' bias by reversing the wording of the questions about the way patients might experience failure in following their medication regimen, since there is a tendency for patients to give their physicians or other health care providers positive answers." The amended complaint refers to the Morisky paper (Am. Compl. ¶53), and in any event it is a publicly available document whose contents cannot be disputed. The Court can take judicial notice of it. *See LoConte v. Forest Lab'ys, Inc.*, No. 14-13848-NMG, 2015 U.S. Dist. LEXIS 77698, at *11-13 (D. Mass. June 15, 2015) (taking judicial notice, on a motion to dismiss, of the fact that medical publications were published, the dates of publication, and the existence of their contents, but not the truth of what they assert).

the point about reversing the expected answers to the questions. MMAS Research alleges (¶ 91)

that the version of the MMAS-8 that the Hospital Defendants "administered scored and coded"

both "utilized and divulged scoring and coding criteria." This must be a reference to a line at the

bottom of the paper version of the assessment that Hartz administered, which reads: "How many

answers did they give that are in **BOLD UPPERCASE ___ (≥2 → ELIGIBLE)"** (Am. Compl.

¶ 91 & Ex. 24).[10] But at most, this text discloses what anyone could tell by looking and what

Morisky explained in his article: that the answers to most of the questions are reversed and a

"yes" answer means that the patient is not taking his medicine as prescribed. Perhaps one could

argue that the statement that anyone who answered two or more questions in the right way would

be eligible for the study is a trade secret. But the amended complaint does not allege that this

criterion was created by MMAS Research rather than Hartz, and in any case, such a trivial rule

could hardly be a valuable trade secret.

The claim fails for another reason. MMAS Research does not allege any

misappropriation, which is the act that the statute forbids. *See* 18 U.S.C. § 1836(b)(1) (creating

civil cause of action for owner of a trade secret "that is misappropriated"). Misappropriation

means acquisition of the trade secret by improper means, 18 U.S.C. § 1839(5)(A), or disclosure

or use without consent in some cases, 18 U.S.C. § 1839(5)(B). Nothing in the amended

complaint suggests that the Hospital Defendants acquired the supposed secrets improperly.

Nothing suggests that the Hospital Defendants disclosed the supposed secrets. Again: the

amended complaint does not allege that they showed the paper MMAS-8 they administered to

anyone. The study description posted on the clinicaltrials.gov website says nothing about the

MMAS except that it is a "validated" scale "to assess baseline adherence," that patients "found to

---

[10] Paragraph 91 of the Amended Complaint misquotes Exhibit 24, for unclear reasons.

have low adherence according to the MMAS" will be enrolled in the study, and that patients will be reassessed using the MMAS after 60 days.

Nor does the amended complaint allege a use of the supposed secret that could support the claim. Here the point is the same as the point in the copyright claim. MMAS Research isn't alleging wrongful *use* of the Widget, but *failure to use* the Widget to administer the assessment or to score or code the results of the assessments using the Widget. The only use of the Widget MMAS Research alleges is Hartz and Palfrey's creation of a questionnaire using the Widget's "test editor." (Am. Compl. ¶¶ 49-52). That use could hardly be unauthorized, because Hartz and Palfrey created the questionnaire "during their training and certification," that is, with MMAS Research present and before they allegedly did anything wrong or contrary to the license agreement. (Am. Compl. ¶ 63). And the Hospital did not administer that version of the questionnaire to patients, so MMAS Research cannot allege that the Hospital Defendants used the supposed secrets by administering the test.

In short, there is no allegation of a secret and no allegation of a misappropriation. Thus there is no claim.

D.  Only the Hospital, not Hartz or Palfrey, had a contract with MMAS Research.

MMAS Research had a contract with the Hospital itself, not with Hartz, Palfrey, or any other Hospital employee. (Am. Compl. ¶ 108). "[When] an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, … the agent is not a party to the contract unless the agent and [the] third party agree otherwise." *Restatement (Third) of the Law of Agency* § 6.01(2) (2006). MMAS Research does not allege such an agreement. The only party that had a contractual duty to MMAS Research was the Hospital. Hartz, who merely signed for the Hospital, cannot be liable for any alleged breach. *See Union Mut. Life Ins. v. Chrysler Corp.*,

15

793 F.2d 1, 11 (1st Cir. 1986) (high corporate officer may be liable for the corporation's torts in some cases but ordinarily is not liable for its breach of contract).

