UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

MMAS RESEARCH LLC,
A Washington Limited Liability
Company, et al.,


                    Plaintiffs,        Civil Action
                                       No. 24-12108-DJC
V.
                                       February 20, 2025
THE CHILDREN'S HOSPITAL CORPORATION,
et al.,                                2:02 p.m.


                    Defendants.
_____




TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. KANE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
debrakane0711@gmail.com

```
 1     APPEARANCES:

 2     FOR THE PLAINTIFFS:

 3     ASHKON ROOZBEHANI, ESQ.
       Persepolis Law, PLLC
 4     809 Washington St.
       Suite A
 5     Newton, MA 02460
       617-431-4329
 6     persepolaw@gmail.com

 7     RONALD D. COLEMAN, ESQ.
       50 Park Place, Suite 1105
 8     Newark, NJ 07102
       973-264-9611

 9
       FOR THE DEFENDANTS:
10
       THEODORE J. FOLKMAN, ESQ.
11     Rubin & Rudman LLP
       53 State Street, 15th Floor
12     Boston, MA 02109
       617-330-7135
13     tfolkman@rubinrudman.com

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2          (The following proceedings were held in open

3   court before the Honorable Denise J. Casper, United States

4   District Judge, United States District Court, District of

5   Massachusetts, at the John J. Moakley United States Courthouse,

6   1 Courthouse Way, Boston, Massachusetts, on February 20, 2025.)

7          THE CLERK:  All rise.

8          (The Court entered the courtroom.)

9          THE CLERK:  Court is in session.  Please be seated.

10         Civil action 24-12108, <u>MMAS Research v. The Children's</u>

11  <u>Hospital Corporation</u>.

12         Would counsel please state your name for the record.

13         MR. ROOZBEHANI:  Good afternoon, your Honor.  My name

14  is Ashkon Roozbehani.

15         THE COURT:  Good afternoon.

16         MR. COLEMAN:  For the plaintiff also, Ronald Coleman.

17         THE COURT:  Good afternoon.

18         MR. FOLKMAN:  Good afternoon, your Honor.  Theodore

19  Folkman for the hospital defendants.

20         THE COURT:  Good afternoon.

21         And, counsel, I know we're here on the hospital

22  defendants' motion to dismiss.  I'll just let both sides know

23  I've reviewed the filings, the motion papers, opposition, reply

24  and notice of supplemental authority, so I'm prepared to hear

25  argument, counsel.  And I'll give you equal time, about 15

1    minutes either side.

2         MR. FOLKMAN:  Thank you, your Honor.

3         The clerk indicated I could reserve some time for

4    rebuttal, so if I could reserve a couple of minutes, that would

5    be great.

6         THE COURT:  Sure.

7         MR. FOLKMAN:  I want to start by being very clear

8    about what the versions of this test are because I think once

9    you understand that and once you understand what the hospital

10   is alleged to have done, it's not a lot of law, it's what has

11   been alleged sort of question.

12        There's a version called the MMAS-8 which was written

13   by Dr. Morisky years before the so-called Widget.

14        We have the certificate of copyright registration

15   attached to our memo.  There's no allegation in the first

16   amended complaint that MMAS Research owns the copyright to the

17   original MMAS-8.  What they say, which isn't really disputed at

18   this point, is that the text of the original MMAS-8 is within

19   the source code of the Widget and that makes the Widget a

20   derivative work, as we've argued in the papers.

21        So you have the 2006 version.  Then you have the

22   Widget, which is a computer program written in 2016 and 2017.

23   The source code was created by a software engineer.  That's the

24   copyright that's at issue in this case.  And I would refer your

25   Honor to paragraphs 30 to 33 of the first amended complaint

 1    where they make this abundantly clear.  This is our registered

 2    copyright, this is our copyright.  That's also the copyright

 3    that the hospital licensed.  You'll see that in Exhibit 8 to

 4    the first amended complaint.

 5            So the first big point that I want you to understand

 6    is that the claimant, the plaintiff, owns the copyright to the

 7    Widget.  The Widget contains the text of the MMAS-8.  The

 8    MMAS-8 copyright is not alleged to be owned by the plaintiff.

 9    And in fact, as the certificate of copyright registration

10    shows, it's owned by Dr. Morisky.