E.   <u>The infringement and breach of contract claims are barred by the doctrine of copyright misuse.</u>

The amended complaint exemplifies copyright misuse. That doctrine, which the First Circuit has referred to but not yet adopted, applies when the copyright holder seeks to "illegally extend[] its monopoly or violate[] the public policies underlying the copyright laws." *See Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 65 (1st Cir. 2012) (citation and internal quotation marks omitted).[11] The doctrine, when it applies, bars not just claims for copyright infringement but claims for breaches of restrictive copyright license agreements, since "[i]ncorporating unduly restrictive language into a licensing agreement is how copyright holders generally secure an exclusive right or limited monopoly not granted by the Copyright Office." *Splunk Inc. v. Cribl, Inc.*, No. C 22-07611 WHA, 2024 U.S. Dist. LEXIS 93732, at *6-7 (N.D. Cal. May 24, 2024).

Every circuit that has decided the issue has adopted or signaled it would adopt the doctrine, and no circuit has rejected it. *See , e.g.*, *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011); *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 973 (4th Cir. 1990); *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1201 (Fed. Cir. 2004); *United Tel. Co. v. Johnson Publ'g Co.*, 855 F.2d 604, 610-12 (8th Cir. 1988); *Edward B. Marks Music v. Colo. Magnetics*, 497 F.2d 285, 290-91 (10th Cir. 1974); *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 203-04 (3d Cir. 2003).[12]

---

[11] This Court has also referred to the doctrine, though it has not yet applied it. *See Shirokov v. Dunlap, Grubb & Weaver P.L.L.C.*, No. 10-12043-GAO, 2012 U.S. Dist. LEXIS 42787, at *97-100 (D. Mass. Mar. 1, 2012) (holding copyright misuse can only be asserted as a defense and not as a claim for relief).

[12] The Seventh Circuit has considered the issue but left it open. *See Assessment Techs. of Wis., L.L.C. v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003).

16

This case cries out for application of the copyright misuse doctrine, because the facts that MMAS Research pleads, if true, show that MMAS Research is using its copyright in the Morisky Widget to try to prevent the Hospital from using the earlier version of the MMAS-8, even though it doesn't claim to own the copyright to it. That is contrary to the Copyright Act's purpose, which is to "promote the Progress of Science and useful Arts, by securing for limited times to Authors … the exclusive Right to their … Writings," U.S. Const. art. I, § 8, not to stifle competition. While "copyright law [seeks] to increase the store of human knowledge and arts by rewarding … authors with the exclusive rights to their works for a limited time …, the granted monopoly power does not extend to property not covered by the … copyright." *Lasercomb,* 911 F.2d at 976.

> The contract between the Hospital and MMAS Research provides:
>
> With Licensor approval, BCH can use MMAS paper or electronic questionnaires but all scoring and coding must be done in the Morisky Widget.

(Am. Compl. Ex. 8). That provision has two effects. First, MMAS Research claims the power to tell the Hospital whether it can use the paper MMAS-8, even though MMAS Research does not own the copyright to the paper MMAS-8. Second, MMAS Research says that if the Hospital does use the paper MMAS-8, it still must use the Morisky Widget to code and score the data. That is, it forbids the Hospital from using the MMAS-8 unless it also uses the Widget.

A restrictive software license like this is textbook copyright misuse. In *Practice Management Information Corp. v. American Medical Association,* 121 F.3d 516 (9th Cir. 1997), the AMA licensed the Physician's Current Procedural Terminology, a medical coding system, to the Health Care Financing Administration. In the agreement, the HCFA agreed not to use any other system for reporting physician's services. A publisher, Practice Management, bought a copy of the PCPT from the AMA and then sued for a declaration that the AMA's copyright was

17

invalid because the AMA had misused the copyright by entering into an agreement that prevented the HCFA from using any other coding system. The Court held that the AMA was guilty of copyright misuse:

> The controlling fact is that HCFA is prohibited from using any other coding system by virtue of the binding commitment it made to the AMA to use the AMA' s copyrighted material exclusively. The absence of the agreement would not preclude HCFA from doing what the AMA suggests would be proper—deciding on its own to use only the AMA's system. What offends the copyright misuse doctrine is not HCFA's decision to use the AMA's coding system exclusively, but the limitation imposed by the AMA licensing agreement on HCFA's rights to decide whether or not to use other forms as well. Conditioning the license on HCFA's promise not to use competitors' products constituted a misuse of the copyright by the AMA.