11            That's sort of big picture number one, what are the

12    versions of this test.

13            Number two, what did the hospital do?  What is the

14    hospital alleged to have done?  There's really two things.

15    It's a very long complaint, but fundamentally it seems to me

16    there are two things the hospital is alleged to have done that

17    are potentially or arguably wrongful.  The first is that the

18    hospital used a version of the test that under its contract

19    with MMAS Research it wasn't supposed to use.  It wasn't

20    supposed to use a paper version that could be scored on paper.

21    It was supposed to use the version that Dr. Morisky came to

22    Boston to train Dr. Hartz on, that they created using the

23    Widget, and it was supposed to be scored -- the data entered

24    into the Widget to be scored that way.  And that, according to

25    the complaint, didn't happen.  And we don't allege or we don't

1    claim that MMAS has not alleged a breach of contract, they

2    have.

3              THE COURT:  Right.  And I understood -- I think there

4    was a note that you wouldn't have opposed a breach of contract

5    claim seeking nominal damages.

6              MR. FOLKMAN:  Right.  I'm going to get to that,

7    because I don't think any real damages have been alleged.

8              So that's -- that's thing number one that the hospital

9    supposedly did.

10              And thing number two is that they published on a

11    government website a description of their study.  And you won't

12    find an exhibit for that but you will find two hyperlinks in

13    the first amended complaint to two different versions of the

14    study description that the hospital posted on an NIH website.

15    And essentially what both of those versions say is we're going

16    to use the MMAS in our study, the MMAS is a validated test,

17    and, you know, anybody who scored higher than 6 on the MMAS-8

18    is going to be eligible to participate in our study.

19              That really, when it comes right down to it, as far as

20    I can tell, those are the things that the hospital supposedly

21    did that could be wrong.

22              There was an allegation in the original complaint that

23    said that the hospital had disclosed the paper, the piece of

24    paper itself with the questionnaire to -- I suppose to the

25    pediatric patients who took the test.

1          I pushed back on that in discussions between counsel

2     and that has been omitted from the new complaint.  There's no

3     allegation that the actual piece of paper was shown to anybody.

4     And, you know, if you think about what that piece of paper is,

5     it makes sense because what probably happened is that some

6     doctor or nurse or somebody was asking questions and writing

7     down the answers and not showing the piece of paper to the

8     patient.

9          Now, the piece of paper says at the bottom of it -- it

10    says a few things.  It says a score greater than 6 is going to

11    be eligible.  And it also says that, you know, some answers are

12    in bold and, you know, that is a reference to the supposed

13    trade secret that was pleaded in detail in the first complaint.

14    And that was a theory that, you know, the great innovation of

15    the MMAS is that the yeses and nos are reversed so that

16    people's natural tendency to say "yes" isn't creating false

17    negatives, so to speak.  That can't possibly be a trade secret,

18    because, as we showed, it was disclosed by Dr. Morisky in a

19    paper that's been published years and years ago.

20         So those are things that the hospital supposedly did

21    that were wrong, and I'd like to run through with you the

22    theories that are pleaded.  And there's a little bit of

23    housekeeping.  My brother and I were speaking in the hall, and

24    I understand that they are not pursuing a claim for copyright

25    infringement, so that is off --

1          THE COURT:  I saw that argument in your reply,

2      counsel.

3          Is that correct?

4          MR. COLEMAN:  That is correct, your Honor.

5          THE COURT:  Thank you.

6          MR. FOLKMAN:  So that is off the table.

7          I think my brother's view is that that means that the

8      copyright misuse doctrine is also off the table.  I'm not

9      convinced that that's so, but I'll come to that.

10          The other theories that are pleaded are breach of

11      contract, as I've said, that's Count I; the Digital Millennium

12      Copyright Act, which is Count II; and a count of trade secret

13      misappropriation under federal law, which is Count V.