*Id.* at 521. This is precisely what happened here. MMAS Research used its copyright of the Morisky Widget to try to prohibit the Hospital from using the paper MMAS-8 without its permission.

Even if it gave permission to use the MMAS-8 (there is no allegation that it did), MMAS Research was trying to tie the use of the paper MMAS-8 to use of the Morisky Widget. That prohibition runs afoul of the rule in *Alcatel USA, Inc. v. DGI Technologies, Inc.* 166 F.3d 772 (5th Cir. 1999). There, DSC sold equipment for telephone switching systems to telephone companies, and it licensed its software to its customers. The license agreement allowed customers to use the software only on DSC equipment. The effect was to give DSC a monopoly on the equipment customers could use, even though it had no copyright in the equipment but only in the code. This, the court said, was copyright misuse. Id.

at 793-94 The same is true here. MMAS Research has no monopoly on how users of the paper MMAS-8 should code or score the assessments. But through its licensing agreement, it tries to arrogate such a monopoly to itself.

Copyright misuse is ordinarily treated as an affirmative defense. *See Shirokov, supra* at *98. The Court can nonetheless address it on a motion to dismiss, because the Complaint itself

demonstrates that the defense will succeed. *See , e.g.*, *Rife v. One W. Bank, F.S.B.*, 873 F.3d 17 (1st Cir. 2017) (affirming dismissal of complaint where it showed that the claim was barred by the statute of limitations); *Medina-Padilla v. U.S. Aviation Underwriters, Inc.*, 815 F.3d 83, 85–87 (1st Cir. 2016) (same, where the complaint showed that the claim was barred by claim preclusion). The text of the license agreement, which is an exhibit to the complaint, and the copyright registrations, of which the Court can take judicial notice, leave no room to doubt that MMAS Research is trying to do just what the doctrine forbids: leverage its ownership of the Morisky Widget copyright to prevent the Hospital from using the older MMAS-8 or doing business with Morisky.

F.   <u>The contract claims fails, because there is no plausible allegation of damage.</u>

For the sake of argument, the Court should assume that MMAS Research has alleged a breach of the contract. But breach is just one element of a contract claim. To prove a breach of contract, a plaintiff has to prove that it suffered damage. *Singarella v. Boston*, 342 Mass. 385, 387 (1961). Once the Court disposes of all the statutory claims, how has MMAS Research been injured?

It hasn't. The amended complaint alleges that the Hospital scored and coded the MMAS-8 without using the Widget (Am. Compl. ¶ 114), but it does not allege that this act had any monetary or non-monetary effect on MMAS Research. It alleges that the Hospital improperly put the "correct" answers to the MMAS-8 in boldface type on the form it used (Am. Compl. ¶¶ 91-92). But it does not allege that this had any monetary or non-monetary consequence or that anyone read or did anything with the document posted on the website or the paper MMAS-8 assessments. It alleges that the Hospital administered an MMAS-8 paper test without permission

(Am. Compl. ¶ 113), but it does not explain how that harms MMAS Research.[13] The Complaint alleges that the Hospital misattributed the MMAS on the clinicaltrials.gov website, but there is no allegation that anyone read or cared about the alleged misattribution, and no plausible reason to suppose that anyone except Morisky would care.

If MMAS Research had pursued a breach of contract claim for nominal damages, *see Rombola v. Cosindas*, 351 Mass. 382, 384 (1966), the Hospital would not seek dismissal for failure to state a claim. But the amended complaint specifically seeks "actual" damages, not nominal damages (Am. Compl. ¶ 159). As it stands, the contract claim should be dismissed.

<u>CONCLUSION</u>

For these reasons, the Court should dismiss the claims without leave to amend.

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION, DR. JACOB HARTZ,
and HANNAH PALFREY

By their attorneys:

*/s/ Theodore J. Folkman*

Theodore J. Folkman (BBO No. 647642)
Steven DiCairano (BBO No. 694228)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
sdicairano@rubinrudman.com

Dated:  November 4, 2024

---

[13] Perhaps the theory is that the Hospital would have had to pay MMAS Research more money if it had used the Widget, but the contract (Ex. 8) had a flat $5,000 fee for the first 10,000 tests administered, and the Complaint alleges at most four administrations.