14          Let me start with the DMCA.  If you look at the

15      statute and specifically Section 1202(c), which is the

16      definition of Copyright Management Information, that's what the

17      statute is about, CMI, it says, The Copyright Management

18      Information means any of the following information conveyed in

19      connection with copies of a work.  And that's the key phrase,

20      "conveyed in connection with copies of a work."

21          What happened here, and I think what plaintiff is

22      complaining about, is that the hospital, because it was

23      receiving all kinds of contradictory instructions from

24      Dr. Morisky and Mr. Trubow about who owned what, it allegedly

25      misattributed the MMAS on that NIH study description that was

posted on the web.  Now, that may be a scientific faux pas, it may be the wrong thing to do, it may not be academically sound, but there is no allegation in the complaint, the amended complaint, that anybody removed any copyright notice from any particular copy of the work.

The work, of course, is the Widget.  Let's just back up a second.  The work is the Widget.  There's no allegation that, you know, anybody from the hospital copied the source code and went out and made a new Widget, you know, copied the text of the programming, which is part of what the copyright covers.  If they copied anything at all, it was the MMAS-8, the questionnaire that we say MMAS Research doesn't own.

But leaving that aside, there's no allegation that there was a copy that someone took the text off of, the copyright notice off of and then distributed it.  So the statute just doesn't apply.

The cases on this, there's a couple of cases cited, one is that Mango case.  I think the two cases really address the same point so I'll address just the one, that's the case where there's a photograph and there's copyright information that appears below the photograph.  And the interesting question in the case is:  Is it enough that it appears below the photograph?  Does it have to appear on the photograph?  And the court said, No, it's enough that it appears below the photograph as long as it's closely enough connected with the

1    photograph.  But if you republish the photograph without the

2    notice, you violated the statute.

3            But there's nothing like that here.  If you look at

4    the hyperlinks of the study descriptions that were posted --

5    and of course you can take judicial notice of those because

6    they're referred to in the complaint -- you'll see that there's

7    not even -- there's not even any of the Morisky questions or

8    any of the text from the Morisky 8 -- of the MMAS-8 listed in

9    what the hospital put on the web.  So there's just no copy and

10   no basis for the statute to apply.

11           So much for the DMCA.

12           Let me talk about trade secrets.  What is the secret?

13   So the secret was actually really clear in the original

14   complaint.  The secret was you reverse the order of some

15   questions to avoid patients giving you answers that they think

16   you want to hear which turn out not to be accurate.  And that's

17   not secret, because, as we pointed out in our original motion

18   and then pointed out again in this motion, it's been published

19   for years and everybody knows about it.

20           So what else could the secret be?  Well, it could be

21   that line of text at the bottom of the page that the hospital

22   used when it created its questionnaire.  It could be that.  And

23   that's the bit that says, you know, some answers are bolded,

24   right, to indicate which is the correct answer and which is the

25   incorrect answer, and that's just a reference to exactly the

1    same point.  That's a reference to we've reversed the order of

2    the answers.  So that can't be it.

3          Or maybe it's, you know, you have to get six right in

4    order for the Morisky test to be satisfied.  But that really

5    can't be it either, because, again, if you look at what the

6    hospital said online in the documents that it posted -- and you

7    may not -- I'm happy to hand it up if you prefer to have it

8    sort of as a handy, rather than clicking the hyperlink

9    yourself -- but you'll see that in the -- in the so-called

10   inclusion criteria that Dr. Hartz put on the web, one of the

11   inclusion criteria for the participation in the study is that

12   you had a Morisky Medication Adherence Score of less than or

13   equal to 6, okay?

14         Now, I want to just make two points on this.  The

15   first is, it's very clear from the allegations of the complaint

16   that they knew that the MMAS that they were licensing was going

17   to be used for a medical study.  So to say, well, you can't

18   possibly disclose the criteria that you use because that's a

19   breach -- that's not how medical studies work.  Of course you

20   have to disclose what you're doing, number one.  But, number

21   two, Dr. Hartz is not saying anything about Morisky or the

22   Widget or what Morisky thinks or why he thinks it.  What he's

23   saying is I have chosen -- if you score greater than 6, you can

24   participate in my study.  That's not a trade secret.  If it's

25   anybody's information at all, it's the hospital's, right?

1          THE COURT:  I understand the point.

2          MR. FOLKMAN:  Okay.

3          I just want to turn now -- well, I'm cognizant of my

4     time.  We don't have the little clock, so please tell me --

5          THE COURT:  So, counsel, I'll give you another minute

6     if you want to reserve two minutes.

7          MR. FOLKMAN:  I appreciate that, your Honor.

8          Very briefly on trade secret, I just want to point you

9     to the sections of our brief where we say that regardless of a

10    trade secret, there's been no misappropriation of a trade

11    secret here -- I'm not going to repeat that here -- and on

12    damages, this is the last point I want to make.

13         Let's just assume for the moment that the copyright

14    misuse doctrine doesn't apply.  What are the damages --

15         THE COURT:  To the breach of contract claim.

16         MR. FOLKMAN:  Just on the breach of contract claim.

17         They say, well, you've harmed our reputation.

18    Frankly, the only people that are harming these gentlemen's

19    reputations are themselves by engaging in the course of

20    litigation that you see in the complaint.  But, more to the

21    point, nothing in the complaint talks at all about any harm to

22    their reputation that they've suffered.  And the particular

23    paragraphs in the complaint that they point you to don't say

24    anything about damages.

25         I think this is a case where even if everything

1     they're saying is true, even if the hospital misused its test,

2     even if it should have coded it or scored it in the Widget,

3     there's no harm to MMAS Research.  They don't like what we did.

4     They wanted to use theirs instead of Dr. Morisky's version;

5     they haven't suffered.

6               And that's it.

7               Thank you, your Honor.

8               THE COURT:  Thank you.

9               Counsel, I'll hear from you.

10              MR. COLEMAN:  Thank you, your Honor.

11              There is -- there is a lot, your Honor, that my

12    colleague and I agree on.  We have always, actually, had that

13    between us.

14              The problem is I think he is, to a large extent,

15    arguing a summary judgment motion.  The grounds for dismissal

16    are mostly unavailable at this stage of the proceedings.

17              The question of damages on the contract, it is an odd

18    position to take that clients -- defendants signed a contract

19    acknowledging that they were not to do certain things and that

20    they would do certain things and that they may -- and then to

21    acknowledge that in fact they may not have done those things

22    but to say that it's breaches of contract that don't -- it's a

23    breach of contract but no damages flow from it.  Our client

24    should have the opportunity to prove its damages.  If it

25    doesn't come forward with damages by summary judgment, then

1      that's an appropriate opportunity for --

2              THE COURT:  And do you think it's sufficiently alleged

3      in the complaint, counsel?

4              MR. COLEMAN:  Yes, your Honor, we do.  Because one of

5      the issues that is raised is that it weakens the value of the

6      license in the market.  This, I believe, would require expert

7      testimony to establish, the quantum of damages, but if you have

8      an agreement with specific provisions with respect to

9      confidentiality, credit, disclosure, and then you breach them,

10     you take the commercial value of those components, of that

11     consideration out of future contracts.  So that would be the

12     course of argument that we would make on the damages.

13             In terms of the trade secret, it is well established

14     that a specific combination of the questions and answers and

15     the presentation of them is an appropriate subject for trade

16     secret protection.  It is very hard to look at the contracts

17     that were signed and not recognize that there is something

18     there that the parties have agreed needs to be maintained as

19     confidential.

20             And it's certainly not the -- it's certainly not

21     appropriate at the pleading stage to say it doesn't really seem

22     like it's all that much.

23             THE COURT:  Well, I guess, counsel, maybe you can

24     just -- maybe I'm just confused about what the alleged

25     misappropriation is.

1        But what is the misappropriation?

2        MR. COLEMAN:  Well, first of all, your Honor, I would

3   say that anyone who is not confused viewing this case would,

4   frankly, have my utmost admiration.  There is really -- not

5   that the Court doesn't otherwise.  What we have here is a

6   really unusual configuration of bundles of rights, the sort of

7   thing we talk about in intellectual property law all the time.

8        The misappropriation that is alleged here is that --

9   it's not quite as my colleague puts it, that a paper version --

10  that basically the original paper version of the test was used,

11  that the MMAS-8 test was used.  But, rather, that it -- because

12  they had privileged and confidential access to the source code

13  and to the methodology that was being protected, the defendants

14  essentially reengineered the Widget for their own purposes by

15  doing the -- reflecting the update that became the Widget as

16  opposed to the original paper version but doing it in a paper

17  version.

18        And we may scratch our heads as to why the heck that

19  matters, but it is something that was the subject of a

20  contractual agreement.  The access was certainly privileged and

21  was contractually acknowledged to be confidential.  And the

22  argument is that this did constitute a derivative work.

23        The reason there's no copyright claim here is because

24  there was a license.  So of course you have licensee estoppel

25  where there is a license.  Now to go to the next step and say,

1     well, let's also ignore the license because no harm, no foul.

2     Well, we believe our clients are entitled to demonstrate

3     harm -- a harm and to recover for the foul.

4          The DMCA issue, again, this is an unusual

5     configuration of notice and the work.  It's true that in the

6     two cases that were discussed in the brief, in the briefing,

7     that the court did agree with our client's point of view that

8     the work and the notice need not be on the same exact location.

9     The court certainly could wonder at that juncture, okay, but

10    they're next to each other.  I think that while my colleague is

11    arguing is that, well, here they're not even really next to

12    each other.

13         We submit that the DMCA does not require that they be

14    juxtaposed.  We will be prepared to prove, given the

15    opportunity, again, to take discovery, and again, it might

16    require expert testimony, but to prove that the purpose of

17    requiring the appropriate notifications in the contract was to

18    protect the rights not necessarily of the nurse or practitioner

19    who is standing there taking -- answering the questions to the

20    survey but to other people in the research and publication

21    chain.

22         This is in a very esoteric world.  We lawyers, we

23    write our things, we upload them to publicly available

24    databases, the whole world second guesses the judges and the

25    lawyers, it's all a great deal of fun.

1          The world of medical research is different.  And I

2     think counsel makes a very good point saying, well, in order to

3     replicate a study, any kind of medical study in order to have

4     validity needs to disclose its methodology.  Nonetheless, we do

5     know -- we're here in Boston after all -- we do know that there

6     are all kinds of confidential methodologies, patented

7     techniques that are utilized in studies and there are limits of

8     that disclosure.

9          At the summary judgment stage, we submit -- I'm sorry,

10    at the 12(b)(6) motion stage, we submit the Court should not

11    take a position on that in this case.

12         Finally, I don't think a lot has been made of it, and

13    I don't think the Court is all that moved by it, the idea that

14    it's appropriate for the Court in any way to rely on

15    proceedings in other cases, sanctions in other cases, this is

16    not a situation where you have a truly serial litigator, such

17    as we're all familiar with from earlier times, someone who just

18    is out of control.

19         Every case has its own facts, its own disputes, its

20    own counsel, its own judicial officers.

21         Certainly, if Mr. Folkman is arguing that the

22    reputation of our clients personally is already so poor that

23    this is a libel-proof plaintiff, well, we're not suing for

24    libel.  That does go to the damages question.  It does go to

25    the damages question, consequential damages, but that is a fact

1    question.

2             And even though I said just a minute ago everything is

3    public, everything is in ECF, the fact is we often magnify the

4    extent to which the world cares about what we lawyers do, I'm

5    not so sure that -- especially in a situation where the test --

6    we're not talking here about Steve Trubow or Dr. Morisky.

7    We're talking about the technology, the corporate owner of the

8    technology, and again, the bundle of rights around that

9    technology.

10            THE COURT:  Right.  But wasn't some of that referenced

11   in the decisions in this other court, what was it, in the

12   Western District?

13            MR. COLEMAN:  Some of it was.  I don't -- I don't

14   believe that defendants are arguing issue preclusion here.

15            THE COURT:  Yeah, no, I guess what I'm saying is, I

16   understand the arguments on either side about judicial notice,

17   meaning, I think I can take judicial notice of them, but I

18   understand the point about what I'm taking judicial notice of

19   them for.

20            MR. COLEMAN:  And there's no more than that.

21            THE COURT:  Okay.

22            MR. COLEMAN:  I'm going to call out another case where

23   my adversary has asked the Court to take judicial notice of

24   basically everything I said wasn't in the complaint, it should

25   have been in the complaint.  That's not what we're talking

1    about here.

2         Frankly, you Honor, those are our responses

3    pinpointing what we've already submitted in the briefing, and I

4    thank you very much for your questions.

5         THE COURT:  Thank you.

6         Counsel, you have a few minutes.

7         MR. FOLKMAN:  Thank you, your Honor.  I'll try to be

8    brief.

9         What my brother said about damages is really

10   inconsistent with Twombly/Iqbal.  He said we haven't alleged

11   damages really, except in the most general sense we said we're

12   damaged.  But when challenged, how have you been damaged?

13   Describe just what it might be.  There's no answer to that.

14   And there's no plausible reason to think there actually is any

15   damage in fact here.

16        Nominal damage, sure.  Did we breach the contract?

17   We're alleged to have breached the contract, sure.  How have

18   they suffered?  They haven't alleged a harm to reputation, they

19   haven't alleged that anybody, anybody ever saw this piece of

20   paper that was filed on the government's website, that a single

21   customer came to them and said, I saw this, I'm concerned about

22   it.  No allegations at all.

23        On the issue of trade secrets, I just refer your Honor

24   to Exhibit 5 to our memorandum in support of the motion, where

25   I red-lined the original MMAS-8 and the version of the MMAS-8

1    that the hospital administered.  And you can see that they are

2    the same.  The original question:  Do you sometimes forget to

3    take your health condition pills?

4        Their question:  Do you sometimes forget to take your

5    prescription cholesterol medication?

6        The words "prescription cholesterol medication" are

7    not a trade secret, they can't be.

8        Taking medicine every day is a real inconvenience.  Do

9    you ever feel hassled about sticking to your health condition

10   treatment plan?  And then substitute the word "cholesterol."

11   That's not a trade secret.  That's absurd.

12       If you look at that exhibit, I think you will see that

13   what my brother said about what the trade secret is, which is

14   the questions, can't possibly be right.

15       The last point I want to make is I would like your

16   Honor to look, please, at the individuals who have been named

17   as defendants in this case.  One is Hannah Palfrey whose title

18   is not alleged but I believe she's a clinical research

19   associate 3 or something.  She's a staffer.  There is no

20   reason -- she's not alleged to have done anything, as far as I

21   can tell, really, and there's no reason that she should be

22   sued.

23       Dr. Hartz signed the contract, was the principal

24   investigator of the study.  But, again, he can't be liable for

25   breach of contract because it's not his contract.

1          And I suggest that there's really not -- when you

2    sue -- when you're suing The Children's Hospital, there's no

3    necessity to have these individuals in the case.  And whatever

4    else you do, I hope you will look at what they are alleged to

5    have done or not alleged to have done and dismiss them.

6          Thank you.

7          THE COURT:  Thank you.

8          Counsel, let me just turn to the plaintiff.

9          Just on defendant Palfrey, do you pursue that against

10   her individually?

11         MR. COLEMAN:  Your Honor, Mr. Folkman and I did

12   discuss this prior to the hearing, and I'm not authorized to

13   say that we would be able to drop her, but I am prepared to

14   have a discussion with my client about why indeed she is a

15   necessary defendant.  We're not looking here to be oppressive.

16         THE COURT:  Okay.

17         So, counsel, I certainly won't take that as a

18   concession of any kind, but if you come to a decision or your

19   client comes to a decision about that, please let the Court

20   know, otherwise I'll move forward in deciding what remains

21   before me and we'll go from there.

22         Thank you.

23         Thank you, counsel.

24         THE CLERK:  All rise.

25         (Court adjourned at 2:30 p.m.)

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Debra M. Kane                    February 27, 2025
Debra M. Kane, RMR, CRR, FCRR       Date
Official Court Reporter