# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MMAS RESEARCH LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION, HARVARD MEDICAL SCHOOL, MORISKY MEDICATION ADHERENCE RESEARCH LLC, JACOB HARTZ, DONALD MORISKY, and F. CHRISTOPHER AUSTIN and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 1:24-cv-12108-DHC<br><br>[PROPOSED]<br><br>**SECOND AMENDED COMPLAINT**<br><br><br><br>JURY TRIAL DEMANDED |

Plaintiff, MMAS Research LLC (hereinafter "Plaintiff" or "MMAS Research"), by and through its undersigned attorneys, complains and alleges as follows:

## I.      JURISDICTION AND VENUE

1.      This action arises, in part, under the Copyright Infringement Under 17 U.S.C. §§ 101, including all sections created or amended by the Digital Millenium Copyright Act conferring federal question jurisdiction under U.S. Code §§ 101, and supplemental jurisdiction on Plaintiff's state law claims under 28 U.S.C. § 1367.

2.      Additionally, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00 and there is a complete diversity of citizenship between the Parties.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) because (a) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this

District; (b) the unlawful acts of Defendants complained of herein have been committed within this District and have, had, or will have had effect in this District; (c) the written agreements identified and described more thoroughly below were entered into by the Parties in this District; and (d) the written agreements identified and described more thoroughly below, by their terms, stipulated to jurisdiction and venue in this District.

4.      Venue is also proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because one or more defendants are amenable to personal jurisdiction in this District.

## II.      INTRODUCTION

5.      Plaintiff MMAS Research is the owner of the "MMAS RESEARCH WIDGET CODE" (the "Morisky Widget"), registered under United States Copyright Registration No. TX 8-816-517 (Registration date December 3, 2019) (the "Morisky Widget Copyright"). Steven Trubow ("Trubow") is the CEO of MMAS Research.

6.      The Morisky Widget provides validated diagnostic risk assessments for medication adherence, depression, anxiety, chemical dependency and suicide.

7.      From January 2017 to July 2019, Trubow and Defendant Donald Morisky co-owned MMAS Research LLC, through which they trained and certified clinicians on the correct use of the Morisky Widget diagnostic assessments. They provided predictive risk diagnostic assessments for over 200 leading pharmaceutical companies, hospitals and universities who administered the Widget's diagnostic assessments to patients in clinical trials, hospitals, clinics and federally qualified health centers worldwide. Many of the clinicians published Morisky Widget results on the NIH ClinicalTrials.gov website, and in the medical literature. Among the hundreds of Morisky Widget licensees that Trubow trained and certified on the Morisky Widget was Boston Children's Hospital.

2

8.     After Morisky's departure from MMAS in July 2019, he formed a competing
entity, Morisky Medication Adherence Research LLC ("MMAR"), and attempted to
undermine Plaintiff's business by interfering with existing Widget licenses and falsely
claiming ownership of the Widget's copyright. This interference included conduct on the
part of Morisky's personal lawyer, F. Christopher Austin and his Nevada LLC, MMAR.
This conduct included sending threatening letters to Boston Children's Hospital ("BCH")
that contained false claims regarding MMAS's rights, which caused confusion and harm to
MMAS Research's business relationship with BCH.

9.     As a result of this interference and, upon information and belief, for reasons of
its own, BCH breached its license agreement with MMAS Research by creating an
unauthorized Morisky Widget MMAS-8 derivative with a different MMAS-8 scoring and
coding criteria for the enrollment protocol of their study. Despite the license's requirement
that all scoring and coding must be performed within the Morisky Widget software, BCH
administered a Morisky Widget MMAS-8 derivative, using paper-based tests and scored them
outside the authorized Morisky Widget platform.

10.     Further, because of the conduct of Morisky, Austin and MMAR, BCH
terminated its Morisky Widget License without good cause and executed a new MMAS-8
license with MMAR LLC. BCH subsequently published reports on the NIH
ClinicalTrials.Gov website in 2023-2024 broadcasting to many of MMAS Research LLC
licensees and prospective clients that BCH had severed its relationship with MMAS Research
LLC and relicensed its study with Defendants Donald Morisky and MMAR LLC.

11.     One year after the original complaint was filed in the instant matter, Defendants
BHS, HMS and Hartz published an article in the medical literature that informed anyone with

access to the internet that MMAS Research LLC and Steven Trubow was suing BCH and personally suing the articles' authors from BCH, HMS and the National Institute of Health, without also informing readers of the basis of that lawsuit and the wrongful conduct that caused it.

12.    These actions caused substantial financial harm to MMAS Research's business and its intellectual property rights, damaged its reputation and interfered with both existing and prospective business relationships and opportunities.

13.    Steven Trubow, the CEO of MMAS Research was a victim of defamatory libel which has caused Trubow, a 75-year-old man significant physical and psychological damage by inducing severe emotional distress and chronic stress responses, which manifest in various clinically recognized symptoms.

14.    Because of the foregoing, MMAS Research brings this complaint for damages against The Children's Hospital Corporation, Harvard Medical School, Morisky Medication Adherence Research LLC, Donald Morisky, F. Christopher Austin and Jacob Hartz, and DOES 1 through 10, inclusive, for breach of contract, willful copyright infringement, tortious interference and defamation as detailed below. MMAS Research seeks damages, injunctive relief, and other remedies to address these breaches of contract, copyright infringements, tortious interference and defamation and libel.

### III.    PARTIES

15.    Plaintiff MMAS Research LLC ("MMAS Research") is a Washington limited liability company in good standing which conducts business in Boston, Massachusetts.

16.    Defendant The Children's Hospital Corporation ("BCH") is a pediatric hospital and research institute in Boston Massachusetts.

17.     Defendant Harvard Medical School ("HMS") is a medical school and research center in Boston Massachusetts.

18.     Defendant Morisky Medication Adherence Research is a Nevada Limited Liability Company that does business as MMAR LLC in Boston Massachusetts.

19.     Defendant Donald Morisky is the founder of Morisky Medication Adherence Research and does business as MMAR LLC.

20.     Defendant Jacob Hartz is a former employee of BCH and HMS.

21.     Defendant F. Christopher Austin (AUSTIN) is a lawyer in Las Vegas Nevada and the author of the "Austin Letter" which is a central threat in this litigation.

22.     Plaintiff is informed and believes and thereon alleges that Defendants DOES 1 through 10, inclusive (the "Doe Defendants," and collectively with the above-named defendants, the "Defendants"), are other parties not yet identified who have breached contracts that are the subject of this lawsuit. The true names, whether corporate, individual, or otherwise, of DOES 1 through 10, inclusive, are presently unknown to Plaintiff, which therefore sues defendants by such fictitious names, and will seek leave to further amend this complaint to show their true names and capacities when their identities have been determined.

23.     Plaintiff is informed and believes, and thereupon alleges, that Doe Defendants were, and are, in some unlawful manner responsible for the actions, acts, and omissions alleged, and for the damage caused by Defendants and are, therefore, liable for the damage caused to Plaintiff.

24.     Plaintiff is informed and believes, and thereon alleges, that Defendants did, at all material times, foresee the nature and extent of the probable consequences of their acts in proximately causing said damage to Plaintiff.

25.     Plaintiff is informed and believes, and thereon alleges, that at all relevant times, Defendants controlled and participated in the acts or conducted alleged herein.

### IV.     FACTS RELEVANT TO ALL ALLEGATIONS

#### A.  Background On The Morisky Widget, MMAS-4, MMAS-8

26.     On information and belief, in December 2016, Donald Morisky moved his California LLC, MMAS Research, to the State of Washington to establish MMAS Research LLC.

27.     On information and belief, Donald Morisky, and Steven Trubow, the equal co-owners of MMAS Research LLC of Washington jointly created the new work, the MMAS Widget Source Code with the assistance of Dustin Machi, a computer programmer from Virginia Tech University. A true and correct copy of email correspondence between Steven Trubow, Donald Morisky and Dustin Machi is attached as Exhibit 1.

#### B.  The Material Differences Between the MMAS-8 andMMAS-4 on the One Hand, and The Morisky Widget MMAS-8 And MMAS-4 on the Other

28.     The development of the Morisky Widget began when Donald Morisky, a Public Health Professor at UCLA, and Steven Trubow, a former Apple Computer Inc. Software Engineer and United States Department of Defense contractor, combined their respective works.

29.     Morisky contributed his paper generic Morisky Medication Adherence Scales (MMAS) 4 and 8 and Trubow contributed predictive analytic risk assessment software that transformed the MMAS 4 and 8 scales from uncopyrightable blank forms to the Morisky Widget's specific expressive source code implementation of predictive tertiary and secondary risk assessments based on new MMAS 8/4 scoring and coding criteria as illustrated below and in Exhibit 2.

6



30.     The Morisky Widget features a trade secret test editor that allowed Defendants BCH and Jacob Hartz to convert the original 2006 MMAS-8 static questions to dynamic medication or condition specific questions with much higher specificity and higher sensitivity in near real time, in over 80 languages. See the Morisky Widget test editor below used by Defendants Hartz and BCH. Exhibit 3.



31.     The Morisky Widget MMAS-8 and MMAS-4 were jointly developed by

Plaintiff and Defendant Donald Morisky, granting both authors joint ownership under § 201(a) of the Copyright Act (17 USC § 201(a)).

32.    Under the Copyright Act, the authors of a joint work are co-owners of copyright in the work.

33.    On information and belief, on January 6, 2021, Defendants Donald Morisky and Austin signed an infringement authorization in accordance with the December 4, 2020 CR2A settlement agreement, which stated, "In accordance with the December 4, 2020, agreement between Dr. Morisky and Steve Trubow and MMAS Research, LLC, I, Dr. Donald E. Morisky hereby authorize Steve Trubow, MMAS Research, LLC, or any attorney working on their behalf or designated by either of them to represent my interests in pursuing, settling and litigating any claim I have for infringement of my intellectual property rights to the MMAS-4, MMAS-8, and Morisky Widget, as well as contract claims related to licenses issued to use the MMAS-4, MMAS-8 or Morisky Widget, accruing on or before December 3, 2020." Exhibit 4

34.    Notwithstanding the fact that both Defendants Donald Morisky and Austin gave their explicit authorization for Steve Trubow, and MMAS Research, LLC, to represent my interests in pursuing, settling and litigating any contract claims related to licenses issued to use the MMAS-4, MMAS-8 or Morisky Widget, accruing on or before December 3, 2020." , in the April 21, 2022 Austin letter, Defendant Austin wrote, **"As such, neither Trubow nor MMAS Research has any right to use or license the Morisky Widget copyright, which includes use or licensure of the Morisky Widget program."** Exhibits 4 and 5.

35.    The December 4, 2020 CR2A settlement agreement provides a list of Morisky Widget licensees that were executed on or before December 3, 2020. Defendant BCH is listed

8

on Exhibit 4 on p. 30. Exhibit 5.

36.     While § 201(a) of the Copyright Act establishes Plaintiff and Defendant Morisky as co-owners, the specific principle that they share ownership equally (as tenants in common) is derived from longstanding common law principles that the statute left undisturbed, rather than being explicitly written in the text of the Act itself.  Pursuant to these principles, unless the joint authors have a written agreement specifying otherwise, each owns an undivided interest in the entire work, regardless of their individual contribution's quantity or quality, and has a duty to account for any profits to the other co-owners.

37.     Under § 201(a), Plaintiff and Defendant Morisky had an undivided interest in the Morisky Widget, each having the right to license non-exclusive uses of the Morisky Widget and to transfer their individual ownership interests.

38.     Morisky wrote, in a June 21, 2019 email to Steven Trubow, as follows (Exhibit 6):

> Subject: Accept your offer of withdrawal
>
> Steve: After consideration, I have decided to accept the offer of withdrawal as a member contained in the February 14, 2019, e-mail from you to me. I have attached below a copy for your convenience. The offer "If you want to withdraw from MMAS Research LLC you are free to do so, but you will give up your 50% ownership in the Morisky Widget" is accepted. I hereby withdraw as a member and from all other of my roles on behalf of MMAS Research, LLC, effective June 21, 2019. Thank you.

39.     Morisky and Trubow developed the Morisky Widget to correct deficiencies in the original works, the MMAS-4 and the MMAS-8, that made the two diagnostic assessments not only unreliable but even dangerous when used to measure the medication adherence of patients with chronic and infectious diseases.

40.     On information and belief, in a 2017 systematic review and meta-analysis, the MMAS-8 scale's performance was evaluated.

41.     The pooled sensitivity of 43% (ability to correctly identify non-adherent patients) and specificity of 73% (ability to correctly identify adherent patients) using a cut-off score of 6 were identified in this context. See, https://pmc.ncbi.nlm.nih.gov/articles/PMC9581089/#:~:text=These%20values%20are%20remarkably%20similar,%E2%80%9378%25%5D%2C%20respectively).

42.     On information and belief, before the development of the Morisky Widget, an MMAS-4 or MMAS-8 test would misdiagnose the medication adherence of at least 25% of the patients.  Such misdiagnosis put at risk the health and lives of heart, cancer, diabetes, HIV or other seriously ill patients, increased hospitalization time, and increased the risk of adverse medical events or even death.

43.     Aware of the debate in the medical literature on the risks to patient safety posed by the use of the MMAS-4 and MMAS-8, beginning on January 1, 2017 and through to June 21, 2019, Morisky informed all prospective licensees including Defendant Jacob Hartz and past licensees of the original MMAS 8/4 that, beginning January 1, 2017, all MMAS-8 and MMAS-4 licenses are administered through the Morisky Widget. A true and correct copy of email correspondence between Donald Morisky and third parties is attached as Exhibit 7.

44.     During this time, Morisky made it crystal clear to anyone interested in using the MMAS-4 or MMAS-8, including Defendants BCH and Jacob Hartz, that there would be no MMAS-4 or MMAS-8 licenses without the use of the Morisky Widget due to patient safety reasons. *See* Exhibit 7.

**C. Susan Morisky, Phillip Morisky, MMAR LLC Declare the Morisky Widget Dead and Lawyer Christopher Austin Wrongfully Threatens to Sue Anyone for Using the Morisky Widget for Copyright Infringement.**

45.     On information and belief, by April 2022, Donald Morisky was suffering from

Alzheimer's Disease.

46. On information and belief, Donald Morisky's wife, son, Phillip Morisky, his MMAR Nevada LLC and his lawyer, Defendant Christopher Austin, began a worldwide campaign to convince Morisky Widget licensees that Plaintiff did not own the Morisky Widget copyright with overt threats that anyone who used the Morisky Widget would be sued by Defendant Morisky for copyright infringement. (Exhibit 8).



47. On information and belief, on April 21, 2022, a letter from Donald Morisky's lawyer, Christopher Austin, was broadcast worldwide via the Internet by being posted on www.moriskyscale.com and transmitted by email to over 200 Morisky Widget licensees, including Defendants BCH and Jacob Hartz. Austin's letter stated (Exhibits 8, 9 and 10):

> Further, the MMAS Research copyright in the Morisky Widget code is an unlawfully obtained derivative of Dr. Morisky's MMAS-4 and MMAS-8 registered copyrights (as noted by the U.S. Copyright Office's reference to Dr Morisky's registered copyrights on the Morisky Widget registration). As such, neither Trubow nor MMAS Research has any right to use or license the Morisky Widget copyright, which includes use or licensure of the Morisky Widget program.
>
> ANY PERSON THAT USES OR LICENSES THE MORISKY WIDGET, MMAS-4 SCALE OR MMAS-8 SCALE WITHOUT THE EXPRESS WRITTEN AUTHORIZATION OF DR. MORISKY WILL BE IN VIOLATION OF U.S. FEDERAL COPYRIGHT LAW FOR COPYRIGHT INFRINGEMENT."

11



48.     According to Defendant BCH's Memorandum of Law in Support of Motion to Dismiss (Doc. 21), "In April 2022, Dr. Morisky's lawyer wrote a letter to Morisky Widget licensees, including the Hospital, asserting that Dr. Morisky owned the Widget copyright and implicitly threatening legal action against anyone who dealt with Trubow. (Compl. ¶ 54 & Ex. 16). This was a source of "confusion for Morisky Widget licensees" (Compl. ¶ 55), evidently including the Hospital." In a footnote to this text on page 7, the submission continues, "The complaint is silent about who received the letter, but it was addressed to Dr. Morisky's 'colleagues' (Compl. Ex. 16) and in fact went to Dr. Hartz."

49.     Contrary to the assertion in Defendant's Austin April 21, 2022 letter, the December 2020 CR2A settlement agreement provides in Section 2, # 7, at page 6, that the Morisky Party and MMAR agree to provide full access to the Morisky Widget and support as needed to all licensees as long as their licenses to the Morisky Widget are in effect, including adhering to all European Union Privacy regulations (including but not limited to GDPR) and HIPPA. (Exhibit 5).

50.     Plaintiff and Defendants Donald Morisky and MMAR and the Plaintiff agreed to dismiss the claims asserted in the Washington lawsuit and Nevada federal district court lawsuit now pending against each other with prejudice and without any award of costs or attorneys' fees in any action. (Exhibit 5).

51.     The December 2020 CR2A settlement agreement also provides, in Section 2, # 14, at page 8, "Each Party covenants and agrees to not make any public defamatory statement about any party to this Agreement." (Exhibit 5).

52.     Notwithstanding this provision, Defendant Austin's April 21, 2022, letter to Defendants BCH and Jacob Hartz made public defamatory statements about Trubow and MMAS Research that included "Further, the MMAS Research copyright in the Morisky Widget code is an unlawfully obtained derivative of Dr. Morisky's MMAS-4 and MMAS-8 registered copyrights (as noted by the U.S. Copyright Office's reference to Dr Morisky's registered copyrights on the Morisky Widget registration). As such, neither Trubow nor MMAS Research has any right to use or license the Morisky Widget copyright, which includes use or licensure of the Morisky Widget program." (Exhibit 10).

53.     In their March 19, 2025, response to Defendants' Donald Morisky and MMAR LLC motion to dismiss, Defendant BCH states, "But if any claim against the Hospital Defendants survives, the Hospital Defendants may decide to bring a cross-claim against Dr. Morisky and MMAR on a tortious interference theory or a similar theory. The Hospital Defendants find themselves embroiled in the dispute between Dr. Morisky and Trubow because the Hospital changed the text regarding attribution of the MMAS-8 assessment on a government website after receiving threatening correspondence from Dr. Morisky's lawyers." Document 56 at 1.

54.     On October 24, 2025, counsel for the parties appeared for oral argument on MMAR and Morisky's motion to dismiss, during which Defendant Austin, counsel for those parties, relied primarily on novel legal arguments based on the Massachusetts litigation privilege and immunity under the Noerr-Pennington doctrine as grounds for dismissing MMAR and Morisky.

55.     These arguments by Defendant Austin were not only novel under the law but were new to the case, not having been raised in any way in the motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by MMAR and Morisky, Document 54.

56.     This omission was noticed not only by counsel for Plaintiff but by the Court, which asked Austin whether the issue had been briefed or only raised at oral argument.  Austin responded that it had been, and the Court asked him to make a supplemental submission to apprise the Court of where these issues, which do not even bear on personal jurisdiction but are substantive defenses, had been raised in the briefing.

57.     Austin was not truthful when he responded to the Court's inquiry.

58.     On October 28, 2025, Defendant Austin filed Document 77, styled a "Supplemental Motion to Dismiss for Lack of Jurisdiction," purportedly in response to the Court's request that he provide documentation to support his representation to the Court at oral argument on that motion that the litigation privilege and Noerr-Pennington doctrine arguments had ever been raised in this matter.

59.     Instead of responding to this request for the Court to substantiate his representation, however, Austin used the Court's invitation to make a supplemental filing as an opportunity to file an entirely new motion based on these new legal grounds of immunity,

14

arguing that because his conduct – specifically, his transmission of legally actionable cease and desist letters to BCH in this District – was supposedly legally privileged, it could not constitute "purposeful availment" grounds for imposing this Court's jurisdiction on MMAR and Morisky.

60.    Defendants did not request leave to brief this new argument as grounds for dismissal under Fed. R. Civ. P. 12(b)(2).

61.    The Court rejected Defendants' new argument, writing, its Memorandum and Order dated December 3, 2025, "Although the Austin Letter did not explicitly demand that licensees 'cease and desist' from infringement, the letter nonetheless made clear that '[a]ny person that uses or licenses the Morisky Widget, MMAS-4 Scale or MMAS-8 scale without express written authorization of Dr. Morisky will be in violation of U.S. federal copyright law for copyright infringement' and '[a]ny person that uses any of [Dr. Morisky's] marks without the express written authorization of Dr. Morisky will be in violation of U.S. federal trademark law.'" (Document 77).

## D. The 9th Circuit Court of Appeals Rules that MMAS Research LLC Is the Owner of the Morisky Widget

62.    In a March 13, 2024, Memorandum for Case: 23-55202, 03/13/2024, the United States Court of Appeals for the Ninth Circuit wrote:

63.    "The district court erred in concluding that MMAS lacked standing to sue for copyright infringement.  The district court had found that a 2020 preliminary settlement agreement from a separate lawsuit between MMAS and Dr. Donald Morisky transferred the Morisky Widget from MMAS to Dr. Morisky.  But that agreement (CR2A)—which simply outlined terms MMAS and Dr. Morisky 'desire[d] to consent and agree to' sometime in the future—was never finalized. MMAS thus never

15

transferred its copyright and remains the registered owner of the Morisky Widget." A true and correct copy of the United States 9th Circuit Court of Appeals Memorandum dated March 13, 2024, is attached as Exhibit 11.

### E. The Nevada Federal District Court Invalidates the MMAS-8 and MMAS-4 Copyrights, Not The Morisky Widget MMAS-8 and MMAS-4 Copyrights.

64.     In their motion to dismiss (Document 21), Defendants BCH, Jacob Hartz and Hannah Palfry's Document 21, claimed that there was no copyright infringement because "MMAS Research does not own the copyright in the version of the of the MMAS Dr Hartz administered." If they infringed any copyright, they argued, it was the copyright in the older, paper-based MMAS-8, which copyright MMAS Research does not claim to own.

65.     On June 25, 2025, however, the copyrights for MMAS-4 and MMAS-8—the ones Defendants BCH, Hartz and Palfry urge were the only ones they could have infringed— were invalidated by the U.S. District Court for the District Court of Nevada in a case styled *Adherence v. CVS Pharmacy, Inc.* (Case No. 2:24-cv-1590-JCM (NJK), in an order signed by U.S. District Judge James McMahan. In that case the Plaintiff, Adherence, asserted ownership of federally registered copyrights in the MMAS-4 and MMAS-8 adherence scales. The Nevada court determined that the 2007 MMAS-4 and 2006 MMAS-8 are not copyrightable subject matters. (Exhibit 12).

66.     Plaintiff does, in fact, own the version of the MMAS-8 that Dr. Hartz administered as both a screener and a medication adherence test, and claims to have possibly infringed. (Exhibit 3).

### F. Licensing Of the Morisky Widget

67.     Plaintiff permits the use of the Morisky Widget, licensing its copyright and diagnostic assessments, only through a licensing program memorialized in a licensing

agreement. Under the licensing program, use of the Morisky Widget source code is authorized by Plaintiff and only in compliance with Plaintiff's strict coding and scoring in the Morisky Widget.

68.    Restrictions on the use and disclosure of the coding and scoring of the Morisky Widget diagnostic assessments are explicit limitations of the licenses.

69.    The terms of the licenses granted by Plaintiff are designed not only to protect federally registered rights, but also to protect patients and health care providers from counterfeit or scientifically incorrect diagnostic assessments and inaccurate results.

70.    All Morisky Widget licensees are explicitly required to score and code diagnostic assessments, MMAS-4, MMAS-8, Clinically Useful Depression Outcome Scales (CUDOS), Clinically Useful Anxiety Outcome Scales (CUXOS), the Columbia-Suicide Severity Rating Scale (C-SSRS), and the NIDA-Modified ASSIST (NM-ASSIST) substance abuse scale in the Morisky  Widget and to be trained and certified on the use of the Morisky Widget before administering any of the Widget diagnostic assessment to patients.

71.    Among the hundreds of pharmaceutical firms, hospitals, and universities that Plaintiff licensed, trained, and certified was Defendant Boston Children's Hospital. *See* Exhibit 5 at 30.

BMS Italy
Bayer NL
Berlin Chemie
Boehringer Ingelheim China
Boehringer Ingelheim GmbH
Boston Children's Hospital
Bristol University
Bristol-Myers Squibb USA
Brussels Free University School of Public Health

(Excerpt from CR2A Exhibit 4)

**G.  BCH Morisky Widget License**

72.    On September 4, 2019, Boston Children's Hospital (BCH) executed a perpetual MORISKY Widget MMAS-8 license with MMAS Research LLC (MMAS) of Bellevue Washington. (Exhibit 13).

73.    On information and belief, the BCH MMAS Morisky Widget License specified that Licensee BCH can use the Morisky Widget, Morisky Kiosk Apple I Phone APP, and the Morisky API to administer Morisky Widget MMAS tests. With Licensor approval, BCH can use MMAS paper or electronic questionnaires, but all scoring and coding must be done in the Morisky Widget. (Exhibit 13).

### H.  Background and Leadup to the Morisky Widget License Agreement as Signed and Executed between BCH and MMAS Research LLC

74.    On July 29, 2018, Dr. Jacob Hartz, then director of the preventive cardiology clinic at Boston Children's Hospital and an instructor in pediatrics at Harvard Medical School, wrote to Dr. Donald Morisky:

> I am an early career pediatric cardiologist at Boston Children's Hospital and am applying for a NIH Career Development Award to improve medication adherence in adolescents with familial hypercholesterolemia. In an effort to accurately identify patients, we were wondering if MMAS-8 would be appropriate. If it could be, what training would we need and what licensing would be needed as well.

*See* Exhibit 14.

75.    On the same day, July 29, 2018, Dr. Morisky responded to Dr. Hartz's (above) request for an MMAS-8 license and the required training and certification, writing:

> Thank you Dr. Hartz for your interest in using my copyrighted and trademarked intellectual property (IP), the MMAS diagnostic adherence assessment instrument. We are currently in Asia conducting training and certification for hundreds of practicing clinicians who are implementing the correct use of the Morisky Widget into the patient health-care delivery system. We plan to be on the east coast in September and October so please fill out the following questionnaire so we

18

can best serve you. My Chief Investigator, Mr. Steve Trubow, will be able to assist you in obtaining your MMAS License. Below are the new training and certification requirements.



*See* Exhibit 14.

76.     Neither Morisky nor Trubow heard from Dr. Hartz until August 7, 2019, when Hartz wrote, "Steve, I am sorry that I was not able to complete this (application) earlier, but we did not know if we had funding for the study, which we do now. I have completed the application for the Morisky Widget below," accompanied by the following:

> *Morisky Widget APPLICATION Date August 7, 2019*
>
> *Completed by:* Jacob Hartz, MD, MPH
>
> *Name and Address of Organization:* Boston Children's Hospital
>
> *Point of Contact*: Jacob Hartz (617-XXX-XXXX, fax: 617-XXX-XXX)
>
> *When do you want to begin using the perpetual Morisky Widget license?* January 2020
>
> *Are there any third-party organizations that will operate the Morisky Widget?* No
>
> *How many Morisky Widget diagnostic assessments in total do you plan to administer?* 80 patients (4-5 times each)
>
> *How do you plan to administer the Morisky Widget diagnostic assessments by paper or the Morisky Widget or Morisky Kiosk Apple I-Phone App?* We would like to use it by paper and iPhone

19

app if possible. If only one option is available, we would prefer paper.

*What health conditions, diseases and specific medications are you trying to assess for medication adherence?* Adolescents with Familial Hypercholesterolemia who are taking a statin.

*Please describe in detail the interventional research design or clinical protocol for using the Morisky Widget?* The Morisky Widget will be used to measure baseline adherence, adherence after receiving the first of two interventions, following a "wash-out" period, and finally at the end of the intervention. If possible, we would also use the Morisky Widget to measure adherence 6 months after the intervention ends to determine if there is a "legacy effect." statin, type and dose of statin prescribed, and if any adverse effects are present.

*How many times will each patient be given the Morisky Widget?* We expect each patient to use it 4 times. Possibly five if we are able to extend the trial. *See* Exhibit 15.

77.    Trubow, having received Hartz's application for a perpetual Morisky Widget

license wrote:

> Jake, The offer of a free perpetual Morisky Widget license for Boston Children's Hospital is dedicated to my sister Sandra Fairbank of Cambridge who has supported the Morisky Widget MMAS since the outset. The cost of the training and certification if it can be scheduled in Boston in late October or early November 2019 will be $5000.00. After certification, MMAS Research LLC will provide Boston Children's Hospital with 25,000
> complimentary Morisky Widget MMAS condition and medication specific tests for clinical applications or translational, sustainable interventional studies for children with chronic and infectious disease. If you wish us to prepare a draft license, please let me know or if you have any other questions. Best Steve in Tokyo

78.    On August 8, 2019, Hartz wrote to Trubow:

> This sounds great. I love that your sister is involved. We should all have dinner! Let's draft a license! -Jake Jacob Hartz, MD, MPH  Department of Cardiology Boston Children's Hospital. *See* Exhibit 15.

79.    In November 2019, after the acceptance of the application BCH personnel were

trained and certified on the Morisky Widget MMAS-8, not the traditional MMAS-8. Dr. Hartz

20

and Ms. Palfrey customized a Morisky Widget MMAS-8 medication and condition specific test for the BCH study.

80.    MMAS Research LLC traveled to Boston at its own expense, to train and certify Jacob Hartz and his colleagues on BCH use of the Morisky Widget software to create a condition and medication assessment of medication taking behaviors for the Mobile Health Technology and Behavioral Economics to Encourage Adherence in Adolescents study.

81.    Defendants Jacob Hartz and Hannah Palfrey were trained and certified on the Morisky Widget MMAS-8, not the traditional MMAS-8. The training included certification on the Morisky Widget trade secret scoring and coding algorithm and test editor/translation algorithm.

82.    Hartz and Palfrey used the Widget's test editor algorithm to customize a Morisky Widget MMAS-8 medication and condition specific test for the BCH study that Defendants BCH and Jacob Hartz later converted to an unauthorized Morisky Widget MMAS-8 screener to use in their study's enrollment protocol to find patients with low adherence to their cholesterol medication. Exhibit 3

83.    On information and belief, Defendants BCH and Hartz clearly understood the differences between the Morisky Widget MMAS-8 assessment they created during their Morisky training and certification in November 2019 and the original MMAS-8 tests published in the *Journal of Clinical Hypertension* article in 2008 which was retracted from the medical literature in 2023 Exhibit 16

## I.    The Material Differentiation of the 2006 MMAS-4/8 Scales From The 2017 Morisky Widget MMAS-4/8 Diagnostic Assessments of Medication Behavior.

84.    The original MMAS-4/8 scoring and coding algorithms are functional measurements. They produce a binary or quantitative status, the MMAS-4 from 0-4 and the

MMAS-8 from 0-8. The original Morisky scales answer the questions, how often the patient takes their medication or not.

85.    The Morisky Widget MMAS-4/8 algorithms are both functional and expressive. Whereas the Morisky Widget MMAS-4/8 produces a raw score for medication adherence. The Morisky Widget MMAS-4/8 algorithms are diagnostic assessment of medication taking behaviors. They quantify why the patients is not taking their medication, producing scores of the patients intentional and non-intentional medication non-adherence. The Morisky Widget algorithms can measure the underlying drivers of medication nonadherence, such as the severity of depression.

86.    The Morisky Widget MMAS 4/8 expressive algorithms and additional Morisky Widget assessments such as the Clinically Useful Depression Outcome Scale (CUDOS) diagnose the specific behavioral archetype of the patient that go far beyond the original MMAS-4/8 functional adherence algorithms by categorizing why and how patients interact with their prescriptions. Unlike the MMAS-4/8 functional algorithms, the Morisky Widget algorithms express actionable psychological profiles that clinicians use to tailor interventions to reduce the risk of hospitalization, adverse medical events and even death from medication non-adherence.

87.    Beginning with the launch of the Morisky Widget on www.morisky.org in January 2017, Defendant Morisky abandoned the original MMAS-4/8  functional algorithms and was only willing to license the 2017 Morisky Widget MMAS-4/8 for the Widget tertiary and secondary quantifiable risk assessment of medication taking behaviors with alerts to clinicians that an intervention was urgently required to prevent a failure in the patient's medication treatment regimen to prevent hospital admissions, adverse medical events or even

22

death.

88.    The original, 2006 static MMAS-8 comprises the following questions:

| | |
|---|---|
| 1. | Do you sometimes forget to take your <health condition> pills? |
| 2. | People sometimes miss taking their medications for reasons other than forgetting. Thinking over the past two weeks, were there any days when you did not take your <health condition> medicine? |
| 3. | Have you ever cut back or stopped taking your medication without telling your doctor, because you felt worse when you took it? |
| 4. | When you travel or leave home, do you sometimes forget to bring along your <health condition> medication? |
| 5. | Did you take your <health condition> medicine yesterday? |
| 6. | When you feel like your <health condition> is under control, do you sometimes stop taking your medicine? |
| 7. | Taking medication everyday is a real inconvenience for some people. Do you ever feel hassled about sticking to your <health condition> treatment plan? |

89.    Question #1 and question #5 are limited to medications that are administered through "pills" and daily ("yesterday"). If a patient is taking a medication administered through an injection or a spray, or if a patient is taking a medication once a week, or twice a month, both the MMAS-8 specificity and sensitivity decrease and increase the risk for a misdiagnosis of a patient's medication adherence.

90.    Using the Morisky Widget test editor, the Licensee can enter condition(s), medication(s) specific MMAS assessments with the correct dosing information and timing of administration to maximize the Widget's specificity and sensitivity. This is impossible with the original MMAS-8 static/generic questions.

91.    On information and belief, this is exactly what was needed by BCH, which was studying adherence in patients taking cholesterol medication according to a non-daily treatment plan. During their training and certification on the Morisky.

92.    On information and belief, during their training and certification, Defendants

23

Hartz and Palfrey created a Morisky Widget MMAS-8 condition and medication(s) specific assessment that was night and day different than the 2006 MMAS-8 test. For question #4 instead of asking, "Did your take your MEDICATION yesterday", they used the Morisky Widget to change question #4 to "Did you take all your prescription cholesterol medication the last time you were supposed to take it" Exhibit 3.

93.     Below is a screenshot of the BCH Morisky Widget test editor which shows the 2006 MMAS-8 and 2019 Morisky Widget MMAS-8 tests side by side. Even an uninformed observer can hardly miss the sharp contrast between the two MMAS-8 tests.



Exhibit 3.

94.     The Morisky Widget MMAS-8 measures factors that the original MMAS-8 never measured. Several questions of the Morisky Widget MMAS-8 Test are used to determine whether a patient's nonadherence to a medication protocol was intentional or unintentional.

95.     In their Morisky Widget license, BCH and Jacob Hartz agreed that coding and scoring criteria of the Morisky Widget can never be divulged in any publication, presentation,

or website without written permission from MMAS. Exhibit 13.

96.     In their Morisky Widget license, Defendants BCH and Jacob Hartz agreed that changes or any modifications to the wording, phrasing, or scoring of the MMAS require certification on the Morisky Widget editor and translator. Exhibit 13.

97.     On July 5, 2022, Dr Hartz and Ms. Palfrey sent MMAS Research LLC a copy of a derivative Morisky Widget MMAS-8 paper test they were administering to patients as a screener. Exhibit 17.

98.     On information and belief, Defendants BCH and Jacob Hartz used the MMAS-8 condition and medication specific MMAS-8 test they created in their Morisky Widget to use as a pre-enrollment MMAS-8 screener with a derivative MMAS-8 scoring and coding criteria. Exhibit 17.

99.     Defendants BCH and Jacob Hartz' unauthorized alteration and modification of the MMAS-8 scoring and coding criteria to use as a screener for enrollment for their study was done without explicit permission of the Plaintiff.

100.    Defendants BCH and Jacob Hartz's creation and use of an unauthorized derivative work breached their Morisky Widget license and constitutes willful copyright infringement and their unauthorized changing to the MMAS-8 scoring and coding criteria jeopardized patient safety and the scientific validity of the Morisky Widget MMAS-8 scale. Exhibits 13, 17.

101.    On July 5, 2022, Plaintiff sent Defendant Hartz an email asking for a status report on the use of the Morisky Widget MMAS-8 tests so far in the study. Plaintiff wrote, "Dr Hartz, Thank you for the prompt response. We can discuss the use of MMAS-8 paper tests in cases when the internet is not available. However, before we begin

the discussion, please answer the questions below. How many MMAS-8 tests have been administered to date ? How were the MMAS-8 tests administered scored and coded ? When were the MMAS-8 tests first administered ? When will the last MMAS-8 test be administered? Best Steve in Tokyo Steven Trubow MMAS Research LLC USA." Exhibit 18.

102.   On July 6, 2022, Defendant Jacob Hartz responded to Steven Trubow and copied Hannah Palfrey. In this email, Hartz admitted that he had modified the Morisky Widget MMAS-8 scoring and coding criteria to meet the requirements of their enrollment process and has administered, scored and coded four Morisky Widget MMAS-8 tests outside of the Morisky Widget.

103.   At this time, Hartz appeared to realize that this was a serious breach of the BCH Morisky Widget license and offered to end the use of the MMAS-8 in the study. Hartz added that MMAS Research LLC had now been added as a collaborator on the BCH NIH ClinicalTrials.gov website as a collaborator, writing:

> Hi,
>
> We have administered 4 tests. The tests were administered from memory. Our enrollment protocol was answering a positive (i.e., consistent with lower adherence) to at least one question. and then I had planned on entering and scoring the tests on the widgets. I will need to confirm the date of the first enrollee and have the details in my office but am not there today. The last MMAS will be administered within the next 2 years once we have completed enrollment. If any of this is serious breach of contract and you feel it necessary to end our agreement, we would understand. We certainly did not mean to do anything incorrectly and it was always our intention to follow our contract entirely. It would be a tremendous loss to our study, but we want to respect our agreement and your organization. Although the citation was included in our references, we have now added you as a "Collaborator" because this appears to be best place to signal your role. If there is a preferred place, please let me know and I can change it.
>
> Thank you. Again, our sincerest apologies if this was done incorrectly. –
>
> Jake Jacob Hartz, MD, MPH Director of Preventive Cardiology Department of Cardiology. (Exhibit 19)

26

104.   Below is the updated BCH Clinical Trials Report for NCT04458766, as shown below, listing MMAS Research LLC as a collaborator on the study. See, https://clinicaltrials.gov/study/NCT04458766?tab=history&a=5#                StudyPageTop.



105.   This unauthorized Morisky Widget MMAS-8 screener met the BCH Study's

AIM 1.1 enrollment criteria. The pre-enrollment Morisky Widget MMAS-8 screener shown

below is referenced as APPROACH AIM 1.1 in BCH ClinicalTrials Report on August 21, 2024, https://clinicaltrials.gov/study/N

CT04458766?term=jacob%20hartz&rank=1&tab=history&a=6#version-content-panel ("The investigators will determine the baseline adherence level in adolescents with FH prescribed a statin using the Morisky Medication Adherence Scale (MMAS). Patients who are found to have low adherence according to the MMAS in Aim 1.1 will be enrolled into an intervention using the Wealth® mobile health application").

106. On information and belief, in January 2023 and again in January 2024, Defendants BCH and Jacob Hartz updated the ClinicalTrials.gov website for NCT04458766 and included the following notification, The MMAS-8 scale, content, name and trademarks are protected by US Copyright and trademark laws. Permission for use of the scale and its coding is required. A license agreement is available from MMAR LLC. See https://clinicaltrials.gov/study/ NCT04458766?term=%20NCT04458766%20&rank=1

107. On information and belief, Defendants Morisky, Austin and MMAR registered Nevada LLC is Morisky Medication Adherence Research LLC, not MMAR LLC. The copyright notification and license for NCT04458766, lists "MMAR LLC," which is an unregistered firm fictitious name (FFN).

108. On information and belief, MMAR LLC is not a legal entity. According to Nevada Revised Statutes Chapter 602, Doing Business Under Assumed or Fictitious Name, Donald Morisky's Nevada registered company Morisky Medication Adherence Research LLC was required to file a fictitious firm certificate (FFC) in Clark County NV, no later than one month after the commencement of business under an assumed or fictitious name. To date, according to the Clark County NV

28

Clerk's Office, there has not been any FFC issued to Morisky Medication Adherence Research LLC, for MMAR LLC.

109.   BCH's contracts/licenses/copyright notifications with MMAR LLC on the ClinicalTrials.gov website are not legal contracts or legal documents because in Nevada, using an unregistered fictitious name in a contract or legal document is a violation of Nevada Revised Statutes Chapter 602.090, which make it a misdemeanor to use an unregistered fictitious name in a contract or legal document.

110.   The BCH Morisky Widget perpetual license requires Defendant BCH to include, in all articles, presentations, web postings, reports and submitted manuscripts that present the Morisky Widget MMAS results or in the Acknowledgment Section of manuscripts submitted for publication, a footnote reading, "A Morisky Widget license agreement is available from MMAS Research LLC 14725 NE 20th St., Bellevue Washington or strubow@morisky.org." (Exhibit 13).

111.   The BCH Morisky Widget perpetual license requires BCH to submit to Plaintiff all presentations and manuscripts being considered for abstracts/poster presentations or publication to make certain that all copyright and trademark requirements are included in all manuscripts submitted for publication. This requirement was included to protect Defendant BCH as Plaintiff has encountered many violations of federal and international copyright laws from clients as well as individuals who use MMAS intellectual property without following the required copyright and trademark guidelines. (Exhibit 13).

112.   On information and belief, on August 14, 2025, Defendants BCH, HMS, and Jacob Hartz published the study article, "In The Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence to Statins and Blood Pressure–Lowering

Medication in Adolescents with Familial Hypercholesterolemia or Hypertension: Protocol for a Pre-Post Cohort Study," available online at https://www.researchprotocols.org/2025/1/e65105 (Accused Study).  (Exhibit 20)

113.   According to the article, the four authors and their affiliations for the Accused Study article were Jacob Hartz, Boston Children's Hospital and Harvard Medical School, Hannah Chiert, Boston Children's Hospital, Sarah de Ferranti, Boston Children's Hospital and Harvard Medical School and Tiffany Powell-Wiley, National Institutes of Health. (Exhibit 20).

114.   The National Institutes of Health is a federal agency within the U.S. Department of Health and Human Services (HHS).

115.   On information and belief, the Accused Study was submitted for publication on January 20, 2025.

116.   On information and belief, lead author of the Accused Study, Jacob Hartz, completed his tenue at BCH and HMS in late 2024, Hartz joined Atrium Health Levine Children's Hospital in January 2025 and was subsequently appointed as Assistant Professor at the affiliated Wake Forest University School of Medicine. Verified patient reviews and faculty profiles confirm he was active in this role at Wake Forest/Atrium Health by at least April 2025.

117.   On August 12, 2025, two days before the Accused Study article was published, this Court granted the motion to dismiss the breach of contract claim (Count I) against Defendants Jacob Hartz and Hannah Palfrey (Chiert) and denied the motion to dismiss the breach of contract claim against Defendant BCH (Document 64).

118.   In the Accused Study article, Defendants BCH, HMS, and Jacob Hartz wrote as follows:

30

Boston Children's Hospital, and the authors personally have been named as defendants in a lawsuit brought by MMAS Research, LLC, which is ongoing, that concerns the attribution of the Morisky Medication Adherence Scale (MMAS). We have received competing demands from MMAS Research, LLC, and another entity, Morisky Medication Adherence Research, LLC, concerning the proper attribution for the MMAS. Because we are uncertain how the MMAS should be attributed and who owns the intellectual property rights, we are providing the attribution that both MMAS Research, LLC, and Morisky Medication Adherence Research, LLC, have demanded that we use.

Exhibit 20.

119.   In fact, Accused Study article author Tiffany Powell-Wiley was never named as a defendant in any lawsuit brought by MMAS Research LLC.

120.   This statement, which is still available online as of the date of hereof, is false in numerous respects, including the following:

a)   The ownership of the Morisky Widget MMAS-8 copyright was affirmed by the U.S. Court of Appeals for the Ninth Circuit in March of 2024;

b)   The ownership of the Morisky Widget MMAS-8 copyright is not being contested by Defendants BCH, HMS, and Jacob Hartz in the instant or any other matter;

c)   The statement, "we are providing the attribution that both MMAS Research, LLC, and Morisky Medication Adherence Research, LLC, have demanded that we use" is false because Plaintiff has not demanded that this statement be used.

d)   On information and belief, in the Accused study article Defendants BCH, HMS, and Jacob Hartz wrote "If the participant was interested, the clinician determined the patient's eligibility based on self-reported adherence [46,47]." Exhibit 20.

121.   The Accused Study article also attributes Plaintiff's Morisky Widget MMAS-8 and Defendant MMAR LLC MMAS-8 test to 'self-reported adherence measure to references [46,47]," which in turn cite the following articles in the medical literature:

31

46. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. J Clin Hypertens (Greenwich). May 2008;10(5):348-354. Berlowitz DR, Foy CG, Kazis LE, Bolin L, Morisky Widget MMAS, Steven Trubow, MMAS Research LLC, ed. [FREE Full text] [CrossRef] [Medline]

47. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. J Clin Hypertens (Greenwich). May 2008;10(5):348-354. Retracted in: J Clin Hypertens (Greenwich). 2023 Sep;25(9):889. [CrossRef] [Medline]

122.   On information and belief, the cited 2017 NEJM article had this acknowledgement "Use of the Morisky Medication Adherence Scale is protected by U.S. copyright laws. Permission for its use is required; address inquiries to Dr. Morisky at dmorisky@gmail.com.  https://www.nejm.org/doi/full/10. 1056/NEJMoa1611179

123.   Defendants BCH, HMS, and Jacob Hartz published a confusing and meaningless attribution to the Morisky Widget at the end of reference # 46 that followed the citation of  a *New England Journal of Medicine* article authored by Donald Morisky with his formal copyright notification and license, while making a false and humiliating attribution of copyright for the Morisky Widget for MMAS Research and Steven Trubow—making it appear to the reader that a free article on the Morisky Widget was available to users clicking on the words "free full text."



124.  In fact, readers

clicking that hyperlink are

redirected to a web page, found at https://europepmc.org/article/_MED/18453793, which

indicates that the article was retracted.  A screen shot of the relevant portion of that page is

shown at right.

125.  Reference #47 of the Accused study article repeats the citation of the 2008

*Journal of Clinical Hypertension* MMAS-8 validation article.

126.  Specificity in MMAS-8 measures how well the MMAS-8 correctly identifies

patients who *do not* have medication non-adherence – essentially the MMAS-8's ability to

produce true negative results and avoid false positives (incorrectly labeling patients that are

medication adherent as patients who are not medication adherence.

127.  In contrast, sensitivity in MMAS-8 measures its ability to correctly identify

people who *are* medication adherent or non-adherent (true positives),

minimizing false negatives; a highly sensitive MMAS-8 test can

33

identify which patients are at risk of adverse medical events for medication non-adherence.

128.   In an April 2021 letter to the editor of the *Journal of Clinical Hypertension*, which published the validation article for the MMAS-8 in 2008, Dr. Michael Ortiz wrote, "the MMAS-8 scores may be no more accurate in detecting patients with uncontrolled BP, than tossing a coin to decide." (Exhibit 21)

129.   This led, in September 2023, to the *Journal of Clinical Hypertension* publishing a notice retracting Defendant Donald Morisky's 2008 MMAS-8 validation article due to its grossly overstating the sensitivity (true positive) and specificity (true negative) values in the MMAS-8 medication adherence scale and a lack of confidence in the study's conclusions. Exhibit 22

130.   The false copyright attribution by Defendants BCH, HMS and Jacob Hartz of the Morisky Widget was harmful to the reputation of MMAS Research and Steven Trubow and harmed the company's economic relations and opportunities.

131.   Defendants BCH, HMS and Jacob Hartz defamatory libel caused Steven Trubow significant psychological damage, which in turn has worsened his physical ailments due to the intense stress and social consequences inflicted upon him from this article..

132.   Defendants BCH breached their Morisky Widget perpetual license, by failing to use the agreed upon acknowledgment, "A Morisky Widget license agreement is available from MMAS Research LLC 14725 NE 20th St., Bellevue Washington or strubow@morisky.org." (Exhibit 13)

133.   Defendants' failure to properly attribute the Morisky Widget copyright was willful copyright infringement, because Defendants BCH, HMS, and Jacob Hartz knew it violated the Plaintiff's exclusive rights under the perpetual BCH Morisky Widget license.

34

Exhibit 13.

134.   On information and belief, to date, Defendants BCH, HMS, and Jacob Hartz scored and coded a total of ten (10) Morisky Widget MMAS-8 tests in the Morisky Widget as shown below in the Morisky Widget.

| 1090 | Boston Children's Hospital | | 10000 | 0 | 12 |
|------|---------------------------|---|-------|---|----|
| 1091 | strubow_bch | trubow1+bch@gmail.com | | 2019-10-27T19:45:19.251Z | 3 |
| 1092 | hannahb | hannah.palfrey@cardio.chboston.org | | 2019-11-01T16:31:24.263Z | 3 |
| 1093 | jacobhartz | jacob.hartz@cardio.chboston.org | | 2019-11-01T16:32:12.414Z | 7 |

135.   On information and belief, Defendants BCH, HMS, and Jacob Hartz scored and coded hundreds of Morisky Widget MMAS-8 screeners with  Defendant Hartz derivative MMAS-8 scoring and coding criteria and administered MMAS- tests on low adherent seriously ill patients using the discredited  MMAS-8 scoring and coding criteria which was found to have low specificity and low sensitivity by Dr. Ortiz and the Editor of the Journal of Clinical Hypertension. Exhibits 21, 22.

136.   By this conduct, Defendants BCH not only breached their Morisky Widget license by scoring and coding a modified Morisky Widget MMAS-8 screener and Morisky Widget MMAS-8 diagnostic assessments outside of their Morisky Widget license but more importantly compromised the Accused Study's validity and reliability by using the discredited MMAS-8 scoring and coding criteria which has been removed from the medical literature by the *Journal of Clinical Hypertension*. Exhibits 16, 22.

137.   The MMAS-8 scoring and coding criteria, Defendants BCH and Jacob Hartz used to score and code Morisky Widget MMAS-8 screeners and the discredited MMAS-8 tests in the Accused Study risked misdiagnosing the medication adherence and medication non-adherence of seriously ill patients. Such a misdiagnosis could lead to improper medical

35

treatment, hospitalization and putting patients at risk of adverse medical events or even death.

138.   Defendants BCH, HMS, and Jacob Hartz had a professional and ethical duty to inform patients and readers of the Accused Study article that the Journal of Clinical Hypertension had retracted the MMAS-8 validation article because they did not have confidence in the validity of the MMAS-8 scale.

139.   The use by Defendants BCH, HMS, and Jacob Hartz of an invalid MMAS-8 scoring and coding criteria that could lead to a misdiagnosis of the patient's medication adherence and increase the risk of patient experiencing adverse medical events, injury or death, could serve as the basis for a medical negligence claim if patients were wrongly diagnosed on MMAS-8 tests and experienced adverse medical events, hospitalization or death.

140.   Two months after the instant case began, the CEO of Defendant MMAR, Phillip Morisky, and Defendant Austin engaged into a correspondence with attorneys for Sanofi, a pharmaceutical firm that executed an agreement with Plaintiff on August 23, 2024 settling breaches of the perpetual Sanofi France Morisky Widget license, curing copyright infringements of the MMAS Digital Source Code, and remedying violations of the trade secret MMAS-8 scoring and coding criteria for the ELIPRO study. (Exhibit 23).

141.   On September 19, 2024, Phillip Morisky, the CEO for Defendant MMAR in the instant matter, wrote an email to Sanofi lawyers Matthew Sachs and Carrie Love with the subject 2298300 MMAS RESEARCH LLC Bank detail confirmation CONFIDENTIAL. Phillip Morisky wrote to Sanofi:

Matthew and Carrie,

There is currently a Federal copyright case in the state of Washington.

2:2021cv01301 Morisky v MMAS Research et al.

36

We allege that Trubow does not own any rights to the MMAS-4 and MMAS-8 scales and that the "widget" is illegally hosting the MMAS scales. We have filed an infringement case in 2019.

I have included our attorney Chris Austin to comment. I am unsure if SANOFI was aware of this but any settlement for alleged use of the actual MMAS Morisky questionnaire can only be authorized by my father Dr Donald Morisky and myself as the company responsible for the rights of the MMAS.

Please put my attorney and myself in touch with the legal representative who is authorizing this.

Philip Morisky, MBA

Chief Optimus

Adherence.

(Exhibit 24).

142.  On October 8, 2024, Phillip Morisky wrote to Defendant Sanofi lawyers Sachs, Love, and Manardo, and copied Defendant Austin. Phillip Morisky wrote "Here is the motion to dismiss for the Boston Case." Phillip Morisky was referring to the instant matter. (Exhibit 24).

143.  On October 8, 2024, Sanofi lawyer Matthew Sachs wrote to Phillip Morisky, Carrie Love, and Susan Manardo and copied Defendant Austin. Sachs wrote, "Thanks for sending (and Chris thanks for sending in your other email). We will review and discuss internally." (Exhibit 24).

144.  On November 26, 2024, Phillip Morisky again wrote to Sanofi lawyers Sachs, Love, and Manardo, and copied Defendant Austin, as follows:

Hi Matthew,

I am checking in to see if Sanofi has made any decision on Trubow matters. I am attaching recent motions in the Boston case as well as additional sanctions in the Washington case which will ultimately prove that Trubow does not own any rights to the MMAS and the widget and that any settlements regarding the MMAS must go through our party. I believe that December 16 is the 90 days, so please let me know prior to.

Happy Thanksgiving, Philip Morisky, MBA.

145.   On June 6, 2025, in Case 2:21-cv-01301-RSM Document 276, the Declaration of Phillip Morisky, the CEO of MMAR LLC was filed in the Western Washington District Court that contained the email correspondence between Phillip Morisky and Sanofi. (Exhibit 24).

146.   More than three years after the "Austin Letter," Defendants MMAR and Austin continued to tortiously interfere with the Plaintiff's Morisky Widget Licenses, confidential settlement agreements and using the pleadings in the instant matter to convince Sanofi to breach the Sanofi Morisky Widget License and recent Settlement Agreement and turn over the financial proceeds to Defendants MMAR and Austin or face a lawsuit.

147.   In order to get Sanofi to honor the Settlement Agreement in light of the interference by Defendants MMAR and Austin, on December 3, 2024 Plaintiff and Sanofi executed an Amendment to the MMAS Research and Sanofi Settlement Agreement that states:

> MMAS and its successors agree to indemnify and hold Sanofi harmless against any and all claims asserted by Donald E. Morisky, Philip Morisky, Marty Morisky, Susan Morisky, Morisky Medication Adherence Research, LLC ("MMAR LLC") (collectively "Morisky"), or any successors, agents or licensees of Donald E. Morisky, Philip Morisky, Marty Morisky, Susan Morisky, MMAR LLC or its Affiliates, regarding use of the Morisky Widget in any manner. In the event that a Morisky Claim is asserted against Sanofi, Sanofi shall control the defense and resolution of the Morisky Claim and SWI shall have the right but not the obligation to hire counsel of its choice.

(Exhibit 25).

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT
### *(As to Defendants BCH, Donald Morisky and MMAR)*

148.   MMAS Research re-alleges each allegation contained in the preceding paragraphs.

149.   This claim for relief for breach of contract is established by the prima facie

elements of (1) existence of a valid contractual obligation, (2) performance by the plaintiff, (3) breach by the defendant, and (4) resulting damages to plaintiff.

150.    A contractual obligation was established by the execution of a license agreement between Defendants BCH and Plaintiff, (the License Agreement), which License Agreement permitted use of the Morisky Widget under specific conditions.

151.    Plaintiff performed or was willing to perform its obligations under the License Agreement.

152.    Under the License Agreement, BCH as licensee is required to score and code Morisky Widget MMAS-8 tests only with Morisky Widget. In the License Agreement, BCH and MMAS mutually agreed that if "BCH divulges Morisky Widget scoring and coding criteria it will be considered a breach of the Morisky Widget license and MMAS [Research] will have the right to suspend or terminate the Agreement."

153.    During Defendant's BCH training and certification on the Morisky Widget Defendant, BCH created a condition and medication specific Morisky Widget MMAS-8 test. BCH later modified their Morisky Widget MMAS-8 condition and medication specific test into a Morisky Widget MMAS-8 screener with its own MMAS-8 scoring and coding criteria which was used in the Accused Study enrollment process too select patients who only answered questions that showed low adherence. BCH never had authorization from Plaintiff to create a derivative Morisky Widget MMAS-8 Screener which breached their Morisky Widget licenses requirement that changes or any modifications to the wording, phrasing or scoring of the MMAS, require certification on the Morisky Widget editor and translator.

154.    Defendant BCH breached their Morisky Widget License Agreement "by using a paper their Morisky Widget MMAS-8 screener on paper questionnaire without the Plaintiff's

permission.

155.   Defendant BCH breached their Morisky Widget License Agreement by scoring and coding the unauthorized Morisky Widget MMAS-8 screener outside of the Morisky Widget with their own derivative MMAS-8 scoring and coding criteria.

156.   Defendant BCH breached their Morisky Widget License Agreement by publishing the unauthorized Morisky Widget MMAS-8 screener derivative MMAS-8 scoring and coding criteria on the Clinical Trials.gov website and in the June 2025 Accused Study Article.

157.   Defendant BCH breached their Morisky Widget License Agreement by failing to publish the required acknowledgement of the MMAS Research as the owner and licensor of the Morisky Widget (including copyright and the trademark notices) per the NIH ClinicalTrials.Gov website and in the acknowledgement for the June 2025 Accused Study article as was required in Defendant BCH Morisky Widget License in Appendix 1.

158.   BCH has breached their Morisky Widget license in violation of the foregoing conditions by the following actions and failures to act and has accordingly violated those obligations. None of the publications by BCH that reference the MMAS tests were published with the proper attribution notices in Appendix 1 of Defendant's Morisky Widget License Agreement.

159.   BCH has breached their Morisky Widget License that they agreed was non-transferable from BCH and transferred Morisky Widget MMAS-8 tests to Defendants Donald Morisky and MMAR LLC.

160.   For at least these acts, Defendants have willfully breached the License Agreement, and MMAS Research is entitled to damages determined at trial and specific relief

for the unauthorized modification and disclosure of Morisky Widget MMAS-8 scoring and coding criteria.

161.   A valid contractual obligation was established by the execution of a settlement agreement, the CR2A between Defendants Donald Morisky and MMAR LLC and Plaintiff MMAS Research LLC in December 2020. The CR2A settlement agreement constitutes a binding contract, under applicable law, enforceable in any Court in the United States.

162.   Plaintiff performed or was willing to perform its obligations under the CR2A settlement agreement.

163.   Defendants Donald Morisky and MMAR LLC breached the CR2A by failing to meet their obligations under Section 2 #7 which stated "The Morisky Party and MMAR agree to provide full access to the Morisky Widget and support as needed to all licensees as long as their licenses to the Morisky Widget are in effect." On page 29 of the CR2A, Boston Children's Hospital was listed as having a Morisky Widget License before the execution of the CR2A, but Defendants Donald Morisky, MMAR LLC and Austin induced BCH under the threat of a copyright infringement lawsuit to terminate their Morisky Widget license and re-license Morisky Widget MMAS-8 tests to Donald Morisky and MMAR LLC.

164.   Defendants Donald Morisky and MMAR LLC breached the CR2A by failing to meet their obligations under Section 2 #14 which stated Each Party covenants and agrees to not make any public defamatory statement about any party to this Agreement by posting defamatory statements about Steven Trubow and MMAS Research LLC   on the www.moriskyscale.com website, sending the "Austin Letter" with defamatory statement about Steven Trubow and MMAS Research LLC to Morisky Widget Licensees including Boston Children's Hospital, and as the Plaintiff in a lawsuit against MMAS Research and Steven

41

Trubow, submitting correspondence with defamatory statements about Steven Trubow and MMAS Research LLC to the Western Washington District Court in a pleading.

165.   Defendants Donald Morisky and MMAR LLC breached the CR2A by failing to meet their obligations under Section 2 #7 by failing to get trained and certified in the use of the Morisky Widget so that they may operate and maintain it as currently constituted and service licensees as presently done by the Trubow Party. Despite several failed efforts to train and certify Donald Morisky and MMAR to service Morisky Widget licensees, as a result of this breach, Plaintiff was required by the terms of their 200+ perpetual Morisky Widget Licenses including BCH, to service their Morisky Widget Licensees to the present time.

166.   For at least these acts, Defendants Donald Morisky and MMAR have willfully breached the CR2A Agreement, and MMAS Research and Steven Trubow are entitled to damages determined at trial and specific relief for inducing hundreds of Morisky Widget licensees to terminate their licenses without cause.

## SECOND CAUSE OF ACTION
## COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. §§ 101, *ET SEQ.*
### (*As to Defendants BCH, Hartz, Harvard Medical School*)

167.   MMAS Research realleges each allegation contained in the preceding paragraphs.

168.   At all times relevant hereto, MMAS Research was the owner of all copyright rights or rights to assert copyright claims for the MMAS Widget Source Code.

169.   MMAS Research has complied in all respects with the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*, and all other laws governing copyright. By reason of the copyright infringements described below, Plaintiff is entitled to recover from Defendants statutory

damages up to $150,000.00 per copyright infringed for Defendants' willful copyright infringement, plus attorneys' fees.

170.   Defendants BCH, Hartz, and Harvard Medical School willfully violated 17 U.S.C. §501, *et seq.*

171.   The claims by Defendants BCH, Harvard Medical School and Jacob Hartz to have not infringed on the Morisky Widget copyright because they had a license and administered the 2006 MMAS-8 copyright are proved false by the MMAS-8 screener and test they wrote in the Morisky Widget test editor as well as the Nevada District Court's decision that the 2006 MMAS-8 test is not copyright protectable subject matter.

172.   MMAS Research LLC granted BCH and Harvard Medical School a limited-use license to use the copyrighted Morisky Widget MMAS-8 solely if they were scored and coded in the Morisky Widget by clinicians who were trained and certified on the Morisky Widget.

173.   BCH, Harvard Medical School and Hartz administered, scored and coded hundreds of unauthorized Morisky Widget MMAS-8 Screener tests with an unauthorized derivative MMAS-8 scoring and coding criteria developed by Jacob Hartz and BCH and Harvard Medical School and reported the derivative screener and scoring and coding criteria on the United States Library of Medicine National Institutes of Health ClinicalTrials.gov website.

174.   BCH and Harvard Medical School administered, scored and coded Morisky Widget MMAS-8 paper tests outside the Morisky Widget with the discredited 2006 MMAS-8 scoring and coding criteria and reported the results in the June 2025 Accused Study article.

175.   Defendants BCH, MMAR and Jacob Hartz willfully committed hundreds of infringements of the MMAS Widget Source Code including in 2023, 2024, and 2025..

176. Because of the copyright infringements described above, Plaintiff is entitled to recover from Defendants statutory damages up to $150,000.00 per copyright infringed for Defendants' willful copyright infringement, plus attorneys' fees.

### THIRD CAUSE OF ACTION
### COPYRIGHT INFRINGEMENT UNDER 17 U.S.C.A. § 1202, *et seq.*
#### (*As to Defendants MMAR, Donald Morisky, and Austin*)

177. MMAS Research realleges each allegation contained in the preceding paragraphs.

178. In the December 2020 CR2A Settlement, Defendants Donald Morisky and MMAR recognized the Plaintiff owner the MMAS Widget Source Code.

179. Defendant Austin had actual knowledge of this recognition.

180. Defendants Donald Morisky and MMAR willfully committed copyright infringements by falsely claiming ownership of the MMAS Widget Source Code and putting their MMAS-8 copyright notice on Morisky Widget MMAS-8 tests on the United States Library of Medicine National Institutes of Health ClinicalTrials.gov website.

181. Defendant Austin, in the worldwide distributed "Austin Letter" willfully committed copyright infringement by falsely claiming ownership of the MMAS Widget Source Code, providing copyright management information that is false with the intent to "induce, enable, facilitate, or conceal infringement" in violation of 17 U.S.C.A. § 1202 with respect to the identity of the copyright owner, the author of the work, or terms and conditions for use of the work.

182. Defendant Austin has continued to publish to third persons the same assertions regarding copyright infringement as in the Austin Letter through at least 2025.

## FOURTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (*As to Defendants Donald Morisky, Austin and MMAR*)

183.   MMAS Research realleges each allegation contained in the preceding paragraphs.

184.   At all times relevant hereto, MMAS Research was the owner of all rights to assert claims for the Morisky Widget License Contract

185.   MMAS Research claims Donald Morisky, MMAR LLC and Austin intentionally interfered with the Morisky Widget license contract between Plaintiff and BCH.

186.   In December 2020, Morisky, MMAR LLC, Trubow, and MMAS Research LLC dismissed all previous complaints against each other with prejudice and signed a preliminary settlement agreement, CR2A. This agreement was meant to protect Plaintiff from Morisky interfering with existing Morisky Widget licenses.

187.   Despite these agreements, Morisky and MMAR LLC dishonored his legal obligations under the CR2A and tortiously interfered with Plaintiff's 200 CR2A Morisky Widget licenses, including Boston Children's Hospital's 2019 Morisky Widget license which Morisky himself authorized in 2018.

188.   The CR2A, through its provisions, was an enforceable contract that precluded Morisky from interfering with the CR2A Exhibit 4 Morisky Widget licenses, including BCH.

189.   Morisky and MMAR were aware of their obligation under the CR2A terms and consented to memorialize the expectations in Exhibit 4 to the CR2A.

190.   Defendants Morisky, MMAR LLC and Austin knowingly induced BCH to alter the copyright management information (CMI) in the BCH Clinical Trials Report, changing the attribution from MMAS Research's copyrighted Morisky Widget MMAS-8 Test to

Defendant Morisky's original MMAS-8 Test.

191. This change in attribution terminated the contractual relationship between MMAS Research and BCH, and it misrepresented the Morisky Widget copyright ownership rights in the public domain, thereby causing confusion and damage to MMAS Research's reputation and contractual rights.

192. As evidenced by the allegations and attached Exhibits, Defendants Morisky, MMAR and Austin through the Austin Letter and their correspondence with Sanofi have repeatedly and intentionally interfered with Trubow and MMAS Research's ability to perform the agreed terms of the CR2A and to effectuate settlements and faithfully execute Morisky Widget licenses provided by the CR2A. This interference has resulted in MMAS Research losing expected revenue and suffering damage to litigation in the Western Washington District Court, its business, scientific, and medical reputation and contractual relationships, with BCH, Sanofi, and over two hundred Morisky Widget licensees.

193. Morisky, MMAR and Austin have tortiously interfered for an improper purpose, to financially gain from the termination of Morisky Widget licenses, settlement agreement and litigation.

194. Trubow and MMAS Research have lost expected revenue resulting from the intentional tortious actions of Morisky MMAR, and Austin in a sum to be proven at trial, but in a sum no less than $10,000,000.

195. To the contrary, instead of meeting "*all ongoing obligations and responsibilities under all Morisky Widget License Agreements,*" Donald Morisky and MMAR have tortiously interfered with Plaintiff's obligations to service, train and otherwise support BCH Morisky Widget license and other Morisky Widget licensees under

the CR2A.

196. Such interference has not only been entirely their obligations but has been directed to cause harm to Plaintiff. These tortious actions have included:

a) Attempts to destroy the Morisky Widget;

b) Interfere with existing licenses and sub-licenses, settlement agreements and litigation concerning the Morisky Widget.

c) Direct threats to existing licenses;

d) Postings on [www.moriskyscale.com](www.moriskyscale.com) and other websites that delivered general threats concerning use of the Morisky Widget; and the distribution of the Austin Letter threatening BCH and other Morisky Widget Licensees with copyright infringement lawsuits if they continued to use the Morisky Widget (Exhibit 10); and

e) Replacing attribution to the Morisky Widget and MMAS in publications as evidenced by the replacement of the BCH Morisky Widget License with an MMAR License on the United States Library of Medicine National Institutes of Health, ClinicalTrials.gov website.

197. The tortious actions by Defendants Donald Morisky, MMAR, and Austin have caused untold damage to Plaintiff, have destroyed ongoing efforts to support the licensees under the CR2A and have damaged the efforts to provide access to the significant benefits of the Morisky Widget to the medical community and to public health.

199. Plaintiff seeks compensatory damages, including lost profits, out-of-pocket losses expectation damage, and consequential damages.

200. Plaintiff seeks tort-specific damages for the specific harm caused by Defendants Austin, Morisky and MMAR including  reputational damage, compensation for harm to MMAS Research business's goodwill and brand reputation in the medical, scientific and pharmaceutical communities, emotional distress damages to help Plaintiff recover from the psychological, physical, and emotional impact the interference has had on the 75 years old

Plaintiff, Steven Trubow.

201. Plaintiff seeks Attorneys' Fees because the willful and malicious tortious interference of Defendants Austin, Morisky and MMAR forced the plaintiff to sue defendant BCH to protect their rights under the BCH Morisky Widget license.

202. Plaintiff seeks temporary, preliminary, and permanent injunctive relief from Defendants BCH and Jacob Hartz to stop them from publishing any future articles, reports, or presentations that use MMAS-8 results.

203. Plaintiff seeks temporary, preliminary, and permanent injunctive relief from Defendants Austin, Morisky and MMAR to stop them from tortiously interfering with any Morisky Widget licensee including those licensees listed in Exhibit IV of the CR2A agreement.

## FIFTH CAUSE OF ACTION
## DEFAMATION (LIBEL)
### (A*s to Defendants BCH, Harvard Medical School, Jacob Hartz, Donald Morisky, MMAR LLC, and Austin*)

204. MMAS Research realleges each allegation contained in the preceding paragraphs as though fully set forth herein.

205. Defendants BCH entered into a License Agreement with Plaintiff MMAS Research specifically agreeing and acknowledging Plaintiff as the owner of the MMAS-8 tests that were ultimately used in the Accused Study. (Exhibit 13)

206. Defendants BCH entered into a License Agreement with Plaintiff MMAS Research specifically agreeing The footnote below is required in all articles, presentations, web postings, reports and submitted manuscripts, and on the first table or figure which present the Morisky Widget MMAS results or in the Acknowledgment Section of manuscripts submitted for publication: A Morisky Widget license agreement is available from MMAS

Research LLC 14725 NE 20th St., Bellevue Washington or strubow@morisky.org.

207.   Defendants BCH entered into a License Agreement with Plaintiff MMAS Research specifically agreeing that BCH must submit to MMAS all presentations and manuscripts that are being considered for abstracts/poster presentations or publication to make certain that all copyright and trademark requirements are included in all manuscripts submitted for publication.

208.   On information and belief, as of 2026, the ClinicalTrials.gov website is an essential, high-traffic resource for the global scientific and medical communities. It serves as the world's largest public clinical research registry, maintaining records for over 560,000 studies across 225 countries.

209.   On information and belief, medical journal articles from JMIR Publications, published by institutions like BCH, Harvard Medical School (HMS), and the National Institutes of Health (NIH) are considered top-tier, highly influential resources that are standard reading for global medical professionals.

210.   As alleged above, on July 4, 2022, Defendants BCH and Jacob Hartz responded to Trubow (with cc to Hannah Palfrey) stating that BCH had updated the BCH Clinical Trials Article for NCT04458766, as shown below, listing MMAS Research LLC as a collaborator on the study.

211.   As alleged above, on January 10, 2023, Defendants BCH and Jacob Hartz removed the MMAS Research notification from ClinicalTrials.gov without the Plaintiff's knowledge or permission. BCH updated the clinicaltrials.gov website for NCT04458766 with a notification that the MMAS-8 was used with permission from Dr. Morisky and licensed by MMAR LLC.

49

212.   As alleged above, on January 24, 2024, Defendants BCH and Jacob Hartz again updated the ClinicalTrials.gov website for NCT04458766 and included the following notification, "The MMAS-8 scale, content, name and trademarks are protected by US Copyright and trademark laws. Permission for use of the scale and its coding is required. A license agreement is available from MMAR LLC."

213.   The removal of Plaintiff MMAS Research LLC's attributions on the BHS study ClinicalTrials.gov website and its replacement by Donald Morisky's and MMAR LLC copyright notification and license on a platform as public and critical as ClinicalTrials.gov was defamatory and damaging because attribution in such contexts is prime academic and professional currency.

214.   Removing MMAS Research from ClinicalTrials.gov suggested a lack of ownership in MMAS-8 copyright and in the legitimacy of BCH Morisky Widget license.

215.   Defendants' conduct created a perception among healthcare professionals and researchers of misconduct on the part of the Plaintiff.

216.   On information and belief, on or about August 14, 2025, Defendants BCH, HMS, and Hartz published the "Accused Study" which included libelous and defamatory false statements of fact concerning MMAS Research and its CEO, Steven Trubow. (Exhibit 20)

217.   In the Accused Study article, Defendants BCH, HMS, and Jacob Hartz wrote as follows:

> Boston Children's Hospital, and the authors personally have been named as defendants in a lawsuit brought by MMAS Research, LLC, which is ongoing, that concerns the attribution of the Morisky Medication Adherence Scale (MMAS). We have received competing demands from MMAS Research, LLC, and another entity, Morisky Medication Adherence Research, LLC, concerning the proper attribution for the MMAS. Because we are uncertain how the MMAS should be attributed and who owns the intellectual property rights.

Exhibit 20.

218.   In fact, Accused Study article author Tiffany Powell-Wiley was never named as a defendant in any lawsuit brought by MMAS Research LLC.

219.   This statement, which is still available online as of the date of hereof, is false in numerous respects, including the following:

a)   The ownership of the Morisky Widget MMAS-8 copyright was affirmed by the U.S. Court of Appeals for the Ninth Circuit in March of 2024;

b)   The ownership of the Morisky Widget MMAS-8 copyright is not being contested by Defendants BCH, HMS, and Jacob Hartz in the instant or any other matter;

c)   The statement, "we are providing the attribution that both MMAS Research, LLC, and Morisky Medication Adherence Research, LLC, have demanded that we use" is false because Plaintiff has not demanded that this statement be used;

d)   On information and belief, in the Accused study article Defendants BCH, HMS, and Jacob Hartz wrote "If the participant was interested, the clinician determined the patient's eligibility based on self-reported adherence [46,47]." Exhibit 20

220.   The Accused Study article also attributes Plaintiff's Morisky Widget MMAS-8 and Defendant MMAR LLC MMAS-8 test to 'self-reported adherence measure to references [46,47]," which in turn cite the following articles in the medical literature:

46. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. J Clin Hypertens (Greenwich). May 2008;10(5):348-354. Berlowitz DR, Foy CG, Kazis LE, Bolin L, Morisky Widget MMAS, Steven Trubow, MMAS Research LLC, ed. [FREE Full text] [CrossRef] [Medline]

47. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. J Clin Hypertens (Greenwich). May 2008;10(5):348-354. Retracted in: J Clin Hypertens (Greenwich). 2023 Sep;25(9):889. [CrossRef] [Medline]

221.   On information and belief, the cited 2017 NEJM article had this acknowledgement "Use of the Morisky Medication Adherence Scale is protected by U.S. copyright laws. Permission for its use is required; address inquiries to Dr. Morisky at dmorisky@gmail.com.  https://www.nejm.org/doi/full/10. 1056/NEJMoa1611179

222.    Defendants BCH, HMS, and Jacob Hartz published a confusing and meaningless attribution to the Morisky Widget at the end of reference # 46 that followed the citation of a *New England Journal of Medicine* article authored by Donald Morisky with his formal copyright notification and license, while making a false and humiliating attribution of copyright for the Morisky Widget for MMAS Research and Steven Trubow—making it appear to the reader that a free article on the Morisky Widget was available to users clicking on the words "free full text."



223.    In fact, readers clicking that hyperlink are redirected to a web page, found at https://europepmc.org/article/ MED/18453793, which indicates that the article was retracted. A screen shot of the relevant portion of that page is shown at right.

224.    Reference #47 of the Accused study article repeats the citation of the 2008 *Journal of Clinical Hypertension* MMAS-8 validation article.

225.    Specificity in MMAS-8 measures how well the MMAS-8 correctly identifies patients who *do not* have medication non-adherence – essentially the MMAS-8's ability to

produce true negative results and avoid false positives (incorrectly labeling patients that are medication adherent as patients who are not medication adherence.

226.   In contrast, sensitivity in MMAS-8 measures its ability to correctly identify people who *are* medication adherent or non-adherent (true positives), minimizing false negatives; a highly sensitive MMAS-8 test can identify which patients are at risk of adverse medical events for medication non-adherence.

227.   In an April 2021 letter to the editor of the *Journal of Clinical Hypertension*, which published the validation article for the MMAS-8 in 2008, Dr. Michael Ortiz wrote, "the MMAS-8 scores may be no more accurate in detecting patients with uncontrolled BP, than tossing a coin to decide." (Exhibit 21).

228.   This led, in September 2023, to the *Journal of Clinical Hypertension* publishing a notice retracting Defendant Donald Morisky's 2008 MMAS-8 validation article due to its grossly overstating the sensitivity (true positive) and specificity (true negative) values in the MMAS-8 medication adherence scale and a lack of confidence in the study's conclusions. Exhibit 22.

229.   The false copyright attribution by Defendants BCH, HMS and Jacob Hartz of the Morisky Widget was harmful to the reputation of MMAS Research and harmed its economic relations and opportunities.

230.   By submitting the Accused Study for publication and approving its content, Defendants BCH, HMS, and Hartz published the above-described false statements of fact about MMAS Research to innumerable third parties.

231.   In addition, as alleged above at ¶¶126–130, Defendants BCH, HMS, and Hartz published within the reference section of the Accused Study a confusing and misleading

attribution entry immediately following a New England Journal of Medicine citation, which read: "Morisky Widget MMAS, Steven Trubow, MMAS Research LLC, ed. [FREE Full text] [doi: 10.1111/j.1751-7176.2008.07572.x] [Medline: 18453793]." (Exhibit 20).

232.  On information and belief, this "FREE Full text" attribution falsely suggested to readers that Plaintiff and Trubow had improperly claimed or manipulated copyright attribution or were offering the Morisky Widget MMAS content for free in a manner inconsistent with legitimate licensing, thereby further defaming MMAS Research and Trubow in the eyes of readers.

233.  At all relevant times, MMAS Research and Trubow were, and are, private figures for purposes of Massachusetts defamation law. On information and belief, Defendants BCH, HMS, and Hartz acted at least negligently, and in reckless disregard of the truth, in publishing the defamatory statements described above.

234.  Defendants knew of, or were reckless in disregarding, the Ninth Circuit's March 13, 2024 Memorandum affirming MMAS Research as the registered owner of the Morisky Widget, the terms of the BCH Morisky Widget license, and the procedural posture of this and related                              litigation.                        Despite                              this knowledge, Defendants chose to characterize the ownership and attribution of the Morisky intellectual property as "uncertain" and to imply that MMAS Research and Trubow were engaged in improper or illegitimate conduct, without undertaking reasonable care to ensure that these statements were accurate.

235.  The defamatory statements in the Accused Study were not made in pleadings, motions, or other filings in this or any other judicial proceeding but instead were made in an "extrajudicial" journal article published in JMIR. No absolute or qualified privilege applies to

shield Defendants from liability for these statements.

236. On information and belief, in the December 2020 CR2A settlement agreement in Section 2, #14, p.8, Donald Morisky, MMAR LLC, and Plaintiff covenants and agrees to not make any public defamatory statement about any party to this Agreement. (Exhibit 5).

237. On information belief, the Austin letter which was sent to over 200 Morisky Widget licensees including Defendant BCH, and broadcast to anyone in the world with access to the internet, contained false and malicious defamatory statements about MMAS Research LLC and Steven Trubow whose reputation, as the principal of MMAS Research LLC, bears on its reputation as well.

238. As alleged above, Plaintiff executed a confidential settlement agreement with Sanofi, a pharmaceutical firm to settle breaches of their perpetual Sanofi France Morisky Widget license, cure copyright infringements of the MMAS Widget Source Code, and remedy violations of the trade secret Morisky Widget MMAS-8 scoring and coding criteria for the ELIPRO study. (Exhibit 23)

239. On information and belief, Defendants MMAR and Austin used Defendant BCH Motion to Dismiss pleadings from the instant matter as well as false factual statements outside the pleadings to persuade Sanofi that Plaintiff was not the owner of the Morisky Widget copyright and to cancel or rescind the settlement agreement. (Exhibit 24).

240. On information and belief, Defendants MMAR and Austin acted with malice, aiming to harm MMAS Research LLC and Steven Trubow's reputation and credibility in an unsuccessful attempt to get Sanofi to turn over a payment of $115,000 to Defendants MMAR and Austin rather than present legal arguments in the public record and allow the matter to be decided on the merits.

241. On information and belief defamation hinges on proving a false statement of fact, publication of that fact to a third party, and actual harm, elements that negate litigation privilege.

242. On information and belief, Defendants MMAR and Austin's presented false information to Sanofi, twisted the facts, added lies, to damage MMAS Research LLC and Steven Trubow business and reputation and take over MMAS Research LLC $115,000 payment from Sanofi.

243. On information and belief, in order to receive the $115,000 payment due MMAS Research, Plaintiff had to amend the  settlement agreement with the condition that MMAS Research and its successors agreed to indemnify and hold Sanofi harmless against any and all claims asserted by Donald E. Morisky, Philip Morisky, Marty Morisky, Susan Morisky, MMAR LL, or any successors, agents or licensees of Donald E. Morisky, Philip Morisky, Marty Morisky, Susan Morisky, MMAR LLC or its Affiliates, regarding use of the Morisky Widget in any manner. (Exhibit 25)

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in their favor and against Defendants as follows:

A.      For actual damages in an amount according to proof at trial, and for any additional profits attributable to infringements of Plaintiff MMAS Research's copyright in the Morisky Widget, in accordance with proof at trial.

B.      For statutory damages for copyright infringement and/or willful copyright infringement by Defendants.

C.      For issuance of preliminary and permanent injunctive relief against

56

Defendants, and each of them, and their respective officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendants, enjoining and restraining them from: using the Widget Tests or the Morisky Widget copyrighted work until a license is obtained, including the maintenance on websites, posted on the Internet, or in any publication, articles, and reports described herein, or any such articles, publication, and reports in the future that use or reference the Widget Tests, MMAS-8, or the Morisky Widget;

D.  Order that Defendants file with this Court and serve upon Plaintiffs within thirty (30) days after service on Defendants of an injunction in this action, a report by Defendants, under oath, setting forth that Defendants have complied with the injunction, as well as the steps they have taken to comply.

E.  For costs of suit incurred.

F.  For attorneys' fees pursuant to the Copyright Act and as otherwise provided by law.

G.  For prejudgment interest in the amount of ten percent (10%) per annum or the maximum amount allowed by law;

H.  For injunctive relief enjoining Defendant Morisky from further violations of the DMCA with respect to the Morisky Widget MMAS-8 Test;

I.  For statutory damages for the willful violation of the DMCA, in an amount to be determined at trial;

J.  For MMAS Research's costs and attorneys' fees incurred herein;

K.  For such other and further relief as the Court deems just and proper; and

L.      For such other and further relief, the Court deems just and proper.

Respectfully submitted this _____ day of _____, 2026.

Respectfully submitted,

MMAS RESEARCH LLC,
By its Attorneys,

_____
A. Neil Hartzell, BBO #544752
Freeman Mathis & Gary, LLP
One Boston Place
201 Washington Street, Suite 2200
Boston, MA 02108
Tel: (617) 963-5966
neil.hartzell@fmglaw.com

_____
Ronald D. Coleman (*pro hac vice*)
COLEMAN LAW FIRM, PC
50 Park Place, Suite 1105
Newark, NJ 07102
973-264-9611
rcoleman@colemanlaw-pc.com

*Attorneys for Plaintiff*
*MMAS Research LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this __ day of January 2026, I caused a true and correct copy of the foregoing to be served via electronic mail upon all counsel of record in this case.

_____

A. Neil Hartzell

# EXHIBIT 1

**From:** Dustin Machi <dmachi@hapticscience.com>
**Date:** November 16, 2016 at 9:51:41 AM PST
**To:** DONALD MORISKY <dmorisky@ucla.edu>
**Cc:** Steve Trubow <trubow1@gmail.com>
**Subject: Re: Requested changes in the Morisky Widget**

Hi Don,

> Hi Dustin and here are some changes that need to be made on the Morisky Widget in which Steve and I went over today.  First, the name Morisky needs to be spelled correctly, which now reads "moriskey".

Where in the site are you seeing this?  I just took a look a moment ago and it seems to be "morisky" everywhere so far, so if you can point me to where on the site you were seeing this typo, I can fix.

> Next, the :Cancel box and Create Assessment Form- is not visible on the right side and needs to be moved up a space or two, Only the top of the box is visible.

I guess that the screen or the browser window is small and thats why you are seeing this happen.  I will make it behave better.

> The Intentional and Unintentional scores are not correct. Currently, there are 3 and 5 and need to be changed to 4 and 4.  I have attached the listing of each item and its resultant categorization of "intentional and unintentional".

Is this a change from before?  It could certainly be a bug, but I copied the existing morisky scoring code that we were using in MHIS. So if it is wrong here, then it is also wrong in MHIS and has been wrong since that functionality was implemented.

> Finally, please make a screen name for Morisky and a password.

> Please send me the instructions for logging on.

1

Will do.  What is your preferred username?


Thanks,
Dustin



Thanks for all your hard work on this Widget.

Don

<Unintentional and Intentional Scoring Criteria_Generic2016.doc>

**trubow1@gmail.com**

**Subject:**          FW: updated protocol and workflow

**From:** Dustin Machi <dmachi@hapticscience.com>
**Sent:** Wednesday, December 7, 2016 6:01 AM
**To:** DONALD MORISKY <dmorisky@ucla.edu>
**Cc:** Steve Trubow <trubow1@gmail.com>
**Subject:** Re: updated protocol and workflow

When you launch the tests, they open in a new browser window/tab.  You can close that window after the test is complete.   Then, in the main window, you click on "assessments" at the top.   Then you will see a list of all the assessments.   You find the one you want to look at, and click the eye icon to open that assessment.  Then you will see that assessment.

I hope this helps.

Dustin



On Dec 7, 2016, at 8:41 AM, DONALD MORISKY <dmorisky@ucla.edu> wrote:

I got the widget to work but it does not go back to the results after I finish answering the MMAS questions.  Please send me the specific steps following data entry.

Thanks and sorry to bother you so early in the am....

On Wed, Dec 7, 2016 at 3:32 AM, Steve Trubow <trubow1@gmail.com> wrote:

Empty broswer

Sent from my iPhone

On Dec 6, 2016, at 10:35 PM, DONALD MORISKY <dmorisky@ucla.edu> wrote:

> hi Steve and Dustin and I am having problems in getting the widget to
> work.  I go to morisky.org and enter my email and password but
> nothing happens.  Please help,,,I have a presentation in the morining...
>
> Thanks,
>
> Don
>
> On Tue, Dec 6, 2016 at 7:07 PM, olympic labs <trubow1@gmail.com>
> wrote:
>
> > <image001.jpg>

**trubow1@gmail.com**

**Subject:**           FW: please send dustin an email asking him to fix the assessment page on the morisky widget and telling him about our frustration today doing the demo

**From:** Dustin Machi <dmachi@hapticscience.com>
**Date:** April 10, 2017 at 4:25:41 PM PDT
**To:** DONALD MORISKY <dmorisky@ucla.edu>
**Cc:** trubow1@gmail.com
**Subject: Re: please send dustin an email asking him to fix the assessment page on the morisky widget and telling him about our frustration today doing the demo**

Ok, I can see one problem that might be causing what you two are seeing. I think this table is only showing the first 50 items. I will get it fixed. In the mean time, remember you can sort on fields by clicking on them, so even if we are only seeing 50 items, you'll be able to see all of your recent things.



On Apr 10, 2017, at 7:09 PM, DONALD MORISKY <dmorisky@ucla.edu> wrote:

I searched on the list of administrations and only found onMarch 9 and none for the 10th.....can not copy this admin...

On Mon, Apr 10, 2017 at 3:51 PM, Dustin Machi <dmachi@hapticscience.com> wrote:

This message is just a warning and will happen on firefox until we get the certificates approved.

1

On Apr 10, 2017, at 6:49 PM, DONALD
MORISKY <dmorisky@ucla.edu> wrote:

On Mon, Apr 10, 2017 at 3:31 PM, DONALD MORISKY
<dmorisky@ucla.edu> wrote:

I logged into Morisky.org and get this page; I do not understand what
this is and why it is here....

# Welcome to nginx on Fedora!

This page is used to test the proper operation of the **nginx** HTTP
server after it has been installed. If you can read this page, it means
that the web server installed at this site is working properly.

## Website Administrator

This is the default `index.html` page that is distributed with **nginx** on
Fedora. It is located in `/usr/share/nginx/html`.

You should now put your content in a location of your choice and edit
the `root` configuration directive in the **nginx** configuration file
`/etc/nginx/nginx.conf`.

| | |
|---|---|
| | |

On Mon, Apr 10, 2017 at 3:10 PM, olympic labs
<trubow1@gmail.com> wrote:

Don go to your www.morisky.org page and see if you can see more
than two assessments on 4/10..see any for bayer?

---

**From:** Dustin Machi [mailto:dmachi@hapticscience.com]
**Sent:** Monday, April 10, 2017 2:44 PM
**To:** DONALD MORISKY <dmorisky@ucla.edu>
**Cc:** trubow1@gmail.com>
**Subject:** Re: please send dustin an email asking him to fix the
assessment page on the morisky widget and telling him about our
frustration today doing the demo

I will need more information this to look into this problem.  Who
created the assessments?  When were the assessments created?  Is
the failure being reported happening while the assessments are

being created or are you not seeing results for an assessment after they have been completed?  Was there an error reported while trying to create an assessment?   I am seeing assessments created today and last night:

<image001.png>

On Apr 10, 2017, at 4:49 PM, DONALD MORISKY <dmorisky@ucla.edu> wrote:

Hi Dustin and I just finished speaking with Steve. There is a big problem with the data entry process as he lost about 15 MMAS-8 entries from several countries last night and today.  In fact, we were on the line with Slovenia and could not bring up the results of the MMAS-8 test I ran for our clients.  These are big pharma companies which need to see how data entry is populated in terms of interpretation of results.  Please get back to us on what is going on.

Thanks,

Don

# EXHIBIT 2



# EXHIBIT 3

EDIT mmas-8 Translation

EDIT Type: mmas-8 Condition: cholesterol Language: english

**Instructions**

Your provider has indicated that you are taking medication to address a health concern. Individuals have identified several issues regarding their medication-taking behavior and we are interested in your experiences. There is no right or wrong answer. Please answer each question based on your personal experience with your cholesterol medication.

**Questions**

Q0   Do you sometimes forget to take your MEDICATION?

Do you sometimes forget to take your prescription cholesterol medication?

Q1   Over the past two weeks, were there any days when you did not take your MEDICATION?

People sometimes miss taking their medications for reasons other than forgetting. Thinking over the past two weeks, were there any times when you did not take your prescri

Q2   Have you ever cut back or stopped taking your MEDICATION without telling your doctor because you felt worse when you took it?

Have you ever cut back or stopped taking your prescription cholesterol without telling your doctor because you felt worse when you took it?

Q3   When you travel or leave home, do you sometimes forget to bring along your MEDICATION?

When you travel or leave home, do you sometimes forget to bring along your prescription cholesterol medication?

Q4   Did you take your MEDICATION yesterday?

Did you take all your prescription cholesterol the last time you were supposed to take it?

Q5   When you feel like your CONDITION is under control, do you sometimes stop taking your MEDICATION?

When you feel like your symptoms are under control, do you sometimes stop taking your prescription cholesterol medicine?

Q6   Taking medication every day is a real inconvenience for some people. Do you ever feel hassled about sticking to your CONDITION treatment plan?

Taking medicine regularly is a real inconvenience for some people. Do you ever feel hassled about sticking to your cholesterol treatment plan?

Q7   How often do you have difficulty remembering to take all of your MEDICATION?

How often do you have difficulty remembering to take all your cholesterol medicine?

**Answers**

| YES: | NO: | Never/rarely: | Once in a while: | Sometimes: | Usually | All the time: |
|------|-----|---------------|------------------|------------|---------|---------------|
| YES | NO | Never/rarely | Once in a while | Sometimes | Usually | All the time |

# EXHIBIT 4



PATENT, TRADEMARK, COPYRIGHT & TRADE SECRET MATTERS

10655 Park Run Drive, Suite 100
Las Vegas, NV 89144
Telephone (702) 382-4804
Mobile (702) 610-9094
Facsimile (702) 382-4805

E-mail: CAustin@weidemiller.com
On the web: www.WeideMiller.com

## INFRINGEMENT AUTHORIZATION

In accordance with the December 4, 2020, agreement between Dr. Morisky and Steve Trubow and MMAS Research, LLC, I, <u>Dr. Donald E. Morisky</u> hereby authorize <u>Steve Trubow, MMAS Research, LLC,</u> or any attorney working on their behalf or designated by either of them to represent my interests in pursuing, settling and litigating any claim I have for infringement of my intellectual property rights to the MMAS-4, MMAS-8, and Morisky Widget, as well as contract claims related to licenses issued to use the MMAS-4, MMAS-8 or Morisky Widget, accruing on or before December 3, 2020.

Dr. Donald E. Morisky
Date: <u>January 25, 2021</u>

F. Christopher Austin, Esq.
Counsel for Dr. Donald E.
Morisky
Date: <u>January 25, 2021</u>

# EXHIBIT 5

## CR 2A Agreement


Pursuant to Washington Civil Rule 2A, the parties signing hereto comprising on the one hand Steven Trubow and MMAS Research, LLC (collectively, the "Trubow Party") and on the other hand Donald Morisky, Susan Morisky, Philip Morisky, Marty Morisky and Morisky Medication Adherence Research, LLC ("MMAR") (collectively, the "Morisky Party") (with the Trubow Party and the Morisky Party collectively identified as the "Parties" and individually as a "Party") have reached a preliminary settlement ("Agreement") and desire to consent and agree to the following terms and conditions, which shall be binding and enforceable in any court:

## I.     Background


A.     On July 29, 2019, MMAS Research, LLC and Steven Trubow filed a lawsuit in King County Superior Court against Defendants Donald Morisky, Susan Morisky, Philip Morisky, Marty Morisky and Morisky Medication Adherence Research, LLC. Defendant Donald Morisky asserted certain counterclaims against MMAS Research, LLC and Steven Trubow.

B.     On May 28, 2020, Donald Morisky filed a lawsuit against MMAS Research, LLC and Steven Trubow in Nevada federal district court asserting claims for copyright and trademark infringement.

C.     On June 19, 2020, MMAR filed a motion for attorney's fees and costs in the Washington lawsuit. Susan Morisky may also file, in the future, a motion for attorney's fees and costs in the Washington lawsuit, but has agreed to postpone doing so pending finalizing a settlement agreement.

D.      On or about July 2, 2020, the Parties reached a preliminary settlement agreement, the terms of which the Parties and their counsel agreed to formalize in a final, long-form written settlement agreement (the "Final Agreement" as defined herein).

E.      In the interim, the Parties desire to consent and stipulate to the following material terms and conditions that are to be fully set forth in the Final Agreement, but which shall be binding pursuant to CR 2A as follows;

Now, therefore, in consideration of the mutual promises and terms set forth below, the Parties agree as follows:

## II.      Settlement Terms and Conditions

1.      MMAS Research, LLC will forego any claims it has to and will acknowledge that Donald Morisky is the sole and exclusive owner of the federal copyrights in and to the MMAS-4 and the MMAS-8, together with any related trademarks, copyrights, derivatives to the same or other intellectual property rights associated with the Morisky Medication Adherence scales or protocols, including without limitation, the items set forth in **Exhibit 1** to this Agreement, (the "Morisky IP").  MMAS Research, LLC will assign the Morisky Widget and any related copyrights, trademarks and related intellectual property rights (the "MMAS IP") to Donald Morisky (or his assignees, collectively "Donald Morisky"), except for any and all copyrights, trademarks and related intellectual property for the Global Medication Reconciliation Form ("GMRF"). A written copy of the GMRF is attached hereto as **Exhibit 2**.   All copyrights, trademarks and related intellectual property for the GMRF ("GMRF IP") shall continue to be owned and controlled by Steven Trubow and/or MMAS Research, LLC; provided, however, that if MMAS Research, LLC is the holder of such GMRF IP, it may only do so under a different corporate name or DBA to

2

which it has up to 60 days from the execution of this Agreement to transition and that complies with Paragraph 8 of this Agreement (prohibiting, among other things, the use of the terms MORISKY or MMAS except in connection with actions related to "Claim Settlements" (as defined herein) in which MMAS Research, LLC is a party).  Steven Trubow represents that the GMRF does not contain any content that would infringe or qualify as a copyright derivative of any of the Morisky IP or the MMAS IP, and the Morisky Party is relying on that representation to enter into this Agreement.

2.     MMAS Research, LLC and/or Steven Trubow will receive fifty-five percent (55%) and Donald Morisky will receive forty-five percent (45%) (respectively, each Party's "Proceeds Percentage") of the "Net Proceeds" (as defined herein) generated from any "Claim Settlements" (as defined herein).  All proceeds of any Claim Settlement payment received from a third-party ("Gross Proceeds") shall be deposited into an attorney client trust account for the benefit of the Parties.  The net of such proceeds remaining after the payment of the attorney fees and recoverable costs incurred by the attorney(s) prosecuting any Claim Settlement ("Net Proceeds"), shall be disbursed from the attorney client trust account to the Parties in accordance with their respective Proceed Percentage along with a financial accounting of the same within thirty (30) days of the attorney's receipt of such Gross Proceeds.  The expenses of each Party incurred in connection with a Claim Settlement shall be exclusively born by that Party and shall not be deducted from the attorney client trust account, the Gross Proceeds, or the Net Proceeds prior to disbursement to the Parties.

3.     As used herein, the term "Claim Settlements" refers to any settlement agreement entered into by MMAS Research and/or Donald Morisky on the one hand and a third-party on the other hand alleged to have infringed the Morisky IP (as defined herein) and/or the MMAS IP, breached a contract or to be liable for any other claim related to or arising from use of the Morisky

3

IP, MMAS IP, or a license agreement for use of the Morisky IP and/or the MMAS IP after January 1, 2017, until the date on which this Agreement is signed by the Parties. The Claim Settlements at issue herein include any Claim Settlement agreements previously signed by Donald Morisky, now pending or existing investigations to be negotiated, finalized or executed in a final Claim Settlement at any time in the future, which concern refer or relate to the Morisky IP or the MMAS IP. The Claim Settlement *may include a retroactive license for the Morisky Widget and may include corrective measures to be performed by the licensee with the assistance of Steve Trubow, and training and certification to be done by Donald Morisky or Steve Trubow, at the option of Donald Morisky. Fees for training and certification shall be paid to the party training and certifying by the party receiving the training and certification.  The "Claim Settlements" are limited to those set forth and listed in **Exhibit 3**, attached to this Agreement, as of the date on which this Agreement is signed by the Parties.

4.    Donald Morisky authorizes MMAS Research, LLC through its attorney(s) to prosecute the Claim Settlements listed in Exhibit 3 from which a Claim Settlement may be sought related to the MMAS-4, MMAS-8, the Morisky Widget and any related intellectual property, and further agrees to cooperate in any existing investigations, claims and ensuing litigation of any such claims, whether now pending or to be litigated in the future, including the formal assignment of such claims, if necessary to MMAS Research, LLC.  With the exception of any filed, active, lawsuit then proceeding, all prosecution of Claim Settlements by MMAS Research, LLC through its attorney(s) must conclude within two (2) years of the expiration of the Transition Period as described in Paragraph 7 of this Agreement.  Any legal actions, including claims for infringement, may be filed in the name of Donald Morisky if required by law, as the owner(s) of the Morisky IP.

5.    Within thirty (30) days of the execution of this Agreement, MMAS Research, LLC and/or Steven Trubow or their counsel prosecuting any Claim Settlement shall disclose or make

available to Donald Morisky or his counsel, all information regarding any Claim Settlement set forth in Exhibit 3, including, without limitation, the nature of the infringement, the type of settlement sought (e.g. retroactive license, new license, etc.), the number of tests or assessments at issue, the estimated settlement payment, etc.  MMAS Research, LLC and/or Steven Trubow or counsel prosecuting the Claim Settlements shall in good faith entertain and address through counsel prosecuting the Claim Settlements any questions or concerns Donald Morisky may have regarding any Claim Settlements set forth in Exhibit 3 and shall dismiss or abandon any Claim Settlement shown to be without legal merit (e.g. a non-infringing use of an adherence scale in the public domain); provided, however, that the final decision as to whether the claim has legal merit shall be determined by the attorney or attorneys prosecuting the Claim Settlement at issue.  Donald Morisky (and/or his heirs, assigns, or successors in interest) further agrees to execute, sign, and cooperate in the finalization of any and all Claim Settlement agreements as directed by MMAS Research, LLC, Steven Trubow or the attorneys prosecuting the Claim Settlements; provided, however, that such Claims Settlement agreements will not impose future obligations on Donald Morisky or his assignees without Donald Morisky's consent, which consent shall not be unreasonably withheld.  MMAS Research, LLC and/or Steven Trubow shall indemnify Donald Morisky against any order, judgment, or award entered in, or any claim arising from, any Claim Settlement and against any costs or attorney's fees exceeding the sum recovered in any Claim Settlement.

6.    MMAS Research, LLC and/or Steven Trubow will assign the domain name for the "morisky.org" website to Donald Morisky or his assigns upon or prior to the completion of the "Transition Period" set forth herein.

7.    MMAS Research, LLC and Steven Trubow will provide access to and transfer the Morisky Widget software and database to Donald Morisky or his assignees. The Trubow Party

shall train the Morisky Party in the use of the Morisky Widget (including, without limitation, any code book or other instructional material, if any, identifying database variables and how they are scored) so that they may operate and maintain it as currently constituted and service licensees as presently done by the Trubow Party. Each Party will agree to cooperate in good faith and keep the existing morisky.org website available and running for a transition period to commence upon the execution of this Agreement and to conclude within 60 days of the date the Final Settlement Agreement becomes binding on the Parties in accordance with Paragraph 17 of this Agreement (the "Transition Period").  Therefore, it is agreed between the Parties that the Transition Period shall be for 120 days following execution of this Agreement unless otherwise modified by the written agreement of the Parties. Upon the completion of: (i) the transfer of the Morisky Widget software, database and all related information and content to Donald Morisky or his assignees sufficient to take over the management and operation of the same, and (ii) the termination of the Transition Period, MMAR shall indemnify MMAS Research, LLC and Steven Trubow from any claims by licensees arising from issues related to the access to or utilization of the Morisky Widget. The Morisky Party and MMAR agrees to provide full access to the Morisky Widget and support as needed to all licensees as long as their licenses to the Morisky Widget are in effect, including adhering to all European Union Privacy regulations (including but not limited to GDPR) and HIPPA).

8.     With the exception of facilitating any existing investigation, litigation, negotiation, finalization or execution of any Claim Settlements, MMAS Research, LLC and/or Steven Trubow each agree, represent and warrant each will no longer use the Morisky IP, the MMAS IP, or the MORISKY name for business purposes, including as part of the name of the company, or transact any business utilizing in whole or in conjunction with other terms, the following terms: "Morisky, Morisky Widget, MMAS, MMAS-8, or MMAS-4".

9.     Neither Steven Trubow nor MMAS Research, LLC shall make any assignment of any Claim Settlement to any other person without the express written permission of Donald Morisky or his assigns.

10.     MMAS Research, LLC and/or Steven Trubow agree to assign to Donald Morisky and to provide a copy to Donald Morisky of the license agreements for all licenses for the Morisky Widget with third parties, including retroactive license agreements, agreements previously executed by MMAS Research, LLC and/or Donald Morisky (the "License Agreements") that are assignable on their terms. With regard to any License Agreements that are not assignable, the Trubow Party shall work in good faith to transition the servicing of such License Agreements to the Morisky Party, including without limitation, providing relevant introductions and authorizing the Morisky Party to be an authorized agent of MMAS Research, LLC for the purpose of so servicing such License Agreements through their term.   Revenue generated on all License Agreements will belong entirely to the Morisky Party. The list of Morisky Widget licensees set forth in **Exhibit 4** to this Agreement represents the minimum number of all such License Agreements. Donald Morisky agrees to assume all ongoing obligations and responsibilities under all License Agreements assigned or serviced by Donald Morisky by the completion of the Transition Period.

11.     With the exception of privileged communications, MMAS Research, LLC and/or Steven Trubow shall forward to Donald Morisky and/or MMAR all communications (including without limitation, all social media communications, texts, emails, draft agreements, etc.) received from any person regarding Donald Morisky, the MMAS-4, the MMAS-8, or the Morisky Widget in perpetuity and/or if such accounts are held in the name of the MMAS Research, LLC, shall transfer or assign all accounts from which all such information is received (including without limitation, email, social media accounts) to Donald Morisky and/or MMAR.

7

12. MMAS Research, LLC and Steven Trubow shall forward all information and communications with prospective licensees of the Morisky IP or the MMAS IP ("Prospective Licensees") and shall work in good faith during the Transition Period to effectuate the transfer and referral of such Prospective Licensees to Donald Morisky and/or MMAR.

13. MMAS Research, LLC, Steven Trubow, Donald Morisky, Susan Morisky, Phillip Morisky, Marty Morisky and Morisky Medication Adherence Research, LLC, together with its affiliates MMAS Research, Italy, and MMAS Research, France, each agree to release one another and their respective beneficiaries, trustees, owners, predecessors, successors, assigns, agents, officers, employees, servicers, representatives, attorneys, and affiliates, present and former heirs, executors, administrators, partners, co-obligors, co-guarantors, guarantors, sureties, family members, spouse, insurers, and all persons acting by, through, under, or in concert with any of the aforesaid persons or entities, or any of them (the "Releasors") from any claims they may have against each other and their respective beneficiaries, trustees, owners, predecessors, successors, assigns, agents, officers, employees, servicers, representatives, attorneys, and affiliates, present and former heirs, executors, administrators, partners, co-obligors, co-guarantors, guarantors, sureties, family members, spouse, insurers, and all persons acting by, though, under, or in concert with any of the aforesaid persons or entities, or any of them (the "Releasees) or any of them, whether known or unknown, asserted or unasserted that could have been made that relate to, arise out of, or are connected in any way with any claim or dispute raised by any Party against another. Each of the Parties also further agree to dismiss the claims asserted in the Washington lawsuit and Nevada federal district court lawsuit now pending against each other with prejudice and without any award of costs or attorneys' fees in any action.

14. Each Party covenants and agrees to not make any public defamatory statement about any party to this Agreement.

15.     The Parties agree to cooperate and take all reasonable steps necessary to effectuate the terms of this Agreement and the Final Agreement, including without limitation, identifying and executing all documents necessary to facilitate any assignment or transfers to Donald Morisky contemplated by this Agreement or as set forth in the Final Agreement, including without limitation, any copyrights in the Morisky Widget, MMAS IP, the Morisky kiosk apple iPhone app, MABU robot used in the Morisky Protocol, the morisky.org domain name and website together with any third-party agreements related to any content or services identified thereon, and all known potential, prospective or unexecuted license agreements or infringement claims.

16.     Steven Trubow and/or MMAS Research, LLC hereby warrant and represent that they have all right, title and authority to the MMAS IP and the morisky.org domain name transferred and assigned to Donald Morisky and indemnify Donald Morisky and his assigns against any claims by third-parties to the same.

17.     Unless extended by a written agreement of the Parties, the Parties agree to enter into a long-form, final settlement agreement, formalizing all the terms set forth herein (the "Final Agreement") on or before 5:00 p.m. (Pacific Time) sixty (60) days after the date this Agreement is executed ("Final Agreement Deadline").  If the Parties are unable to agree upon any provision or content of the Final Agreement, then no later than the Final Agreement Deadline, the Parties shall identify and appoint an agreed upon neutral mediator with the Seattle office of JDR as an "Appointed Decider" to hear and finally resolve all such disputed issues.  If the Parties cannot agree on upon a single Appointed Decider by the Final Agreement Deadline, each Party may identify a single mediator of the Seattle office of JDR, and the mediators so identified, or—in the event a Party fails to identify a mediator by the Final Agreement Deadline—the sole mediator identified by the Final Agreement Deadline, shall be the Appointed Decider.  Within thirty (30) days of appointment, the Appointed Decider shall produce and sign the Final Agreement on behalf

of the Parties, which Final Agreement shall be binding upon the Parties regardless of whether they ultimately execute it. The Parties shall equally bear the costs and fees of the Appointed Decider.

18.    The Parties agree that if any legal action or other proceeding brought by the Parties to enforce this Agreement, or the Final Agreement or to recover damages or equitable relief for a breach of this Agreement or the Final Agreement, the prevailing party shall recover its costs and reasonable attorneys' fees incurred in any such action or proceeding, including the proceeding to resolve any dispute over the terms of the Final Agreement by the Appointed Decider.

DATED this 4th day of December 2020

By:_____      By:_____

Steven Trubow                                             Donald Morisky

By:_____      By:_____

MMAS Research, LLC, Washington                Susan Morisky
limited liability Company

                                                              By:_____
Steven Trubow, its Managing Member
                                                              Philip Morisky

                                                              By:_____

                                                              Marty Morisky

                                                              By:_____

                                                              Morisky Medication Adherence Research,
                                                              LLC, A Nevada limited liability company

                                                              Philip Morisky, Its Managing Member

of the Parties, which Final Agreement shall be binding upon the Parties regardless of whether ...

to enforce this Agreement, or the Final Agreement or to recover damages or equitable relief for a

reasonable attorneys' fees incurred in any such action or proceeding, including the proceeding to

DATED this ___ day of December 2020

Steven Trubow

MMAS Research, LLC, Washington
limited liability Compa...

Steven Trubow, its Managing Member

Donald Morisky

Susan Morisky

Philip Morisky

Marty Morisky

Morisky Medication Adherence Research

of the Parties, which Final Agreement shall be binding upon the Parties regardless of whether they ultimately execute it. The Parties shall equally bear the costs and fees of the Appointed Decider.

18.    The Parties agree that if any legal action or other proceeding brought by the Parties to enforce this Agreement, or the Final Agreement or to recover damages or equitable relief for a breach of this Agreement or the Final Agreement, the prevailing party shall recover its costs and reasonable attorneys' fees incurred in any such action or proceeding, including the proceeding to resolve any dispute over the terms of the Final Agreement by the Appointed Decider.

DATED this ___ day of December 2020

By:_____
    Steven Trubow

By:_____
    MMAS Research, LLC, Washington
    limited liability Company

    Steven Trubow, its Managing Member

By:_____
    Donald Morisky

By:_____
    Susan Morisky

By:_____
    Philip Morisky

By:_____
    Marty Morisky

By:_____
    Morisky Medication Adherence Research,
    LLC, A Nevada limited liability company

    Philip Morisky, Its Managing Member

of the Parties, which Final Agreement shall be binding upon the Parties regardless of whether they ultimately execute it. The Parties shall equally bear the costs and fees of the Appointed Decider.

18. The Parties agree that if any legal action or other proceeding brought by the Parties to enforce this Agreement, or the Final Agreement or to recover damages or equitable relief for a breach of this Agreement or the Final Agreement, the prevailing party shall recover its costs and reasonable attorneys' fees incurred in any such action or proceeding, including the proceeding to resolve any dispute over the terms of the Final Agreement by the Appointed Decider.

DATED this ___ day of December 2020

By:_____      By:_____
   Steven Trubow                                           Donald Morisky


By:_____      By:_____
   MMAS Research, LLC, Washington             Susan Morisky
   limited liability Company

   Steven Trubow, its Managing Member      By:_____
                                                           Philip Morisky

                                             By:_____
                                                Marty Morisky

                                             By:_____
                                                Morisky Medication Adherence Research,
                                                LLC, A Nevada limited liability company

                                                Philip Morisky, Its Managing Member

**EXHIBIT 1**

**Morisky Intellectual Property**

**1.      Registered Copyrights**

- (MMAS-4 Scale) TX0008285390 Copyright (06-12-2016)
- (MMAS-8 Scale) TX0008632533 Copyright (09-21-2018)

**2.      MMAS Morisky Protocol-2015, including as part of such protocol the following:**

- Subjective and Objective Measurement of Adherence
- Social Desirability, Response Bias
- Validity, Sensitivity and Specificity, MMAS health condition(s) and Medication Specific health condition(s)
- Criterion Related Validity, Patient Outcomes (following educational counseling, outcome measures including appointment-keeping behavior, 30-day hospital readmissions, quality of life, morbidity, and mortality).
- Baseline and Follow up Assessments, Never One-Off
- Diagnosis of Medication Taking Behavior, Intentional and Unintentional Non-Adherence
- Translational Research, Sustainability, Self-Management.
- Polypharmacy
- MMAS-8 scoring algorithm

**3.      Morisky Medication Adherence Protocol, including as part of such protocol the following:**

- A Beneficence
- B Evidence-Based
- C Determinants of Non-Adherence
- D Chronic Care Mgmt. and Medication Reconciliation
- E Tailored and Targeted Intervention
- F Disease Control, Remission of Mental Health and Substance Use Disorders

**4.      Trademarks/Service Marks.** The following marks have attained common law trademark rights in connection with the provision of diagnostic procedures to assess adherence to medication protocols, and in connection with identifying and proscribing compliance and intervention protocols and other related goods and services offered in connection with the same:

- MORISKY
- MORISKY MEDICATION ADHERENCE SCALE
- MORISKY SCALE
- MORISKY MEDICATION ADHERENCE PROTOCOL
- MORISKY PROTOCOL
- MMAS
- MMAS-4
- MMAS-8

# EXHIBIT 2

### GMRF

| NEW GMRF | MGL (Public) |
|---|---|
| 1. If you feel worse when you take [name of medication], do you stop taking it? | 4. Sometimes you feel worse, when you take the medicine, do you stop taking it? |
| 2. Do you ever forget to take your [name of medication]? | 1. Do you ever forget to take your medicine? |
| 3. When you feel better, do you sometimes stop taking your [name of medication]? | 3. When you feel better do you sometimes stop taking your medicine? |
| 4. Do you ever forget to take your [name of medication], because you are using other medications? | 1. Do you ever forget to take your medicine? |

# EXHIBIT 3
## Claim Settlements

1. University of California Irvine agrover3@uci.edu 2020

2. Virginia Commonwealth 2020 Donna Wilson

3. Kings College 2 new cases Weinmen and Khan 2020

4. Li-Hui Zhu, Hunan Hospital 2020

5.yulhamin@gmail.com korea 2020

6. Shen@waldenuniversity.edu; Subocz@waldenuniversity.edu 2020

7.kkruetzf@its.jnj.com 2020

8. Ghada_thabet@aun.edu.eg mbioph@dir.bg; JHMN@iiste.org 2020

9. cecile.gaujoux.viala@chu-nimes.fr 2020 NCT03642795

   10 Jiancheng Xiu, MD NCT04409210 2020

11.  NCT04442776  Montse Cañabate, Cardenal Herrera University 2020

12.dhouha.khalifa@hotmail.fr

13. NCT04532528 Boehringer Ingelheim clintriage.rdg@boehringer-ingelheim.com

14. Zhan Shi Beijing Chao-yang Hospital, Capital Medical University,
15 m.omar2218@yahoo.com; port said university infringement on the mmas-8

16. Ospedale Regina Montis Regalis 2020 infringement

17.Xue WANG, Aiqin LV vd6n3d@163.com ijph@tums.ac.ir tyc@sdu.edu.cn

18. Hanoi Vietnam 2016 MMAS-8 license 2020 infringement
19 michael conley mmas psoterpresntatoin 2019


20. lbiganzoli@usl4.toscana.it , gina nightingale

**21. three posterprsentation infringers 2020  and 2017 mmas-8 article mercer**

**22.  MedSentry system Timothy M Hale Joseph C Kvedar**

23. Mrs. Katrin Kruetzfeldt Janssen-Cilag GmbH

24 'Geraldine Leguelinel'marion warembourg'

25. zjhzyyfy@163.com AUGUST-AHF Study>; Dr. Zhang

26. pulsewatch timmothy fitzgibbons umass mmas-8

27. abbvie austria mmas-4 andy brooks

28Mackenzie Salisbury, Walden bruce roberts dissertation

29. Iranian Transfer Nora.Kellock@ed.ac.uk University Edinburgh Morisky Widget  License

30 Daiichi Sankyo Morisky Widget License

31.Xiaona Jia  18811195613@163.com Pharmacy,  First Hospital, Beijing, China.

32. agrover3@uci.edu <agrover3@uci.edu>; ucal irvine

33. silvia.rabotti@infomed-online.it IRS

34. Jack Bernard <bernar@umich.edu> paula casey morisky widget license

35.pnj5@hotmail.com

36. wislon massey cancer center virginia commonwealth Morisky Widget license poster pres

 37. mmas-8 phillip morisky license  Bratislava 2020 peter valkovic

38 grammercy research group Melicia C. Whitt-Glover, Ph.D.

39. aozaydin26@hotmail.com MMAS-4 NCT04301128 koc university

40 Merck KGaA, Darmstadt, Germany NCT02921035

41. akelleher@kirby.unsw.edu.au  NCT04132479_jhanson@kirby.unsw.edu.au

42 NCT03185858 Lijing.yan@duke.edu duke university china

  43. brewer.laprincess@mayo.edu NCT04554147

44. Devin Mann, MD, MSIcahn School of Medicine at Mount Sinai NCT00548639

45. NCT02234713 E. Ann Yeh, The Hospital for Sick Children

46 Jonathan Knights Jonathan.Knights@otsuka-us.com

47Carolyn Bostros NCT03077711

48 g.eguchi@ommc-hp.jp; ymaeda@ommc-hp.jp,y_kanai@ommc-hp.jp mmas-9

49.  Souad.Moudallel@uzbrussel.be patricia.vanderniepen@uzbrussel.be matt stratton

50 patientslikeme morisky widget license Rich.russo@healthtell.com 'Stratton, Matthew

51.tsaejyy@ntunhs.edu.tw_taiwan

52. mcastenosis@gmail.com; mspark@chonnam.ac.kr

53 gerlando.natalello@gmail.com belligerent

54 <aozaydin26@hotmail.com,vemren@hotmail.com

55. tsegahunm@gmail.com; yimtubezenash.wamanuel@aau.edu.et

56. NCT04017559 complaints@belfasttrust.hscni.net

57 argi@cogeco.ca; annajhussey@gmail.com rodondo

58. malshibani@kau.edu.sa; mohannad_ah@hotmail.com

 59Caroline.Fabry@astrazeneca.com> kantar health morisky widget

60 bayer italy Rivaroxaban Treatment Discontinuation Rates

61habouma1@jhmi.edu Hanan Aboumatar, MD

62Montse Cañabate, Cardenal Herrera University NCT04442776,

63g.eguchi@ommc-hp.jp; ymaeda@ommc-hp.jp; g.eguchi@ommc-hp.jp

64. thkim@hanyang.ac.kr

65nadine.houede@chu-nimes.fr

66.vozzhaev-av@rudn.ru

67 info@annedeveer.com; j.ten.berg@antoniusziekenhuis.nl

68 groningen 3 morisky widget license 2020

69 barcelona dialcat morisky widget licenswe

70 liuyong2099@126.com counterfeit scoring and coding clinical trials. Gov

71 Qing-qing SONG hunan

72 'Ayse Ozkaraman' <aozaydin26@hotmail.com>  Turkey

73. mspark@chonnam.ac.kr morisky widget

74michael.crawford@howard.edu

75m.crawford@imperial.ac.uk

76john.weinman@kcl.ac.uk;

77. Muhammet Furkan Korkmaz

78 unchalee.permsuwan@gmail.com

79 Cristian M. Garmendia, cm.garmendia@gmail.com

80 Assistance Publique - Hôpitaux de Paris (Dr. Valeyrie)

81Assistance Publique - Hôpitaux de Paris (MELBASE)

82 National Cheng Kung University Hospital (Dr. Ou)

83 Wayne State University (Aranha and Patel)

84 Assistance Publique Hopitaux De Marseille

85 marta.baviera@marionegri.it  NCT03921905 Mario Negri Institute

86. henri.gonde@chu-rouen.fr,Ms. Monchablon, Anne.dandeville@univ-rouen.fr
France Open Cases at the NIH CLINICAL TRIAL.GOV WEBSITE

87 NCT03753035

88 NCT02422602

89 NCT02856542

90 NCT02926560

91 NCT02060747

92 NCT01509989

93 NCT03492476

94 NCT03454971

95 NCT03606850

96 NCT02364310

97 NCT02828449

98 NCT02611440

99. NCT03240341

100 NCT03561467

101 NCT03630692

102 NCT02147938

103 NCT02733965

104 NCT03296150

105 NCT02143479

106 NCT03145051

107 NCT02356367

108 NCT02322450

109 NCT03257969

110 NCT03642795

111 NCT01774630

112 NCT02687594

113 NCT01244750

114 avorder@umass.edu; quill004@mc.duke.edu

115. Society of Geriatric Oncology (SIOG) taskforce recommendations Laura Biganzoli

116.vanitharani.n@sriramachandra.edu.in elsevier

117.Jessica Núñez-Rodríguez and Co-authors jessica.nr92@gmail.com

118.Mulat Tirfie mulatbonny@gmail.com elsevier

119.z_azul@hotmail.com elsevier

120.yac.achouri@gmail.com elsevier

121. ouahchiyacine@gmail.com elsevier

122. shakibazadeh@tums.ac.ir elsevier

123. Nicholas Rodondi

124.dr.tayseeer@hotmail.com

125 s5854@medimail.co.kr University of Ulsan pred1054@naver.com

126. complaints@belfasttrust.hscni.net NIH study

127. NIH study FARMA-CANP NCT04391218 rmarinello@cittadellasalute.to.it

128. alma.au@polyu.edu.hk mmas-4 infringement nih website

129. michael.marschollek@plri.de

130 jose.mira@umh.es Universidad Miguel Hernandez   NCT04159558

131. NCT03753035 Nancy Hospital   barbara.girard54@gmail.com

132. Juliet N Sekandi, MD, MS, DrPHUniversity of Georgia NCT04134689

133. Ping Huang, Zhejiang Cancer Hospital NCT03455023

134. François GERNIER <f.gernier@baclesse.unicancer.fr> NCT04554927

135. National Cheng-Kung University Hospital huihua@mail.ncku.edu.tw NCT04488172

136 Boehringer Ingelheim wslin545@ms27.hinet.net tri-service general hospital taiwan scoring

137. NCT04253639 sublimed scoring and coding contact@subli-med.comfrance

138. olivia.lesaux@gmail.com, claire.falandry@chu-lyon.fr NCT03296150 lyon

139 Kalicort NCT04107246 Centre Hospitalier Universitaire de Saint Etienne philippe.gain@chu-

140 MARLENE COUPE, MD University Hospital, Montpellier stephane.vignes@cognacq-jay.fr

141 Mario Negri Institute for Pharmacological Research NCT03921905 counterfeit marta.baviera

142 NCT03541109 Shervin Ghaffari Hoseini, MD,PhD shghaffari@yahoo.com sfa.yazdekhasti@

143 sungyk@hanyang.ac.kr modified morisky 6 hanyang unversity NCT04449224

144. Murdoch Childrens Research Institute alison.boast@gmail.com amanda.gwee@rch.org.au

`145. UNC Chapel Hill cabjones@email.unc.edu NCT04131816

146. Dott.ssa RENATA MARINELLO, rmarinello@cittadellasalute.to.it NCT04391218

147 University Hospital, Bordeaux NCT04043052 (MMAS-6) igor.sibon@chu-bordeaux.fr

148. Judith A. Cook, University of Illinois at Chicago morisky widget 312-355-3921jcook@uic.edu NCT04028609

149. Morisky Widget License Julie Wright-Nunes, University of Michigan counterfeit jcolbert@me

150. Ana-Maria Vranceanu,Massachusetts General Hospital,Harvard case6 NCT04537728avranc

151. NCT04499950 jsheng7@jhmi.edujohnshopkins 2 mmas-4

152. Centre Hospitalier Universitaire de Nîmes NCT03642795 cecile.gaujoux.viala@chu-nimes.fr

153. Ms. Savannah Cunningham and Dr. Joshua D. Kinsey of Mercer University

154. Linda Simenrio similx@upmc.edu, krall, stottsj@upmc.edu,NCT03999268

155.: NCT04560062 Lucy Anne Parker, Universidad Miguel Hernandez de Elche counterfeit lparl

156. Diego Ardissino, Azienda Ospedaliero-Universitaria di Parma ALLEPRE gpaoli@ao.pr.it,mar

157. NCT04409210Nanfang Hospital of Southern Medical University xiujc@126.com

158. amoreno1@imim.es Parc de Salut Mar NCT03848858

159. Mohammed N Meah m.meah@ed.ac.uk, d.e.newby@ed.ac.uk,University of Edinburgh, Mor

160. Centre Leon Berard NCT04070443 franck-emmanuel.nicolini@lyon.unicancer.fr

161. Radboud nienke.devries-farrouh@radboudumc.nl NCT03830190

162. International University of La Rioja,NCT03161249 anabelen.calvo@unir.net

163. Henrik Nielsen, Aalborg University Hospital NCT04140903 counterfeit henrik.nielsen@rn.dk,

164. Boehringer Ingelheim Beijing NCT04180813 Mori Widget doctorgw@163.com

165 wslin545@ms27.hinet.net Boehringer Ingelheim taiwan counterfeit MWid NCT04532528

166.vconti@unisa.it

167.jntobin@cdnetwork.org albert einstein morisky wid

168.hynesd@oregonstate.edu; aporte3@uic.edu morisky widget license illinois

169.magee medstar georgetown morisky widget license pcori

170. moser barksdale vcu morisky widget hudasn@squ.edu.om

171.Joseph Colbert 734-936-5515jcolbert@med.umich.edu morisky widget nih counterfeit

172.chen_yanhua25@163.com sichuan

173 h-inoue@saiseikai-toyama.jp daiichi sankyo 2

174 'François GERNIER' <f.gernier@baclesse.unicancer.fr>

175.Northwell Berstein Steger 2018

176.University of Penn (Stein) Fraser Brier  Tuteja and Radner)  anti Morisky website 2017-2019

177.  University of Mass (Boucher Zerillo Goldberg McManus Fitzpat plus 3 other cases 2017-20

178  mathew scarbourough oxford berstein lawsuit 2 PUBLICATIONS

179  Breast Cancer Trials (Australia)(New Zeland Gross Berstein mbuckingham@tglaw.com.au
180 J Barner (2) University of Texas  3 cases 2017-2019 gross berstein ramirezag@uthsca.edu

181lidia.moura@mgh.harvard.edu,tmhale@mgh.harvard.eduBerstein Letter Gross File Morisky \

182.  drinkard iskandar dunbar plus two other cases emory berstein gross

 183 Yale University  Connecticut VA Hospital Berstein letter nicholas.xanthakos@va.gov Yale M

184 10 Duke University School of Medicine 7 cases 2016-2019 license gross 2017-2018 bernste

185. conend@mcmaster.ca> gross settlement june 2019

186. david.farabee@nyulangone.org

187. University of Western Ontario (Cecilia Sandoval)

188 Pfizer Stenger 8 cases

189  Dana Farber Stenger

190 Miami Stenger

191. Humana Gross Dana Drzayich Jankus <ddrzayichjankus@humana.com>

192 . Astra Zeneca Gross MORISKY WIDGET 3 LICENSES

193.  USF Gross

194 Dr. Hamilton University of Bristol Morisky Widget anna.davies@bristol.ac.uk;

195Essmann.Claudia@mh-hannover.de;; baum.christopher@mh-hannover.de; michael.marscho
196 UMASS STENGER 4 CASES 1 LICENSE

197  candace feldman brigham womens hospital harvard gross berstein lawsuit

198 . william Patterson University for Pamela Foju Kem Louie steger gross

199  Hannover Medical School gross 2018

200  Leukemia Patient Advocates Foundation (Sharf) gross berstein

201 Nationwide Children Hospital, Inc. gross berstein

202  Michigan State University (Erin Sarzynski, M.D.) gross berstein

203 AUSTRALIA NEW ZEALEND CANCER

204 South Shore Neurologic Associates morisky widget gross berstein

205<conend@mcmaster.ca berstein gross june 2019

206 French Social Security gross berstein french lawyers 2017-2019

207 University of Parma Gross DaVide

208 Sapeinza University Rome Gross Davide ;carlo.lai@uniroma1.it, pa.aceto@gmail.com

209 Chiesi Italy Chiesi Germany Morisky Widget Berlin Chemie

210 Miranda Murray GSKO'Donnell, Brian" Gross Berstein

211. Massachusetts General Hospital (Dr. Mateen & Dr. Barry) Dr. Hale & Dr. Jethwani berstein

212 Dr. Deepak Voora, M.D. Dr Patel Brian Duscha Verizon Duke Gross Bertstein lawsuit

213 unc Chapel Hill serial

214 Doyle Cummings Gross Berstein serial infringer 4 years Jia-Rong Wu,dewalt

215  Korb Salvodeli Gross Berstein French Lawyer 4 years serial infrigner

216  Cuevas Serial Infringer 4 years gross

217 Cabral Serial Infringer 4 years refile lawsuit

218 naloudah@KSU.EDU.SA university of aberdeen gross berstein 2018

219 observia settled in March 2019 geoffroy.vergez@observia-group.com>

220  Dr. Vorderstrasse, Dr. Quillian and Dr. Krauss Duke

221 Chonbuk National University Youngran13@jbnu.kr berstein final letter

222 .bojing.cai@iqvia.com IQVIA DURHAM nc BERSTEINfinal letter

223  jizan universitymjyo545@hotmail.com  berstein final letter

224 eva.joelsson-alm@sll.se Karolinska Institute Morisky Widget Berstein finalletter

225 Chia-Yi Jenny Wu National Taiwan University jenycyw@ntu.edu.tw berstein final letter

226 .Shingo Kato Saitama Medical University skato@saitama-med.ac.jp  bernstein letter

227 aaranha@med.wayne.edu berstein final letter lawsuit

228 Katherine Holmes University of Marylandkholmes@umaryland.edu berstein final letter kgros

229. Mayo Clinic 1 2017 and 2 2019 Kane Sunanda;Becker Brenda;Klemp Ellen;Caines Jake;Ca

229. LaPrincess C. Brewer, Mayo Clinic NCT04554147 brewer.laprincess@mayo.edu

230.E. Ann Yeh, MDUniversity of Toronto, The Hospital for Sick Children NCT02234713

231.thurston_mm@mercer.edu

232.thomas jefferson university poster presentation gina nightingale

233.Mohannad Alshibani,  King Abdulaziz University, Jeddah, Saudi Arabia

234.https://www.hal.inserm.fr/inserm-00663888/file/1472-6874-10-26-S2.PDF

235.'Wang, Tina' <twang@wiley.com>

236.the university of georgia  juliet.sekandi@uga.edu morisky widget

237 igor.sibon@chu-bordeaux.fr bordeaux mmas-6

238.tsegahunm@gmail.com emory

239.jsheng7@jhmi.edu hopkins 2

240. Bayer Clinical Trials (+)1-888-84 22937clinical-trials-contact@bayer.com mmas-8

Five Moore Drive P.O. 13398 Research Triangle Park, NC 27709-3398,NCT02227238

243.Tammy Toscos, Research Scientist, Informatics, Parkview Health NCT02690649

244.Athena Philis-Tsimikas, Scripps Whittier Diabetes Institute NCT02643797

245.marta.baviera@marionegri.it mmas-8 counterfeit NCT03921905

246.Dott.ssa RENATA MARINELLO  NCT04391218

247.Eliane Boucher, PhDHappify Inc. julia@happify.com

248 University Hospital of North Norway NCT02770599

249 inda Siminerio, University of Pittsburgh NCT03999268

250. john.billimek@uci.edu NCT04585594

251. NCT03830190 radboud nienke.devries-farrouh@radboudumc.nl

252.info@deltahealthalliance.org,NCT03374098

253.franck-emmanuel.nicolini@lyon.unicancer.fr NCT04070443

254.: Ana Calvo, PI anabelen.calvo@unir.net NCT03161249

255. z.jalal@bham.ac.uk university of birmingham

256.Jenni Sheng <jsheng7@jhmi.edu>, Spaulding, Erin Murdock

257.MEAH Mohammed <m.meah@ed.ac.uk>

258.Anne.dandeville@univ-rouen.fr

259.ragna.anne.lind@helse-bergen.no

260.claire.falandry@chu-lyon.fr clinical trials.gov

261.janssen johnson and johnson

262.G. Natalello E. De Lorenzis  Catholic University of the Sacred Heart, Institute

263.jblitstein@rti.org <jblitstein@rti.org>;

264.yulhamin@gmail.com university of chuncheon korea

265. Ghada_thabet@aun.edu.eg Assiut University, Egypt Ghada Thabet Mohammed

267.marco.proietti@unimi.it,;Deirdre.Lane@liverpool.ac.uk

268 m.e.t.mcmurdo@dundee.ac.uk; miles.witham@ncl.ac.uk

269 texas tech alexander morisky widget license

270 'SEVDA EFİL' <sevda_efil@hotmail.com> istanbul

271 nadia_shams@yahoo.com

271 beata.jankowska-polanska@am.wroc.pl scoring and coding incorrect

272 schira@uta.edu, d brown texas

273 Lane, Deirdre <Deirdre.Lane@liverpool.ac.uk> marco.proietti@unimi.it

274 Nagoya 2

275 swhan@dsmc.or.kr Keimyung University Korea

276 ahmad.naddaf@iu.edu.jo jordan

277 kkruetzf@its.jnj.com

278 Caterina Bucca morisky widget

279 tilahunabdeta@gmail.com ethiopia mmas-4 scoring and coding

280.Yong Huo, Peking University First Hospital NCT03565978

281 kevin.dolgin@observia-group.com

282 timothy.welty@drake.edu

283. julius.katzmann@medizin.uni-leipzig.de

284.Furkan Korkmaz <korkmazmfurkan@gmail.com>

285.argi@cogeco.ca; annajhussey@gmail.com

286. merve.kolcu@sbu.edu.tr

287.Shandong University YAO Jing-jing, SUN Qiang, LI Qi, et al

288. Chomgqing university lijingfang@hospital.cqmu.edu.cn disclosed scoring

289.duanjinju@163.com Second Hospital of Shanxi Medical

290.m.eisele@uke.de hamburg

291.university of british columbia

292.danielt@arsiun.edu.et franco.veglio@unito.it

293.prorektoratfw@uni-halle.de Bleidorn@med.uni-jena.de

294.Jia-RongWu, sandra dunbar  unc emory https://www.sciencedirect.com/science/article/abs/p

295.burra@unipd.it

296 Géraldine Leguelinel-Blache University of Montpellier

297. akosobucka@wp.pl

298. jfarrellhcc@yahoo.com umass

299. goates@uab.edu

300. tawben11@hotmail.com qatar hamadi medical center

301 romagnoli_alessia@libero.it <romagnoli_alessia@libero.it>;

302.a.chatziefstratiou@yahoo.gr Papataxiarchou Katerina <k.papataxiarchou@elpen.gr> morisk

303.Ahmad Naddaf Jordan MMAS-8

304.mdsrinopiyani@yahoo.com, sri.nopiyani@unud.ac.id  mmas-8 without license

305.Valerio.neiviller@fmc-ag.com

306.nasib.babaei@yahoo.com iran mmas-8 unlicensed

307.leigh.Edward@svha.org.au

308.Karen-leigh.Edward@svha.org.au <Karen-leigh.Edward@svha.org.au>;

309.6-item Morisky Medication Adherence Scale (MMAS-6) drhopper@ikoob.com catholic unive

310.Branislava Krstic <branka022@yahoo.co.uk>

311 ra.mazzill@gmail.com <ra.mazzill@gmail.com>;Morisky widget license university of pisa

312.heloisiq@gmail.com <heloisiq@gmail.com>;Ms. Heloise Helena Siqueira brazil

313.asjarab@just.edu.jo mmas jordan mmas-4

314.angelina_wibowo@yahoo.com

315.angelina_wibowo@yahoo.com indonesia

316.Abedi.a@ArakMU.ac.ir abedi30@yahoo.co.uk

317.Ilaria Aredano,Caterina Bucca,IRS Morisky Widget

318.farmaciaalaxe@galicia.com Andrea Leites-Docío university of santiagao mmas-8 scoring an

319.yxk12@ewha.ac.kr younhee kang

320.dr.hazimraffaa@gmail.com KING KHALID

321.amalsaied19@yahoo.com Mahmoud

322.juwagner@uchc.edu, Buckley, Thomas <thomas.e.buckley@uconn.edu>UCONN

323.vozzhaev-av@rudn.ru,pokrovskii@bsu.edu.ru

324.nc.ten.362@oaynai fuwai

325.claudia.giavoli@unimi.it <claudia.giavoli@unimi.it>;

326.yenpingng@hotmail.com malaysia

327.sametsancarkaya@hotmail.com

328. fusaunga@gmail.com S
fsn299@gmail.com

329. wafaa_ramadan27@yahoo.com

330.manuel_cappellari@libero.it

331.Manuel.Schwanda@fhstp.ac.at

332.y_kanai@ommc-hp.jp

333.mohamedizham@gu.edu.qa,arafatyara@gmail.com

334.RENATA MARINELLO, Azienda Ospedaliera Città della Salute e della Scienza di Torino:NC

335.cecile.gaujoux.viala@chu-nimes.fr NCT03642795

336.yenbinliu@gmail.com,wslin545@ms27.hinet.net BI Taiwan NCT04532528

337.barbara.girard54@gmail.com  NCT03753035

338.clinical-trials-contact@bayer.com NCT04174859, mmas-8 (Non-valvular Atrial Fibrillation, N

339.montserrat.canabate@uchceu.es NCT04442776

340.similx@upmc.edu NCT03999268 siminelo

341.sandra.michiels@bordet.be

342.G Natalello morisky

343.Jing Xiao jxiaont@163.com

344.giuseppe.procopio@istitutotumori.mi.it

345.mahmoud.hassanein@alexmed.edu.eg

346.Nathalie TEXIER <nathalie.texier@kappasante.com> portel

347.info@annedeveer.com; j.ten.berg@antoniusziekenhuis.nl

348.allison.gibson@uky.edu

349.greg.rosenfeld@me.com

350.moustafaesraa0@gmail.com

351.manesh.patel@duke.edu; brian.duscha@duke.edu

352.rondi.beth.gelbard@emory.edu; info@memorahealth.com

353.sadeghimasoumeh@gmail.com; shghaffari@yahoo.com

354.albcicero@gmail.com; uisllorentepeters57@gmail.com

355.nriera@chv.cat

356.Indiana tarab@iu.edu; tarahb@iu.edu

357.chenyan72_72@zju.edu.cn

358.r.paterson, napier

359.lujiao801@163.com

360.Amanda Gethman mercer

361.northeastern university poster

362.swhan@dsmc.or.kr,'황종민' <dsmcep@gmail.com>

363.Anna.Mislang@sa.gov.au nightingale mercer 'Stratton, Matthew

364.M.Tomassen@nivel.nl matthew stratton

365.'DiMezza, Danielle' <Danielle.DiMezza@umassmed.edu>

366.abigail.crocker@uvm.edu mmas-4

367.soxl@musc.edu <soxl@musc.edu>;

368.smansberger@deverseye.org
369.Zhan Shi, Liang Shi Chao-yang Hospital, Capital Medical University,

370.michellehyczy@gmail.com

CARBP

372.brunaeibel@gmail.com clinical trials NCT04475367

373.olivia.lesaux@gmail.com NCT03296150

374.ssbunova@mail.ru <ssbunova@mail.ru>;

375.kto0440@paik.ac.kr

376.'宋青青' <zimoqingqing1226@163.com>

377.annedeveer@outlook.com
378.rachel.a.elliott@manchester.AC.UK
ac.uk

378.LU UNIVERSITY OF TEXAS AUSTIN SOUTH TEXAS VA MORISKY

379.J. Seelig & M. E. W. Hemels

380.mehdi_zoghi@hotmail.com turkey

381.manuel.schwanda@fhstp.ac.at

382.ianyao@263.net.cn fuwai hospital

383. libya saved in trubow picture asus

384.audrey-castet@chu-montpellier.fr> NCT02422602
Korchmaros,Jeannie K. Lee, Susan J. Shaw Krista K. Stone
University of Massachusetts President's Office

387. Dana Opas dopas@humancaresystems.com, jholley@humancaresystems.com

388.Yale University  Connecticut VA Hospital Nicholas D. Xanthakos (nicholas.xanthakos@va.go

389.Georges.Mayeux@groupecen.com

390.Michel Bernier PIVOT Dr. Alain Larouche, Concerto Groupe Santé MMAS-4 INFRINGEMEN

12.NCT04391218  Torino
with
Medication Adherence and Asthma Control in Hispanic
Adults with Asthma?

393. Susan Feyerabend praxis@studienurologie.de HAMBURG JANSSEN MMAS4

394.  Neighborcare Health AIMS UW COMPASS cneely@icsi.org DISTRIBUTOR

395. minami VESS-Program saint louis university .Hataka R. Minami

396. University of western ontario sandoval asalmoni@uwo.ca (Professor Alan Salmoni

397.Packard, Katie A <KatiePackard@creighton.edu>

398.ahmedmajly@yahoo.com mmas-9,Ahmed Mjalia

399.giada.pietrabissa@unicatt.it

400.Astellas Pharma laurence.dubel@astellas.com; Sue.Sargeant@astellas.com lyon and mars

401.francoise.laroche2@aphp.fr

402. tawben11@hotmail.com hamed medical corp qatar

403.Ana Aguiar : anaaguiar590@gmail.com

404.TANG Xiang, ZHANG Jian-lin Guangzhou

405.krb747@gmail.com Rock Bum Kim

406. shuper@bsmu.edu.ua ukrainian mmas-8 wrong scoring and coding
407.Nadine Hellmann DelfinoValerim Teixeira Remor

# EXHIBIT 4

## Morisky Widget Licensees

**Licensees**

AbbVie Canada
Abbvie
Adelphi
Albert Einstein College of Medicine
Ankara Yildirim Beyazit University
Ascensia Diabetes Care
Assurex Health
AstraZeneca Greece
AstraZeneca Kantar
AstraZeneca Latin America
Astrazeneca Russia
Azienda Ospedaliero Universitaria di Modena

BMS Italy
Bayer NL
Berlin Chemie
Boehringer Ingelheim China
Boehringer Ingelheim GmbH
Boston Children's Hospital
Bristol University
Bristol-Myers Squibb USA
Brussels Free University School of Public Health

CARIM/Maastricht University
CHIESI GmbH
CHU de Clermont-Ferrand
Caritas Medical Center
Catalia Health
Centre François Baclesse, Caen
Charing Cross Hospital - Imperial College
Chiesi Poland
China Crohns & Colitis Foundation
Chonnam National University
Clermont-Ferrand 2
Clermont-Ferrand 3
Click Therapeutics
Columbia University Medical Center
Columbia University Medical Center, Department of Psychiatry
Community Health Initiatives FQHC Brooklyn NY
Consorci Hospitalari de Vic
Consorci Sanitari de Terrassa
Copenhagen University Hospital

Daiichi-Sankyo
Denmark IBD

1

Department of Emergency Medicine, University of Illinois at Chicago
Dilla University Referral Hospital
Duhok University-Kurdistan,Iraq
Duke-NUS Medical School
Duquesne University School of Pharmacy

ELPEN
Ethiopia National

Federico II University
Ferring Pharmaceuticals
Florida Orthopaedic Institute
Fukuoka University Chikushi Hospital
Fundació Althaia
Fundació Mútua de Terrassa
Fundació Privada Hospital Asil de Granollers
Fundació Universitària del Bages
Fuwai Hospital

G.I. Research Institute
GSK Spain
German Liver Foundation
Gimema
Gustave Roussy

Hospital Robert Debre
Hospital de Clinicas de Porto Alegre
Hospital for Special Surgery
Huazhong University of Science and Technology
Hunan Children's Hospital
Hôpital Claude Huriez
Hôpital de la Cavale Blanche

IGES Institut GmbH
Imperial College London
Inje University Haeundae Paik Hospital
Institute Cancer De La Loire Lucien Neuwirth
Intarcia

Janssen Pharmaceutical Companies of Johnson & Johnson Japan
Jawaharlal Institute
Johnson and Johnson USA
Julius Maximilian University of Wurzburg
Kameda General Hospital

Kappa Sante
Karolinska Institute 2
Keelung Hospital Taiwan
King Faisal Specialist Hospital
King Saud University
King's College
Kyoto University Hospital

2

Laboratoires Théa
Lifespan
Louis Mourier Hospital
Lurie Childrens Hospital of Chicago

MSD KK
Maastricht University GROW School for Oncology
Mamara University
Marmara University
Mbarara University of Science and Technology
McGovern Medical School-UTHealth
MedStar
MediNeos Observational Research
Medical University of South Carolina
Medpace, Inc
Menarini France
Merck Greece
Michael E DeBakey VA Medical Center
Michigan State University
Mitsubishi Tanabe Pharma Corporation
Montefiore
Morgan Stanley Children's Cancer Center

NYU College of Global Public Health
NYU School of Medicine
NYU Taylor
Nihon Chouzai
Nippon Medical School
Nordic Pharma SAS
Northwell Health
Norway IBD
Novartis Pharma GmbH
Novartis South Korea PrimeCore
Novartis UK
Novo Nordisk

OPIS
Odenplans Medical Center
Open Vie UK
OptiNose
Oslo University Hospital
Oslo University Hospital 2
Oslo University Hospital Department of Gastroenterology
Otsuka Pharmaceutical Co

Parc Sanitari Pere Virgili
Partizan Health
Peking University First Hospital
People of Rwanda
People's Hospital of Guizhou Province
Pfizer France

3

Roche Diabetes Care
Rocky Mountain Suicide Prevention VA
Rush University Medical Center
Rīga Stradiņš University

S. Anna of Pisa Management Institute
SANOFI
SANOFI China
Sarawak Research Society
Saudi Stroke Society
Servier Global Medical Affairs
Servier Russia
Shanghai Clinical Center for Endocrine and Metabolic Diseases
Shanghai Institute of Endocrine and Metabolic Diseases
Shinshu University School of Medicine
Singapore Clinical Research Institute
Societa Italiana di Pneumologia
South Shore Neurologic
Southside Medical Center
Spain IBD
St George's Hospital
St Olavs University Hospital
Suqian First Hospital
Sweden IBD

Taiwan Society of Preventive Medicine
Takeda Greece
Texas Tech El Paso Medical Center
Tianjin University
Tufts Medical Center

U.S. Department of Veteran Affairs Geriatric Research, Education and Clinical Center
Gainesville
UCLA Integrated Substance Abuse Programs
UOC Farmacia Ospedaliera di Rovigo
USC School of Pharmacy
Ulster University
United Christian Hospital
Universal Medica
University College London
University Hospital, Heinrich-Heine University Dusseldorf
University Medical Center Groningen
University of Bari
University of Brescia
University of British Columbia
University of Edinburgh
University of Groningen
University of Ljubljana, Faculty of pharmacy
University of Michigan
University of Modena
University of Pisa

4

University of Wolverhampton
Université de Bordeaux
Uniwersytet Jagielloński – Collegium Medicum

VA Greater Los Angeles
VCU
Vall d'Hebron Institut de Recerca
Value Outcomes Organization CZ
Vatche and Tamar Manoukian Division of Digestive Diseases, David Geffen School of Medicine, UCLA

Wake Forest Health
West China School of Nursing & West China Hospital
West China Sichuan Women's and Children's Hospital
Western Wayne FQHC

Xi'an Jiaotong University Hospital

Yeshiva

Zuckerberg San Francisco General Hospital

# EXHIBIT 6

**From:** Donald Morisky <dmorisky@gmail.com>
**Sent:** Friday, June 21, 2019 12:37 PM
**To:** Steve Trubow <trubow1@gmail.com>
**Subject:** Accept your offer of withdrawal

Steve: After consideration, I have decided to accept the offer of withdrawal as a member contained in the February 14, 2019 e-mail from you to me. I have attached below a copy for your convenience. The offer "If you want to withdraw from MMAS Research LLC you are free to do so, but you will give up your 50% ownership in the Morisky Widget" is accepted. I hereby withdraw as a member and from all other of my roles on behalf of MMAS Research, LLC, effective June 21, 2019. Thank you. "


**From:** trubow1@gmail.com
**Sent:** Thursday, February 14, 2019 11:13 AM
**To:** 'Donald Morisky'
**Cc:** 'Rodney Watkins'
**Subject:** RE: MMAS executive assistant/manager

Don,

I have been the managing partner of MMAS Research LLC for the last two years.
I perform 90% of the work. I work on average over 70 hours a week.
I pay 100% of the bills.
I write 100% of the licenses and settlement agreements for our three lawyers.
I have not changed our original agreement to split the revenues 50/50
You have known Imani was on the payroll since August of last year.
Imani gets paid for her invaluable assistance training and certifying licensees.
If you want to remove her from the payroll, that is your right.
I will pay her out of my personal quarterly dividends
Please let me and Rodney know that it is your wish to remove Imani from the payroll.
If you want to withdraw from MMAS Research LLC you are free to do so, but you will give up your 50% ownership in the Morisky Widget.

Sincerely yours
Steven Trubow
Donald Morisky
MMAS Research LLC
Coronado California USA
360-824-0701
www.morisky.org

# EXHIBIT 7

**From:** DONALD MORISKY <dmorisky@ucla.edu>
**Date:** November 12, 2017 at 2:08:49 PM PST
**To:** "Tarr, Amanda" <atarr@healthcore.com>
Cc: "Merkh, Rebecca D." <rmerkh@healthcore.com>, dmorisky@gmail.com, "Grabner, Michael"
<mgrabner@healthcore.com>, "Marshall, Amanda" <amarshall@healthcore.com>, olympic labs
<trubow1@gmail.com >
**Subject: Re: Question regarding MMAS-8 license**

Ms. Tarr, you are not permitted to use the copyrighted MMAS scales without a license. You must apply
for a retroactive license from Mr. Trubow and use the Morisky Widget to enter your data.

Beginning January 2017, all data collection of the MMAS adherence scales must use the Morisky
Widget, which is a digital data entry process using any digital electronic device. The Morisky Widget
not only provides a diagnostic assessment as to why the patient is non-adherent and but also offers a
tailored educational counseling session based on the patient's response to the simple 8 items in the
MMAS-8.  All MMAS-8 and MMAS-4 licenses are administered through the Morisky Widget pictured
above.  The Morisky Widget provides anywhere, anytime, patient-centered, medication adherence
diagnostic assessments using the validated  Morisky Medication Adherence Scale (MMAS-8 & MMAS-
4). The Morisky Widget automatically administers (to any internet connected device) MMAS-tests in
over 80 languages with zero clinician and minimum patient burden. The Morisky Widget automatically
scores, and reports adherence levels & the risk of intentional/unintentional non-adherence into
databases and electronic medical records (EMR) where they are correlated with primary markers of
adherence, timely physiological measures and with the prescribed medication for medication
reconciliation. Another HUGE ADVANTAGE of the Morisky Widget is the option to select from 110
MMAS-8 condition-specific tests with MAPI validated translations which offer a sensitivity of 93% as
compared to the generic MMAS-8 at 83% sensitivity (including condition-specific MMAS tests for all
chronic and long-term infectious diseases.  All MMAS-8 users are required to obtain a signed MMAS-
8 license.  You can go to my website at Morisky.erg and see how the widget works. If you are an
individual only that will use it, would not be cost-beneficial.  However if your institution or University
would purchase it, it can be used by all faculty /students in your institution. The ongoing cost is $1.00
for each administration or $1.50 for a translated version of the MMAS-8.
**Please answer all items below Please return by email to <u>trubow1@gmail.com</u> to receive
consideration for a Morisky Widget MMAS License**

Name and Address of Organization:

Point of Contact with contact info

Has your organization ever used the Morisky Medication Adherence Scales: If so give some detailed descriptions of When, Where, How, What and Why you or your organization used the MMAS.

When do you want to begin using the perpetual Morisky Widget MMAS license?

How many MMAS-8 or MMAS-4 tests in total do you plan to administer?

How do you plan to administer the MMAS diagnostic assessments by paper or electronic questionnaire?

Do you need to use MMAS Tests in languages other than English? Name the specific translation (s) required.

What conditions, diseases, and specific medications are you trying to assess for medication adherence? Do you track the dynamic level of medication adherence with changing physical measures of disease or the severity of mental health conditions? BP, HbA1C, GFR, LDL, HIV Viral Load Depressive Severity?

Please describe in detail you study design or if a Provider the clinical application for using the MMAS.

How many times will each patient be given the MMAS?  Will you establish a baseline measurement of adherence and do follow-up reassessment over time to measure changes?

If the MMAS included with other assessments in your study or clinical application? If so please list


Sincerely,

dmorisky

Donald E. Morisky, Sc.D., M.S.P.H., Sc.M.
Research Professor and Former Chair
Distinguished Chair Professor at Kaohsiung University, Taiwan
Department of Community Health Sciences
UCLA Fielding School of Public Health
650 Charles E. Young Drive South
Los Angeles, CA 90095-1772

On Wed, Nov 8, 2017 at 11:02 AM, Tarr, Amanda <atarr@healthcore.com> wrote:

> Good afternoon Dr. Morisky,
>
>
> As Rebecca stated in her email below, the research team I am working with used the MMAS-8 in a survey study conducted earlier this year. Now that the project has been completed, the sponsor of that study has requested to use the survey data for further research questions. Our plan is to transfer the survey data to the sponsor under a contract that outlines the use of that data and steps for publication. Specifically, that the data is to be used for research purposes only, notification sent to you for any resulting publications with the survey data, and the appropriate acknowledgments and references for the MMAS-8 must be included in all publications. As

we begin this process, we wanted to make you aware of the request for further use of the survey data and the stipulations we will have surrounding the continued work with the MMAS-8.

Should you have any questions or concerns please reach out and we will be happy to discuss further.

Best,

Amanda

**Amanda Caldwell-Tarr, PhD**

*Research Project Manager*



HealthCore, Inc.

300 Brickstone Square, Suite 801A

Andover, MA 01810 USA

Office (978) 247-6622

---

**From:** Merkh, Rebecca D.
**Sent:** Wednesday, November 08, 2017 10:00 AM
**To:** dmorisky@ucla.edu
**Cc:** dmorisky@gmail.com; Tarr, Amanda <atarr@healthcore.com>; Grabner, Michael <mgrabner@healthcore.com>; Marshall, Amanda <amarshall@healthcore.com>
**Subject:** Question regarding MMAS-8 license

Hello Dr. Morisky,

About a year ago my company, HealthCore, licensed the MMAS-8 for use in one of our survey studies. The team leading the study has a few questions for you around use of the data. I've included two team members, Mike Grabner and Amanda Tarr, on this email so they can reach out to you with their questions. Please expect an email from them to be coming shortly.

Thank you,

Rebecca


**Rebecca D. Merkh, MA**

<image007.png>

*Research Data Coordinator*

**<image008.png>**

HealthCore, Inc.

123 Justison Street, Suite 200

Wilmington, DE 19801 USA

Office (302) 230-2019

Fax (302) 230-2020


**From:** DONALD MORISKY [mailto:dmorisky@ucla.edu]
**Sent:** Tuesday, October 11, 2016 5:11 PM
**To:** Merkh, Rebecca D. <rmerkh@healthcore.com>
**Cc:** Marshall, Amanda <amarshall@healthcore.com>
**Subject:** Re: FW: Requesting a license for the MMAS-8


Hi Rebecca and thanks for your investigation re the cashing of the check and I note that this has been also deposited to my account, so all is good. I have attached the final signed contract and two appendices related to the copyright requirements in terms of references and the scoring and re-coding trade secrets of the MMAS-8 scale and psychometric properties of the scale. Please let me know if you have any additional questions.


Best always,


dmorisky


| 10/05/2016 | Show additional information for activity type deposit 472.50 Counter Credit | activity type deposit | status type icon cleared | 472.50 |

Cleared. Select to mark activity type deposit 472.50 Counter Credit as Reconciled

On Tue, Oct 11, 2016 at 1:02 PM, Merkh, Rebecca <rmerkh@healthcore.com> wrote:

Hi Dr. Morisky,

Our fiscal person was able to look into the status of the check and our records indicate it was already cashed. Please see the attached copy.

If you have any questions or concerns, please let me know. Otherwise, we will consider this paid and expect to receive the fully executed license shortly.

Thank you!

Rebecca

---

**From:** Merkh, Rebecca
**Sent:** Tuesday, October 11, 2016 11:02 AM
**To:** 'DONALD MORISKY' <dmorisky@ucla.edu>
**Cc:** Marshall, Amanda <AMarshall@healthcore.com>
**Subject:** RE: FW: Requesting a license for the MMAS-8

Hello again,

To follow up on my earlier email, a check was sent on 9/23 (check #62478911); this was NOT a credit card payment. The check would have come from Anthem. Can you please confirm that you did not receive it?

We typically allow 7-10 business days for checks to arrive, so you definitely should have received it by now. If you confirm that it was NOT received, we can stop payment and issue a new check.

Thank you!

Rebecca

---

**From:** Merkh, Rebecca
**Sent:** Tuesday, October 11, 2016 10:33 AM
**To:** 'DONALD MORISKY' <dmorisky@ucla.edu>
**Cc:** Marshall, Amanda <AMarshall@healthcore.com>
**Subject:** RE: FW: Requesting a license for the MMAS-8

Hi Dr. Morisky,

Thank you for sending back a copy of our MMAS-8 survey questions with the copyright date corrected – we will use this version in our survey.

I've reached out to our fiscal department and they are looking into this payment. I will keep you posted.

Thanks for all your help with this!

Rebecca

**From:** DONALD MORISKY [mailto:dmorisky@ucla.edu]
**Sent:** Monday, October 10, 2016 4:27 PM
**To:** Merkh, Rebecca <rmerkh@healthcore.com>
**Cc:** Marshall, Amanda <amarshall@healthcore.com>
**Subject:** Re: FW: Requesting a license for the MMAS-8

Thank you Rebecca for your follow up note and I am wondering if you have sent a check or a credit card payment, as the contract indicates that you will pay your invoice by credit card. I am not aware of receiving any payment, so please update me as to your method of payment. Here is the pending PayPal "Payment Request" I sent to Shirley Ware several weeks ago.

# Money Request Details

## Request Sent

| | |
|---|---|
| From: | MMAS Research |
| To: | sware@healthcore.com |
| Amount: | $472.50 USD |
| Status: | Pending |
| Date Requested: | Sep 16, 2016 |
| Subject: | PayPal money request from MMAS Research |
| Note: | In consideration of the owner's intellectual property, client agrees to pay owner a license fee of $450 ($1.00 x 450 participants, one time, and a credit card fee of $22.50.for a total of $472.50 |

Sincerely,

Professor Morisky

Thank you for your follow up information. I have attached an updated version of your basil insulin MMAS=8 with the correct ciopyrght date.

Sincerely,

Professor Donald
Morisky

On Mon, Oct 10, 2016 at 12:29 PM, Merkh, Rebecca <rmerkh@healthcore.com> wrote:

Hello Dr. Morisky,

I wanted to follow up on this again. Your check for use of the MMAS-8 was sent more than 2 weeks ago, so you should have received it by now – please let me know if that is not the case. We are scheduled to begin fielding our survey within the next week, so we hope to get the license executed as soon as possible to prevent any delays.

Please let me know if you have any questions or if there's anything else you need from me.

Thank you,

Rebecca

---

**From:** Merkh, Rebecca
**Sent:** Wednesday, October 05, 2016 11:35 AM
**To:** 'DONALD MORISKY' <dmorisky@ucla.edu>
**Cc:** Marshall, Amanda <AMarshall@healthcore.com>
**Subject:** FW: Requesting a license for the MMAS-8

Hi Dr. Morisky,

I'm following up to see if you've received the payment for the MMAS-8 from HealthCore/Anthem yet. Our fiscal department indicated it was mailed on 9/23, so please let me know if you have not received it.

Upon receipt of the payment, please (1) send back a fully executed copy of the license and copy of the MMAS-8, (2) confirm that the text in the WORD document and screenshot from the online survey (both attached) look good, and (3) provide a response to my question about possibly switching the order of the response options (*e.g.* so "Yes" appears before "No").

Thanks in advance,

Rebecca

---

**From:** Merkh, Rebecca
**Sent:** Wednesday, September 28, 2016 12:30 PM
**To:** 'DONALD MORISKY' <dmorisky@ucla.edu>
**Cc:** Marshall, Amanda <AMarshall@healthcore.com>
**Subject:** RE: Requesting a license for the MMAS-8

Thank you for the quick reply!

The 3 documents listed below have been attached. If any of them will require further revisions, please let me know.

• PDF of the complete license, signed by the PI

• WORD document containing the MMAS-8 section of the study survey → Coding next to response options has been replaced with check boxes

• Screenshot showing how MMAS-8 question #1 appears in our online survey administration software (the introductory text and each question will appear on a separate screen)

As I noted before, we'd like to switch the order of the response options for the No/Yes questions (#1-#7) so 'Yes' appears first, then 'No' below it. Would that be okay?
Thanks again,
Rebecca

**From:** DONALD MORISKY [mailto:dmorisky@ucla.edu]
**Sent:** Wednesday, September 28, 2016 11:52 AM
**To:** Merkh, Rebecca <rmerkh@healthcore.com>
**Cc:** Marshall, Amanda <amarshall@healthcore.com>
**Subject:** Re: Requesting a license for the MMAS-8

Thanks so much Rebecca for your updated information. I have reviewed your assessment instrument and find only one problem. Please do not identify the coding on the questionnaire, but use boxes for each response, that is, for yes and no, and for the 5 Likert scale items for Item number 8. I am very cautious of our intellectual property and do not want this as public information, only the licensee. Upon receipt of your check, I will send you all the MMAS-8 document s, including all Copyright requirements, citations, footnote requirements for all publications, scoring trade secrets, etc....

On Wed, Sep 28, 2016 at 4:33 AM, Merkh, Rebecca <rmerkh@healthcore.com> wrote:

Hello Dr. Morisky,

Someone from our financial department just informed me that your check for use of the MMAS-8 was sent on 9/23. If you have not received it yet, it should be arriving soon. I look forward to receiving the fully executed license and official copy of the MMAS-8 instrument.

Attached again is the MMAS-8 portion of the survey we'll be using for our upcoming study.

• Please let me know if we need to make any changes to the question wording or legend/citation text before implementing.

• If possible, we'd like to switch the order of the response options for the No/Yes questions (#1-#7) so 'Yes' appears first, then 'No' below it. Would that be okay?

Thanks in advance,

Rebecca

**From:** Merkh, Rebecca
**Sent:** Friday, September 23, 2016 11:37 AM
**To:** 'DONALD MORISKY' <dmorisky@ucla.edu>
**Cc:** Marshall, Amanda <AMarshall@healthcore.com>
**Subject:** RE: Requesting a license for the MMAS-8

Hi Dr. Morisky,

In regard to the document I sent yesterday showing the exact wording of the MMAS-8 that will be used in our study survey (attached), would it be okay if the order of the Yes and No response options was switched for questions #1-7 (*i.e.* Yes would appear first, then No)? This

would match the standard order used for Yes/No questions throughout the rest of the survey.

We look forward to receiving your feedback on the wording and formatting we plan to use for the MMAS-8 section of our survey.

Thank you,

Rebecca

---

**From:** Merkh, Rebecca
**Sent:** Thursday, September 22, 2016 12:05 PM
**To:** 'DONALD MORISKY' <dmorisky@ucla.edu>
**Cc:** Marshall, Amanda <AMarshall@healthcore.com>
**Subject:** RE: Requesting a license for the MMAS-8

Hello Dr. Morisky,

Language about our online survey monitoring and security processes has been added to **Section A. Ownership and Fees** of the license Appendix, as shown below. A clean, signed copy of the full license agreement is attached.

> survey participants. For online survey administration scrambled ID codes will be distributed to potential respondents, who can only access the online survey if they enter the scrambled ID code that matches back to the sample list. ORC will monitor production closely and shut down the survey website once the target of 400 completed surveys is reached. At that point, the survey will no longer be accessible. An extra 50 administrations of the MMAS-8 are being requested in the event that the target is exceeded slightly.

Regarding your payment, it has been submitted to Anthem (our 'parent' company), but has not yet been approved. This typically only takes a few days (but please note that our official terms state they have up to 45 days). Upon receipt of payment, please send back the counter-signed copy of the license for our records.

I've also attached a WORD document that includes the MMAS-8 section of the survey we'll be implementing for our study. Can you please review and let me know if you approve?

Thank you,

Rebecca

**From:** DONALD MORISKY [mailto:dmorisky@ucla.edu]
**Sent:** Wednesday, September 21, 2016 4:54 PM
**To:** Merkh, Rebecca <rmerkh@healthcore.com>
**Cc:** Marshall, Amanda <amarshall@healthcore.com>; dmorisky@gmail.com
**Subject:** Re: FW: Requesting a license for the MMAS-8

Thanks again Rebecca for your quick reply and yes, please add this information to the MMAS-8 License Contract in the section where this is addressed. I look forward to receiving your final signed contract and details of your payment method.

Best always,

dmorisky

On Wed, Sep 21, 2016 at 12:10 PM, Merkh, Rebecca <rmerkh@healthcore.com> wrote:

> Hi Dr. Morisky,

Thank you so much for the quick reply – it's greatly appreciated.

In regard to your questions about monitoring and security of the online survey, I sent the information below over to you previously, and you indicted your approval. If you need additional information, or want this language to be added into the license agreement itself, please let me know and I'd be happy to accommodate your wishes. Otherwise, I will plan to create a clean copy of the license and have it signed and returned to you by the end of the week.

*Online survey administration*

*We distribute scrambled ID codes to our potential respondents, and they can only access the online survey if they enter the scrambled ID code that matches back to our sample list. We will monitor production closely and shut down the survey website once we reach our target of 400 completed surveys. At that point, the survey will no longer be accessible. We're requesting an extra 50 administrations of the MMAS-8 so we're covered in the event that we exceed our target slightly.*

Thanks again,

Rebecca

**From:** DONALD MORISKY [mailto:dmorisky@ucla.edu]
**Sent:** Wednesday, September 21, 2016 1:40 PM
**To:** Merkh, Rebecca <rmerkh@healthcore.com>
**Cc:** Marshall, Amanda <amarshall@healthcore.com>; dmorisky@gmail.com
**Subject:** Re: FW: Requesting a license for the MMAS-8

Hi Rebecca and thanks for getting back to me. I approve all your modifications, but you have to expand on your digital assessment monitoring and security procedures you are using to be able to quantify the total number of MMAS-8 administrations being conducted and password protected procedures to prevent outside individuals or institutions from gaining access to your web page.

Thanks for your clarification on this and once I assess how you are monitoring and protecting my intellectual property, we can move ahead with the final signed contract and payment of invoice. Please send me an update on the timetable for delivering this to me....

Best always,

dmorisky

On Wed, Sep 21, 2016 at 8:27 AM, Merkh, Rebecca <rmerkh@healthcore.com> wrote:

Hello Dr. Morisky,

Unfortunately, when I initially submitted the MMAS-8 licensing documents to our legal department for review, they somehow overlooked the Appendix document. They've now reviewed the Appendix and have made some revisions in track changes – please see attached.

I apologize for all of the back and forth about this. I hope these edits are acceptable to you, and we can get this license finalized soon.

Thank you,

Rebecca

**From:** DONALD MORISKY [mailto:dmorisky@ucla.edu]
**Sent:** Friday, September 16, 2016 12:37 PM
**To:** Merkh, Rebecca <rmerkh@healthcore.com>
**Subject:** Re: FW: Requesting a license for the MMAS-8

Thanks Rebecca for your clear explanation of your data collection process. I approve of this approach. I have made three minor changes in the MMAS-8 contract draft, two regarding the need to send me all manuscripts prior to submission and one change in the copyright date of the MMAS-8.

I hope this completes the draft and you can sign and return to me for co-signature. Please send me the email address of Shirley Ware

HealthCore, Inc., the person responsible for paying the credit card invoice payment.

Best,

dmorisky

On Fri, Sep 16, 2016 at 5:41 AM, Merkh, Rebecca <rmerkh@healthcore.com> wrote:

> **From:** Merkh, Rebecca
> **Sent:** Friday, September 16, 2016 8:39 AM
> **To:** 'mailto:dmorisky@ucla.edu' <mailto:dmorisky@ucla.edu>; 'dmorisky@gmail.com' <dmorisky@gmail.com>; Donald Morisky <dmorisky@g.ucla.edu>
> **Cc:** Marshall, Amanda <AMarshall@healthcore.com>
> **Subject:** FW: Requesting a license for the MMAS-8
>
> Hi Dr. Morisky,
>
> Can you please confirm that the version of the license you sent on Wednesday is correct? You mentioned a change to the amount of time you will have to review manuscripts, but I don't see that change in the document you sent.
>
> Below is some information about our online survey administration. Please let me know if this sufficiently answers your questions.
>
> Online survey administration
>
> We distribute scrambled ID codes to our potential respondents, and they can only access the online survey if they enter the scrambled ID code that matches back to our sample list. We will monitor production closely and shut down the survey website once we reach our target of 400 completed surveys. At that point, the survey will no longer be accessible. We're requesting an extra 50 administrations of the MMAS-8 so we're covered in the event that we exceed our target slightly.
>
> Thank you,
>
> Rebecca
>
> ---
>
> **From:** Merkh, Rebecca
> **Sent:** Wednesday, September 14, 2016 11:56 AM
> **To:** 'DONALD MORISKY' <dmorisky@ucla.edu>
> **Cc:** Marshall, Amanda <AMarshall@healthcore.com>; Donald Morisky

<dmorisky@g.ucla.edu>; Best Buy <dmorisky@gmail.com>
**Subject:** RE: Requesting a license for the MMAS-8

Hi Dr. Morisky,

Thanks for your response. I took a quick look at the license you attached and don't see any changes related to the amount of time you will have to review the MMAS-8 for submitted manuscripts. Before I pass this on to our legal department, can you please confirm this is the correct version?

I will look into your questions related to online data collection and get back to you as soon as possible.

Thank you!

Rebecca

**From:** DONALD MORISKY [mailto:dmorisky@ucla.edu]
**Sent:** Wednesday, September 14, 2016 11:24 AM
**To:** Merkh, Rebecca <rmerkh@healthcore.com>
**Cc:** Marshall, Amanda <amarshall@healthcore.com>; Donald Morisky <dmorisky@g.ucla.edu>; Best Buy <dmorisky@gmail.com>
**Subject:** Re: Requesting a license for the MMAS-8

Thank you very much Rebecca for your prompt call this am and sorry that it has taken me longer than anticipated to get back to you on this contract agreement. I have made one correction in the amount of time I will have to review the MMAS-8 related copyright concerns on all submitted manuscripts, and one insertion of the required legend re copyright on the first page of questionnaires and submitted manuscripts.

Since you are using a digital method for data collection, please inform me as to how you are protecting the access to this venue and how you will monitor the total number of administrations of the MMAS-8. As you may be aware, there are many unauthorized uploaded and often incorrect copies of the MMAS diagnostic adherence tools on the internet and this significantly compromises the integrity of the copyrighted intellectual property protecting the use of the MMAS.

Thanks for your understanding in this request and I look forward to moving this contract to its final signature stage.

Please do not hesitate to get back to me if you have any questions.

Best wishes,

Dmorisky

Donald E. Morisky, Sc.D., M.S.P.H., Sc.M.
Professor and Former Chair
Distinguished Chair Professor at Kaohsiung University, Taiwan
Department of Community Health Sciences
UCLA Fielding School of Public Health

On Wed, Sep 7, 2016 at 12:19 PM, Merkh, Rebecca <rmerkh@healthcore.com> wrote:

> Greetings Dr. Morisky,
>
> Thank you again for the MMAS-8 licensing materials. Our legal department is requested that a few edits be made to the license agreement, as indicated (in track

changes) in the attached document. Additionally, we'd like to increase the number of administrations from 400 to 450, so that has been changed throughout the document, including in the invoice. Please let me know if these revisions are acceptable to you.

Once you confirm that the invoice is correct, I'll send that to our financial department right away. This study is moving along quickly, so please let me know if there's anything else I can do to help expedite the licensing process.

Thank you,

Rebecca

---

**From:** Marshall, Amanda
**Sent:** Thursday, August 25, 2016 10:07 AM
**To:** DONALD MORISKY <dmorisky@ucla.edu>
**Cc:** Merkh, Rebecca <rmerkh@healthcore.com>; Donald Morisky <dmorisky@g.ucla.edu>
**Subject:** RE: Requesting a license for the MMAS-8

This is perfect, thanks so much! I will get these moving around on our side towards finalization and keep you posted.

Thanks for the rapid response!

**Amanda Marshall**


*Director, Research Data Collection*

**<image008.png>**

HealthCore, Inc.

123 S. Justison St. Suite 200

Wilmington, DE 19801 USA

Office (302) 230-2115

Fax (302) 230-2020

**<image009.png>**
**<image010.gif>**

**From:** DONALD MORISKY [mailto:dmorisky@ucla.edu]
**Sent:** Thursday, August 25, 2016 10:00 AM
**To:** Marshall, Amanda <amarshall@healthcore.com>
**Cc:** Merkh, Rebecca <rmerkh@healthcore.com>; Donald Morisky <dmorisky@g.ucla.edu>
**Subject:** Re: Requesting a license for the MMAS-8

Thanks so much Amanda for your patience and follow up in Rebecca's absence in obtaining a new license application for use of our validated and copyrighted MMAS-8 diagnostic assessment instrument. I have attached for your review and signature the MMAS-8 License Contract and Copyright documents. Please sign and

make a PDF copy of the entire document and return to me for my co-signature. Upon payment of your credit card invoice, I will send you the final signed agreement and all MMAS-8 documents. I am attaching Appendix I which identifies required citations for all reports, manuscripts and publications that use the MMAS-8. Please add to the the red lined information request on page 2 that asks for the starting and ending date of your Data Collection as this is a requirement for use of the MMAS-8. Please let me knoe if you need any additional documents.

Thanks,

Dmorisky

Donald E. Morisky, Sc.D., M.S.P.H., Sc.M.
Professor and Former Chair
Distinguished Chair Professor at Kaohsiung University, Taiwan
Department of Community Health Sciences
UCLA Fielding School of Public Health

On Thu, Aug 25, 2016 at 5:41 AM, Marshall, Amanda <amarshall@healthcore.com> wrote:

> Hello Dr. Morisky,
>
> I hope all is well with you! Rebecca is out of the office this week, but I wanted to follow up in her absence to see if we could provide you any additional information to finalize the licensing of the MMAS-8 for an upcoming HealthCore study?
>
> Please let me know how we can assist in this process.
>
> Thanks!
>
> **Amanda Marshall**
>
> <image012.png>
> *Director, Research Data Collection*
>
> **<image008.png>**
>
> HealthCore, Inc.
>
> 123 S. Justison St. Suite 200
>
> Wilmington, DE 19801 USA
>
> Office (302) 230-2115
>
> Fax (302) 230-2020
>
> **<image009.png>**
> **<image010.gif>**

---

**From:** Merkh, Rebecca
**Sent:** Thursday, August 18, 2016 11:00 AM
**To:** Donald E. Morisky <dmorisky@ucla.edu>
**Cc:** Marshall, Amanda <amarshall@healthcore.com>
**Subject:** RE: Requesting a license for the MMAS-8

Hello Dr. Morisky,

I wanted to follow up to confirm you received my email from earlier this week. Please let me know if you have any questions, or if there's anything else you need from me to get the licensing process started.

Thank you,

Rebecca

---

**From:** Merkh, Rebecca
**Sent:** Monday, August 15, 2016 10:17 AM
**To:** 'Donald E. Morisky' <dmorisky@ucla.edu>
**Cc:** Marshall, Amanda <AMarshall@healthcore.com>
**Subject:** Requesting a license for the MMAS-8

Greetings Dr. Morisky,

I work for HealthCore, Inc., a health outcomes research company, and have reached out to you previously regarding MMAS licensing. As a reminder, part of the work we do here at HealthCore involves contracting with external vendors to conduct surveys with physicians and members of the general population, on behalf of our clients. We are interested in licensing the MMAS-8 for one of our upcoming commercially-sponsored survey studies.

When we were last in contact, you indicated the cost of licensing the MMAS-8 is $1.00 per administration. Is that still the case?

We plan to administer the instrument both by phone and online. Can you please confirm that minor wording changes to accommodate method of administration are okay?

Below is information about the study for which the license is being requested. Please let me know if there's anything else you need.

- **Total # of administrations:** Approximately 450

- **Study title:** Insulin Adherence: Bridging the Gap

- **Person to whom the license agreement should be addressed:**

  David Kern

  HealthCore, Inc.

  123 Justison Street, Suite 200

  Wilmington, DE 19801

  Phone: 302-230-2102

- **Person responsible for payment:**

  Shirley Ware

  HealthCore, Inc.

  123 Justison Street, Suite 200

Wilmington, DE 19801

Phone: 302-230-2152

Fax: 302-230-2020

Thank you,

Rebecca

**Rebecca D. Merkh, MA**

<image012.png>
*Research Data Coordinator*

**<image008.png>**

HealthCore, Inc.

123 Justison Street, Suite 200

Wilmington, DE 19801 USA

Office (302) 230-2019

Fax (302) 230-2020

**<image009.png>**
**<image010.gif>**

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or may otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message and any attachment thereto.

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or may otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message and any attachment thereto.

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or may otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message and any attachment thereto.

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or may otherwise be protected by law. Any

unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message and any attachment thereto.

...

[Message clipped]

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or may otherwise be protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message and any attachment thereto.

**From:** Donald Morisky <dmorisky@gmail.com>
**Date:** November 15, 2017 at 9:03:34 PM PST
**To:** drkramy_g@yahoo.com
Cc: Steve Trubow <trubow1@gmail.com>
**Subject: Re: Asking for Permission for use MMAS-8**


**Thank you very much, Dr. Abdel Rahman, regarding your note that you have used my copyrighted intellectual property without authorization. This is a very serious issue and you will need to purchase a retroactive MMAS-license before any continuing data analysis or writing of any manuscript is submitted.**

**Beginning January 2017, all data collection of the MMAS adherence scales must use the Morisky Widget, which is a digital data entry process using any digital electronic device. The Morisky Widget not only provides a diagnostic assessment as to why the patient is non-adherent and but also offers a tailored educational counseling session based on the patient's response to the simple 8 items in the MMAS-8. All MMAS-8 and MMAS-4 licenses are administered through the Morisky Widget pictured above. The Morisky Widget provides anywhere, anytime, patient-centered, medication adherence diagnostic assessments using the validated  Morisky Medication Adherence Scale (MMAS-8 & MMAS-4). The Morisky Widget automatically administers (to any internet connected device) MMAS-tests in over 80 languages with zero clinician and minimum patient burden. The Morisky Widget automatically scores, and reports adherence levels & the risk of intentional/unintentional non-adherence into databases and electronic medical records (EMR) where they are correlated with primary markers of adherence, timely physiological measures and with the prescribed medication for medication reconciliation. Another HUGE ADVANTAGE of the Morisky Widget is the option to select from  110 MMAS-8health condition-specific tests with MAPI validated translations which offer a sensitivity of 93% as compared to the generic MMAS-8 at 83% sensitivity (including condition-specific MMAS tests for all chronic and long-term infectious diseases.  All MMAS-8**

users are required to obtain a signed MMAS-8 license. **You can go to my website at Morisky.org and see how the widget works**. If you are an individual only that will use it, would not be cost-beneficial.  However if your institution or University would purchase it, it can be used by all faculty /students in your institution. The ongoing cost is $1.00 for each administration or $1.50 for a translated version of the MMAS-8.

**Please answer all items below Please return by email to trubow1@gmail.com to receive consideration for a Morisky Widget MMAS License**

**Name and Address of Organization:**

**Point of Contact with contact info**

**Has your organization ever used the Morisky Medication Adherence Scales: If so give some detailed descriptions of When, Where, How, What and Why you or your organization used the MMAS.**

**When do you want to begin using the perpetual Morisky Widget MMAS license?**

**How many MMAS-8 or MMAS-4 tests in total do you plan to administer?**

**How do you plan to administer the MMAS diagnostic assessments by paper or electronic questionnaire?**

**Do you need to use MMAS Tests in languages other than English? Name the specific translation (s) required.**

**What conditions, diseases, and specific medications are you trying to assess for medication adherence? Do you track the dynamic level of medication adherence with changing physical measures of disease or the severity of mental health conditions? BP, HbA1C, GFR, LDL, HIV Viral Load Depressive Severity?**

**Please describe in detail you study design or if a Provider the clinical application for using the MMAS.**

**How many times will each patient be given the MMAS?  Will you establish a baseline measurement of adherence and do follow-up reassessment over time to measure changes?**

**If the MMAS included with other assessments in your study or clinical application? If so please list**

**Sincerely,**

**Dmorisky**

**Donald E. Morisky, Sc.D., M.S.P.H., Sc.M.**
**Professor and Former Chair**
**Distinguished Chair Professor at Kaohsiung University, Taiwan**

**Department of Community Health Sciences**
**UCLA Fielding School of Public Health**
**650 Charles E. Young Drive South**
**Room 46-071 CHS**
**Los Angeles, CA 90095-1772**

**email: dmorisky@ucla.edu**
**Phone: (310) 825-8508**
**Fax: (310) 794-1805**

On Tue, Nov 14, 2017 at 11:42 AM, <drkramy_g@yahoo.com> wrote:

Dear dr. Donald Morisky

I am dr.Ekramy Eissa Abdel rahman consultant of geriatrics. I am lecturer of geriatrics at Geriatric department ain shams university hospital Egypt. I and 3 of my colleagues will do research about non adherence to medication in elderly patients in ain shams university hospital outpatient clinic.and we will be happy if you give us  permission to use Morisky Medication Adherence Scale(MMAS-8) in our research

thanks

**From:** DONALD MORISKY <dmorisky@ucla.edu>
**Date:** January 21, 2018 at 7:53:32 PM PST
**To:** Dr Turky Almigbal  <almogbal@yahoo.com>
**Cc:** r.horne@ucl.ac.uk, Fadwa AI-Halaiqa <fhalaiqa@philadelphia.eduJo>, olympic labs <trubow1@gmail.com>
**Subject: Re: Regarding one of your research**

Greetings Dr. Almigbal and thank you for your follow up on your request to use the MMAS-8 in your study.  There are specific guidelines and requirements for use of my intellectual property and my Chief Investigator, Mr. Steve Trubow, will be able to assist you in obtaining a license for legal use  The King Saud University Medical City and College of Medicine has been in contact with us regarding a lifetime contract for use of the Morisky Widget.

All data collection of the MMAS adherence scales must use the Morisky Widget, which is a digital data entry process using any digital electronic device. The Morisky Widget not only provides a measure of the magnitude of nonadherence but also provides a diagnostic assessment as to why the patient is nonadherent, leading a tailored educational counseling session based on the patient's response to the simple 8 items in the MMAS-8. All MMAS-8 and MMAS-4 licenses are administered through the Morisky Widget pictured above. The Morisky Widget automatically administers (to any internet connected device) MMAS-tests in over 80 languages with zero clinician and minimum patient burden. The Morisky Widget automatically scores, and reports adherence levels & the risk of intentional/unintentional non-adherence into databases and electronic medical records (EMR) where they are correlated with primary markers of adherence, timely physiological measures and with the prescribed medication for medication reconciliation. Another HUGE ADVANTAGE of the Morisky Widget is the option to select from 110 MMAS-8 condition-specific tests with MAPI validated translations which offer a sensitivity of 93% as compared to the generic MMAS-8 at 83% sensitivity (including condition-specific MMAS tests for all chronic and long-term infectious diseases. I

I look forward to assisting you in the use of the Morisky Widget.

Sincerely,

Donald E. Morisky, Sc.D., M.S.P.H., Sc.M.
Research Professor and Former Chair
Distinguished Chair Professor at Kaohsiung University, Taiwan
Department of Community Health Sciences
UCLA Fielding School of Public Health

On Sun, Jan 21, 2018 at 1:16 PM, <almogbal@yahoo.com> wrote:
> Dear Prof Horne and Prof Morisky,
>
> I hope this e mail finds well and happy.
>
>
> I have come a cross dr Fadwa's research project entitled as (Adherence therapy for medication
> non-compliant patients with hypertension: a randomised controlled trial).
> It is an amazing work and it catches my attention.
>
>
> I am planning to conduct a research and using MMAS and BMQ tools in Arabic which dr Fadwa's
> and her research team translated them already based on The Eight Steps Translation Process.
> I have asked her to send me the Arabic versions of MMAS and BMQ to use them in my research
> project. As you have agreement for the copy right, she needs your permission to send them to me.
> Kindly, if you can give dr Fadwa this permission.
>
> I am looking forward to hear back from you.
>
> Best regards
> **Dr Turky Almigbal  MBBS, SBFM, ABFM, CFDM, CFCDM**
> Assistant Professor and Consultant
> Family Medicine, Diabetes & Chronic Disease Management
> King Saud University Medical City and College of Medicine, KSU, Riyadh, KSA
> P.O Box 2925
> Email: dralmigbal@gmail.com
> Email: talmigbal@ksu.edu.sa
>
> ――――――――――――――――――――――――――――――――――――――――――
>
> **From:** Fadwa Al-Halaiqa <fhalaiqa@philadelphia.edu.jo>
> **To:** Dr Turky Almigbal  <almogbal@yahoo.com>
> **Cc:** "r.horne@ucl.ac.uk" <r.horne@ucl.ac.uk>; Donald E. Morisky <dmorisky@ucla.edu>
> **Sent:** Sunday, January 21, 2018 9:52 AM
> **Subject:** RE: Regarding one of your research
>
>
> Dear Dr. Turky,
> Hope you are doing well.

Thanks for your request. I have an agreement with Prof Horne  (BMQ original author )and Prof Morisky (MMAS original author) to save the copy right protection. In order to send you the validated  Arabic version of these instruments, you have to ask their agreement first(CC PART). When you get the Professors agreement, definitely I will send the instruments.


Regards
Dr. Fadwa N Alhalaiqa RN, CNS, PhD
Faculty of Nursing
Philadelphia University.
Tel: (+962) 4799000-ext 2170
B.O. Box:1-Philadelphia University 19392 Amman-Jordan
>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>
   Try not to become a man of success but rather to
   become a man of value.
   **Albert Einstein** (1879 - 1955)


**From:** Dr Turky Almigbal  [mailto:almogbal@yahoo.com]
**Sent:** Saturday, January 20, 2018 1:45 PM
**To:** Fadwa Al-Halaiqa
**Subject:** Regarding one of your research

Dear Fadwa,


I hope this e mail finds well and happy.


I have come a cross your research project entitled as (Adherence therapy for medication non-compliant patients with hypertension: a randomised controlled trial).
It is an amazing work and it catches my attention.


I am planning to conduct a research and using MMAS and BMQ tools in Arabic which you and your research team translated them already based on The Eight Steps Translation Process. Kindly, if you can send me the Arabic versions of MMAS and BMQ to use them in my research project.


I am looking forward to hear back from you.

Best regards
**Dr Turky Almigbal  MBBS, SBFM, ABFM, CFDM, CFCDM**
Assistant Professor and Consultant
Family Medicine, Diabetes & Chronic Disease Management
King Saud University Medical City and College of Medicine, KSU, Riyadh, KSA
P.O Box 2925
Email: dralmigbal@gmail.com
Email: talmigbal@ksu.edu.sa

**From:** Donald Morisky <dmorisky@gmail.com>
**Date:** April 12, 2018 at 10:42:0BAM PDT
To: "Burch, Ashley" <BURCHAS15@ecu.edu>, Steve Trubow <trubow1@gmail.com>
**Cc:** Donald Morisky <dmorisky@g.ucla.edu>
**Subject: Re: Morisky Medication Adherence Scale**

Greetings Dr. Burch, and thanks for your interest in using my copyrighted and trademarked intellectual property, the MMAS-8 diagnostic adherence assessment instrument.

A license and training session is required for all use of the MMAS Scales. Also, only institutions are permitted to purchase a license. Individual licensees are no longer available. The MMAS Scales are now administered by the Morisky Widget (MW), a revolutionary approach to accurately measure a very complicated behavior. During your training session, you will understand not only how the MW works but also **why the patient is nonadherent.** Patients found to be low adherence at baseline have been found to increase their medicine-taking behavior following educational counseling. Patients who do not engage in educational counseling do not improve and over time have increased levels of morbidity and mortality. You can get an idea as to how the Morisky Widget works by going to my website morisky.org.

My Chief Investigator, Mr. Steve Trubow, will be able to assist you in obtaining your MMAS License.   Best,

Dmorisky

Donald E Morisky, Sc.D., M.S.P.H., Sc.M.
Research Professor and Former Chair
Distinguished Chair Professor at Kaohsiung University, Taiwan

Department of Community Health Sciences
UCLA Fielding School of Public Health

On Thu, Apr 12, 2018 at 9:55 AM, Burch, Ashley <BURCHAS15@ecu.edu> wrote:

Hello Dr. Morisky,


I'm a research professor at East Carolina University. We are starting an Atrial Fibrillation Clinic and I would like to use the Morisky Medication Adherence Scale for research/quality assessment in this new clinic.

Could you tell me what is required to obtain permission to use this questionnaire?


Thank you,

Ashley


Ashley Burch, PhD

Psychology and Cardiovascular Sciences

East Carolina University

209 Rawl Building

Greenville, NC  27858

Telephone: 252.328.1377

# EXHIBIT 8

To:

0 Comments



**MORISKY WIDGET PHASE OUT**

0 Comments

3/1/2022

MMAS/Trubow does not have any rights to use the Widget. I alone am the sole right holder of the Widget; MMAS/Trubow are in breach and are infringing my copyrights in the MMAS 4/8 and my trademarks; MMAS/Trubow does not have the right to use the terms "MMAS" or "MORISKY" in connection with any services offered; I have filed a federal copyright and trademark infringement action against MMAS/Trubow.

Any use by anyone of the Widget must immediately contact us to transfer their services to the MMAR platform, or they will be subject to potential copyright and trademark infringement actions against them.

0 Comments

Unauthorized licenses

0 Comments



STUDENT PRICING   MMAS LICENSE PRICING   BLOG   LOG IN

Abandoned Trademark for Widget

2/20/2022                                                            0 Comments

# Morisky Widget

**Serial Number**
87775097

**Word Mark**
MORISKY WIDGET

**Status**
602 - Abandoned-Failure To Respond Or Late
Response

**Status Date**
2019-06-18

---

     STUDENT PRICING   MMAS LICENSE PRICING   BLOG   LOG IN

### The Defunct Morisky widget/Morisky.org

2/19/2022                                                      0 Comments

The defunct Morisky widget (www.Morisky.org) is the subject of a federal lawsuit against Steve Trubow for copyright infringement of Dr. Morisky's IP MMAS 4&8 & malicious misrepresentation of global medication reconciliation scale (GMRF). Trubow is not authorized to issue perpetual Morisky widget licenses. Buyers beware.

0 Comments

### Steve Trubow is not authorized to license the MMAS-4 or MMAS-8

2/17/2022                                                      0 Comments

Steve Trubow is not authorized to license MMAS 4&8 and defunct Morisky widget. A federal lawsuit was filed against Trubow for egregious MMAS IP copyright infringement & GMRF deception. For use of MMAS scales, contact only Dr. Donald Morisky (donald.morisky@moriskyscale.com. DO NOT contact Trubow to avoid liability claims.

0 Comments

### Update on the Morisky Widget Being Phased out of Existence

12/26/2021                                                    0 Comments

Effective immediately, the Morisky Widget is being phased out of existence.   Under the settlement agreement with Steven Trubow signed December 2020, MMAS Research LLC was required to transfer all MMAS 4 and 8 derivatives to Dr. Morisky by September 2021,including the Morisky Widget, Morisky.org, all language translations, all licenses including Morisky widget sub-licenses, and copyright registrations relating to MMAS4 and 8 widget software that bear the name Morisky, etc.



STUDENT PRICING   MMAS LICENSE PRICING   BLOG   LOG IN

## Significant legal developments with phasing-out the Morisky Widget

10/5/2021                                                                                   0 Comments

Effective November 2021, I have phased-out the Morisky Widget.   Under the settlement agreement with Steven Trubow, MMAS Research LLC was required to transfer the Morisky Widget (all MMAS 4 and 8 derivatives) to Dr. Morisky by September 2021.   The derivatives include the Morisky Widget Morisky.org, all language translations, all licenses including Morisky widget sub-licenses, and copyright registrations relating to MMAS4 and 8 widget software that bear the name Morisky, etc.

While, Steven Trubow has very limited authorization to investigate and pursue infringement cases prior to December 2020, his involvement will completely terminate in 2023.  I remain the sole developer/owner/licensor of the Morisky Medication Scales 4 and 8.

We are transitioning all Morisky Widget users who request it to a new upgraded HIPAA and GDPR compliant digital format  the MMAR digital platform  within the next 45 days.  You may receive an email from Philip Morisky, CEO of MMAS LLC, if you would like to commence the process.  The Morisky Party and MMAR agrees to provide full access to the Morisky Widget and support as needed to all licenses as long as their licenses to the Morisky Widget are in effect, including adhering to all European Union Privacy regulations (including but not limited to GDPR and HIPAA).  You can reach us on our website at www.moriskyscale.com.

Thank you very much for your understanding and cooperation as we transition widget licenses into our company's operations.

Dr. Donald Morisky
President MMAR, LLC

# EXHIBIT 9

# WEIDE & MILLER Ltd.

PATENT, TRADEMARK, COPYRIGHT & TRADE SECRET MATTERS

10655 Park Run Drive, Suite 100
Las Vegas, NV 89144
Telephone (702) 385-6000
Mobile (702) 610-9094
Facsimile (702) 385-6008

E-mail: CAust@weidemiller.com
On the web www.WeideMiller.com

April 21, 2022

**Re:    Infringement Against MMAS Research, LLC and Steven Trubow**

Dear Colleagues of Dr. Morisky:

I am counsel for Dr. Donald Morisky, ScD, ScM, MSPH, UCLA Fielding School of Public Health, Research Professor, Emeritus, and have been asked to contact you in response to the email communication you received from Seven Trubow below.

On September 24, 2021, Dr. Morisky filed a federal copyright infringement, trademark infringement, and breach of contract action against MMAS Research, LLC and its principal Steven Trubow in the Federal District Court for the Western District of Washington (Case No. 2:21-cv-01301). It appears Mr. Trubow is engaging in trade libel against Dr. Morisky and seeking to interfere in Dr. Morisky's existing and prospective contractual relations.

Contrary to the false claims of Mr. Trubow, **no claim** of Dr. Morisky's against the Trubow and MMAS Research has been dismissed or limited in any manner by the Court. The Court roundly rejected Trubow and MMAS Research's motion to dismiss the action. As such, absent the Court's granting of our pending extraordinary request for a preliminary injunction against Trubow because of the egregious, wanton and willful nature of his continuing infringing behavior, this matter will continue to proceed on all counts against MMAS Research and Trubow in the ordinary course.

As set forth in the federal lawsuit, neither Mr. Trubow nor MMAS Research has any authority to use or license any copyright of Dr. Morisky **or any derivative** of any copyright of Dr. Morisky. Dr. Morisky is the registered holder of copyrights in the **MMAS-4 Scale (Registration No. TX 8285390)** and the **MMAS-8 Scale (Registration No. TX 8632533)**. As such, neither Trubow nor MMAS Research has any lawful right to use or license the MMAS-4 Scale or the

# EXHIBIT 10



PATENT, TRADEMARK, COPYRIGHT & TRADE SECRET MATTERS

10655 Park Run Drive, Suite 100
Las Vegas, NV 89144
Telephone (702) 382-4804
Mobile (702) 610-9094
Facsimile (702) 382-4805

E-mail: CAustin@weidemiller.com
On the web: www.WeideMiller.com

April 21, 2022

Re:   *Infringement Against MMAS Research, LLC and Steven Trubow*

Dear Colleagues of Dr. Morisky:

I am counsel for Dr. Donald Morisky, ScD, ScM, MSPH, UCLA Fielding School of Public Health, Research Professor, Emeritus, and have been asked to contact you in response to the email communication you received from Seven Trubow below.

On September 24, 2021, Dr. Morisky filed a federal copyright infringement, trademark infringement, and breach of contract action against MMAS Research, LLC and its principal Steven Trubow in the Federal District Court for the Western District of Washington (Case No. 2:21-cv-01301). It appears Mr. Trubow is engaging in trade libel against Dr. Morisky and seeking to interfere in Dr. Morisky's existing and prospective contractual relations.

Contrary to the false claims of Mr. Trubow, **no claim** of Dr. Morisky's against the Trubow and MMAS Research has been dismissed or limited in any manner by the Court. The Court roundly rejected Trubow and MMAS Research's motion to dismiss the action. As such, absent the Court's granting of our pending extraordinary request for a preliminary injunction against Trubow because of the egregious, wanton and willful nature of his continuing infringing behavior, this matter will continue to proceed on all counts against MMAS Research and Trubow in the ordinary course.

As set forth in the federal lawsuit, neither Mr. Trubow nor MMAS Research has any authority to use or license any copyright of Dr. Morisky **or any derivative** of any copyright of Dr. Morisky. Dr. Morisky is the registered holder of copyrights in the **MMAS-4 Scale (Registration No. TX 8285390)** and the **MMAS-8 Scale (Registration No. TX 8632533)**. As such, neither Trubow nor MMAS Research has any lawful right to use or license the MMAS-4 Scale or the MMAS-8 Scale.

Further, the MMAS Research copyright in the Morisky Widget code is an unlawfully obtained derivative of Dr. Morisky's MMAS-4 and MMAS-8 registered copyrights (as noted by the U.S. Copyright Office's reference to Dr Morisky's registered copyrights on the Morisky Widget registration). As such, neither Trubow nor MMAS Research has any right to use or license the Morisky Widget copyright, **which includes use or licensure of the Morisky Widget program**.

April 21, 2022
Page 2

**ANY PERSON THAT USES OR LICENSES THE MORISKY WIDGET, MMAS-4 SCALE OR MMAS-8 SCALE WITHOUT THE EXPRESS WRITTEN AUTHORIZATION OF DR. MORISKY WILL BE IN VIOLATION OF U.S. FEDERAL COPYRIGHT LAW FOR COPYRIGHT INFRINGEMENT.**

Finally, Trubow and MMAS Research are infringing Dr. Morisky's trademarks. Dr. Morisky is the only person authorized under U.S. federal trademark law to use the following marks in connection with the provision of medication adherence scales, protocols, consultation, training and related goods and services: MORISKY, MORISKY MEDICATION ADHERENCE SCALE, MMAS, MMAS-4, MMAS-8, MMAS WIDGET (the "Marks").

**ANY PERSON THAT USES ANY OF THESE MARKS WITHOUT THE EXPRESS WRITTEN AUTHORIZATION OF DR. MORISKY WILL BE IN VIOLATION OF U.S. FEDERAL TRADEMARK LAW.**

You are welcome to contact me should you have any questions regarding this letter.

Sincerely,

F. Christopher Austin, Esq.

# EXHIBIT 11 B

On Jul 5, 2022, at 1:47 PM, Steve trubow <trubow1@gmail.com> wrote:

**Dr Hartz,**

**Thank you for the prompt response.**

**We can discuss the use of MMAS-8 paper tests in cases when the internet is not available.**

**However, before we begin the discussion, please answer the questions below.**

**How many MMAS-8 tests have been administered to date ?**

**How were the MMAS-8 tests administered scored and coded ?**

**When were the MMAS-8 tests first administered ?**

**When will the last MMAS-8 test be administered?**

Best
Steve in Tokyo
Steven Trubow
MMAS Research LLC USA
Petaluma California
MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
www.medicationsafety.healthcare
https://eu.medicationsafety.healthcare/

**From:** Jacob Hartz <jacob.hartz@icloud.com>
**Sent:** Tuesday, July 5, 2022 10:01 AM
**To:** Steve trubow <trubow1@gmail.com>
**Cc:** Hannah Palfrey <Hannah.Palfrey@cardio.chboston.org>; thad@scrogginsesq.com; Peter Hoeller <peter.hoeller@bjfip.com>
**Subject:** Re: NCT04458766

We plan on administering the questions through the widget. We were planning on having a copy of the questions in case we do not have immediate access to the widget (our wifi and cell service in clinic can be spotty). All questions would then be entered using the widget.

Would that be okay.


Jacob Hartz, MD, MPH
Department of Cardiology
Boston Children's Hospital
jacob.hartz@cardio.chboston.org


> On Jul 5, 2022, at 12:11 AM, Steve trubow <trubow1@gmail.com> wrote:
>
> Dr Hartz,
>
> Sorry for the inconvenience, one more question.
>
> How will the MMAS-8 tests be administered ?
>
> Please remember if you administer MMAS-8 tests outside of the Morisky Widget, it requires Licensor approval, to use MMAS paper or electronic questionnaires.
>
> Best
> Steve in Tokyo
> Steven Trubow
> MMAS Research LLC USA
> Petaluma California
> MMAS Research France SAS
> Paris France
> MMAS Research Italy SRL
> Vicenza Italy
> (+1)360-824-0701
> www.morisky.org
> www.medicationsafety.healthcare

https://eu.medicationsafety.healthcare/

---

**From:** Steve trubow <trubow1@gmail.com>
**Sent:** Monday, July 4, 2022 8:58 PM
**To:** jacob.hartz@icloud.com;
Hannah.Palfrey@cardio.chboston.org
**Cc:** thad@scrogginsesq.com; 'Peter Hoeller'
<peter.hoeller@bjfip.com>; 'Steve trubow'
<trubow1@gmail.com>
**Subject:** FW: NCT04458766

**Hi Dr. Hartz,**

**Thank you for your prompt response.**

**Please update the clinical trials website with the required reference to the Morisky Widget. When it is updated, please send me a link.**

**Thank you for your cooperation.**

Best
Steve in Tokyo
Steven Trubow
MMAS Research LLC USA
Petaluma California
MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
www.medicationsafety.healthcare
https://eu.medicationsafety.healthcare/

**From:** Jacob Hartz jacob.hartz@icloud.com
**Sent:** Monday, July 4, 2022 7:34 PM
**To:** Steve trubow trubow1@gmail.com
**Cc:** thad@scrogginsesq.com; peter.hoeller@bjfip.com;
Hannah Palfrey Hannah.Palfrey@cardio.chboston.org

**Subject:** Re: NCT04458766

Hi,

Hannah and I are the only ones who are administering MMAS. No one at Wellth will be administering this test. Wellth uses a different mechanism to measure adherence through a photograph and will not take part in MMAS or have results of the MMAS.

I will include the listing.

Thank you.

---

**From:** Steve trubow <trubow1@gmail.com>
**Sent:** Sunday, July 3, 2022 5:17 PM
**To:** 'jacob.hartz@icloud.com' <jacob.hartz@icloud.com>
**Cc:** 'thad@scrogginsesq.com' <thad@scrogginsesq.com>; 'peter.hoeller@bjfip.com' <peter.hoeller@bjfip.com>; 'Steve trubow' <trubow1@gmail.com>
**Subject:** NCT04458766

<image001.png>

Dear Dr Hartz,

I hope this email finds you well.

MMAS Research is very concerned about the unauthorized use of the Wellth App in "The Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence in Adolescents NCT04458766 study." On the clinical trial website for NCT04458766 , you reported that "Lastly, the investigators will test the subject's adherence (using the Morisky Medication Adherence Scale and Wellth App) during the 60 days following discontinuation of the incentives to determine if any effect of the incentive persists after the incentive is discontinued.

---

In the BCH Morisky Widget license, you agreed that only BCH employees trained and certified by the Licensor may use the Morisky Widget MMAS.  BCH can use the Morisky Widget, Morisky Kiosk Apple I Phone
APP, and the Morisky API to administer Morisky Widget MMAS tests. With Licensor approval, BCH can use MMAS paper or electronic questionnaires, but all scoring and coding must be done in the Morisky Widget.

As I recall the only persons trained and certified to use the Morisky Widget MMAS were you and your associate. I have no recollection of training, certifying or authorizing the use of the MMAS-8 by Wellth.

In addition Appendix 1 of your attached license requires that the footnote below is required in all web postings,

A Morisky Widget license agreement is available from MMAS Research LLC 14725 NE 20th St., Bellevue Washington or strubow@morisky.org

Can you please provide an explanation ?

Thank you in advance for your prompt response.

Best
Steve
Steven Trubow
MMAS Research LLC USA
Petaluma California
MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
www.medicationsafety.healthcare
https://eu.medicationsafety.healthcare/

From: trubow1@gmail.com <trubow1@gmail.com>
Sent: Wednesday, October 23, 2019 9:13 AM
To: 'Jacob Hartz' <jacob.hartz@icloud.com>
Cc: trubow1@gmail.com; 'KENNETH I GROSS' <kgross@kigrosslaw.com>
Subject: invoice for BCH license and training

Dr. Hartz,

Please find attached an invoice, 2019 w-9 and wire instructions.

I also attached a slide deck for the training.
Looking forward to meeting you and your colleagues in Boston.
Please let me know if you have any questions.

Steven Trubow
MMAS Research LLC USA
Coronado California
MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
SEE the new I-Phone Morisky Kiosk in the APP Store

# EXHIBIT 11

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAR 13 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| MMAS RESEARCH, LLC, a Washington Limited Liability Company,<br><br>                    Plaintiff-Appellant,<br><br>    v.<br><br>THE CHARITE; ANIKA STEINER; ELISABETH THEISSEN, Dr.; SMARTPATIENT GMBH, a German corporation; MY THERAPY; DOES, 1-50, inclusive,<br><br>                    Defendants-Appellees. | No.    23-55202<br><br>D.C. No.<br>2:21-cv-01406-MWF-JPR<br><br>MEMORANDUM* |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted February 13, 2024
Pasadena, California

Before:  W. FLETCHER, NGUYEN, and LEE, Circuit Judges.

This case involves a copyright dispute between MMAS Research, a medical

software company, and The Charité, a German hospital.  MMAS alleges that Charité

infringed its copyright to the Morisky Widget, a medical software program, by using

---

    *    This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

the Morisky Widget in unauthorized medical studies.  The district court dismissed the suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), finding that MMAS lacked standing to pursue a copyright claim because it did not own the Morisky Widget and that MMAS failed to allege a copyright violation.

MMAS raises three arguments on appeal.  First, MMAS argues that the district court erred in concluding it lacked standing to sue.  Second, MMAS argues that the district court erred in analyzing its copyright claim under the Copyright Act rather than the Digital Millenium Copyright Act (DMCA).  Third, MMAS argues that the district court erred in dismissing its state law claims because there was diversity jurisdiction over those claims.[1]  We have jurisdiction under 28 U.S.C. § 1291 and affirm.

1. <u>The district court erred in concluding that MMAS lacked standing to sue for copyright infringement.</u>  The district court found that a 2020 preliminary settlement agreement from a separate lawsuit between MMAS and Dr. Donald Morisky transferred the Morisky Widget from MMAS to Dr. Morisky.  But that agreement—which simply outlined terms MMAS and Dr. Morisky "desire[d] to

---

[1] MMAS also argues that the district court should have considered Charité's unclean hands before dismissing MMAS's claims.  Because unclean hands are a defense against a party seeking equitable relief, not a reason to find that a complaint plausibly alleged a claim, this argument is meritless.  *See Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985), *abrogated on other grounds by Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1527 (9th Cir. 1993).

2

consent and agree to" sometime in the future—was never finalized.  MMAS thus never transferred its copyright and remains the registered owner of the Morisky Widget.  Similarly, because the agreement was a private contract between Dr. Morisky and MMAS, and because it was never finalized, it was not an abandonment of MMAS's right to sue Charité for copyright infringement.  *See Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960) (finding abandonment where copyright owner's actions demonstrated the intent to "surrender the[ir] rights and allow the public to copy").

 2. <u>The district court did not err in analyzing MMAS's copyright claim under the Copyright Act rather than the DMCA.</u>  The district court analyzed MMAS's claim under the Copyright Act, concluding that MMAS failed to state a claim because it had not alleged any domestic acts of infringement.  On appeal, MMAS does not contend that Charité infringed its copyright under the Copyright Act or argue that the district court erred in concluding that MMAS failed to allege a Copyright Act violation.  Instead, MMAS argues that the district court should have analyzed its claims under the DMCA.  Although MMAS referenced the DMCA in the caption of its operative pleading, MMAS did not allege facts that prove a DMCA violation, make a DMCA argument to the district court, or otherwise alert the district court that it was pursuing a claim under the DMCA.  For example, although MMAS contends on appeal that Charité violated the DMCA's "prohibition on the removal

or alteration of copyright management information," MMAS never mentioned copyright management information in its operative pleading or district court briefing.  MMAS instead presented its claims as if they were traditional copyright infringement claims.  The district court thus did not err in analyzing MMAS's complaint under the Copyright Act rather than the DMCA.

3.  <u>The district court did not err in dismissing the state law claims.</u>  MMAS argues that the district court erred in dismissing its state law claims because there was diversity jurisdiction over those claims.  MMAS did not allege the citizenship of the parties other than smartpatient GmbH in its operative complaint, and its allegation that "there is a complete diversity of citizenship" is insufficient to invoke the court's jurisdiction.  *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857–58 (9th Cir. 2001).  Although "[d]effective allegations of jurisdiction may be amended," *id.* at 858 (quoting 28 U.S.C. § 1653), the district court previously put MMAS on notice that its jurisdictional allegations were defective, and MMAS did nothing to correct them.  The district court thus did not err in dismissing those claims.

**AFFIRMED.**

# EXHIBIT 12

**ADHERENCE, Plaintiff(s),**

**v.**

**CVS PHARMACY, INC., et al., Defendant(s).**

Case No. 2:24-CV-1590 JCM (NJK).

**United States District Court, D. Nevada.**

June 25, 2025.

# ORDER

JAMES C. MAHAN, District Judge.

Presently before the court is defendants CVS Pharmacy Inc. and Asembia, LLC's partial motion to dismiss the First Amended Complaint ("FAC"). (ECF No. 12). Plaintiff Adherence responded in opposition (ECF No. 30), to which defendants replied. (ECF No. 31).

# I. BACKGROUND

This action arises out of an alleged trademark infringement, copyright infringement, and related state-law claims. (ECF No. 1). On October 16, 2024, plaintiff filed its First Amended Complaint. (ECF No. 9).

Plaintiff alleges that it is the exclusive owner of the federally registered copyrights in the MMAS-4© and MMAS-8©© "adherence scales," following an assignment of all related intellectual property by Dr. Donald E. Morisky in 2023. (*Id.* at ¶¶ 26-32). These copyrighted questionnaires are designed to assess a patient's likelihood of adhering to prescribed medication regimens and form the core of the Morisky Medication Adherence Protocol.

Plaintiff alleges defendants either copied or reproduced assessments that are identical or substantially similar to the copyrighted questionnaires. (*Id.* at ¶ 86). Plaintiff alleges it received notice of the improper use through an employee of CVS, who claimed they used the MMAS-4 and MMAS-8 every day. (*Id.* at ¶¶ 40-41). Plaintiff alleges that CVS has been using the MMAS-4 and MMAS-8 scales through the Asembia-1 platform since at least 2016, without authorization. (*Id.* at ¶ 44).

Defendants claim the forms are not copyrightable under the blank forms rule and moves to dismiss the copyright claim as well as the intentional interference claim, and related Nevada deceptive trade practices claim. (ECF No. 12 at 1).

# LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires every pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Although Rule 8 does not require detailed factual allegations, it does require more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In other

words, a pleading must have *plausible* factual allegations that cover "all the material elements necessary to sustain recovery under *some* viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citation omitted) (emphasis in original); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

The Supreme Court in *Iqbal* clarified the two-step approach to evaluate a complaint's legal sufficiency on a Rule 12(b)(6) motion to dismiss. First, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678-79. Legal conclusions are not entitled to this assumption of truth. *Id.* Second, the court must consider whether the well-pleaded factual allegations state a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the court can draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. When the allegations have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570; *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

If the court grants a Rule 12(b)(6) motion to dismiss, it should grant leave to amend unless the deficiencies cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). Under Rule 15(a), the court should "freely" grant leave to amend "when justice so requires," and absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments . . . undue prejudice to the opposing party . . . futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The court should grant leave to amend "even if no request to amend the pleading was made." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks omitted).

## II. DISCUSSION

Plaintiff consents to the dismissal of its claims for intentional interference and related deceptive trade practices. The court also finds the forms not copyrightable and dismisses the copyright infringement claim.

## A. Copyright Infringement

To prevail in a copyright infringement action, the plaintiff must demonstrate: (1) ownership of a valid copyright in the allegedly infringed work, and (2) copying of protected expression contained in the allegedly infringed work by the defendants. *Triad Systems Corp. v. Southeastern Express Co., Inc.*, 64 F.3d 1330, 1335 (9th Cir. 1995). At issue is whether the forms qualify for copyright protection. A certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden of persuasion to the defendant to demonstrate the work is not copyrightable. *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir. 1990).

Nevertheless, the presumption of copyrightable subject matter established by the timely issuance of a certificate of registration is rebuttable. *Id.* at 1107 (holding work uncopyrightable despite prior registration by the Copyright Office). In rebuttal to this presumption, defendants argue that the MMAS-4 and MMAS-8 forms fall under the blank forms rule and are uncopyrightable as a matter of law.

### *i. Copyrightability of MMAS-4 and MMAS-8*

The blank forms doctrine originates from an 1879 case, *Baker v. Selden*, where the U.S. Supreme Court found that forms containing primarily blank spaces to be filled could not be the subject of copyright. 101 U.S. 99, 107 (1879). According to Copyright Office regulations, the following works are not subject to copyright protection: "(c) Blank forms, such as time cards, graph paper, account books, diaries, blank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information and do not themselves convey information . . .." 37 C.F.R. § 202.1(c).

An exception to the blank forms rule exists in the Ninth Circuit when text is integrated with a form and the work as a whole has "explanatory force because of the accompanying copyrightable textual material." *Bibbero*, 893 F.2d at 1107. However, the Ninth Circuit held that simple text integrated with a form indicating which information is important does not constitute a "conveyance of information" as intended by the Copyright Office. *Id.* Thus, text instructions must convey more than simple instruction designed to assist in completing the form. See, e.g. *Edwin K. Williams & Co. v. Edwin K. Williams & Co.-E.*, 542 F.2d 1053, 1060 (9th Cir. 1976) (account books with several pages of instructions on the use of the forms and advice on the successful management of a service station conveyed information and were therefore copyrightable). The blank forms doctrine turns on the purpose and function of the form; if the form is designed primarily to record rather than convey information, it is not copyrightable. *Bibbero*, 893 F.2d at 1107-08.

Defendants argue that the forms are uncopyrightable because they are blank forms. (ECF No. 12 at 6). Plaintiff opposes, arguing: 1) the forms convey information through the algorithm's application, 2) the questions and instructions convey information through subtext, and 3) the creative compilation of the text makes the forms copyrightable. (ECF No. 30 at 6-9).

# 1. Application of the Algorithm Does Not Confer Copyrightability.

First, plaintiff argues "...ultimately, the assessment made by the practitioner's application of Dr. Morisky's algorithm" conveys a patient's prospective medication adherence. However, *Bibbero* clearly holds that forms that do not convey information in their blank state are not copyrightable. 893 F.2d at 1107. Therefore, the argument that a form conveys info once it's filled out does not negate that it is still considered a "blank form". *Id*.

Further, copyright law holds that "a system or art of practical utility cannot be copyrighted, no matter what the manner of its representation." *Advanz Behavioral Mgmt. Res., Inc. v. Miraflor*, 21 F. Supp. 2d 1179, 1184 (C.D. Cal. 1998) (interpreting *Baker*, 101 U.S. at 107). The MMAS algorithm, even if useful in application, constitutes a method or system, and the forms used to implement it are functional tools for data collection, not original expression entitled to copyright protection.

Additionally, plaintiff alleges that "the pirated Morisky Scales used in the Asembia-1 platform are incorrectly scored and patients are thereby incorrectly counseled." (ECF No. 9 ¶ 70). Therefore, plaintiff's argument that the forms convey information through the algorithm does not apply here, as the algorithm appears not to have been used.

# 2. Subtextual Information is Not Protectable Expression.

Second, plaintiff argues that the instructions on the forms were crafted in a creative and intentional manner to "provide subtextual information." (ECF No. 30 at 8). Specifically, plaintiff claims that the introductory paragraph is designed to put patients at ease, signal that they will not be judged, and encourage frankness.

*Id.* Similarly, plaintiff asserts that the phrasing of the questions conveys the subtext that the patient is "normal" and that it is acceptable to respond honestly. *Id.*

No case law is cited that would support an analysis of subtextual information. In fact, defendants rightfully point out that such a claim would be contrary to the law. (ECF No. 31 at 4). "[T]he scope of copyright subject matter does not extend to ideas that are not within a fixed medium." *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011). The subtextual information cannot be protected under the Copyright Act's scope because that information is not in any tangible medium of expression. 17 U.S.C. § 301(b).

Further, permitting subtextual information to render forms copyrightable would directly contradict the Ninth Circuit's reasoning in *Bibbero*, which confined the exception to the blank forms rule. 893 F.2d at 1107. The court rejected extending protection to text that merely signals which information is important, warning that such a standard would be "limitless" and risk swallowing the rule entirely. *Id.* Therefore, allowing subtext to transform basic questions or instructions that simply guide the forms user into protected expression would also produce a limitless exception to the blank form rule.

# 3. Plaintiff's Creative Compilation Argument Fails Under Precedent.

Third, plaintiff argues that the structure and order of the questions and instructions were creatively and intentionally put together, qualifying protection as a compilation. (ECF No. 30 at 10). Under the Copyright Act, a compilation is defined as a work formed by the collection and assembly of preexisting material "selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. Here, however, plaintiff does not allege that its forms were registered as compilations, so this route of possible protection is foreclosed. Even if the forms had been registered as such, the argument would likely still fail. In *Bibbero*, the Ninth Circuit held that a superbill, though registered as a compilation, was unprotectable because it fell squarely within the blank forms' doctrine. 893 F.2d at 1108 n.3. Thus, even assuming the forms could qualify as compilations, plaintiff must still show they are not blank forms.

Moreover, plaintiff's arguments that its forms are creative and were intentionally created are misplaced. Plaintiff's response brief relies on *Advanz*, stating that copyright protection for its forms exists where there is "at least some ingenuity involved in labeling, selection, and arrangement of the blank spaces." (ECF No. 30 at 6). But plaintiff noticeably leaves out an important part of *Advanz*, which properly informs the court of controlling law. In fact, the Ninth Circuit explicitly rejected the argument upon which plaintiff relies. *Advanz*, 21 F. Supp. 2d at 1191. *Bibbero* made clear that the fact "considerable effort and creativity went into design[ing]" a form "does not make the form any less blank." 893 F.2d at 1107-08 & n.1. Therefore, plaintiff fails to identify any argument grounded in legal precedent that would render their forms copyrightable.

# B. Plaintiff's Claim Must Be Dismissed With Prejudice

Because the court's "findings are based on the works themselves rather than on [plaintiffs'] pleadings, the infringement claim must therefore be dismissed with prejudice." *Capcom Co., Ltd. v. MKR Grp., Inc.*, No. C 08-0904 RS, 2008 U.S. Dist. LEXIS 83836, 2008 WL 4661479, at \*11 (N.D. Cal. Oct. 10, 2008). Plaintiff's forms are primarily designed to record information, and the accompanying text simply provides instruction

to assist in completing the form. Because the court finds the claim precluded as a matter of law, it need not address whether the claim satisfies the notice pleading requirements.

## III. CONCLUSION

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendants' partial motion to dismiss (ECF No. 12) be, and the same hereby is, GRANTED. Claims 2, 4 and 5 are DISMISSED with prejudice. Plaintiff's claims for trademark infringement and common law trademark infringement remain.

Save trees - read court opinions online on Google Scholar.

# EXHIBIT 13

Morisky Widget MMAS Retroactive and Perpetual  License

The following shall constitute a perpetual (indefinite term) MORISKY
Widget MMAS-8 license between the licensee, Boston Children's Hospital
(BCH), 300 Longwood Avenue, Boston MA 02115 and the licensor,
MMAS Research LLC (MMAS), 14725 NE 20th Avenue, Bellevue
Washington 98007 made this day August 24, 2019.

SECTION 1. TERMS OF USAGE

Ownership and Fees: Morisky Widget software is the intellectual
property of MMAS Research LLC.

Translations: Permission will only be granted to use MMAS certified
translations from the Morisky Widget or with special arrangements
approved and signed by the MMAS. There are no exceptions.

Changes or any modifications to the wording, phrasing or scoring of
the MMAS, CUDOS and CUXOS require certification on the Morisky
Widget editor and translator.

Coding and scoring criteria of the MMAS are trade secrets of
MMAS and as such can never be divulged in any publication,
presentation, or website without written permission from MMAS. If
BCH divulges Morisky Widget scoring and coding criteria it will be
considered a breach of the Morisky Widget license and MMAS will
have the right to suspend or terminate the Agreement.

Trademark & Copyright: Permission to use the copyright and
trademark protected Morisky Widget MMAS is not and will not be
granted for any unauthorized use or translations of the MMAS or
other MORISKY intellectual property, in whole or in part. No
electronic questionnaires, analyses, research results or publications
based on unauthorized use of the Morisky Widget will be permitted.
The MMAS required citations and licensing statement provided in
Appendix 1 must be included in all manuscripts, web postings or other
publication containing Morisky Widget MMAS descriptions or results.

In case of scientific, administrative or intellectual properly
misconduct in using the MORISKY Widget diagnostic

assessments, MMAS reserves the right to withdraw permission for use and to pursue all legal remedies. This Agreement shall be governed by and construed under the laws of Massachusets. The Morisky Widget agreed to in this license are non-transferrable from the BCH

BCH must submit to MMAS all presentations and manuscripts that are being considered for abstracts/poster presentations or publication to make certain that all copyright and trademark requirements are included in all manuscripts submitted for publication. This is to protect BCH as MMAS has encountered many violations of federal and international copyright laws from clients as well as individuals who use MMAS intellectual property without following the required copyright and trademark guidelines.

SECTION 2. FEES

In consideration of MMAS granting BCH a free perpetual Morisky Widget MMAS license, BCH agrees to pay MMAS a one-time training and certification fee of $5000.00 .The six-hour training and certification will take place in Boston in late October 2019 for up to 35 participants. After certification, MMAS will provide  10,000 complimentary Morisky Widget MMAS tests. After the 10,000 complimentary test have been used, additional MMAS condition and medication specific tests are $1.00 each. Any additional required training and certification of additional BCH clinicians who wish to use the Morisky Widget MMAS will be at BCH  expense.

SECTION 3. DUTIES OF BCH

BCH can use the Morisky Widget, Morisky Kiosk Apple I Phone APP, and the Morisky API to administer Morisky Widget MMAS tests. With Licensor approval, BCH can use MMAS paper or electronic questionnaires but all scoring and coding must be done in the Morisky Widget.

SECTION 4. DUTIES OF MMAS

MMAS will provide BCH with a perpetual license that can used by any trained and certified clinician, physician, pharmacist, nurse, psychologist or health care professional at BCH. Only BCH employees trained and certified by the Licensor may use the

Morisky Widget MMAS.

MMAS will provide BCH with their own secure Morisky Widget with 10,000 complimentary Morisky Widget MMAS tests after training and certification in Boston.

## SECTION 5. TERMS and TERMINATION

In case of scientific, administrative or intellectual property misconduct in using the Morisky Widget, MMAS reserves the right to withdraw permission for us and to pursue all legal remedies. BCH may terminate this license with or without cause at any time.

## SECTION 6. PAYMENT OF FEES

All fees must be paid by November 30 , 2019 . License fee will be wired to the MMAS Chase bank account.

## SECTION 7. RESULTS

All Morisky Widget data or results will become the sole property of BCH.

Boston Children's Hospital


By:

_____



Date        _____




MMAS Research LLC

By: _____

Date _____

Appendix 1
Required citations, acknowledgement and footnote for the 8-item MMAS are as follows:
Morisky DE, Ang A, Krousel-Wood M, Ward H. Predictive Validity of a Medication Adherence Measure in a Patient Setting. J Clin Hyper 2008; 10(5):348-354. Berlowitz DR, Foy CG, Kazis LE, Bolin L,

Conroy LB, Fitzpatrick P, Gure TR, Kimmel PL, Kirscner K, Morisky DE, Newman J, Okney C, Oparil S, et al. for the SPRINT Study Research Group. Impact of Intensive Blood Pressure Therapy on Patient-Reported Outcomes: Outcomes Results from the SPRINT Study. N Engl J Med 2017; 377:733-44.
Morisky DE, DiMatteo MR. Improving the measurement of self-reported medication nonadherence: Final response. J Clin Epidem 2011; 64:258-263.

The footnote below is required in all articles, presentations, web postings, reports and submitted manuscripts, and on the first table or figure which present the Morisky Widget MMAS results or in the Acknowledgment Section of manuscripts submitted for publication:

A Morisky Widget  license agreement is available from MMAS Research LLC 14725 NE 20th St., Bellevue Washington or strubow@morisky.org

# EXHIBIT 9

# EXHIBIT 14

**From:** DONALD MORISKY <dmorisky@ucla.edu>
**Date:** July 29, 2018 at 8:15:36 PM PDT
**To:** Jacob.Hartz@cardio.chboston.org
**Cc:** olympic labs <trubow1@gmail.com>
**Subject: Re:** NIH Career Development Award and correct use of Morisky Medication Adherence Scale (MMAS-8)


Thank you Dr. Hartz for your interest in using my copyrighted and trademarked intellectual property (IP), the MMAS-8 diagnostic adherence assessment instrument. Individual licenses are no longer given to an individual, only institutions and health care organizations are permitted to use the MMAS IP and hands-on, in-person training is required. We are currently in Asia conducting training and certification for hundreds of practicing clinicians who are implementing the correct use of the Morisky Widget (see Morisky.org) into the patient health-care delivery system. We plan to be on the east coast in September and October so please fill out the following questionnaire so we can best serve you.


**Morisky Widget MMAS APPLICATION**

**Date**


**We NEVER License individuals or individual studies.**


**Please answer all items below if your Organization wants to obtain a perpetual indefinite term Morisky Widget MMAS License and will participate in training and certification on the Morisky Widget and the Morisky Medication Adherence Protocol**


 **Please return by email to <u>trubow1@gmail.com</u> to receive consideration for a Morisky Widget MMAS License**

- Name and Address of Organization:

- Point of Contact:

- Have you ever used the Morisky Medication Adherence Scales?

- If so give some detailed descriptions of When, Where, How, What and Why did you or your organization used the MMAS? Please send an attached signed MMAS license.

- When do you want to begin using the perpetual Morisky Widget MMAS license?

- Will you use the MMAS for translational research or clinical applications such as chronic care management or medication reconciliation?

It for clinical research.

- Are there any third-party organizations that will operate the Morisky Widget or administer MMAS paper or electronic questionnaires?

- Do you need to use MMAS Tests in LANGUAGES OTHER THAN ENGLISH? Name the specific translation (s) required.

- How many MMAS-8 or MMAS-4 tests in total do you plan to administer?

- How do you plan to administer the MMAS diagnostic assessments by paper or electronic questionnaire?

- What health conditions, diseases and specific medications are you trying to assess for medication adherence?

mmm    Do you track the dynamic level of medication adherence with changing physical measures of disease or the severity of mental health conditions? i.e. BP, HbA1C, GFR, LDL, HIV Viral Load Depressive Severity?

- Please describe in detail the translational research design or clinical protocol for using the MMAS.

- How many times will each patient be given the MMAS?

- Will you establish a baseline measurement of adherence and do follow up reassessment over time to measure changes?

- Is the MMAS included with other assessments in your clinical application? If so, please list

- Is your organization a university, government agency, hospital, clinic, or other? Please be specific.

Below are the new training and certification requirements:

## Morisky Widget & Morisky Medication Adherence Protocol Training

### MMAS Fundamentals
A. Subjective and Objective Measurement of Adherence
B. Social Desirability, Response Bias
C. Validity, Sensitivity and Specificity, MMAS Condition and Medication Specific
D. Criterion Related Validity, Patient Outcomes
E. Baseline and Follow up Assessments, Never One-Off
F. Diagnosis of Medication Taking Behavior, Intentional and Unintentional Non-Adherence
G. Translational Research, Sustainability, Self Management.
H. Polypharmacy

### Morisky Medication Adherence Protocol
A Beneficence
B Evidence Based
C Determinants of Non-Adherence
D Chronic Care Mgmt. and Medication Reconciliation
E Tailored and Targeted Intervention
F Disease  Control, Remission of Mental Health and Substance Use Disorders

My Chief Investigator, Mr. Steve Trubow, will be able to assist you in obtaining your MMAS License.

Best, Don and Steve in Hong Kong

Dmorisky

Donald E. Morisky, Sc.D., M.S.P.H., Sc.M.
Research Professor and Former Chair
Lifetime Career Award, American Public Health Association
Department of Community Health Sciences
UCLA Fielding School of Public Health

On Sun, Jul 29, 2018 at 4:59 PM Hartz, Jacob <Jacob.Hartz@cardio.chboston.org> wrote:

Dr. Morisky,

I am an early career pediatric cardiologist at Boston Children's Hospital and applying for a NIH Career Development Award that incorporates behavioral economics to improve medication adherence in adolescents with familial hypercholesterolemia. In an effort to accurately identify patients, we were wondering if the MMAS-8 would be appropriate. If it could be, what training would we need and what licensing would be needed as well.

Thank you very much for your help.

- Jake

Jacob Hartz, MD, MPH
Preventive Cardiology
Department of Cardiology
Boston Children's Hospital
jacob.hartz@cardio.chboston.org

# EXHIBIT 15

**From:** "Hartz, Jacob" <Jacob.Hartz@cardio.chboston.org>
**Date:** August 17, 2019 at 9:37:34AM PDT
**To:** trubow1@gmail.com
**Subject: Re: Request for licensure for Morisky Scale  [EXTERNAL]**

Of course. I understand.

I'm from New Mexico and my father and mother live there. Maybe they can help make  sure she get the most out of a very relaxing state?

-Jake

Jacob Hartz, MD, MPH
Department of Cardiology
Boston Children's Hospital

On Aug 17, 2019, at 10:32 AM, "trubow1@gmail.com" <trubow1@gmail.com> wrote:

<image001.png>

Hi Jacob,

Thank you for your patience.
We finished three months of non-stop training this week in Los Angeles at USC and the Los Angeles VA Hospital.
We are headed to New Mexico and Colorado for some much needed rest.
I will send you a draft license and our requirements shortly.
We are looking forward to meeting you in Boston in October.

Best

Steve

**MMAS** Research LLC USA
Coronado California
MMAS Research France SAS
Paris France
**MMAS** Research Italy SRL
Vicenza Italy
(+1 )360-824-0701
www.moriskY..org

SEE the new I-Phone Morisky Kiosk in the APP Store

---

**From:** Hartz, Jacob <Jacob.Hartz@cardio.chboston.org>
**Sent:** Thursday, August 15, 2019 6:44 AM
**To:** trubow1@gmail.com
**Subject:** Re: Request for licensure for Morisky Scale [EXTERNAL]

Terrific.
I want to make sure you have everything you need when you get here. What do I need to arrange for training? Do we need a conference room with AV support? How many people need to be there for training?

Thank you so much.

-Jake

Jacob Hartz, MD, MPH
Department of Cardiology
Boston Children's Hospital

On Aug 15, 2019, at 8:44 AM, "trubow1@gmail.com" <trubow1@gmail.com> wrote:

> Hi Jake,
>
> We are in Los Angeles training and certifying Morisky licensees at the University of Southern California School of Pharmacy.
> I will send you a draft license this weekend or early next week.
> We can confirm training in Boston on October 31 or November 1, 2019.
>
> Best
> Steve
>
>> **From:** "Hartz, Jacob" <Jacob.Hartz@cardio.chboston.org>
>> **Date:** August 8, 2019 at 7:48:24 PM GMT+9
>> **To:** "trubow1@gmail.com" <trubow1@gmail.com>
>> **Subject: Re: Request for licensure for Morisky Scale [EXTERNAL]**
>>
>> This sounds great. I love that you me sister is involved. We should all have dinner! Let's draft a license!
>>
>> -Jake
>>
>> Jacob Hartz, MD, MPH
>> Department of Cardiology
>> Boston Children's Hospital
>>
>> On Aug 7, 2019, at 10:26 PM, "trubow1@gmail.com" <trubow1@gmail.com> wrote:
>>
>>> <image001.png>
>>>
>>> <image002.png>

Jake,

The offer of a free perpetual Morisky Widget license for Boston Children's Hospital is dedicated to my sister Sandra Fairbank of Cambridge who has supported the Morisky Widget MMAS since the outset.
The cost of the training and certification if it can be scheduled in Boston in late October or early November, 2019  will be $5000.00.  After certification, MMAS Research LLC will provide Boston Children's Hospital with 25,000 complimentary Morisky Widget MMAS condition and medication specific tests for clinical applications or translational, sustainable interventional studies for children with chronic and infectious disease.
If you wish us to prepare a draft license, please let me know or if you have any other questions.

Best

Steve in Tokyo

**From:** Hartz, Jacob <Jacob.Hartz@cardio.chboston.org>
**Sent:** Wednesday, August 7, 2019 6:23 PM
**To:** trubow1@gmail.com
**Subject:** Re: Request for licensure for Morisky Scale [EXTERNAL]

Steve,

Thank you for your prompt response. I am sorry that I was not able to complete this earlier, but we did not know if we had funding for the study, which we do now.

I have completed the application below. Please let me know if you need more information.

What would be our next steps?

- Jake

Jacob Hartz, MD, MPH
Department of Cardiology
Boston Children's Hospital
jacob.hartz@cardio.chboston.org

On Aug 7, 2019, at 8:20 PM, trubow1@gmail.com wrote:

<image001.png>
<image002.png>

Hi Jake,

Greetings from Tokyo where we are finishing three months of training on the Morisky Widget in the North America, Europe, and Asia.

Thank you for your renewed interest in the Morisky Widget MMAS.

MMAS Research LLC
only grants licenses for the Morisky Widget to health care organizations to improve medication adherence for patients with chronic and infectious disease.

We only license clinical applications and interventional studies that are sustainable and benefit the patient.

The Morisky Widget's conditional and medication specific MMAS assessment not only measures the level of medication adherence, (low, medium and high) with 93% sensitivity, it is also a diagnostic assessment of medication taking behaviors that identifies why the patient is not taking their medications.

The Morisky Widget quantifies two dimensions of medication taking  behavior, intentional and unintentional non-adherence and the barriers to adherence (polypharmacy/determinants/disease impact).

Every Morisky Widget licensee must participate in five hours of face to face training and certification on the Morisky Widget before use on patients. See attached slide deck.

We are still willing to provide a free perpetual Morisky Widget license to Boston Children's Hospital. The only cost would be for face to face training and certification and MMAS tests after 3000 complimentary tests are completed.

If you wish to apply for license, please complete the application below

Please let me know if you have any questions,

<image003.png>

Morisky Widget  APPLICATION
Date_____August 7, 2019_____

Completed by_____Jacob Hartz, MD, MPH_____

We only license organizations and approved interventional studies or clinical applications NO EXCEPTIONS

Please answer all items below if your Organization wants to obtain a perpetual indefinite term Morisky Widget MMAS License and will participate in training and certification on the Morisky Widget

Please return by email to trubow1@gmail.com to receive consideration for a Morisky Widget License

**Name and Address of Organization:** Boston Children's Hospital
**Point of Contact:** Jacob Hartz (617-355-0955, fax: 617-730-0600)
**Have you ever used the Morisky Medication Adherence Scales?** No
If so give some detailed descriptions of When, Where, How, What and Why did you or your organization used the MMAS? Please send an attached signed MMAS license.
**When do you want to begin using the perpetual Morisky Widget license?** January 2020
**Will you use the Morisky Widget for an interventional research study or clinical applications such as patient coaching, chronic care management or medication reconciliation?** Yes. We are using it to assess pre- and post-adherence in
**Are there any third-party organizations that will operate the Morisky Widget?** No
**Do you need to use MMAS Tests in LANGUAGES OTHER THAN ENGLISH? Name the specific translation (s) required.** We would like it in Spanish as well.
**How many Morisky Widget diagnostic assessments in total do you plan to administer?** 80 patients (4-5 times each)
**How do you plan to administer the Morisky Widget diagnostic assessments by paper or the Morisky Widget or Morisky Kiosk Apple I-Phone App?** We would like to use it by paper and iPhone app if possible. If only one option is available, we would prefer paper.
**What health conditions, diseases and specific medications are you trying to assess for medication adherence?** Adolescents with Familial Hypercholesterolemia who are taking a statin. Depending on recruitment for the study,

we may also recruit adolescents with hypertension who are treated with a medication. **Do you track the dynamic level of medication adherence with changing physical measures of disease or the severity of mental health conditions? i.e. BP, HbA1C, GFR, LDL, HIV Viral Load Depressive Severity?** Yes. We will be checking adherence using a fasting lipid profile. We will also be testing adherence using the Wellth® iPhone app in which patients will take a picture of the pill prior to taking it to receive a reward.

**Please describe in detail the interventional research design or clinical protocol for using the Morisky Widget?** I hope that I am providing sufficient detail and can provide more if needed, but I wanted to make it brief as well. The objective of the study is to determine if financial incentives will increase medication adherence in adolescents taking a statin for Familial Hypercholesterolemia. We will test two different financial incentives in a randomized, cross-over trial that are delivered through the mobile health application, Wellth®, which hope to use in our clinic if it is effective at improving medication adherence. The Morisky Widget will be used to measure baseline adherence, adherence after receiving the first of two interventions, following a "wash-out" period, and finally at the end of the intervention. If possible, we would also use the Morisky Widget to measure adherence 6 months after the intervention ends to determine if there is a "legacy effect." We will be able to control for baseline LDL cholesterol, age, gender, race/ethnicity, comorbidities, time since first being prescribed a statin, type and dose of statin prescribed, and if any adverse effects are present.

**How many times will each patient be given the Morisky Widget?** We expect each patient to use it 4 times. Possibly five if we are able to extend the trial.
**Will you establish a baseline measurement of adherence and do follow up reassessment over time to measure changes?** Yes.
**Is your organization a university, government agency, hospital, clinic, or other? Please be specific.** We are an academic hospital.

Best
Steve in Tokyo
Steven Trubow
MMAS Research LLC USA
Coronado California

MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
SEE the new I-Phone Morisky Kiosk in the APP
Store

From: Hartz, Jacob
<Jacob.Hartz@cardio.chboston.org>
Sent: Wednesday, August 7, 2019 3:03 PM
To: trubow1@gmail.com
Subject: Request for licensure for Morisky Scale

Mr. Steve Trubow,

We spoke about one year ago about using
obtaining training for the adherence scale
developed by Dr. Morisky. I was wondering if it
would still be possible to have face-to-face
training and obtain a license.

Thank you very much.

- Jake

Jacob Hartz, MD, MPH
Department of Cardiology
Boston Children's Hospital

<morisky widget training deck summer 2019 ucsf
and usc.pdf>



Merck MSD Tokyo Japan



Johnson & Johnson Japan



UCSF & Zuckerberg San Francisco General Hospital



USC School Of Pharmacy
VA Greater Los Angeles Healthcare System



Chinese Academy of Medical Sciences
West China Womens and Children's Hospital



Peking University First Hospital

Shanghai Institute of Endocrine and Metabolic Disease

# EXHIBIT 16

# Original Paper

# Predictive Validity of a Medication Adherence Measure in an Outpatient Setting

Donald E. Morisky, ScD, MSPH;[1] Alfonso Ang, PhD;[2] Marie Krousel-Wood, MD, MSPH;[3,4] Harry J. Ward, MD[5]

*This study examines the psychometric properties and tests the concurrent and predictive validity of a structured, self-reported medication adherence measure in patients with hypertension. The authors also assessed various psychosocial determinants of adherence, such as knowledge, social support, satisfaction with care, and complexity of the medical regimen. A total of 1367 patients participated in the study; mean age was 52.5 years, 40.8% were male, 76.5% were black, 50.8% graduated from high school, 26% were married, and 54.1% had income <$5,000. The 8-item medication adherence scale was reliable (α=.83) and significantly associated with blood pressure control (P<.05). Using a cutpoint of <6, the sensitivity of the measure to identify patients with poor blood pressure control was estimated to be 93%, and the specificity was 53%. The medication adherence measure proved to be reliable, with good concurrent and predictive validity in primarily low-income, minority patients with hypertension and might function as a screening tool in outpatient settings with other patient groups.* J Clin Hypertens (Greenwich). 2008;10:348–354.
©2008 Le Jacq

From the Department of Community Health Sciences, UCLA School of Public Health;[1] the Department of Internal Medicine, UCLA School of Medicine;[2] the Center for Health Research, Ochsner Clinic Foundation;[3] Epidemiology and Family and Community Medicine, Tulane University Health Sciences Center;[4] and the Hypertension Clinic, Charles Drew Medical School[5]
Address for correspondence:
Donald E. Morisky, ScD, MSPH, UCLA School of Public Health, Department of Community Health Sciences, 650 Charles E. Young Drive South, Los Angeles, CA 90095-1772
E-mail: dmorisky@ucla.edu
Manuscript received August 10, 2007; revised December 5, 2007; accepted January 8, 2008

www.lejacq.com                ID: 7572

Hypertension is one of the most important risk factors for coronary heart disease, stroke, heart failure, and end-stage renal disease and remains an important public health challenge.[1–3] Although there are effective medical therapies for hypertension management, only 37% of hypertensive patients in a 2003–2004 survey were reported to have their blood pressure controlled.[1] One factor contributing to less than ideal blood pressure control is patient nonadherence to prescribed therapies. A meta-analysis revealed that the odds of blood pressure control among patients adherent to antihypertensive medications, compared with those who were nonadherent, was 3.44 (95% confidence interval, 1.6–7.37).[4] Multiple factors that influence patient adherence to prescribed therapies have been described and include quality of life; complexity and side effects of medications; health care system issues; demographic, behavioral, treatment, and clinical variables; and lack of knowledge regarding hypertension, to name only a few.[5] A recent Harris Poll survey suggested that there have been improvements in knowledge of hypertension risks, percentages of patients receiving specific medications, and numbers of patients controlled.[6] Nevertheless, patient nonadherence to antihypertensive treatment recommendations remains a global problem, and promoting patient adherence is a major clinical hurdle that is necessary to decrease cardiovascular morbidity and mortality.[7,8]

A first step in understanding adherence, or lack thereof, is assessing or measuring adherence. In outpatient clinical settings, there is a need for a valid, reliable, cost-effective tool that is accepted by both health care providers and patients for measuring medication adherence. Widespread use of such a tool, which could provide insight into modifiable factors regarding adherence in different patient populations, would lead to better understanding of

The Journal of Clinical Hypertension® (ISSN 1524-6175) is published monthly by Le Jacq, located at Three Enterprise Drive, Suite 401, Shelton, CT 06484. Le Jacq is an imprint of Blackwell Publishing, which was acquired by John Wiley & Sons in February 2007. Blackwell's programme has been merged with Wiley's global Scientific, Technical, and Medical business to form Wiley-Blackwell. Copyright ©2008 by Le Jacq. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publishers. The opinions and ideas expressed in this publication are those of the authors and do not necessarily reflect those of the Editors or Publisher. For copies in excess of 25 or for commercial purposes, please contact Ben Harkinson at BHarkinson@bos.blackwellpublishing.com or 781-388-8511.

1751776, 2008, 5. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1751776.2008.07572.x, Wiley Online Library on [22/08/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

nonadherence and lay the groundwork for interventions aimed at increasing adherence to therapies.

The primary objective of the current study is to examine the psychometric properties and test the concurrent and predictive validity of an 8-item structured, self-reported medication adherence measure in primarily low-income, minority patients with hypertension. Predictive validity is assessed through associations with blood pressure control, knowledge, social support, stress, and patient satisfaction with clinic visits, each of which was described previously to be associated with medication adherence.[9]

## METHODS

As part of a randomized experimental pretest and posttest study design over a 12-month period to evaluate the effects of structural and educational interventions on blood pressure control,[10] we examined the psychometric properties of an 8-item medication adherence measure. The study was undertaken at a large teaching hospital. Institutional review board approval was obtained from the medical center. A total of 1400 participants were randomly recruited from a list of approximately 2000 patients attending the hypertension clinic during regularly scheduled appointments at the medical center.[10,11] Project staff explained the program to each patient. Individuals who consented to participate completed the baseline interview with a community health worker at the end of that clinic visit. More than 98% of the patients approached agreed to participate. The baseline interview assessed demographic information, medical history, pertinent health behaviors, appointment keeping, and medication adherence. Other psychosocial factors that were known to be related to treatment adherence were also evaluated, including satisfaction with medical care, social support, stress, knowledge, and attitudes toward blood pressure control treatment, and coping skills.[7,12–14]

### Medication Adherence Measure

The self-reported measure of medication taking was developed from a previously validated 4-item scale and supplemented with additional items addressing the circumstances surrounding adherence behavior.[15] The theory underlying this measure was that failure to adhere to a medication regimen could occur because of several factors such as "do you sometimes have problems remembering to take your medication?" "do you sometimes forget to take your medication?" and problems with the complexity of the medical regimen such as, "do you ever feel hassled about sticking to your treatment plan?" The questions are phrased to avoid the "yes-saying" bias by reversing the wording of the questions about the way patients might experience failure in following their medication regimen, since there is a tendency for patients to give their physicians or other health care providers positive answers. Each item measures a specific medication-taking behavior and not a determinant of adherence behavior. Response categories are yes/no for each item with a dichotomous response and a 5-point Likert response for the last item.

### Other Measures

Using a standardized protocol, a calibrated mercury sphygmomanometer and stethoscope were used by an American Heart Association certified nurse to measure blood pressure at least 5 minutes after the patient arrived for his or her medical examination, 2 blood pressure measurements were taken 5 minutes apart on the right arm with the patient sitting. Measures were collected for all outpatient visits during a 6-month period following the baseline survey. The average of the measurements was calculated and used in the analyses. Blood pressure was considered to be controlled if either the mean of the systolic pressure was ≥140 mm Hg or the mean of the diastolic pressure was ≥90 mm Hg.

Knowledge concerning high blood pressure was measured using a 6-item index from a previous study regarding patient knowledge of hypertension.[16] The knowledge index ranged from 0 to 6, with higher scores indicating greater knowledge. Attitudes toward hypertension were measured with a 13-item instrument using a 4-point Likert-type scale (α reliability, .86).[13] Patient satisfaction was measured by a 6-item scale (α reliability, .87) that measured the degree to which patients were satisfied with their clinic visit, including appointment waiting times, availability of doctor, amount of information received from doctor, and concerns the doctor had for the patients.[17,18] A social support scale (α reliability, .76) measured the extent to which respondents were receiving social support from their family and friends to take their medications. A 7-item coping scale (α reliability, .84) was used to measure social coping behaviors.[14] A 4-item scale (α reliability, .79) was used to measure psychological stress.[19] A 2-item index that incorporates the number of antihypertensive drugs taken and the number of times the medication should be taken each day was used to measure medication complexity.

### Statistical Analyses

Using standard statistical procedures described by Cronbach,[20] the reliability of the 8-item scale

NOTICE

The Journal of Clinical Hypertension® (ISSN 1524-6175) is published monthly by Le Jacq, located at Three Enterprise Drive, Suite 401, Shelton, CT 06484. Le Jacq is an imprint of Blackwell Publishing, which was acquired by John Wiley & Sons in February 2007. Blackwell's programme has been merged with Wiley's global Scientific, Technical, and Medical business to form Wiley-Blackwell. Copyright ©2008 by Le Jacq. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publishers. The opinions and ideas expressed in this publication are those of the authors and do not necessarily reflect those of the Editors or Publisher. For copies in excess of 25 or for commercial purposes, please contact Ben Harkinson at BHarkinson@bos.blackwellpublishing.com or 781-388-8511.

17517176, 2008, 5, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1751-7176.2008.07572.x, Wiley Online Library on [23/08/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

was derived. Concurrent validity of the scale with a previously validated 4-item measure of adherence[15] was assessed using Pearson's correlation coefficient. Predictive validity of the scale was assessed through associations with blood pressure levels, knowledge, attitude, social support, stress, coping, and patient satisfaction with clinic visits. Standard procedures, including confirmatory factor analysis, for assessing the dimensionality of the scale was used to confirm a single-factor scale.[21]

To determine how well the 8-item scale would serve as a screening tool for identifying patients with poor blood pressure control, sensitivity, specificity, and correct classification rates were estimated.[22] Multivariate logistic regression analysis was conducted to evaluate the odds ratios of various risk factors associated with medication adherence.

## RESULTS

The sociodemographic characteristics of the 1367 participants in the study are presented in Table I. The mean age of respondents was 52.5 years (SD=12.2 years), with 61.5% older than 50 years, 40.8% male, 76.5% black, 50.8% having graduated from high school, 26% married, and 54.1% having an income <$5,000. The mean score for the medication adherence scale was 6.6 (SD=1.6). The item-total correlations were >0.30 for each of the 8 items composing the medication adherence scale. The internal consistency (Cronbach's alpha reliability) was 0.83. (Table II).

The current 8-item scale was significantly correlated with the previously validated 4-item self-reported medication-taking scale[15] (Pearson correlation, 0.64; P<.05). Confirmatory factor analysis (Table III) indicated that the 8-item scale was unidimensional and the items loaded well on the single factor.

In assessing the sensitivity and specificity of the self-report measure to identify patients with poor blood pressure control, all possible cutpoints were examined. Final cutpoints were chosen based on the relationship with blood pressure control, so that the medication adherence scale could provide useful information in a clinical setting (Table IV). Highly adherent patients were identified with the score of 8 on the scale, medium adherers with a score of 6 to <8, and low adherers with a score of <6. Using these cutpoints, this study population had 32.1% low adherers, 52.0% medium adhereers, and 15.9% high adherers. Patients who scored high on the adherence scale were more likely to have their blood pressure under control compared with patients who scored medium or low. A significant relationship between the adherence scale and blood pressure control (chi-square, 6.6; P<.05) was found (Table IV). Correct classification with blood pressure control was based on a dichotomous low versus high/medium level of adherence, which had a rate of 80.3%. Sensitivity and specificity of the 8-item scale were 93% and 53% respectively. In the multivariate model (adjusted for age, sex, ethnicity, marital status, income, and education level), attitude, knowledge, social support, patient satisfaction, coping, and stress were evaluated with respect to medication adherence (Table V). When all of these variables were included in the model, knowledge, patient satisfaction, coping, stress level, and medication complexity were each found to be significantly associated with adherence at the 0.05 level. Patients who displayed high knowledge of the medical regimen, higher satisfaction with medical care, positive family member social support, and stronger coping behavior were significantly more likely to have high levels of adherence. On the other

| Table I. Sociodemographic Characteristics of the Participants at Baseline (N=1367) | |
| --- | --- |
| SOCIODEMOGRAPHIC CHARACTERISTIC | % |
| Sex | |
| Male | 40.8 |
| Female | 59.2 |
| Age, y | |
| 18–39 | 12.2 |
| 40–49 | 26.3 |
| 50–59 | 32.9 |
| ≥60 | 28.6 |
| Ethnicity | |
| Black | 76.5 |
| Hispanic | 20.6 |
| Asian | 1.1 |
| White | 0.9 |
| Other | 0.9 |
| Income | |
| No income | 31.4 |
| <$5,000 | 22.7 |
| $5,000–$14,999 | 36.6 |
| $15,000–$24,999 | 5.5 |
| $25,000–$49,999 | 3.6 |
| >$50,000 | 0.2 |
| Marital status | |
| Married | 26.0 |
| Living with someone | 4.3 |
| Divorced, separated, alone | 28.9 |
| Never married | 27.0 |
| Widowed, alone | 13.8 |
| Highest education level | |
| <High school | 48.5 |
| High school graduate | 40.6 |
| Some college | 9.9 |
| Graduate school | 0.3 |
| Other | 0.7 |

NOTICE    The Journal of Clinical Hypertension® (ISSN 1524-6175) is published monthly by Le Jacq, located at Three Enterprise Drive, Suite 401, Shelton, CT 06484. Le Jacq is an imprint of Blackwell Publishing, which was acquired by John Wiley & Sons in February 2007. Blackwell's programme has been merged with Wiley's global Scientific, Technical, and Medical business to form Wiley-Blackwell. Copyright ©2008 by Le Jacq. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publishers. The opinions and ideas expressed in this publication are those of the authors and do not necessarily reflect those of the Editors or Publisher. For copies in excess of 25 or for commercial purposes, please contact Ben Harkinson at BHarkinson@bos.blackwellpublishing.com or 781-388-8511.

1751717X, 2008, 5. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1751-7176.2008.07572.x, Wiley Online Library on [22/08/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Table II.** The 8-Item Medication Adherence Scale

| Item | Corrected Item-to-total Correlation |
|---|---|
| 1. Do you sometimes forget to take your high blood pressure pills? | .4639 |
| 2. Over the past 2 weeks, were there any days when you did not take your high blood pressure medicine? | .5108 |
| 3. Have you ever cut back or stopped taking your medication without telling your doctor because you felt worse when you took it? | .4277 |
| 4. When you travel or leave home, do you sometimes forget to bring along your medications? | .4095 |
| 5. Did you take your high blood pressure medicine yesterday? | .3038 |
| 6. When you feel like your blood pressure is under control, do you sometimes stop taking your medicine? | .5044 |
| 7. Taking medication everyday is a real inconvenience for some people. Do you ever feel hassled about sticking to your blood pressure treatment plan? | .4009 |
| 8. How often do you have difficulty remembering to take all your blood pressure medication? | .5896 |

α Reliability, .83.

**Table III.** Factor Loadings of the 8-Item Medication Adherence Scale

| Item | Factor Loadings[a] |
|---|---|
| 1. Do you sometimes forget to take your high blood pressure pills? | 0.56 |
| 2. Over the past 2 weeks, were there any days when you did not take your high blood pressure medicine? | 0.617 |
| 3. Have you ever cut back or stopped taking your medication without telling your doctor because you felt worse when you took it? | 0.519 |
| 4. When you travel or leave home, do you sometimes forget to bring along your medications? | 0.493 |
| 5. Did you take your high blood pressure medicine yesterday? | 0.425 |
| 6. When you feel like your blood pressure is under control, do you sometimes stop taking your medicine? | 0.543 |
| 7. Do you ever feel hassled about sticking to your blood pressure treatment plan? | 0.479 |
| 8. How often do you have difficulty remembering to take all your blood pressure medication? | 0.668 |

[a]Root mean square error of approximation <0.01.

hand, patients who reported high levels of stress, greater complexity of the medical regimen, and poor perceived health status were found to have significantly lower levels of medication adherence.

## DISCUSSION

Hypertension is the most prevalent health problem among adult patients, affecting approximately 65 million persons in the United States and about 1 billion persons worldwide, but its recognition and treatment are still suboptimal.[1,23,24] It is one of the leading risk factors for cardiovascular disease, the leading cause of death in the United States. Adherence to appropriate medical therapy for hypertension can result in controlled blood pressure and reduction in adverse outcomes. With increasing need for long-term adherence to treatment, a reliable and valid measure of patient adherence that can be easily administered is needed. This study reports the development and evaluation of a medication adherence scale that is easy to administer. The scale can be used as an initial tool to screen patients for low adherence who are at risk for uncontrolled blood pressure, compared with patients with medium to high adherence. When appropriate, tailored interventions can be implemented, such as education of the patient regarding hypertension care, correcting misunderstandings and incorrect beliefs regarding hypertension treatment, reducing stress and improving coping skills among patients, or re-establishing a treatment regimen to foster medication adherence.

Adherence to treatment for high blood pressure is influenced by a number of factors, some of which are modifiable.[14–19] Adherence rates have been shown to be associated with age, sex, and race. Several studies have noted demographic disparities regarding medication adherence with lower adherence reported among younger individuals,[25,26] men,[26] and black persons.[27] Other factors reported to negatively impact adherence to prescribed therapies include depression,[28] lack of knowledge regarding hypertension and its treatment,[29] complexity of medication regimen,[30] health care system perceptions by the patient,[31] sexual dysfunction,[32] side effects of medication,[33] and poor quality of life.[34] In our study, we identified several modifiable variables in the logistic regression model that predict medication adherence. Some of the interesting findings in the model indicated that knowledge of hypertension, patient satisfaction, and coping skills were significantly associated with medication adherence. This implies the need for patient education to increase knowledge regarding hypertension treatment and for effective communication between the

The Journal of Clinical Hypertension® (ISSN 1524-6175) is published monthly by Le Jacq, located at Three Enterprise Drive, Suite 401, Shelton, CT 06484. Le Jacq is an imprint of Blackwell Publishing, which was acquired by John Wiley & Sons in February 2007. Blackwell's programme has been merged with Wiley's global Scientific, Technical, and Medical business to form Wiley-Blackwell. Copyright ©2008 by Le Jacq. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publishers. The opinions and ideas expressed in this publication are those of the authors and do not necessarily reflect those of the Editors or Publisher. For copies in excess of 25 or for commercial purposes, please contact Ben Harkinson at BHarkinson@bos.blackwellpublishing.com or 781-388-8511.

15217176, 2008, 5, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1751-7176.2008.07572.x, Wiley Online Library on [22/08/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

physician and patients to improve understanding regarding hypertension and its treatment.

A national US survey found that 30% of the patients who reported a systolic blood pressure value of ≥140 mm Hg indicated that they did not have high blood pressure.[29] In addition, about 20% of patients acknowledging a diagnosis of high blood pressure were not taking medications as prescribed. Reasons for nonadherence were recorded as forgetfulness (46%), blood pressure under control (40%), did not like taking medications (33%), adverse effect (30%), blood pressure controlled other ways (28%), and cost (16%).[29] In another study, a similar finding was reported: hypertensive patients had poorer awareness of normal blood pressure values than normotensive participants.[35] In a general study of over 600 adults taking prescribed medications for hypertension, 80% reported having reservations about their therapy, with 66% indicating that they preferred to lower their blood pressure without taking blood pressure pills.[36] Another study found that hypertensive black patients with controlled blood pressure reported higher mean self-efficacy scores compared with patients with uncontrolled hypertension.[37] More recent surveys suggest that patient knowledge and control rates are improving.[6] In addition to addressing patient nonadherence to therapy as a contributor to poor blood pressure control, there is an important issue of clinical or therapeutic inertia, in which physicians or other health care providers do not adhere to treatment guidelines, change, or intensify antihypertensive therapy if blood pressure remains uncontrolled with pharmacotherapy.

In order for physicians or other health care providers to adequately address poor patient adherence to therapy as a key factor leading to inadequate blood pressure control, they must first be able to reliably assess it. In the inpatient setting, there are 4 approaches that are commonly reported for measuring medication adherence: self-report, electronic monitoring, pill count, and pharmacy fill rates.[5,39,40] Each of these approaches can lead to a quantifiable measure of adherence and, with the exception of self-report, these approaches are objective. Recent attention has been given to electronic monitoring with systems such as medication event monitoring systems (MEMS). Provided they are used correctly, these systems capture data on daily intake and dosing over time, allowing analyses of long-term patterns and opportunities to identify "white-coat adherers."[39] However, these devices are relatively expensive and somewhat cumbersome to carry, are subject to interference by the patient or other devices, can fail, and are able to capture large quantities

**Table IV.** Relationship Between Adherence Scale and BP Control

|  | BP Controlled[a] | |
| --- | --- | --- |
|  | No | Yes |
| Low adherence, <6 | 67.2% | 32.8% |
| Medium adherence, 6 - <8 | 55.2% | 44.8% |
| High adherence, 8 | 43.3% | 56.7% |

[a]Chi-square, 6.6; $P<.05$. Blood pressure (BP) controlled, systolic BP <140 mm Hg and diastolic BP <90 mm Hg.

**Table V.** Odds Ratios of Determinants of High Medication Adherence

|  | Odds Ratio | 95% Confidence Interval |
| --- | --- | --- |
| Knowledge | 1.15 | 1.03–1.29[a] |
| Attitude | 0.99 | 0.96–1.03 |
| Satisfaction | 1.07 | 1.02–1.11[a] |
| Social support | 1.18 | 1.02–1.37[a] |
| Coping | 1.94 | 1.19–3.15[a] |
| Stress | 0.91 | 0.86–0.98[a] |
| Medication complexity | 0.55 | 0.38–0.81[a] |

[a]Significant at <.05.

of data points over time, posing challenges for data analysis. Research involving MEMS caps as a measure of adherence identified several problems with this approach, including not using the electronic monitoring device consistently (36%), taking out more than 1 dose at a time (41%), and reporting opening the electronic monitoring device but not taking the medication (26%).[41] In addition, each medication that is being monitored for adherence requires its own device, and reasons for nonadherence are not captured by the electronic system.

In contrast, self-report measures, such as the one proposed in this study, are simple and economical to use and can provide real-time feedback regarding adherence behavior and potential reasons for poor adherence including social, situational, and behavioral factors affecting adherence. Although self-report measures may be subject to recall bias, overestimation of adherence, and elicitation of socially acceptable responses, efforts aimed at increasing validity and reliability of self-report measures in different populations will facilitate the adoption and use of these tools in clinical practice. In a racially diverse sample of elderly patients with hypertension in a managed care setting, the 8-item medication adherence scale and antihypertensive medicine pharmacy fill rates were significantly correlated ($r=0.46$; $P<.001$).[34] Other work has been conducted

NOTICE

The Journal of Clinical Hypertension® (ISSN 1524-6175) is published monthly by Le Jacq, located at Three Enterprise Drive, Suite 401, Shelton, CT 06484. Le Jacq is an imprint of Blackwell Publishing, which was acquired by John Wiley & Sons in February 2007. Blackwell's programme has been merged with Wiley's global Scientific, Technical, and Medical business to form Wiley-Blackwell. Copyright ©2008 by Le Jacq. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publishers. The opinions and ideas expressed in this publication are those of the authors and do not necessarily reflect those of the Editors or Publisher. For copies in excess of 25 or for commercial purposes, please contact Ben Harkinson at BHarkinson@bos.blackwellpublishing.com or 781-388-8511.

in research settings with self-reported medication adherence measures[15,42,43]; however, further refinement of these tools and consistent demonstration of validity and reliability in different populations are needed before widespread adoption. Several studies have highlighted the importance of assessing medication-taking behavior and the positive benefits of enhanced provider-patient communication.[44]

Given the validity and reliability reported with the 8-item instrument and its ease of use in the outpatient setting, this self-report measure could function as a screening tool in the clinic setting to identify patients who are poorly adherent and at risk for uncontrolled blood pressure. The 8-item scale had a higher sensitivity than the original 4-item scale. This sensitivity of 93% indicates that the scale is good at identifying patients who have low medication adherence and have uncontrolled blood pressure relative to all patients who have uncontrolled blood pressure. The specificity of the 8-item scale of 53% indicates moderate performance of the scale in identifying patients who do not have problems with medication adherence and have their blood pressure under control relative to all those with controlled blood pressure. This self-reported adherence classification, along with blood pressure control data, could be useful in the clinical decision-making process. For example, a patient with high medication adherence and good blood pressure control could be complemented on his or her medication-taking behavior and reminded of the benefits of controlled blood pressure and importance of continued adherence to medication. A patient with inadequate blood pressure control but high medication adherence could be considered a patient with difficult-to-control or refractory hypertension or with inappropriate or inadequate pharmacologic treatment. In this case, intensification of therapy or change in therapy to achieve the appropriate blood pressure response should be considered.[45] Alternatively, for patients classified as having low adherence to medications and with poor blood pressure control, the physician may consider discussing potential side effects of medications with the patient, engaging family member support, or using cueing behaviors or memory devices.[46]

### Limitations

The results of this study should be interpreted with the following limitations in mind. This study was conducted in very low–income minority patients treated for hypertension seeking routine care in a clinic setting and may not be representative of patients from other socioeconomic backgrounds. Also, as noted previously, a recent survey suggests

that patient knowledge and control rates are improving,[6] yet opportunities still exist to improve these rates if we are to achieve the Healthy People 2010 goals for the nation. Although the scale was not validated with pharmacy refill rates in this study, it was correlated with another 4-item adherence scale[15] that was previously found to have a moderate level of reliability and high levels of concurrent and predictive validity and was validated with a chemical marker for actual medication-taking behavior.[47] Further research is recommended with more objective measures in patients with hypertension.

### CONCLUSIONS

The medication adherence scale presented in this research is relatively simple and practical to use in clinical settings. The instrument can be used initially to identify patients with adherence problems and can also be used to monitor adherence over the course of the treatment. One important feature of this scale is that treatment-related attitude and behavior problems that the patient may be facing can be immediately identified and health care providers may provide reinforcement and advice such that the patient can take positive steps early on to address these issues. Further research is needed to validate this measurement scale in other settings and with other health problems.

*Acknowledgments: The authors acknowledge the tremendous assistance provided by their staff and trained Community Hypertension Intervention Program (CHIP) workers in the implementation of this intervention study. This research was supported by the National Heart, Lung, and Blood Institute, award number RO-H251119 to the principal investigator, Dr Harry J. Ward, and supported in part by grant number R01 AG022536 from the National Institute on Aging (principal investigator, Dr Marie Krousel-Wood). The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Heart, Lung, and Blood Institute, the National Institute on Aging, or the National Institutes of Health. A patient education booklet, "High Blood Pressure. What You Should Know About It and How You Can Help Your Doctor Treat It," is available from the Hypertension Education Foundation, PO Box 631, Scarsdale, NY 10583.*

### REFERENCES

1  Ong KL, Cheung BM, Man YB, et al. Prevalence, awareness, treatment, and control of hypertension among United States adults 1999–2004. *Hypertension*. 2007;49(1):69–75.
2  Krousel-Wood MA, Muntner P, He J, et al. Primary prevention of essential hypertension. *Med Clin North Am*. 2004;88:223–238.
3  The Seventh Report of the Joint National Committee on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure. The JNC 7 Report. *JAMA*. 2003;289:2560–2572.
4  DiMatteo MR, Giordani PJ, Lepper HS, et al. Patient adherence and medical treatment outcomes: a meta-analysis. *Med Care*. 2002;40:794–811.
5  Krousel-Wood M, Thomas S, Muntner P, et al. Medication adherence: a key factor in achieving blood pressure control and good clinical outcomes in hypertensive patients. *Curr*

The Journal of Clinical Hypertension (ISSN 1524-6175) is published monthly by Le Jacq, located at Three Enterprise Drive, Suite 401, Shelton, CT 06484. Le Jacq is an imprint of Blackwell Publishing, which was acquired by John Wiley & Sons in February 2007. Blackwell's programme has been merged with Wiley's global Scientific, Technical, and Medical business to form Wiley-Blackwell. Copyright ©2008 by Le Jacq. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publishers. The opinions and ideas expressed in this publication are those of the authors and do not necessarily reflect those of the Editors or Publisher. For copies in excess of 25 or for commercial purposes, please contact Ben Harkinson at BHarkinson@bos.blackwellpublishing.com or 781-388-8511.

1751/1176, 2008, 5. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1751-7176.2008.07572.x. Wiley Online Library on [22/08/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Opin Cardiol.* 2004;19:357–362.

6 Moser M, Franklin SF. Hypertension management: results of a new national survey for the Hypertension Education Foundation: Harris Interactive. *J Clin Hypertens (Greenwich).* 2007;9(5):316–323.

7 Hamilton GA. Measuring adherence in a hypertension clinical trial. *Eur J Cardiovasc Nurs.* 2003;2:219–228.

8 Wogen J, French F. Patient adherence with hypertension medication. *J Manag Care Pharm.* 2004;10:90–101.

9 Haynes RB, McDonald HP, Garg AX. Helping patients follow prescribed treatment: clinical applications. *JAMA.* 2002;288:2880–2883.

10 Ward HJ, Morisky DE, Lees NB, et al. A clinic and community-based approach to hypertension control for an underserved minority population: design and methods. *Am J Hypertens.* 2000;13:177–183.

11 Morisky DE, Lees NB, Sharif BA, et al. Reducing disparities in hypertension control: a community based Hypertension Control Project (CHIP) for a low income minority population. *Health Promot Pract.* 2002;3:267–278.

12 Van Veen WA. Treatment adherence in hypertension: problems and research. *J R Coll Gen Pract Occas Pap.* 1980;12:22–25.

13 Stamler R, Stamler J, Civinelli J, et al. Adherence and blood-pressure response to hypertension treatment. *Lancet.* 1975;2:1227–1230.

14 Schoenberg NE. The relationship between perceptions of social support and adherence to dietary recommendations among African-American elders with hypertension. *Int J Aging Hum Dev.* 1998;47:279–297.

15 Morisky DE, Green LW, Levine DM. Concurrent and predictive validity of a self reported measure of medication adherence. *Med Care.* 1986;24:67–74.

16 Norman SA, Marconi KM, Schezel GW, et al. Beliefs, social normative influences, and compliance with anti-hypertensive medication. *Am J Prev Med.* 1985;1:10–17.

17 Klein LE. Compliance and blood pressure control. *Hypertension.* 1988;11:II61–II64.

18 Bittar N. Maintaining long-term control of blood pressure: the role of improved compliance. *Clin Cardiol.* 1995;18(6 suppl 3):12–16.

19 Svensson S, Kjellgren KI. Adverse events and patient's perceptions of antihypertensive drug effectiveness. *J Hum Hypertens.* 2003;17:671–675.

20 Cronbach LJ. Coefficient alpha and the internal structure of tests. *Psychometrika.* 1951;16:297–334.

21 Boone KB, Ponton MO, Gorsuch RL, et al. Factor analysis of four measures of prefrontal lobe functioning. *Arch Clin Neuropsychol.* 1998;13:585–595.

22 Katz D, Foxman B. How well do prediction equations predict? Using receiver operating characteristic curves and accuracy curves to compare validity and generalizability. *Epidemiology.* 1993;4:319–326.

23 Fields LE, Burt VL, Cutler JA, et al. The burden of adult hypertension in the United States 1999 to 2000. *Hypertension.* 2004;44:398–404.

24 Kearney PM, Whelton M, Reynolds K, et al. Global burden of hypertension: analysis of worldwide data. *Lancet.* 2005;365:217–223.

25 Monane M, Bohn RL, Gurwitz JH, et al. The effects of initial drug choice and comorbidity on antihypertensive therapy compliance: results from a population-based study in the elderly. *Am J Public Health.* 1996;86:1805–1808.

26 Marentette MA, Gerth WC, Billings DK, et al. Antihypertensive persistence and drug class. *Can J Cardiol.* 2002;18:649–656.

27 Monane M, Bohn RL, Gurwitz JH, et al. A population-based study of compliance with antihypertensive therapy: role of age, gender and race. *Am J Public Health.* 1996;86:1805–1809.

28 Wang PS, Bohn RL, Knight E, et al. Noncompliance with antihypertensive medications: the impact of depressive symptoms and psychosocial factors. *J Gen Intern Med.* 2002;17:504–511.

29 Egan BM, Lackland DT, Cutler NE. Awareness, knowledge and attitudes of older Americans about high blood pressure. *Arch Intern Med.* 2003;163:681–687.

30 Iskedjian M, Einarson TR, MacKeigan LD, et al. Relationship between daily dose frequency and adherence to antihypertensive pharmacotherapy: evidence from meta-analysis. *Clin Ther.* 2002;24:302–316.

31 World Health Organization. Adherence to long-term therapies evidence for action. World Health Organization. 2003;107-114. http://www.who.int/bookorders/anglais/detart1.isp?sesslan=1&codlan=1&codcol=15&codcch-526. Accessed march 31, 2008.

32 Wassertheil-Smoller S, Blaufox MD, Oberman A, et al. Effect of antihypertensives on sexual function and quality of life: the TAIM Study. *Ann Intern Med.* 1991;114(8):613–620.

33 Gregoire JP, Moisan J, Guibert R, et al. Tolerability of antihypertensive drugs in a community-based setting. *Clin Ther.* 2001;23:715–726.

34 Krousel-Wood MA, Thomas S, Munu A, et al. Low adherence to prescribed antihypertensive medication and poorer quality of life in elderly hypertensive patients. Poster presented at: American Heart Association, 2nd Scientific Conference: Compliance in Healthcare and Research, Washington, DC, May 7-8, 2004.

35 Wizner B, Gryglewska B, Gasowski J, et al. Normal blood pressure values as perceived by normotensive and hypertensive subjects. *J Hum Hypertens.* 2003;17:87–91.

36 Benson J, Britten N. Patients' views about taking antihypertensive drugs: questionnaire study. *BMJ.* 2003;3:314–1315.

37 Ogedegbe G, Mancuso CA, Allegrante JP, et al. Development and evaluation of a medication adherence self-efficacy scale in hypertensive African-American patients. *J Clin Epidemiol.* 2003;56:520–529.

38 O'Connor PJ. Overcome clinical inertia to control systolic blood pressure. *Arch Intern Med.* 2003;163:2677–2678.

39 Christensen DB, Williams B, Goldberg HI, et al. Assessing compliance to antihypertensive medications using computer-based pharmacy records. *Med Care.* 1997;35:1164–1170.

40 Hawkshead J, Krousel-Wood MA. Techniques for measuring medication adherence in hypertensive patients in outpatient settings: advantages and limitations. *Dis Manage Health Outcomes.* 2007;15:109–118.

41 Bova CA, Fennie KP, Knafl GJ, et al. Use of electronic monitoring devices to measure antiretroviral adherence: practical considerations. *AIDS Behav.* 2005;9:103–110.

42 Kim MT, Hill MN, Bone LR, et al. Development and testing of the Hill-Bone Compliance to High Blood Pressure Therapy Scale. *Prog Cardiovasc Nurs.* 2000;15(3):90–96.

43 Shea S, Misra D, Ehrlich MH, et al. Correlates of nonadherence to hypertension treatment in an inner-city minority population. *Am J Public Health.* 1992;82:1607–1612.

44 Harmon G, Lefante J, Krousel-Wood MA. Overcoming barriers: the role of providers in improving patient adherence to antihypertensive medications. *Curr Opin Cardiol.* 2006;21:310–315.

45 Moser M, Setaro JF. Clinical practice. Resistant or difficult-to-control hypertension. *N Engl J Med.* 2006;355(4):385–392.

46 Morisky DE, Levine DM, Green LW, et al. Five-year blood pressure control and mortality following health education for hypertensive patients. *Am J Public Health.* 1983;73:153–162.

47 Morisky DE, Malotte CK, Choi P, et al. A patient education program to improve adherence rate with antituberculosis drug regimens. *Health Educ Q.* 1990;17:253–268.

The Journal of Clinical Hypertension® (ISSN 1524-6175) is published monthly by Le Jacq, located at Three Enterprise Drive, Suite 401, Shelton, CT 06484. Le Jacq is an imprint of Blackwell Publishing, which was acquired by John Wiley & Sons in February 2007. Blackwell's programme has been merged with Wiley's global Scientific, Technical, and Medical business to form Wiley-Blackwell. Copyright ©2008 by Le Jacq. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publishers. The opinions and ideas expressed in this publication are those of the authors and do not necessarily reflect those of the Editors or Publisher. For copies in excess of 25 or for commercial purposes, please contact Ben Harkinson at BHarkinson@bos.blackwellpublishing.com or 781-388-8511.

# EXHIBIT 17

Patient name:                                    Date:
MRN:

| | | |
|---|---|---|
| 1) | Do you sometimes forget to take your prescription cholesterol medication? | ☐ YES<br>☐ No |
| 2) | People sometimes miss taking their medications for reasons other than forgetting. Thinking over the past two weeks, were there any days when you did not take your prescription cholesterol medication? | ☐ YES<br>☐ No |
| 3) | Have you ever cut back or stopped taking your prescription cholesterol medication without telling your doctor because you felt worse when you took it? | ☐ YES<br>☐ No |
| 4) | When you travel or leave home, do you sometimes forget to bring along your prescription cholesterol medication? | ☐ YES<br>☐ No |
| 5) | Did you take all your prescription cholesterol medication last time you were supposed to take it? | ☐ Yes<br>☐ NO |
| 6) | When you feel like your symptoms are under control, do you sometimes stop taking your prescription cholesterol medication? | ☐ YES<br>☐ No |
| 7) | Taking medicine every day is a real inconvenience for some people. Do you ever feel hassled about sticking to your cholesterol treatment plan? | ☐ YES<br>☐ No |
| 8) | How often do you have difficulty remembering to take all your prescription medications to lower your cholesterol level? | ☐ Never/rarely<br>☐ Once in a while<br>☐ Sometimes<br>☐ Usually<br>☐ ALL THE TIME |

How many answers did they give that are in **BOLD UPPERCASE?** _____ (≥ 2 → **ELIGIBLE**)

# EXHIBIT 18

On Jul 5, 2022, at 1:47 PM, Steve trubow <trubow1@gmail.com> wrote:

**Dr Hartz,**

**Thank you for the prompt response.**

**We can discuss the use of MMAS-8 paper tests in cases when the internet is not available.**

**However, before we begin the discussion, please answer the questions below.**

**How many MMAS-8 tests have been administered to date ?**

**How were the MMAS-8 tests administered scored and coded ?**

**When were the MMAS-8 tests first administered ?**

**When will the last MMAS-8 test be administered?**

Best
Steve in Tokyo
Steven Trubow
MMAS Research LLC USA
Petaluma California
MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
www.medicationsafety.healthcare
https://eu.medicationsafety.healthcare/

**From:** Jacob Hartz <jacob.hartz@icloud.com>
**Sent:** Tuesday, July 5, 2022 10:01 AM
**To:** Steve trubow <trubow1@gmail.com>
**Cc:** Hannah Palfrey <Hannah.Palfrey@cardio.chboston.org>; thad@scrogginsesq.com; Peter Hoeller <peter.hoeller@bjfip.com>
**Subject:** Re: NCT04458766

We plan on administering the questions through the widget. We were planning on having a copy of the questions in case we do not have immediate access to the widget (our wifi and cell service in clinic can be spotty). All questions would then be entered using the widget.

Would that be okay.

Jacob Hartz, MD, MPH
Department of Cardiology
Boston Children's Hospital
jacob.hartz@cardio.chboston.org

> On Jul 5, 2022, at 12:11 AM, Steve trubow
> <trubow1@gmail.com> wrote:
>
> Dr Hartz,
>
> Sorry for the inconvenience, one more question.
>
> How will the MMAS-8 tests be administered ?
>
> Please remember if you administer MMAS-8 tests outside of the Morisky Widget, it requires Licensor approval, to use MMAS paper or electronic questionnaires.
>
> Best
> Steve in Tokyo
> Steven Trubow
> MMAS Research LLC USA
> Petaluma California
> MMAS Research France SAS
> Paris France
> MMAS Research Italy SRL
> Vicenza Italy
> (+1)360-824-0701
> www.morisky.org
> www.medicationsafety.healthcare

https://eu.medicationsafety.healthcare/

---

**From:** Steve trubow <trubow1@gmail.com>
**Sent:** Monday, July 4, 2022 8:58 PM
**To:** jacob.hartz@icloud.com;
Hannah.Palfrey@cardio.chboston.org
**Cc:** thad@scrogginsesq.com; 'Peter Hoeller'
<peter.hoeller@bjfip.com>; 'Steve trubow'
<trubow1@gmail.com>
**Subject:** FW: NCT04458766

**Hi Dr. Hartz,**

**Thank you for your prompt response.**

**Please update the clinical trials website with the required reference to the Morisky Widget. When it is updated, please send me a link.**

**Thank you for your cooperation.**

Best
Steve in Tokyo
Steven Trubow
MMAS Research LLC USA
Petaluma California
MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
www.medicationsafety.healthcare
https://eu.medicationsafety.healthcare/

**From:** Jacob Hartz jacob.hartz@icloud.com
**Sent:** Monday, July 4, 2022 7:34 PM
**To:** Steve trubow trubow1@gmail.com
**Cc:** thad@scrogginsesq.com; peter.hoeller@bjfip.com;
Hannah Palfrey Hannah.Palfrey@cardio.chboston.org

**Subject:** Re: NCT04458766

Hi,

Hannah and I are the only ones who are administering MMAS. No one at Wellth will be administering this test. Wellth uses a different mechanism to measure adherence through a photograph and will not take part in MMAS or have results of the MMAS.

I will include the listing.

Thank you.

---

**From:** Steve trubow <trubow1@gmail.com>
**Sent:** Sunday, July 3, 2022 5:17 PM
**To:** 'jacob.hartz@icloud.com' <jacob.hartz@icloud.com>
**Cc:** 'thad@scrogginsesq.com' <thad@scrogginsesq.com>; 'peter.hoeller@bjfip.com' <peter.hoeller@bjfip.com>; 'Steve trubow' <trubow1@gmail.com>
**Subject:** NCT04458766

<image001.png>

Dear Dr Hartz,

I hope this email finds you well.

MMAS Research is very concerned about the unauthorized use of the Wellth App in "The Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence in Adolescents NCT04458766 study." On the clinical trial website for NCT04458766 , you reported that "Lastly, the investigators will test the subject's adherence (using the Morisky Medication Adherence Scale and Wellth App) during the 60 days following discontinuation of the incentives to determine if any effect of the incentive persists after the incentive is discontinued.

In the BCH Morisky Widget license, you agreed that only BCH employees trained and certified by the Licensor may use the Morisky Widget MMAS.  BCH can use the Morisky Widget, Morisky Kiosk Apple I Phone APP, and the Morisky API to administer Morisky Widget MMAS tests. With Licensor approval, BCH can use MMAS paper or electronic questionnaires, but all scoring and coding must be done in the Morisky Widget.

As I recall the only persons trained and certified to use the Morisky Widget MMAS were you and your associate. I have no recollection of training, certifying or authorizing the use of the MMAS-8 by Wellth.

In addition Appendix 1 of your attached license requires that the footnote below is required in all <u>web postings</u>,

A Morisky Widget license agreement is available from MMAS Research LLC 14725 NE 20th St., Bellevue Washington or strubow@morisky.org

Can you please provide an explanation ?

Thank you in advance for your prompt response.

Best
Steve
Steven Trubow
MMAS Research LLC USA
Petaluma California
MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
www.medicationsafety.healthcare
https://eu.medicationsafety.healthcare/

From: trubow1@gmail.com <trubow1@gmail.com>
Sent: Wednesday, October 23, 2019 9:13 AM
To: 'Jacob Hartz' <jacob.hartz@icloud.com>
Cc: trubow1@gmail.com; 'KENNETH I GROSS' <kgross@kigrosslaw.com>
Subject: invoice for BCH license and training

Dr. Hartz,

Please find attached an invoice, 2019 w-9 and wire instructions.

I also attached a slide deck for the training.
Looking forward to meeting you and your colleagues in Boston.
Please let me know if you have any questions.

Steven Trubow
MMAS Research LLC USA
Coronado California
MMAS Research France SAS
Paris France
MMAS Research Italy SRL
Vicenza Italy
(+1)360-824-0701
www.morisky.org
SEE the new I-Phone Morisky Kiosk in the APP Store

# EXHIBIT 19

**From:** "Hartz, Jacob" <Jacob.Hartz@cardio.chboston.org>
**Date:** July 6, 2022 at 2:22:50 PM PDT
**To:** Steve trubow <trubow1@gmail.com>
**Cc:** "Palfrey, Hannah" <Hannah.Palfrey@cardio.chboston.org>,
thad@scrogginsesq.com, Peter Hoeller <peter.hoeller@bjfip.com>
**Subject: Re: NCT04458766**

Hi,

We have administered 4 tests. The tests were administered from memory. Our enrollment protocol was answering a positive (i.e., consistent with lower adherence) to at least one question. and then I had planned on entering and scoring the tests on the widgets. I will need to confirm the date of the first enrollee and have the details in my office, but am not there today. The last MMAS will be administered within the next 2 years once we have completed enrollment.

If any of this is serious breach of contract and you feel it necessary to end our agreement, we would understand. We certainly did not mean to do anything incorrectly and it was always our intention to follow our contract entirely. It would be a tremendous loss to our study, but we want to respect our agreement and your organization. Although the citation was included in our references, we have now added you as a "Collaborator" because this appears to be best place to signal your role. If there is a preferred place, please let me know and I can change it.

Thank you. Again, our sincerest apologies if this was done incorrectly.

- Jake


Jacob Hartz, MD, MPH
Director of Preventive Cardiology
Department of Cardiology
Boston Children's Hospital

# EXHIBIT 20

Protocol

# The Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence to Statins and Blood Pressure–Lowering Medication in Adolescents with Familial Hypercholesterolemia or Hypertension: Protocol for a Pre-Post Cohort Study

Jacob Hartz[1,2], MD, MPH; Hannah Chiert[1], BS; Sarah de Ferranti[1,2], MD, MPH; Tiffany Powell-Wiley[3,4], MD, MPH

[1]Department of Cardiology, Boston Children's Hospital, Boston, MA, United States

[2]Department of Pediatrics, Harvard Medical School, Boston, MA, United States

[3]Social Determinants of Obesity and Cardiovascular Risk Laboratory, Cardiovascular Branch, Division of Intramural Research, National Heart, Lung, and Blood Institute, National Institutes of Health, Bethesda, MD, United States

[4]Intramural Research Program, National Institute on Minority Health and Health Disparities, National Institutes of Health, Bethesda, MD, United States

**Corresponding Author:**
Jacob Hartz, MD, MPH
Department of Cardiology
Boston Children's Hospital
300 Longwood Ave
Boston, MA, 02115
United States
Phone: 1 6173550955
Fax: 1 7300600
Email: jacob.hartz@icloud.com

## Abstract

**Background:** Cardiovascular disease (CVD) is a leading cause of mortality and morbidity in the United States, with risk factors such as hypertension and elevated low-density lipoprotein (LDL) cholesterol originating in childhood. While statins and blood pressure–lowering medications can mitigate these risks, adherence is often poor, particularly among youth. Innovative solutions, such as monetary incentives via smartphone apps, may enhance adherence, but evidence in youth is lacking.

**Objective:** This study aims to evaluate the efficacy of a smartphone app (Wellth) offering financial incentives to improve adherence to statins and blood pressure–lowering medications among youth aged 12 to 19 years at risk for cardiovascular disease.

**Methods:** We initially designed a randomized controlled trial to compare the efficacy of 2 different incentive structures in youth treated with a statin for familial hypercholesterolemia with inadequate adherence. After facing recruitment challenges, the study protocol was changed to evaluating a single incentive in a pre-post design. The primary outcome was the change in adherence rate over the 60-day incentive period compared to the adherence rate during the 14-day run-in period. The secondary outcome was a change in LDL cholesterol level. Adjustments to the protocol were made in response to recruitment challenges during the COVID-19 pandemic, simplifying the incentive structure and expanding eligibility criteria.

**Results:** The study is currently undergoing recruitment and collection of data from the first participants. The study has faced recruitment challenges exacerbated by the COVID-19 pandemic, necessitating protocol modifications. Detailed analysis of adherence rates and LDL cholesterol changes is ongoing.

**Conclusions:** This study explores the efficacy of monetary incentives delivered through a smartphone app to improve medication adherence in youth at risk for CVD. The findings will be used to build upon the existing literature in an effort to improve medication adherence throughout the life course and ultimately reduce CVD.

**Trial Registration:** ClinicalTrials.gov NCT04458766; https://clinicaltrials.gov/study/NCT04458766

**International Registered Report Identifier (IRRID):** DERR1-10.2196/65105

*(JMIR Res Protoc 2025;14:e65105)* doi: 10.2196/65105

**KEYWORDS**

dyslipidemia; hypertension; adherence; mobile health; incentives; behavioral health; youth



JMIR RESEARCH PROTOCOLS

Hartz et al

## Introduction

Cardiovascular disease (CVD) is the leading cause of death and disability in the United States. It leads to US $216 billion in direct costs and an additional US $147 billion in indirect costs each year [1]. While the presentation of CVD events primarily occurs in adulthood, the significant risk factors for CVD, including hypertension and elevated low-density lipoprotein (LDL) cholesterol, have their antecedents in childhood [2,3]. With the use of statins [4-17] and blood pressure–lowering medications [18], substantial reductions in this risk are possible.

However, adherence to statins and blood pressure–lowering medications is needed to accrue these potential benefits. Unfortunately, medication adherence is frequently poor, with up to 50% of adults not taking all their prescribed medications [19-23]. In adults, nonadherence is associated with an increased risk for CVD events and all-cause mortality [20,24], as well as almost US $44 billion annually in additional health care costs [25,26]. Although studies are limited, adherence to statins and blood pressure–lowering medications also has been shown to be inadequate in youth [27-30]. Youth seem to be particularly vulnerable to nonadherence [31], even in conditions in which the consequences of nonadherence can lead to rapid disease progression or severe, acute symptoms, such as bipolar disorder [32], HIV infection [33], or asthma [34].

Multiple factors impact adherence (Figure 1), including patient-related factors (eg, beliefs and expectations), socioeconomic factors, medication-related factors (eg, complexity of the regimen and adverse effects), the disease being treated, and the health care system [35]. Unfortunately, successful interventions to improve medication adherence overall are rare in both adults [36] and youth [36,37]. Further, there are no formally tested interventions to improve adherence to statins or blood pressure–lowering medications in youth. One potential solution to improve adherence is to provide monetary incentives. Traditional economic theory suggests that providing individuals with incentives to complete an action will lead to increased frequency of the occurrence of the desired action. Studies in adults have shown monetary incentives to be modestly successful in certain diseases [38-40], but not all studies have shown positive results [41]. Further, it is unclear if these findings translate to youth.

**Figure 1.** Five components of medication adherence as proposed by the World Health Organization [35]. The green curved arrows indicate components expected to respond to incentives, while the dashed black arrows are components that are less likely to respond.



To address this gap, we planned a study using a smartphone app (Wellth) to provide financial incentives to improve medication adherence in youth at risk of CVD. Smartphone apps are promising interventional tools as they are familiar to most youth [42,43]. Data suggests using smartphone apps in a health care setting is of interest to youth [44] across a diverse set of socioeconomic and cultural backgrounds [42]. The Wellth app is designed to improve medication adherence through reminders and by providing monetary rewards for taking a medication as prescribed.

The objective of this paper is to describe the original study design, recruitment methods, outcomes, analysis plan, strengths, and limitations. In addition, we highlight modifications to the design and recruitment strategies because of social distancing requirements related to the COVID-19 pandemic and the need to improve recruitment. The principal aim of our study is to determine if financial incentives are effective at improving adherence to medications in youth who are at an increased risk of CVD.



## Methods

### Study Design

The study, originally titled "Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence to Blood Pressure–Lowering Medications and Statins in Youth at Risk for Cardiovascular Disease," was designed as a randomized control trial to compare the efficacy of 2 interventions on improving medication adherence to statins in youth aged 12 to 19 years using a smartphone app (Figure 2). The 104-day study consisted of a 14-day run-in period, 2 periods of 30 days in which participants received incentives, and a 30-day follow-up period in which participants were asked to record adherence but did not receive any incentives. During the run-in and follow-up periods, all features of the Wellth app were available, but the participants did not receive any monetary incentives.

This approach was used to isolate the effect of the monetary incentive from the other features of the app and to provide an objective baseline measure of adherence. After the 14-day run-in, the participants were eligible to receive incentives during two 30-day incentive periods. Incentives were disbursed at the end of period 1 (day 44) and period 2 (day 74). In addition, we also measured the patients' adherence in the 30-day period after the incentive periods to determine if the effect of the intervention was sustained. The study was approved by the research ethics board at the Boston Children's Hospital with a waiver of individual participant consent as this research used data that had previously been obtained through a departmental quality improvement project. Patients who were older than 18 years at any time while participating in the study signed an informed consent form. For patients who were younger than 18 years, informed consent was obtained from their legal guardian, and assent was obtained from the participant.

**Figure 2.** Final study timeline. The fasting lipid profile included total cholesterol, triglyceride level, high-density lipoprotein cholesterol, and low-density lipoprotein cholesterol.



### Eligibility Criteria

The original eligibility criteria are described in Textbox 1. Patients were eligible to participate if they were aged 12 to 19 years, had a diagnosis of familial hypercholesterolemia (FH), were prescribed a statin, and reported less-than-ideal statin adherence. The diagnosis of FH was based on genetic testing or if the patient met the National Lipid Association recommendations, which are an LDL cholesterol level greater than or equal to 160 mg/dL or a non–high density lipoprotein cholesterol level greater than or equal to 190 mg/dL in patients younger than 20 years [11,19,20,45].



**Textbox 1.** Eligibility and exclusion criteria.

**Eligibility criteria**

- Less-than-ideal adherence by self-report
- Age 12 to 19 years
- Diagnosis of familial hypercholesterolemia (FH) based on National Lipid Association criteria and/or genetic testing or a diagnosis of hypertension
- Prescribed a statin or blood pressure–lowering medication
- Ability to provide written informed consent or have a parent or guardian provide written informed consent

**Exclusion criteria**

- Homozygous FH
- Residence in a long-term care facility where medications are administered
- Being pregnant/possibility of becoming pregnant
- History of adverse effects or allergies to a statin or blood–pressuring lowering medication or any ingredient in one of these medications

## Recruitment

We recruited patients from a tertiary care hospital and its satellite outpatient clinics. Recruitment took place at outpatient clinic visits in a preventive cardiology clinic. The study clinicians approached eligible patients and provided a brief overview of the study. If the participant was interested, the clinician determined the patient's eligibility based on self-reported adherence [46,47]. If the patient was eligible and agreed to participate, the clinician conducted the informed consent and enrollment procedures.

We supplemented clinic recruitment by recruiting patients with FH treated with a statin by phone using a database maintained by the preventive cardiology program, which includes approximately 400 patients. We estimated that 20 patients per month who met the eligibility criteria would be seen. If 50 percent of those patients agreed, we expected to complete the recruitment of 30 patients in 6 months (power calculation shown below). Patients could be removed from the study if there was concern for their safety or there was a change in the medication that they were prescribed. Patients could voluntarily stop participating in the study at any time.

## Outcomes

The primary outcome was medication adherence as measured by the Wellth app and defined as the proportion of doses taken per doses prescribed. The adherence rate used in the analysis was measured over 14-day period and three 30-day periods (days 1-14, days 15-44, days 45-74, and days 75-104). Secondary outcomes included change in the LDL cholesterol level from baseline until the end of the intervention period (day 74). LDL cholesterol was considered a baseline measurement if it was obtained within 60 days from the day of consenting to the study. The covariates we included in the analysis were gender, age, and race/ethnicity.

## Description of Wellth App

The Wellth app was the primary tool used in the study to promote medication adherence. Patients used the app to receive reminders, make check-ins (ie, document adherence), check their reward balance, and view their adherence history.

Participants downloaded the app to their smartphone without any additional software or encryption needed. In order to prevent patients from being excluded based on the costs of the necessary hardware, we provided a smartphone and data plan free of charge to patients. Wellth monitored app use and uploaded photos through a secure, customized analytics dashboard for data monitoring and customer support.

## Structure of Incentives

Initially, participants were to be randomized to 1 of 2 incentive structures. The first structure of the incentive was based on the principles of present bias and loss aversion. Present bias refers to the tendency of individuals to prefer more immediate rewards and outcomes and to discount future risks [48]. For instance, studies suggest that even small rewards, if provided frequently and immediately after a participant completes a desired task, can improve adherence in adults and may be more effective at promoting behavior change than larger rewards provided in the distant future [36,49,50]. The principle of loss aversion was included to help strengthen the incentive and is based on findings from studies that suggest individuals place more value on money or objects that they have than on new objects of the same value [51].

Participants received US $30 at the beginning of each of the two 30-day periods but were only able to access the money at the end of the 30-day periods. However, participants could view their balance within the app at any time. For each missed check-in, the participant lost US $2 from the amount to be paid out at the end of the 30-day period. Participants who missed more than 15 check-ins did not receive any money at the end of the 30-day period.

In the second incentive approach, we planned for participants to not receive rewards for each check-in but instead receive the *chance* to receive a reward of varying amounts. This incentive structure is similar to that of a slot machine. As in the first incentive structure, the total amount a participant could receive over the two 30-day periods was US $60. However, participants would not lose money if a check-in was missed; rather, they would lose an opportunity to receive a reward. The random distribution of the reward was structured to ensure that a fully



adherent participant would receive a full US $60 over the study period. However, in this arm of the study, it was also possible that a participant could receive US $60 even if they were not fully adherent.

## Power

Power calculations were planned to be performed for the primary outcome variable of adherence rate at the end of the 60-day period. The mean difference in adherence rates at 60 days after the start of the intervention (day 74) would be compared to 0%, which was the value that would be expected if there was no difference between the two interventions using a 2-sided paired $t$ test conducted at the .05 level of significance. The mean adherence rate was hypothesized to be 80% when patients received small frequent awards and 74% when receiving a large, randomly delivered reward, suggesting a mean within-patient difference of 6%. The SD of the adherence rate was assumed to be 10% at each time point [27], and the correlation between the two measures of adherence was assumed to be 0.50, resulting in an SD of differences in adherence rate of 10%. If the correlation between measurements of adherence was conservatively assumed to be 0.30, the SD of differences in adherence rate was estimated to be 11.8%. We expected to enroll 30 patients.

## Statistical Analysis

Data were planned to be analyzed on an intention-to-treat basis. Baseline patient characteristics measured prior to randomization would be compared between the two intervention groups to look for imbalances. Primary and secondary outcomes would be compared between groups on day 44, day 74, and day 104. Continuous variables would be compared using the 2-sample $t$ test or Wilcoxon rank sum test. Differences in categorical variables would be assessed using the Fisher exact test. Analyses of the primary outcome variables (ie, percentage change in LDL cholesterol and proportion of days adherent) would use a significance level of .025 at each follow-up time point; all other comparisons would be performed at the .05 level of significance. If differences in baseline characteristics were detected between the two groups, linear regression would be used to perform additional comparisons of the primary and secondary outcomes, controlling for these potential confounders. Transformations would be applied to continuous outcomes that were not normally distributed.

## Ethical Considerations

This study was approved by the Boston Children's Hospital Institutional Review Board (IRB-A00032841-2).

A majority of participants in the proposal are younger than 21 years and thus meet the National Institutes of Health's definition of children. The study will not exclude participants based on race/ethnicity, gender, or sexual preference. The final study sample will be representative of the patient population of the Boston Children's Hospital Preventive Cardiology Program. Our sampling plan was developed in consultation with a statistician to ensure appropriate representation of all groups.

Privacy is a fundamental concern any time that personal information is transmitted electronically, especially if a third

party is involved. Wellth does not share patient data with any third party. Wellth uses deidentified datasets wherever possible, including internal reports and communications. Wellth will share data with members of the Boston Children's Hospital study team needed for data analysis and patient safety monitoring. Wellth uses HITRUST (Health Information Trust Alliance)-certified, HIPAA (Health Insurance Portability and Accountability Act)-compliant application hosting services provided by HealthcareBlocks. All computers used by Wellth are encrypted, including hosting computers. Every member of the company performs annual HIPAA compliance training. All software development and company activities are performed inside the United States. We specifically instructed participants not to upload photos that include any personally identifying information.

## Results



The intervention was developed to encourage patients to take their medication every day, and the pre-post study was used to determine the efficacy of this intervention. The findings of the study will help determine if monetary incentives can lead to increased adherence and help determine if this is a viable strategy that can be expanded. Recruitment started in August 2019 and concluded in August 2024 (n=9 participants were recruited). Data collection was ongoing throughout the trial and will be analyzed after study completion. The study's findings are to be published after study completion, which is expected in December 2025 or January 2026.

## Discussion

### Anticipated Findings

We expect to find that providing small, frequent financial incentives will improve medication adherence among youth taking medications to reduce their risk for cardiovascular disease. We expect that this improved adherence will be demonstrated by an increase in adherence as measured by the Wellth app.

Unfortunately, only a few studies with adolescents have used incentives to promote behavioral change. In a study with youth with type 1 diabetes, incentives had a positive impact on glucose monitoring frequency and adherence to the prescribed insulin regimen [50]. However, patients with diabetes mellitus fundamentally differ from those with hypertension or dyslipidemia, as the latter conditions are typically asymptomatic [7]. While studies in adults have had mixed results [52], adolescents differ substantially regarding attitudes toward health, and they have less mature cognitive function and capacities than adults [49].

### COVID-19 Pandemic

Our initial protocol and recruitment strategy had to be modified in response to the challenges that arose during the COVID-19 pandemic. In the original proposal, we planned to recruit patients seen during routine outpatient visits. However, in the early months of the pandemic, outpatient clinic appointments were limited to those with urgent concerns, which rarely included patients with dyslipidemia. Enrolling participants remotely,



though, posed several challenges. The first was connecting the patient to our research assistant. Unlike an in-person clinic visit in which the research assistant is readily available, connecting the research assistant with the patient during a remote encounter required arranging additional contact with the patient. We found that if there were any delays in connecting to the research assistant, eligible participants seemed to quickly lose interest.

A second problem arose in obtaining written consent from participants seen via telehealth visits. Unfortunately, the infrastructure for obtaining an electronic signature was initially unavailable and written consent was required by our institution. The written consent was rarely completed during the course of a virtual visit. Instead, families typically planned to send the signed consent forms that evening or the next day, which often did not occur despite repeated attempts to contact eligible patients. In addition, errors in the consent, such as missing signatures or illegible handwriting, often led to patients not participating, as obtaining corrected consent forms was challenging.

The third barrier that arose was related to technical issues signing patients up for the Wellth app. While configuring the app for the patient was not cumbersome, and there were no complaints by participants enrolling in the study, adding study-related information (eg, participant identification number and study codes) was sometimes technically challenging. We could not have the participant download the smartphone app until the consent was finalized, which often meant arranging a separate time to ensure the app was operational, and some participants dropped out after signing the consent form because of the additional time commitment.

## Low Recruitment

Recruitment for the trial was more difficult than expected, in part related to the COVID-19 pandemic. We were concerned that the complexity and duration of the trial were deterrents. Over the first year, we made a series of changes to simplify the intervention.

First, we decided to use only the first intervention, which involved small, frequent rewards, while removing the second intervention, which entailed random, variable rewards. This was based on our perception that the first intervention was conceptually easier for pediatric participants to understand. Since we would no longer be comparing two types of incentive structures, we also removed randomization and created a pre-post study design (Figure 2). Adherence measures collected via the app during the 14-day run-in period would be used as the baseline adherence measure to be compared to adherence recorded on day 44, day 74, and day 104.

The second modification was to shorten the trial duration by removing the 30-day follow-up period. We received feedback from potential participants during recruitment that the length of the trial prevented them from participating. As this portion of the trial was included mainly to assess the sustainability of the incentive, it made more sense to remove it rather than shorten the incentive period.

Third, we expanded the protocol to include patients with hypertension who had been prescribed a blood

pressure–lowering medication (eg, angiotensin-converting enzyme inhibitors, angiotensin receptor blockers, diuretics, or calcium-channel blockers) to increase the pool of eligible participants. We did not change the incentive structure, even for those patients who were prescribed regimens with twice-daily dosing. In these patients, we required both doses to be taken to earn the reward. The diagnosis of hypertension was based on chart review (ie, hypertension-associated diagnosis codes in the *International Classification of Diseases*, ninth or tenth revisions) and was not based on blood pressure–specific thresholds.

## Limitations

As has been acknowledged, recruiting for pediatric studies can be difficult. To overcome this obstacle, we changed the protocol and recruitment strategies. In the future, we plan to increase the pool of recruits by expanding to other clinics outside of Boston Children's Hospital. Another potential limitation is the inability to ensure that the increase in adherence is specifically from the incentives and not another component of the Wellth app. We have tried to mitigate this potential problem by not offering the incentive for the first two weeks. We will compare the adherence during the first two weeks with adherence during the periods when incentives are provided to isolate the effect of the incentive.

## Future Directions

This research protocol will test whether providing incentives that leverage the principles of behavioral economics can improve medication adherence in youth with FH and hypertension. Understanding the effectiveness of different types of incentives is crucial to improve medication adherence. The incentive structure in regard to the type of reward, frequency of receiving the award, and timing of delivery of the reward can lead to different responses. In fact, there is evidence that inappropriate reward structures can serve as a negative enforcer.

In addition, this proposal will harness the power of digital health technology, taking advantage of the fully developed Wellth app to reduce costs and simplify the intervention. Digital health apps allow for automating patient–health care provider interactions, improving monitoring using cameras with embedded metadata (eg, date and time), and reducing the complexity of interventions, allowing for more widespread distribution of interventions.

Patients with FH and hypertension provide an ideal cohort to explore the role of different incentive packages. FH is rarely symptomatic in youth, and treatment is typically well tolerated. One critical factor is that missed doses do not generally lead to acute complications in either disease. Therefore, health care providers and caretakers can safely distance themselves from interfering, which prevents adding biases introduced by frequent health care provider engagement.

It should be acknowledged that there are important differences between those prescribed lipid-lowering therapy for an inherited condition and those treated for hypertension, which is typically an acquired condition. Further, blood pressure–lowering medications have a different side effect profile than statins and



may be prescribed more than once daily, which may impact adherence.

## Conclusion

This proposal will elicit information critical for creating developmentally appropriate incentive structures to improve medication adherence in youth with risk factors for CVD. However, the efficacy of monetary incentives is extrapolated from adult studies, and it remains to be seen if they are ideal for youth.

## Acknowledgments

JH acknowledges that research reported in this publication was supported by the National Heart, Lung, And Blood Institute of the National Institutes of Health (award K23HL145109).

TP-W is funded by the Division of Intramural Research in the National Heart, Lung, and Blood Institute and the Intramural Research Program of the National Institute on Minority Health and Health Disparities. The contributions of the NIH author(s) were made as part of their official duties as NIH federal employees, are in compliance with agency policy requirements, and are considered Works of the United States Government. However, the findings and conclusions presented in this paper are those of the author(s) and do not necessarily reflect the views of the NIH or the U.S. Department of Health and Human Services. Boston Children's Hospital and the authors personally have been named as defendants in a lawsuit brought by MMAS Research, LLC, which is ongoing, that concerns the attribution of the Morisky Medication Adherence Scale (MMAS). We have received competing demands from MMAS Research, LLC, and another entity, Morisky Medication Adherence Research, LLC, concerning the proper attribution for the MMAS. Because we are uncertain how the MMAS should be attributed and who owns the intellectual property rights, we are providing the attribution that both MMAS Research, LLC, and Morisky Medication Adherence Research, LLC, have demanded that we use.

## Data Availability

The datasets used and analyzed in this study are available from the corresponding author on reasonable request.

## Authors' Contributions

All authors contributed to the study conception and design. JH, SdF, and TP-W were responsible for the primary design of the study. Material preparation and data was collected by JH and SdF. The first draft of the manuscript was written by JH, and all authors commented on previous versions of the manuscript. All authors read and approved the final manuscript.

## Conflicts of Interest

None declared.

## Multimedia Appendix 1

Peer review report form the HLBI Mentored Patient-Oriented Research Review Committee - Heart, Lung, and Blood Initial Review Group MPOR (MA) - National Heart, Lung, and Blood Institute (National Institutes of Health, USA).
[PDF File (Adobe PDF File), 143 KB-Multimedia Appendix 1]

## References

1. Virani SS, Alonso A, Aparicio HJ, Benjamin EJ, Bittencourt MS, Callaway CW, et al. American Heart Association Council on Epidemiology and Prevention Statistics Committee and Stroke Statistics Subcommittee. Heart Disease and Stroke Statistics-2021 Update: a report from the American Heart Association. Circulation. Feb 23, 2021;143(8):e254-e743. [FREE Full text] [doi: 10.1161/CIR.0000000000000950] [Medline: 33501848]
2. Juonala M, Järvisalo MJ, Mäki-Torkko N, Kähönen M, Viikari JS, Raitakari OT. Risk factors identified in childhood and decreased carotid artery elasticity in adulthood: the Cardiovascular Risk in Young Finns Study. Circulation. Sep 06, 2005;112(10):1486-1493. [doi: 10.1161/CIRCULATIONAHA.104.502161] [Medline: 16129802]
3. Nicklas TA, von Duvillard SP, Berenson GS. Tracking of serum lipids and lipoproteins from childhood to dyslipidemia in adults: the Bogalusa Heart Study. Int J Sports Med. May 2002;23 Suppl 1(S1):S39-S43. [doi: 10.1055/s-2002-28460] [Medline: 12012261]
4. Statins for the prevention of cardiovascular events. National Institute for Health and Clinical Excellence. 2006. URL: https://www.nice.org.uk/guidance/ta94 [accessed 2025-07-24]
5. Scientific Steering Committee on behalf of the Simon Broome Register Group. Mortality in treated heterozygous familial hypercholesterolaemia: implications for clinical management. Scientific Steering Committee on behalf of the Simon Broome Register Group. Atherosclerosis. Jan 1999;142(1):105-112. [Medline: 9920511]
6. Baigent C, Keech A, Kearney PM, Blackwell L, Buck G, Pollicino C, et al. Cholesterol Treatment Trialists' (CTT) Collaborators. Efficacy and safety of cholesterol-lowering treatment: prospective meta-analysis of data from 90,056



participants in 14 randomised trials of statins. Lancet. Oct 08, 2005;366(9493):1267-1278. [doi: 10.1016/S0140-6736(05)67394-1] [Medline: 16214597]

7. Braamskamp MJ, Kastelein JJ, Kusters DM, Hutten BA, Wiegman A. Statin Initiation During Childhood in Patients With Familial Hypercholesterolemia: Consequences for Cardiovascular Risk. J Am Coll Cardiol. Feb 02, 2016;67(4):455-456. [FREE Full text] [doi: 10.1016/j.jacc.2015.11.021] [Medline: 26821635]

8. Braamskamp MJ, Langslet G, McCrindle BW, Cassiman D, Francis GA, Gagné C, et al. Efficacy and safety of rosuvastatin therapy in children and adolescents with familial hypercholesterolemia: results from the CHARON study. J Clin Lipidol. 2015;9(6):741-750. [doi: 10.1016/j.jacl.2015.07.011] [Medline: 26687694]

9. de Jongh S, Ose L, Szamosi T, Gagné C, Lambert M, Scott R, et al. Simvastatin in Children Study Group. Efficacy and safety of statin therapy in children with familial hypercholesterolemia: a randomized, double-blind, placebo-controlled trial with simvastatin. Circulation. Oct 22, 2002;106(17):2231-2237. [doi: 10.1161/01.cir.0000035247.42888.82] [Medline: 12390953]

10. Gidding SS, Champagne MA, de Ferranti SD, Defesche J, Ito MK, Knowles JW, et al. American Heart Association Atherosclerosis, Hypertension,Obesity in Young Committee of Council on Cardiovascular Disease in Young, Council on CardiovascularStroke Nursing, Council on Functional GenomicsTranslational Biology,Council on LifestyleCardiometabolic Health. The agenda for familial hypercholesterolemia: a scientific statement from the American Heart Association. Circulation. Dec 01, 2015;132(22):2167-2192. [doi: 10.1161/CIR.0000000000000297] [Medline: 26510694]

11. Jacobson TA, Maki KC, Orringer CE, Jones PH, Kris-Etherton P, Sikand G, et al. National Lipid Association recommendations for patient-centered management of dyslipidemia: part 2. J Clin Lipidol. 2015;9(6 Suppl):S1-122.e1. [FREE Full text] [doi: 10.1016/j.jacl.2015.09.002] [Medline: 26699442]

12. Kavey RW, Allada V, Daniels SR, Hayman LL, McCrindle BW, Newburger JW, American Heart Association Expert Panel on PopulationPrevention Science, American Heart Association Council on Cardiovascular Disease in the Young, American Heart Association Council on EpidemiologyPrevention, American Heart Association Council on Nutrition, Physical ActivityMetabolism, American Heart Association Council on High Blood Pressure Research, American Heart Association Council on Cardiovascular Nursing, American Heart Association Council on the Kidney in Heart Disease, et al. Interdisciplinary Working Group on Quality of CareOutcomes Research. Cardiovascular risk reduction in high-risk pediatric patients: a scientific statement from the American Heart Association Expert Panel on Population and Prevention Science; the Councils on Cardiovascular Disease in the Young, Epidemiology and Prevention, Nutrition, Physical Activity and Metabolism, High Blood Pressure Research, Cardiovascular Nursing, and the Kidney in Heart Disease; and the Interdisciplinary Working Group on Quality of Care and Outcomes Research: endorsed by the American Academy of Pediatrics. Circulation. Dec 12, 2006;114(24):2710-2738. [doi: 10.1161/CIRCULATIONAHA.106.179568] [Medline: 17130340]

13. Nawrocki JW, Weiss SR, Davidson MH, Sprecher DL, Schwartz SL, Lupien P, et al. Reduction of LDL cholesterol by 25% to 60% in patients with primary hypercholesterolemia by atorvastatin, a new HMG-CoA reductase inhibitor. Arterioscler Thromb Vasc Biol. May 1995;15(5):678-682. [doi: 10.1161/01.atv.15.5.678] [Medline: 7749881]

14. Neil A, Cooper J, Betteridge J, Capps N, McDowell I, Durrington P, et al. Reductions in all-cause, cancer, and coronary mortality in statin-treated patients with heterozygous familial hypercholesterolaemia: a prospective registry study. Eur Heart J. Nov 2008;29(21):2625-2633. [FREE Full text] [doi: 10.1093/eurheartj/ehn422] [Medline: 18840879]

15. Rodenburg J, Vissers M, Wiegman A, van Trotsenburg A, van der Graaf A, de Groot E, et al. Statin treatment in children with familial hypercholesterolemia: the younger, the better. Circulation. Aug 07, 2007;116(6):664-668. [doi: 10.1161/CIRCULATIONAHA.106.671016] [Medline: 17664376]

16. Wiegman A, Gidding SS, Watts GF, Chapman MJ, Ginsberg HN, Cuchel M, et al. European Atherosclerosis Society Consensus Panel. Familial hypercholesterolaemia in children and adolescents: gaining decades of life by optimizing detection and treatment. Eur Heart J. Sep 21, 2015;36(36):2425-2437. [FREE Full text] [doi: 10.1093/eurheartj/ehv157] [Medline: 26009596]

17. Wiegman A, Hutten BA, de Groot E, Rodenburg J, Bakker HD, Büller HR, et al. Efficacy and safety of statin therapy in children with familial hypercholesterolemia: a randomized controlled trial. JAMA. Jul 21, 2004;292(3):331-337. [doi: 10.1001/jama.292.3.331] [Medline: 15265847]

18. DiMatteo MR, Giordani PJ, Lepper HS, Croghan TW. Patient adherence and medical treatment outcomes: a meta-analysis. Med Care. Sep 2002;40(9):794-811. [doi: 10.1097/00005650-200209000-00009] [Medline: 12218770]

19. Chi MD, Vansomphone SS, Liu I-LA, Cheetham C, Green KR, Scott RD, et al. Adherence to statins and LDL-cholesterol goal attainment. Am J Manag Care. Apr 01, 2014;20(4):e105-e112. [FREE Full text] [Medline: 24884955]

20. De Vera MA, Bhole V, Burns LC, Lacaille D. Impact of statin adherence on cardiovascular disease and mortality outcomes: a systematic review. Br J Clin Pharmacol. Oct 2014;78(4):684-698. [FREE Full text] [doi: 10.1111/bcp.12339] [Medline: 25364801]

21. Fung V, Graetz I, Reed M, Jaffe MG. Patient-reported adherence to statin therapy, barriers to adherence, and perceptions of cardiovascular risk. PLoS One. 2018;13(2):e0191817. [FREE Full text] [doi: 10.1371/journal.pone.0191817] [Medline: 29420613]



22. Pittman DG, Chen W, Bowlin SJ, Foody JM. Adherence to statins, subsequent healthcare costs, and cardiovascular hospitalizations. Am J Cardiol. Jun 01, 2011;107(11):1662-1666. [doi: 10.1016/j.amjcard.2011.01.052] [Medline: 21439533]

23. Vrijens B, Vincze G, Kristanto P, Urquhart J, Burnier M. Adherence to prescribed antihypertensive drug treatments: longitudinal study of electronically compiled dosing histories. BMJ. May 17, 2008;336(7653):1114-1117. [FREE Full text] [doi: 10.1136/bmj.39553.670231.25] [Medline: 18480115]

24. Wei L, Wang J, Thompson P, Wong S, Struthers AD, MacDonald TM. Adherence to statin treatment and readmission of patients after myocardial infarction: a six year follow up study. Heart. Sep 2002;88(3):229-233. [FREE Full text] [doi: 10.1136/heart.88.3.229] [Medline: 12181210]

25. Gatwood J, Bailey J. Improving medication adherence in hypercholesterolemia: challenges and solutions. Vasc Health Risk Manag. 2014;10:615-625. [FREE Full text] [doi: 10.2147/VHRM.S56056] [Medline: 25395859]

26. Osterberg L, Blaschke T. Adherence to medication. N Engl J Med. Aug 04, 2005;353(5):487-497. [doi: 10.1056/NEJMra050100] [Medline: 16079372]

27. Braamskamp MJAM, Kusters DM, Avis HJ, Smets EMA, Wijburg FA, Kastelein JJP, et al. Long-term statin treatment in children with familial hypercholesterolemia: more insight into tolerability and adherence. Paediatr Drugs. Apr 2015;17(2):159-166. [FREE Full text] [doi: 10.1007/s40272-014-0116-y] [Medline: 25644328]

28. Joyce NR, Wellenius GA, Eaton CB, Trivedi AN, Zachariah JP. Patterns and predictors of medication adherence to lipid-lowering therapy in children aged 8 to 20 years. J Clin Lipidol. 2016;10(4):824-832.e2. [FREE Full text] [doi: 10.1016/j.jacl.2016.03.002] [Medline: 27578113]

29. Weinstock RS, Trief PM, Burke BK, Wen H, Liu X, Kalichman S, et al. Antihypertensive and lipid-lowering medication adherence in young adults with youth-onset type 2 diabetes. JAMA Netw Open. Oct 02, 2023;6(10):e2336964. [FREE Full text] [doi: 10.1001/jamanetworkopen.2023.36964] [Medline: 37792373]

30. Eakin MN, Brady T, Kandasamy V, Fivush B, Riekert KA. Disparities in antihypertensive medication adherence in adolescents. Pediatr Nephrol. Aug 2013;28(8):1267-1273. [FREE Full text] [doi: 10.1007/s00467-013-2455-2] [Medline: 23512259]

31. Normansell R, Kew KM, Stovold E. Interventions to improve adherence to inhaled steroids for asthma. Cochrane Database Syst Rev. Apr 18, 2017;4(4):CD012226. [FREE Full text] [doi: 10.1002/14651858.CD012226.pub2] [Medline: 28417456]

32. Goldstein TR, Krantz M, Merranko J, Garcia M, Sobel L, Rodriguez C, et al. Medication adherence among adolescents with bipolar disorder. J Child Adolesc Psychopharmacol. Dec 2016;26(10):864-872. [FREE Full text] [doi: 10.1089/cap.2016.0030] [Medline: 27419273]

33. Reisner SL, Mimiaga MJ, Skeer M, Perkovich B, Johnson CV, Safren SA. A review of HIV antiretroviral adherence and intervention studies among HIV-infected youth. Top HIV Med. 2009;17(1):14-25. [FREE Full text] [Medline: 19270345]

34. Desager K, Vermeulen F, Bodart E. Adherence to asthma treatment in childhood and adolescence - a narrative literature review. Acta Clin Belg. Oct 2018;73(5):348-355. [doi: 10.1080/17843286.2017.1409684] [Medline: 29228891]

35. De Geest S, Sabaté E. Adherence to long-term therapies: evidence for action. Eur J Cardiovasc Nurs. Dec 2003;2(4):323. [doi: 10.1016/S1474-5151(03)00091-4] [Medline: 14667488]

36. van Driel ML, Morledge MD, Ulep R, Shaffer JP, Davies P, Deichmann R. Interventions to improve adherence to lipid-lowering medication. Cochrane Database Syst Rev. Dec 21, 2016;12(12):CD004371. [FREE Full text] [doi: 10.1002/14651858.CD004371.pub4] [Medline: 28000212]

37. Jones M, Moffatt F, Harvey A, Ryan JM. Interventions for improving adherence to airway clearance treatment and exercise in people with cystic fibrosis. Cochrane Database Syst Rev. Jul 18, 2023;7(7):CD013610. [doi: 10.1002/14651858.CD013610.pub2] [Medline: 37462324]

38. Linnemayr S, Stecher C, Mukasa B. Behavioral economic incentives to improve adherence to antiretroviral medication. AIDS. Mar 13, 2017;31(5):719-726. [FREE Full text] [doi: 10.1097/QAD.0000000000001387] [Medline: 28225450]

39. Raiff BR, Jarvis BP, Dallery J. Text-message reminders plus incentives increase adherence to antidiabetic medication in adults with type 2 diabetes. J Appl Behav Anal. Dec 2016;49(4):947-953. [FREE Full text] [doi: 10.1002/jaba.337] [Medline: 27417877]

40. Strang S, Park SQ, Strombach T, Kenning P. Applied economics: The use of monetary incentives to modulate behavior. Prog Brain Res. 2016;229:285-301. [doi: 10.1016/bs.pbr.2016.06.010] [Medline: 27926443]

41. Thirumurthy H, Asch DA, Volpp KG. The uncertain effect of financial incentives to improve health behaviors. JAMA. Apr 16, 2019;321(15):1451-1452. [doi: 10.1001/jama.2019.2560] [Medline: 30907936]

42. Molfenter T, Bhattacharya, Gustafson. The roles of past behavior and health beliefs in predicting medication adherence to a statin regimen. Patient Prefer Adherence. 2012;6:643-651. [FREE Full text] [doi: 10.2147/PPA.S34711] [Medline: 23055697]

43. Riekert K. Promoting adherence and increasing life span. Johns Hopkins Adv Stud Med. 2009;9(1):14-19. [FREE Full text]

44. Cell phone and smartphone ownership demographics. Pew Research Internet Project. 2014. URL: https://www.pewresearch.org/internet/2015/04/01/chapter-one-a-portrait-of-smartphone-ownership/ [accessed 2018-01-22]

45. Ademi Z, Watts GF, Juniper A, Liew D. A systematic review of economic evaluations of the detection and treatment of familial hypercholesterolemia. Int J Cardiol. Sep 10, 2013;167(6):2391-2396. [doi: 10.1016/j.ijcard.2013.01.280] [Medline: 23490080]



46. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. J Clin Hypertens (Greenwich). May 2008;10(5):348-354. Berlowitz DR, Foy CG, Kazis LE, Bolin L, Morisky Widget MMAS, Steven Trubow, MMAS Research LLC, ed. [FREE Full text] [doi: 10.1111/j.1751-7176.2008.07572.x] [Medline: 18453793]

47. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. J Clin Hypertens (Greenwich). May 2008;10(5):348-354. Retracted in: J Clin Hypertens (Greenwich). 2023 Sep;25(9):889. [doi: 10.1111/jch.14718] [Medline: 37594022]

48. Benabou R, Tirole J. Intrinsic and extrinsic motivation. Rev Econ Studies. Jul 2003;70(3):489-520. [doi: 10.1111/1467-937x.00253]

49. Blakemore S, Robbins TW. Decision-making in the adolescent brain. Nat Neurosci. Sep 2012;15(9):1184-1191. [doi: 10.1038/nn.3177] [Medline: 22929913]

50. Mulvaney S, Lee JM. Motivating health behaviors in adolescents through behavioral economics. JAMA Pediatr. Dec 01, 2017;171(12):1145-1146. [FREE Full text] [doi: 10.1001/jamapediatrics.2017.3464] [Medline: 29059260]

51. Sen AP, Sewell TB, Riley EB, Stearman B, Bellamy SL, Hu MF, et al. Financial incentives for home-based health monitoring: a randomized controlled trial. J Gen Intern Med. May 2014;29(5):770-777. [FREE Full text] [doi: 10.1007/s11606-014-2778-0] [Medline: 24522623]

52. Hoskins K, Ulrich CM, Shinnick J, Buttenheim AM. Acceptability of financial incentives for health-related behavior change: An updated systematic review. Prev Med. Sep 2019;126:105762. [doi: 10.1016/j.ypmed.2019.105762] [Medline: 31271816]

## Abbreviations

**CVD:** cardiovascular disease
**FH:** familial hypercholesterolemia
**HIPAA:** Health Insurance Portability and Accountability Act
**HITRUST:** Health Information Trust Alliance
**LDL:** low density lipoprotein

*Edited by T Leung;The proposal for this study was peer-reviewed by: NHLBI Mentored Patient-Oriented Research Review Committee - Heart, Lung, and Blood Initial Review Group MPOR (MA) - National Heart, Lung, and Blood Institute (National Institutes of Health, USA). See the Multimedia Appendix for the peer-review report; Submitted 05.08.24; accepted 15.03.25; published 14.08.25.*

*Please cite as:*
*Hartz J, Chiert H, de Ferranti S, Powell-Wiley T*
*The Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence to Statins and Blood Pressure–Lowering Medication in Adolescents with Familial Hypercholesterolemia or Hypertension: Protocol for a Pre-Post Cohort Study*
*JMIR Res Protoc 2025;14:e65105*
*URL: https://www.researchprotocols.org/2025/1/e65105*
*doi: 10.2196/65105*
*PMID:*

©Jacob Hartz, Hannah Chiert, Sarah de Ferranti, Tiffany Powell-Wiley. Originally published in JMIR Research Protocols (https://www.researchprotocols.org), 14.08.2025. This is an open-access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work, first published in JMIR Research Protocols, is properly cited. The complete bibliographic information, a link to the original publication on https://www.researchprotocols.org, as well as this copyright and license information must be included.



# EXHIBIT 21

Received: 2 April 2021 | Accepted: 26 April 2021

DOI: 10.1111/jch.14353

## LETTER TO THE EDITOR

**WILEY**

# Inconsistencies in the sensitivity and specificity values in an Review Paper published in the Journal of Clinical Hypertension

To the Editor

A research Review Paper published in your Journal[1] reported on the use of the 8-item Morisky Medication Adherence Scale (MMAS-8) as a diagnostic tool to identify patients with uncontrolled hypertension (BP > 140/90 mm Hg) who were treated with medication for hypertension. This Review Paper contains mathematically implausible results for the Sensitivity and Specificity (S&S) based on the following evidence:

1. The publication described a "**sensitivity of 93%**[1]" with a specificity of **53%** (pubS&S) and an accuracy of **80%** that "indicates that the scale is good at identifying patients who have low medication adherence and have uncontrolled blood pressure".[1]

2. Using the 3 × 2 percentage data in Table 1 to calculate number of people in each medication adherence category (page 4 of the text) and blood pressure control (Table 4 on page 13), it is possible to reconstruct the study patient numbers by category. These values: 295, 144; 486, 482, are shown in the 2 × 2 table of Table 1. These data were used to calculate the S&S (calcS&S) values of **38%** [95%CI: 34–41%] and **75%** [72–79%], respectively, with an accuracy of **53%** [51.3–56.5%].

3. These values are remarkably similar to those published in a 2017 systematic review of the accuracy of the MMAS-8[2] (pooled S&S of: **43%** [33–53%] and **73%** [68–78%], respectively).

4. Based on the sensitivity, specificity, and accuracy, it is possible to derive a set of numerical values used to calculate the pubS&S. The 2 × 2 table of the *unique* mathematical solution includes: **858, 209; 65, 236**. These numbers were independently verified against the pubS&S values of 93% and 53%, along with accuracy of 80%.

The pubS&S values (Point 1) differed markedly from the calcS&S values (Point 2). All the calculations were verified as being correct; however, the pubS&S number of non-adherent patients (score < 6) is mathematically implausible. *This indicates that the pubS&S values are not consistent with the patient level data.*

1. The chi-square value of 6.6 (*p* < .05) in Table 4[1] is an obvious error as it does not reflect the 37.4 (*p* < 0.001) from the 3 × 2 data in Table 1. The study chi-square value of the 2 × 2 patient numbers in Table 1 is 26.2 (*p* < .001), while the chi-square value of the 2 × 2 patient numbers from the pubS&S (point 4) is much higher at 367.4 (*p* < .001).

So, not only is the chi-square value in Table 4 incorrect, but also the difference between the latter two chi-square values indicates that the pubS&S clearly overstates, by an order of magnitude, the diagnostic properties of the MMAS-8 compared with the calcS&S values.

This study has a high impact in the Medication Compliance literature (cited > 3000 times in Pubmed). It is important for readers to be

**TABLE 1** Patient numbers used to calculate the calcS&S values

| (3 × 2) percentage data from the study | | | | (2 × 2) reconstructed study population | | |
|---|---|---|---|---|---|---|
| Test: Adherence | BP controlled | | | Test: Adherence | BP controlled | |
| MMAS-8 score | No[a] | Yes | % total[b] | MMAS-8 score | No | Yes |
| Low (< 6) | 67.2% | 32.8% | 32.1% | Low (< 6) | 295 | 144 |
| Medium (6– < 8) | 55.2% | 44.8% | 52.0% | Adherent (6–8) | 486 | 442 |
| High (8) | 43.3% | 56.7% | 15.9% | | | |
| chi-square | 37.4 | *p* < .001 | *n* = 1367 | chi-square | 26.2 | *p* < .001 |

*Source*: Patient numbers were derived by multiplying proportions in the Review Paper by the number of patients and pooling by groups as shown.
[a]From Table 4 page 13.
[b]Text on page 4.

This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited.
© 2021 The Authors. *The Journal of Clinical Hypertension* published by Wiley Periodicals LLC.

Case 1:24-cv-12108-DJC    Document 196-21    Filed 02/15/26    Page 216 of 262

confident in the integrity of this Review Paper and that the published results are independently verified using the real data.

In conclusion, the S&S and accuracy values reported in this paper[1] are mathematically implausible. The pubS&S values are inconsistent with the patient data and they overstate the diagnostic properties of the MMAS-8. Unless these inconsistencies are resolved, it would appear that, based on the study results in Point 2 and the meta-analysis,[2] the MMAS-8 scores may be no more accurate in detecting patients with uncontrolled BP, than tossing a coin to decide.

## ACKNOWLEDGMENT

I wish to thank Dr Mark Bolland from the University of Auckland for his help including an independent verification of all the calculations.

## CONFLICT OF INTEREST

The author has no competing interests.

Michael S. Ortiz BPharm, MSc, PhD, GradDipEpi 

*St. Vincent's Clinical School, School of Medicine, University of NSW, Darlinghurst, NSW, Australia*

### Correspondence
Michael S. Ortiz, St Vincent's Clinical School, School of Medicine, University of NSW, Darlinghurst, NSW 2006, Australia.
Email: m.ortiz@unsw.edu.au

### ORCID
*Michael S. Ortiz BPharm, MSc, PhD, GradDipEpi* https://orcid.org/0000-0003-0183-9273

### REFERENCES
1. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. *J Clin Hypertens (Greenwich)*. 2008;10(5):348-354.
2. Moon SJ, Lee WY, Hong YP, Morisky DE. Accuracy of a screening tool for medication adherence: a systematic review and meta-analysis of the Morisky medication adherence Scale-8. *PLoS One*. 2017;12(11):e0187139.

# EXHIBIT 22

DOI: 10.1111/jch.14712



## NOTIFICATION

WILEY

# Notification

Ortiz, M.S. (2022), Inconsistencies in the sensitivity and specificity values in a review paper published in *Journal of Clinical Hypertension* 24: 1390−1391. https://doi.org/10.1111/jch.14353.

This note is for the above Letter to the Editor, published online on August 21, 2021 on Wiley Online Library (wileyonlinelibrary.com), and has been published by agreement between the Journal's Editor-in-Chief, Dr Ji-Guang Wang, and Wiley Periodicals, LLC. In the above Letter to the Editor, concerns were raised regarding inconsistencies in the sensitivity and specificity values in an article by Morisky et al. published in the *Journal of Clinical Hypertension*.[1] Following an investigation by the Journal, which included an independent statistical review, it was concluded that the results of the article[1] were misleading due to issues regarding the sensitivity and specificity of the medical adherence scale used. As a result, the Journal no longer has confidence in the reported conclusions and has retracted the article. The Journal is issuing this note to alert readers that the article to which this Letter to the Editor refers has now been retracted.

### REFERENCE

1. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. *J Clin Hypertens*. 2008;10:348-354. doi:10.1111/j.1751-7176.2008.07572.x

This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited.

© 2023 The Authors. *The Journal of Clinical Hypertension* published by Wiley Periodicals LLC.

# EXHIBIT 23

**CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE**

THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE ("Settlement Agreement") is made by and between MMAS Research LLC and Steven Trubow (collectively "MMAS") and Sanofi Winthrop Industrie as successor to Sanofi-Aventis France whose business was transferred to it on July 1, 2023, as consequence of an internal reorganization ("SWI"), as of the last date signed below. Herein, MMAS and SWI are individually referred to as a "Party" and collectively referred to as the "Parties."

WHEREAS on or about July 5, 2017, the Parties entered into a Licensing Agreement governing SWI's licensing and utilization of MMAS's Morisky Widget (a patient adherence test used in clinical studies);

WHEREAS between 2017 and 2023, SWI analyzed patient adherence utilizing the Morisky Widget in conjunction with clinical trial(s);

WHEREAS on or about July 26, 2023, an SWI-sponsored clinical study titled, "Patient reported outcomes of patients with Gaucher disease type 1 treated with eliglustat in real-world settings: The ELIPRO study" (the "ELIPRO Study") was published. The study utilized the Morisky Widget and was conducted in collaboration with the entities detailed at Appendix A (all Appendix A named entities collectively referenced as the "Supplemental Released Parties");

WHEREAS MMAS has asserted claims against SWI regarding the scope and terms of the Licensing Agreement; and

WHEREAS MMAS and SWI have agreed to resolve fully all claims, differences and controversies by and between MMAS and SWI that exist, have existed, or may exist in the future, involving or relating to the Licensing Agreement (hereinafter, "the Dispute"), as follows:

I.    **DEFINITIONS**

    A.    **Effective Date.** The term "Effective Date" shall mean the later of either: the date of the signing of this Settlement Agreement.

    B.    **Settled Claims.** The term "Settled Claims" shall mean any and all claims and counterclaims, causes of action, demands, damages, costs, expenses, liabilities or other losses, whether in law or in equity, existing now or arising in the future, by the Parties or their Affiliates relating to the 2017 Licensing Agreement and/or the ELIPRO study.

II.    **SETTLEMENT PAYMENT**

    A.    **Consideration.** In consideration of the releases, covenants, representations, and warranties granted, extended and made by MMAS, SWI agrees to pay to MMAS the sum of $115,000 (one hundred fifteen thousand and NO/100 US dollars) ("the Payment"), in accordance with Section II(B) of this Settlement Agreement.

**B.** **Timing and Manner of Payment.** Upon signing this Settlement Agreement, MMAS shall send wire instructions for the payment amount via email to SWI at matthew.sachs@sanofi.com and carrie.love@sanofi.com. Within 90 days of receiving the wire instructions, SWI shall make the payment by wire transfer and notify MMAS that that the wire has been initiated via email.

**C.** **Taxes.** Each Party agrees to be responsible for and bear all taxes as determined by the applicable law, and no Party shall be liable at any time for any other Party's taxes incurred in connection with or related to amounts paid under this Settlement Agreement.

## III. RELEASE

**A.** **Grant of Release by MMAS.** Subject to and conditioned upon receipt by MMAS of the Payment, MMAS, on behalf of itself and its Affiliates, and their respective predecessors, successors, parents, subsidiaries, assigns, agents, attorneys, directors, officers, partners, employees, and their heirs and executors do hereby fully and unconditionally release, acquit, and forever discharge SWI, SWI's Affiliates, predecessors, successors, parents, subsidiaries, permitted assigns, agents, attorneys, directors, officers, employees, and insurers, as well as the Supplemental Released Parties, from any and all actions, causes of action, claims or demands, liabilities, damages, attorneys' fees, costs, or any other form of claim or compensation, at law, in equity, or otherwise, known or unknown, contingent or fixed, suspected or unsuspected, relating to, based on, or arising out of:

      (i)    the Settled Claims; and

      (ii)   the conduct of related settlement negotiations (except for representations or obligations expressly included in this Settlement Agreement).

**B.** **Grant of Release by SWI.** SWI, on behalf of itself and its Affiliates, and their respective predecessors, successors, parents, subsidiaries, assigns, agents, attorneys, directors, officers, partners, employees, and their heirs and executors do hereby fully and unconditionally release, acquit, and forever discharge MMAS and MMAS's Affiliates, predecessors, successors, parents, subsidiaries, permitted assigns, agents, attorneys, directors, officers, employees, and insurers from any and all actions, causes of action, claims or demands, liabilities, damages, attorneys' fees, costs, or any other form of claim or compensation, at law, in equity, or otherwise, known or unknown, contingent or fixed, suspected or unsuspected, relating to, based on, or arising out of:

      (i)    the Settled Claims; and

      (ii)   the conduct of related settlement negotiations (except for representations or obligations expressly included in this Settlement Agreement).

- 2 -

C.  **General Release.** MMAS (and its Affiliates) and SWI (and its Affiliates), having specific intent to release all potential claims described in the foregoing Sections III(A) and III(B), whether known or unknown, hereby acknowledge and expressly waive the provision of section 1542 of the California Civil Code (and similar provisions in other jurisdictions, whether by statute or common law), which provides:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her, must have materially affected his settlement with debtor."

## IV.  COMPROMISE; NO ADMISSIONS

A.  **Compromise.** The Parties acknowledge and agree that this Settlement Agreement, including the Payment, has been entered into solely for the purpose of settling and compromising the Dispute and to avoid the expense and uncertainty of alternative methods of resolution.

B.  **No Admissions.** The resolution of the Dispute, this Settlement Agreement, and any action contemplated by this Settlement Agreement, shall not be construed as an admission by any Party of, or support any finding as to, the merit or lack thereof of any potential claim or counterclaim raised by the Parties in connection with the Dispute.

## V.  CONFIDENTIALITY

A.  **Settlement Terms.** The terms of this Settlement Agreement, and all correspondence relating to it, are confidential, and no Party shall now or hereafter disclose them to any third party except: (a) with the prior written consent of each Party, (b) as may be required by applicable law or order of a governmental authority of competent jurisdiction, (c) as deemed appropriate by either Party in connection with its financial reporting obligations, (d) in confidence to the professional legal and financial counsel and accounting professionals representing such Party, or (e) in confidence, under a written confidentiality agreement (with confidentiality terms and conditions no less restrictive than those set forth herein), to any party covered or potentially to be covered by the releases granted herein, including, but not limited to the Supplemental Released Parties. With respect to the foregoing (b) and (c), such disclosing Party shall, to the extent legally permissible, provide the other Party with prior written notice of such Applicable Law or order and, at the written request of any other Party, use reasonable efforts to limit the disclosure of the terms and conditions of this Settlement Agreement, and to obtain a protective order or other confidential treatment are confidential resolution mechanisms.

B.  **Public Statements, Non-Disparagement.** No Party shall issue any press release or make any public statement regarding this Settlement Agreement without prior written consent of the other Party, except as a Party may deem necessary to satisfy

a public reporting obligation. The Parties may make appropriate disclosures in their public filings with the SEC. Neither Party will disparage the other with respect to the subject matter of the Dispute.

## VI.  REPRESENTATIONS AND WARRANTIES

A.  **Authority to Enter Agreement**.  Each Party represents and warrants that it has the full right and power to enter this Settlement Agreement and, on behalf of itself and its Affiliates, has the full right and power to grant the rights, releases, and covenants as set forth herein, and that there are no other persons or entities whose consent to this Settlement Agreement or whose joinder herein is necessary to make fully effective the provisions of this Settlement Agreement.

B.  **NO IMPLIED WARRANTIES.**  EXCEPT AS EXPRESSLY PROVIDED OTHERWISE HEREIN, THE PARTIES MAKE NO REPRESENTATION OR WARRANTY OF ANY KIND. EXCEPT AS EXPRESSLY PROVIDED OTHERWISE HEREIN, EACH PARTY HEREBY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES OF ANY KIND, INCLUDING THOSE REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. TO THE EXTENT PERMITTED BY APPLICABLE LAW, NO PARTY WILL BE LIABLE UNDER OR IN CONNECTION WITH THIS SETTLEMENT AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## VII.  ASSIGNMENT RIGHTS

A.  **Permitted Assignments.**  This Settlement Agreement shall not be assignable without the prior written consent of the other Party, except that no consent is required in the following circumstances: Either Party may assign rights under this Settlement Agreement to the surviving entity (an "Assignee") in any merger, consolidation, equity exchange, recapitalization, or reorganization of the Party or its business, or other sale or transfer of all or substantially all of a Party's business, stock, or assets, provided that, in the case of such an assignment, (i) the Assignee agrees to be bound by the terms of the Settlement Agreement, and (ii) the releases and covenants granted under this Settlement Agreement as assigned shall apply only to the Assignee's continuation of the Party's business activities existing as of the date of such assignment. If Assignee engaged in other business activities prior to such assignment, the rights under this Settlement Agreement shall not be expanded to cover Assignee's own business activities prior to, on, or that are continued after such assignment.

## VIII.  NOTICES

A.  **Procedure.**  All notices required or permitted to be given hereunder shall be in writing and shall be delivered by

(i)  Hand,

(ii) Prepaid courier with package tracking capabilities, or

(iii) Registered or certified mail postage prepaid;

And in each case shall be addressed as provided in Section VIII(B). Such notices shall be deemed to have been served when received by addressee.

B.  **Addresses.**

(i)  For notices to MMAS:

**Steven Trubow**
**MMAS Research LLC**
**101 2nd Street, Unit 303**
**Petaluma, CA 94952**

(ii)  For notices to SWI:

**Matthew Sachs**
**Sanofi-Aventis**
**55 Corporate Drive**
**Bridgewater, NJ 08807**

C.  **Change of Addresses.** A Party may give written notice of a change of address. After notice of such change has been received, any notice or request shall thereafter be given to such Party at such changed address.

## IX.  BANKRUPTCY

A.  **Executory Contract; Rejection.**  Each Party acknowledges this Settlement Agreement is an Executory Contract under the Bankruptcy Code and that, should either Party become a petitioner under the Bankruptcy Code, Section 365(n) of the Bankruptcy Code applies to this Settlement Agreement and the rights afforded thereunder apply. Each Party further acknowledges that if such Party, as a debtor in possession or a trustee-in-bankruptcy in a case under the Bankruptcy Code, rejects this Settlement Agreement, the other Party may elect to retain its rights under this Settlement Agreement as provided in Section 365(n) of the Bankruptcy Code.

- 5 -

## X.   MISCELLANEOUS

**A.   Entire Agreement.** The terms and conditions of this Settlement Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof, and this Settlement Agreement supersedes all prior agreements, understandings, and representations by or between the Parties, whether written or oral, to the extent they relate to the subject matter hereof. Any rights not expressly granted in this Settlement Agreement are reserved.

**B.   Modification; Waiver.** No modification, waiver, or amendment of any term of this Settlement Agreement shall be binding on the Parties unless the same shall be in writing signed by authorized representatives of the Parties. The waiver of any breach or default will not constitute a waiver of any other right hereunder or any subsequent breach or default. The failure to enforce any provision of this Settlement Agreement shall not be deemed a waiver of any rights under this Settlement Agreement.

**C.   Governing Law.** This Settlement Agreement shall be governed by, and interpreted and construed in accordance with, the domestic law of the State of New Jersey without giving effect to any choice of law provision or rule (whether of the State of New Jersey or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of New Jersey.

**D.   Binding Effect on Parties, Affiliates, Successors in Interest.** This Settlement Agreement shall be binding upon and inure to the benefit of the Parties hereto, their Affiliates, and their respective successors and permitted assignees. To the extent such binding effect is not provided by operation of law, the Parties and their Affiliates shall require any successor or permitted assignee to agree to be bound to the terms of this Settlement Agreement as a condition precedent to such succession or assignment.

**E.   Rules of Construction.** The language of this Settlement Agreement has been approved by counsel for the Parties. The language of this Settlement Agreement shall be construed as a whole according to its fair meaning, and none of the Parties (or the Parties' respective attorneys) shall be deemed to be the draftsman of this Settlement Agreement in any action which may hereafter arise between the Parties.

**F.   Severability.** If any provision of this Settlement Agreement is found or held to be invalid or unenforceable by a court or other decision-making body of competent jurisdiction, the remainder of this Settlement Agreement shall remain valid and enforceable to the greatest extent allowed by such court or body under law.

**G.   Actions to Enforce Agreement.** In the event that any action is required to enforce the terms of this Settlement Agreement, the Parties shall resolve those issues via mediation in Somerset County, New Jersey, to be administered by JAMS or a similar, professional alternative dispute organization. The prevailing Party in any such action shall be entitled to recover against the non-prevailing Party, in addition

to any actual damages, its reasonable attorneys' fees, and costs incurred in connection with such enforcement action. In the event an action is brought in any other forum in contravention of this provision, the parties expressly waive the right to a jury in that action.

**H.    Headings.** Descriptive headings and titles used in this Settlement Agreement are inserted for convenience of reference only and do not constitute a part of and shall not be utilized in interpreting this Settlement Agreement.

**I.    Counterparts, Facsimile Signatures.** This Settlement Agreement may be executed as duplicate originals, both of which shall be regarded as one and the same instrument, and each of which shall be the official and governing version of this Agreement. A faxed or emailed copy of the signature page shall be considered an original for purposes of this Settlement Agreement. In addition, single or duplicate original copies of this Settlement Agreement may be executed by the Parties with multiple counterpart signature pages, where each individual Party may execute a separate signature page, provided that every Party executes a signature page.

In Witness Whereof, the Parties have caused this Settlement Agreement to be signed below by their respective duly authorized representatives.

MMAS Research LLC                          SWI

By: _____             By: _____
     Name: Steven Trubow                        Name: Susan A. Manardo
     Title: CEO                                 Title: Vice President Head of North
     MMAS Research LLC                          American Litigation & Investigations

Date: 8/23/2024                            Date: 8/23/2024

## Appendix A
## Supplemental Released Parties

| HEALTH CARE PRACTITIONER | INSTITUTION |
|---|---|
| Aubert, Nathalie | ICTA Project Management |
| Bauduer, Frédéric | Center hospitalier de la côte basque |
| Bienvenu, Boris | Hôpital St Joseph |
| Belmatoug, Nadia | Hôpital Beaujon |
| Benboubker, Lotfi | Center régional de cancerologie |
| Berger, Marc | CHU Estaing |
| Brottier Mancini, Elisabeth | Hôpital St Louis |
| Cador Rousseau, Berengere | Hôpital Pontchaillou |
| Camou, Fabrice | Hôpital St André |
| Coutinho, Angela | Vaincre les Maladies Lysosomales |
| De Moreuil, Claire | Hôpital La Cavale Blanche |
| Desmurs-Clavel, Helene | Hôpital Edouard Herriot |
| Gaches, Francis | Hôpital Joseph Ducuing |
| Guffon, Nathalie | Hôpital Femme Mère Enfant |
| Hivert, Bénédicte | Service d'Onco-hématologie |
| Hutin, Pascal | CHI de Cornouaille |
| Jaussaud, Roland | Hôpitaux De Brabois - Bat Philippe Canton |
| Lavigne, Christian | Hôtel Dieu |
| Leguy Sequin, Vanessa | CHU Dijon Bourgogne -Hôpital François Mitterand |
| Leone, Jean | Hôpital Robert Debré |
| Lioure, Bruno | Hôpital Civil |
| Loustau, Valentine | Center hospitalier Alpes Leman |
| Luycx, Odile | Center hospitalier de Bretagne Sud |
| Maillot, Francois | Hôpital Bretonneau |
| Mariette, Clara | CHU Grenoble |
| Masseau, Agathe | CHU de Nantes |

| HEALTH CARE PRACTITIONER | INSTITUTION |
|---|---|
| Michaud, Martin | Hôpital Joseph Ducuing |
| Moineuse, Christine | CH d'Auch |
| Paternotte, Simon | ICTA Project Management |
| Pers, Yves-Marie | Hôpital Lapeyronie CHU Montpellier |
| Rose, Christian | Hôpital St Vincent |
| Schmidt, Jean Alphonse | Hôpital Nord |
| Servettaz, Amélie | Hôpital Robert Debré – CHR Reims |
| Swiader, Laure | Hôpital Timone Adultes |
| Vignaud, Guillaume | Center hospitalier Dubois |
| Wachtel, Mélanie | ICTA Project Management |

# EXHIBIT 24

The Honorable David W. Christel

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON AT SEATTLE

DONALD E. MORISKY,

                Plaintiff,

        v.

MMAS RESEARCH LLC, et al.,

                Defendants.

Case No. 2:21-cv-01301-RSM-DWC

**DECLARATION OF PHILIP MORISKY IN SUPPORT OF PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION**

I, Philip Morisky, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am the son of Plaintiff Donald E. Morisky and currently serve as a principal officer of Adherence, the exclusive licensee of the MMAS-4 and MMAS-8 instruments. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.     On December 11, 2024, I participated in a phone call with attorneys Carrie Sarhangi Love and Matthew Sachs, both of whom represented Sanofi in connection with prior MMAS-related discussions. Mr. F. Christopher Austin, counsel of record in this case, was also on the call.

3.      During that conversation, Sanofi's counsel unequivocally confirmed that Sanofi had transmitted a wire payment in the amount of $115,000 to MMAS Research LLC. That representation was made in reference to the settlement agreement and the bank account wiring instructions that had been circulated.

4.      On June 5, 2025, Mr. Austin sent a confirming email summarizing Sanofi's representation regarding the completed wire transfer. I reviewed that email after it was sent.

5.      Attached hereto as **Exhibit 1** is a true and correct copy of the email thread reflecting our scheduling communications with Sanofi's counsel and Mr. Austin's confirmation of what was stated during the call. That communication accurately reflects what I personally heard.

6.      At no time did I, or any Adherence representative, have access to the wire transaction records of either Sanofi or MMAS Research LLC. However, the confirmation provided by Sanofi's legal counsel was unambiguous, professional, and direct.

7.      I submit this declaration to clarify that Plaintiff did, in fact, obtain clear confirmation that the $115,000 was paid to MMAS Research LLC, and that confirmation was both recorded and independently witnessed.


        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

        Executed this 6th day of June, 2025.



                                        */s/ Philip Morisky*_____
                                        Philip Morisky

Page 2 of 2

Morisky Declaration

EXHIBIT 1

**From:** "F. Christopher Austin" <caustin@weidemiller.com>
**Subject: Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation**
**Date:** June 5, 2025 at 10:00:58 PM MDT
**To:** "Love, Carrie Sarhangi" <carrie.love@faegredrinker.com>, Philip Morisky <philip.morisky@adherence.cc>, "Sachs, Matthew /US" <Matthew.Sachs@sanofi.com>, "Love, Carrie /US/EXT" <Carrie.Love@sanofi.com>
**Cc:** Amanda Bruss <amanda@brusslegal.com>

Carrie and Matthew:

This email confirms that in our phone conversation shortly after your email below scheduling it, you both confirmed that the $115,000 from Sanofi was successfully wired to MMAS Research LLC, as set forth in the attached settlement agreement and as intended by the attached wiring instructions.

Chris Austin

702-610-9094
Sent from my iPad

---

**From:** Love, Carrie Sarhangi <carrie.love@faegredrinker.com>
**Date:** Wednesday, December 11, 2024 at 12:00 PM
**To:** Philip Morisky <philip.morisky@adherence.cc>, Sachs, Matthew /US <Matthew.Sachs@sanofi.com>, Love, Carrie /US/EXT <Carrie.Love@sanofi.com>, Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** RE: 2298300 MMAS RESEARCH LLC Bank detail confirmation

I apologize for the inconvenience, but my current call is running 5 minutes late. Can we all log on at 2:05 EST? Thank you!

Best,
Carrie

---

**From:** Love, Carrie Sarhangi
**Sent:** Tuesday, December 10, 2024 2:41 PM
**To:** 'Philip Morisky' <philip.morisky@adherence.cc>; Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>

**Subject:** RE: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Thanks, Philip.  I just circulated a zoom invite.  Talk with you tomorrow.

Best,
Carrie

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Tuesday, December 10, 2024 2:35 PM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>; Love, Carrie Sarhangi <carrie.love@faegredrinker.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

**This Message originated outside your organization.**

---

Yes, that spot is open. Send it.

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802



---

**From:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>
**Sent:** Tuesday, December 10, 2024 7:44 AM
**To:** Philip Morisky <philip.morisky@adherence.cc>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>; Carrie Love <carrie.love@faegredrinker.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>

**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Any chance you could do 2pm ET (11am Pacific) tomorrow?

Matthew Sachs

*Senior Corporate Counsel*

*North American Litigation*

Mobile: 786.546.5768

matthew.sachs@sanofi.com

55 Corporate Drive, Bridgewater, New Jersey 08807

The information in this e-mail, including any attachments, is confidential and intended solely for the addressee(s). In addition, this e-mail may be subject to privilege protecting communications between attorneys and their clients. Access to this e-mail by anyone else is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution is prohibited and may be unlawful and any action taken or not taken in reliance on this e-mail is not authorized by the sender. If you received this in error, kindly notify the sender by return e-mail and delete this e-mail and any attachments.

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Tuesday, December 10, 2024 10:22:55 AM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>; Carrie Love <carrie.love@faegredrinker.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Thanks Matt, I really appreciate the communication. Tomorrow and Thursday are open in the afternoons pacific time. Last time, 1:30pm pacific worked for you.

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

---

**From:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>
**Sent:** Monday, December 9, 2024 4:01 PM
**To:** Philip Morisky <philip.morisky@adherence.cc>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>; Carrie Love <carrie.love@faegredrinker.com>

**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Hi Philip, I was actually going to email you this evening. Can you send Carrie and me some times this week that work for you for a brief call? Thanks.


Matthew Sachs

*Senior Corporate Counsel*

*North American Litigation*


Mobile: 786.546.5768

matthew.sachs@sanofi.com

55 Corporate Drive, Bridgewater, New Jersey 08807


The information in this e-mail, including any attachments, is confidential and intended solely for the addressee(s). In addition, this e-mail may be subject to privilege protecting communications between attorneys and their clients. Access to this e-mail by anyone else is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution is prohibited and may be unlawful and any action taken or not taken in reliance on this e-mail is not authorized by the sender. If you received this in error, kindly notify the sender by return e-mail and delete this e-mail and any attachments.

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Monday, December 9, 2024 6:59 PM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Hi Matthew,


I haven't heard anything in a while, I know next week on the 16th or 17th is the 90 days. So, I need to confirm what decision Sanofi made regarding any payment and then we can also discuss a formal release from me regarding the use of the MMAS-8, but I also need to know more information about the original settlement in the first place.

BR,


**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Tuesday, November 26, 2024 4:03 PM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT
<Carrie.Love@sanofi.com>; Manardo, Susan /US <susan.manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Hi Matthew,

I am checking in to see if Sanofi has made any decision on the Trubow matters. I am attaching recent motions in the Boston case as well as additional sanctions in the Washington case which will ultimately prove that Trubow does not own any rights to the MMAS and the widget and that any settlements regarding the MMAS must go through our party.

I believe that December 16 is the 90 days, so please let me know prior to.

Happy Thanksgiving,

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

---

**From:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>
**Sent:** Tuesday, October 8, 2024 3:08 PM
**To:** Philip Morisky <philip.morisky@adherence.cc>; Love, Carrie /US/EXT
<Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** RE: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Thanks for sending (and Chris thanks for sending in your other email). We will review and discuss internally.

Matthew Sachs
*Senior Corporate Counsel*
*North American Litigation*

Mobile: 786.546.5768
matthew.sachs@sanofi.com
55 Corporate Drive, Bridgewater, New Jersey 08807

The information in this e-mail, including any attachments, is confidential and intended solely for the addressee(s).  In addition, this e-mail may be subject to privilege protecting communications between attorneys and their clients.  Access to

this e-mail by anyone else is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution is prohibited and may be unlawful and any action taken or not taken in reliance on this e-mail is not authorized by the sender. If you received this in error, kindly notify the sender by return e-mail and delete this e-mail and any attachments.

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Tuesday, October 8, 2024 5:19 PM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Here is the motion to dismiss for the Boston case.

I did not see the Sanofi draft that Trubow threatened if you don't mind sharing it. Thanks for the reassurance that you will keep us updated.


**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802



**From:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>
**Sent:** Friday, September 20, 2024 7:07 AM
**To:** Philip Morisky <philip.morisky@adherence.cc>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Thanks, Philip. All I can say at this time is that, based on your recent emails, we are taking another very close look at this matter and the settlement agreement to determine the appropriate course of action for Sanofi. We'll be in touch once we've figured everything out.

Matthew Sachs

*Senior Corporate Counsel*

*Senior Corporate Counsel*

*North American Litigation*

Mobile: 786.546.5768

[matthew.sachs@sanofi.com](mailto:matthew.sachs@sanofi.com)

55 Corporate Drive, Bridgewater, New Jersey 08807

The information in this e-mail, including any attachments, is confidential and intended solely for the addressee(s). In addition, this e-mail may be subject to privilege protecting communications between attorneys and their clients. Access to this e-mail by anyone else is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution is prohibited and may be unlawful and any action taken or not taken in reliance on this e-mail is not authorized by the sender. If you received this in error, kindly notify the sender by return e-mail and delete this e-mail and any attachments.

---

**From:** Philip Morisky <[philip.morisky@adherence.cc](mailto:philip.morisky@adherence.cc)>
**Sent:** Friday, September 20, 2024 9:52:44 AM
**To:** Sachs, Matthew /US <[Matthew.Sachs@sanofi.com](mailto:Matthew.Sachs@sanofi.com)>; Love, Carrie /US/EXT <[Carrie.Love@sanofi.com](mailto:Carrie.Love@sanofi.com)>; Manardo, Susan /US <[Susan.Manardo@sanofi.com](mailto:Susan.Manardo@sanofi.com)>
**Cc:** F. Christopher Austin <[caustin@weidemiller.com](mailto:caustin@weidemiller.com)>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Hi again Matt and Carrie,

An acknowledgement and reply to this email would be appreciated. I am still unclear as to the reason behind this settlement action. My father is nearly 80 years old and he is no longer involved with the day-to-day oversight of the MMAS use, which is now my sole responsibility. The last I heard was that the case against Sanofi was dismissed with prejudice. I do not understand the settlement agreement at all.

The original Sanofi license included Dr Donald Morisky as an individual. Why now does this settlement not even mention his name? Sanofi was aware of the tensions and ultimate separation between Dr Morisky and Trubow even during the initial discussions of the global license for the Elipro study. You can see the corresponding email to previous Sanofi legal counsel attached. I believe there was a disconnect and you don't have all of the information needed.

I need to understand the context of the claims he is making because there most likely are not any. Please understand that we have been fighting this court case for several years and hundreds of thousands of dollars in court costs and millions in stolen revenue, as well as the negative visibility of using the scales in themselves and the association with this individual.

The published article only mentions the MMAS-8, I don't even see where this widget would be used.

I have established global collaborations with Servier, Janssen, Novo, Eli Lilly and others in order to take back control of the MMAS and ensure that proper licensing protocol is followed, and our collaborations are harmonious. I hope to establish this same connection with Sanofi.

I look for your response today so that we can plan our next course of action. This settlement agreement needs to be stopped and investigated. Sanofi already paid way too much for services that were not even needed or used.

Much appreciated.

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Thursday, September 19, 2024 8:38 AM
**To:** matthew.sachs@sanofi.com <matthew.sachs@sanofi.com>; carrie.love@sanofi.com <carrie.love@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

CONFIDENTIAL

Matthew and Carrie,

There is currently a Federal copyright case in the state of Washington.

2:2021cv01301 Morisky v MMAS Research et al.

We allege that Trubow does not own any rights to the MMAS-4 and MMAS-8 scales and that the "widget" is illegally hosting the MMAS scales. We have filed an infringement case in 2019.

I have included our attorney Chris Austin to comment. I am unsure if SANOFI was aware of this but any settlement for alleged use of the actual MMAS Morisky questionnaire can only be authorized by my father Dr Donald Morisky and myself as the company responsible for the rights of the MMAS.

Please put my attorney and myself in touch with the legal representative who is authorizing this.

Philip Morisky, MBA
Chief Optimus
Adherence

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

---

**From:** Donald Morisky <donald.morisky@moriskyscale.com>
**Sent:** Thursday, September 19, 2024 8:28 AM
**To:** Philip Morisky <philip.morisky@adherence.cc>
**Subject:** Fwd: 2298300 MMAS RESEARCH LLC Bank detail confirmation


---------- Forwarded message ---------
From: **DONALD MORISKY** <dmorisky@ucla.edu>
Date: Thu, Sep 19, 2024 at 6:58 AM
Subject: Fwd: 2298300 MMAS RESEARCH LLC Bank detail confirmation
To: Morisky <philip.morisky@moriskyscale.com>


Philip, please respond.

---------- Forwarded message ---------
From: **CHUVASHOVA-ext, Tatiana /FR/EXT** <Tatiana.CHUVASHOVA-ext@sanofi.com>
Date: Thu, Sep 19, 2024 at 6:39 AM
Subject: 2298300 MMAS RESEARCH LLC Bank detail confirmation
To: dmorisky@g.ucla.edu <dmorisky@g.ucla.edu>


Dear vendor,

We have received this agreement and bank details (please, refer to attached documents).

We already have un account for your company in our database, but with different address and bank details :


Please, confirm us if we can update this information as mentioned in attached wire instructions.

Thank you in advance for your confirmation.

Best regards,

Tatiana CHUVASHOVA
*Expert  Master Data eVendor & eProc*
*Sanofi Business Services France*

+33 (0) 4 81 49 04 26
Tatiana.Chuvashova-ext@sanofi.com
14, Espace Henri Vallée, 69007 LYON , France

-

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**Wire Instructions.pdf**

**Sanofi-MMAS Executed Agreement.pdf**
378 KB

# EXHIBIT 25 A

1                                               The Honorable David W. Christel

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

DONALD E. MORISKY,

               Plaintiff,

             v.

MMAS RESEARCH LLC, et al.,

             Defendants.

Case No. 2:21-cv-01301-RSM-DWC

**DECLARATION OF PHILIP MORISKY IN SUPPORT OF PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION**

I, Philip Morisky, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am the son of Plaintiff Donald E. Morisky and currently serve as a principal officer of Adherence, the exclusive licensee of the MMAS-4 and MMAS-8 instruments. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.     On December 11, 2024, I participated in a phone call with attorneys Carrie Sarhangi Love and Matthew Sachs, both of whom represented Sanofi in connection with prior MMAS-related discussions. Mr. F. Christopher Austin, counsel of record in this case, was also on the call.

3.      During that conversation, Sanofi's counsel unequivocally confirmed that Sanofi had transmitted a wire payment in the amount of $115,000 to MMAS Research LLC. That representation was made in reference to the settlement agreement and the bank account wiring instructions that had been circulated.

4.      On June 5, 2025, Mr. Austin sent a confirming email summarizing Sanofi's representation regarding the completed wire transfer. I reviewed that email after it was sent.

5.      Attached hereto as **Exhibit 1** is a true and correct copy of the email thread reflecting our scheduling communications with Sanofi's counsel and Mr. Austin's confirmation of what was stated during the call. That communication accurately reflects what I personally heard.

6.      At no time did I, or any Adherence representative, have access to the wire transaction records of either Sanofi or MMAS Research LLC. However, the confirmation provided by Sanofi's legal counsel was unambiguous, professional, and direct.

7.      I submit this declaration to clarify that Plaintiff did, in fact, obtain clear confirmation that the $115,000 was paid to MMAS Research LLC, and that confirmation was both recorded and independently witnessed.


        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

        Executed this 6th day of June, 2025.



                                        */s/ Philip Morisky*_____
                                        Philip Morisky

Morisky Declaration

EXHIBIT 1

**From:** "F. Christopher Austin" <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation
**Date:** June 5, 2025 at 10:00:58 PM MDT
**To:** "Love, Carrie Sarhangi" <carrie.love@faegredrinker.com>, Philip Morisky <philip.morisky@adherence.cc>, "Sachs, Matthew /US" <Matthew.Sachs@sanofi.com>, "Love, Carrie /US/EXT" <Carrie.Love@sanofi.com>
**Cc:** Amanda Bruss <amanda@brusslegal.com>

Carrie and Matthew:

This email confirms that in our phone conversation shortly after your email below scheduling it, you both confirmed that the $115,000 from Sanofi was successfully wired to MMAS Research LLC, as set forth in the attached settlement agreement and as intended by the attached wiring instructions.

Chris Austin

702-610-9094
Sent from my iPad

---

**From:** Love, Carrie Sarhangi <carrie.love@faegredrinker.com>
**Date:** Wednesday, December 11, 2024 at 12:00 PM
**To:** Philip Morisky <philip.morisky@adherence.cc>, Sachs, Matthew /US <Matthew.Sachs@sanofi.com>, Love, Carrie /US/EXT <Carrie.Love@sanofi.com>, Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** RE: 2298300 MMAS RESEARCH LLC Bank detail confirmation

I apologize for the inconvenience, but my current call is running 5 minutes late. Can we all log on at 2:05 EST? Thank you!

Best,
Carrie

---

**From:** Love, Carrie Sarhangi
**Sent:** Tuesday, December 10, 2024 2:41 PM
**To:** 'Philip Morisky' <philip.morisky@adherence.cc>; Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>

**Subject:** RE: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Thanks, Philip.  I just circulated a zoom invite.  Talk with you tomorrow.

Best,
Carrie

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Tuesday, December 10, 2024 2:35 PM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>; Love, Carrie Sarhangi <carrie.love@faegredrinker.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

**This Message originated outside your organization.**

---

Yes, that spot is open. Send it.

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802



---

**From:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>
**Sent:** Tuesday, December 10, 2024 7:44 AM
**To:** Philip Morisky <philip.morisky@adherence.cc>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>; Carrie Love <carrie.love@faegredrinker.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>

**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Any chance you could do 2pm ET (11am Pacific) tomorrow?

Matthew Sachs

*Senior Corporate Counsel*

*North American Litigation*

Mobile: 786.546.5768

matthew.sachs@sanofi.com

55 Corporate Drive, Bridgewater, New Jersey 08807

The information in this e-mail, including any attachments, is confidential and intended solely for the addressee(s). In addition, this e-mail may be subject to privilege protecting communications between attorneys and their clients. Access to this e-mail by anyone else is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution is prohibited and may be unlawful and any action taken or not taken in reliance on this e-mail is not authorized by the sender. If you received this in error, kindly notify the sender by return e-mail and delete this e-mail and any attachments.

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Tuesday, December 10, 2024 10:22:55 AM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>; Carrie Love <carrie.love@faegredrinker.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Thanks Matt, I really appreciate the communication. Tomorrow and Thursday are open in the afternoons pacific time. Last time, 1:30pm pacific worked for you.

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

---

**From:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>
**Sent:** Monday, December 9, 2024 4:01 PM
**To:** Philip Morisky <philip.morisky@adherence.cc>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>; Carrie Love <carrie.love@faegredrinker.com>

**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Hi Philip, I was actually going to email you this evening. Can you send Carrie and me some times this week that work for you for a brief call? Thanks.

Matthew Sachs

*Senior Corporate Counsel*

*North American Litigation*

Mobile: 786.546.5768

matthew.sachs@sanofi.com

55 Corporate Drive, Bridgewater, New Jersey 08807

The information in this e-mail, including any attachments, is confidential and intended solely for the addressee(s).  In addition, this e-mail may be subject to privilege protecting communications between attorneys and their clients.  Access to this e-mail by anyone else is unauthorized.  If you are not an intended recipient, any disclosure, copying, distribution is prohibited and may be unlawful and any action taken or not taken in reliance on this e-mail is not authorized by the sender.  If you received this in error, kindly notify the sender by return e-mail and delete this e-mail and any attachments.

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Monday, December 9, 2024 6:59 PM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Hi Matthew,

I haven't heard anything in a while, I know next week on the 16th or 17th is the 90 days. So, I need to confirm what decision Sanofi made regarding any payment and then we can also discuss a formal release from me regarding the use of the MMAS-8, but I also need to know more information about the original settlement in the first place.

BR,

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Tuesday, November 26, 2024 4:03 PM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <susan.manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Hi Matthew,

I am checking in to see if Sanofi has made any decision on the Trubow matters. I am attaching recent motions in the Boston case as well as additional sanctions in the Washington case which will ultimately prove that Trubow does not own any rights to the MMAS and the widget and that any settlements regarding the MMAS must go through our party.

I believe that December 16 is the 90 days, so please let me know prior to.

Happy Thanksgiving,


**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

---

**From:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>
**Sent:** Tuesday, October 8, 2024 3:08 PM
**To:** Philip Morisky <philip.morisky@adherence.cc>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** RE: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Thanks for sending (and Chris thanks for sending in your other email). We will review and discuss internally.

Matthew Sachs
*Senior Corporate Counsel*
*North American Litigation*

Mobile: 786.546.5768
matthew.sachs@sanofi.com
55 Corporate Drive, Bridgewater, New Jersey 08807

The information in this e-mail, including any attachments, is confidential and intended solely for the addressee(s).  In addition, this e-mail may be subject to privilege protecting communications between attorneys and their clients.  Access to

this e-mail by anyone else is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution is prohibited and may be unlawful and any action taken or not taken in reliance on this e-mail is not authorized by the sender. If you received this in error, kindly notify the sender by return e-mail and delete this e-mail and any attachments.

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Tuesday, October 8, 2024 5:19 PM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Here is the motion to dismiss for the Boston case.

I did not see the Sanofi draft that Trubow threatened if you don't mind sharing it. Thanks for the reassurance that you will keep us updated.

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802



**From:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>
**Sent:** Friday, September 20, 2024 7:07 AM
**To:** Philip Morisky <philip.morisky@adherence.cc>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Thanks, Philip. All I can say at this time is that, based on your recent emails, we are taking another very close look at this matter and the settlement agreement to determine the appropriate course of action for Sanofi. We'll be in touch once we've figured everything out.

Matthew Sachs
*Senior Corporate Counsel*

*Senior Corporate Counsel*

*North American Litigation*

Mobile: 786.546.5768

matthew.sachs@sanofi.com

55 Corporate Drive, Bridgewater, New Jersey 08807

The information in this e-mail, including any attachments, is confidential and intended solely for the addressee(s). In addition, this e-mail may be subject to privilege protecting communications between attorneys and their clients. Access to this e-mail by anyone else is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution is prohibited and may be unlawful and any action taken or not taken in reliance on this e-mail is not authorized by the sender. If you received this in error, kindly notify the sender by return e-mail and delete this e-mail and any attachments.

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Friday, September 20, 2024 9:52:44 AM
**To:** Sachs, Matthew /US <Matthew.Sachs@sanofi.com>; Love, Carrie /US/EXT <Carrie.Love@sanofi.com>; Manardo, Susan /US <Susan.Manardo@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

Hi again Matt and Carrie,

An acknowledgement and reply to this email would be appreciated. I am still unclear as to the reason behind this settlement action. My father is nearly 80 years old and he is no longer involved with the day-to-day oversight of the MMAS use, which is now my sole responsibility. The last I heard was that the case against Sanofi was dismissed with prejudice. I do not understand the settlement agreement at all.

The original Sanofi license included Dr Donald Morisky as an individual. Why now does this settlement not even mention his name? Sanofi was aware of the tensions and ultimate separation between Dr Morisky and Trubow even during the initial discussions of the global license for the Elipro study. You can see the corresponding email to previous Sanofi legal counsel attached. I believe there was a disconnect and you don't have all of the information needed.

I need to understand the context of the claims he is making because there most likely are not any. Please understand that we have been fighting this court case for several years and hundreds of thousands of dollars in court costs and millions in stolen revenue, as well as the negative visibility of using the scales in themselves and the association with this individual.

The published article only mentions the MMAS-8, I don't even see where this widget would be used.

I have established global collaborations with Servier, Janssen, Novo, Eli Lilly and others in order to take back control of the MMAS and ensure that proper licensing protocol is followed, and our collaborations are harmonious. I hope to establish this same connection with Sanofi.

I look for your response today so that we can plan our next course of action. This settlement agreement needs to be stopped and investigated. Sanofi already paid way too much for services that were not even needed or used.

Much appreciated.

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

---

**From:** Philip Morisky <philip.morisky@adherence.cc>
**Sent:** Thursday, September 19, 2024 8:38 AM
**To:** matthew.sachs@sanofi.com <matthew.sachs@sanofi.com>; carrie.love@sanofi.com <carrie.love@sanofi.com>
**Cc:** F. Christopher Austin <caustin@weidemiller.com>
**Subject:** Re: 2298300 MMAS RESEARCH LLC Bank detail confirmation

CONFIDENTIAL

Matthew and Carrie,

There is currently a Federal copyright case in the state of Washington.

2:2021cv01301 Morisky v MMAS Research et al.

We allege that Trubow does not own any rights to the MMAS-4 and MMAS-8 scales and that the "widget" is illegally hosting the MMAS scales. We have filed an infringement case in 2019.

I have included our attorney Chris Austin to comment. I am unsure if SANOFI was aware of this but any settlement for alleged use of the actual MMAS Morisky questionnaire can only be authorized by my father Dr Donald Morisky and myself as the company responsible for the rights of the MMAS.

Please put my attorney and myself in touch with the legal representative who is authorizing this.

Philip Morisky, MBA
Chief Optimus
Adherence

**Philip Morisky, MBA, Ξ**

Chief Optimus| C. 562.533.2706

100 Oceangate 12th floor | Long Beach, CA | 90802

---

**From:** Donald Morisky <donald.morisky@moriskyscale.com>
**Sent:** Thursday, September 19, 2024 8:28 AM
**To:** Philip Morisky <philip.morisky@adherence.cc>
**Subject:** Fwd: 2298300 MMAS RESEARCH LLC Bank detail confirmation


---------- Forwarded message ---------
From: **DONALD MORISKY** <dmorisky@ucla.edu>
Date: Thu, Sep 19, 2024 at 6:58 AM
Subject: Fwd: 2298300 MMAS RESEARCH LLC Bank detail confirmation
To: Morisky <philip.morisky@moriskyscale.com>


Philip, please respond.

---------- Forwarded message ---------
From: **CHUVASHOVA-ext, Tatiana /FR/EXT** <Tatiana.CHUVASHOVA-ext@sanofi.com>
Date: Thu, Sep 19, 2024 at 6:39 AM
Subject: 2298300 MMAS RESEARCH LLC Bank detail confirmation
To: dmorisky@g.ucla.edu <dmorisky@g.ucla.edu>


Dear vendor,

We have received this agreement and bank details (please, refer to attached documents).

We already have un account for your company in our database, but with different address and bank details :


Please, confirm us if we can update this information as mentioned in attached wire instructions.

Thank you in advance for your confirmation.

Best regards,

Tatiana CHUVASHOVA
*Expert  Master Data eVendor & eProc*
*Sanofi Business Services France*

+33 (0) 4 81 49 04 26
Tatiana.Chuvashova-ext@sanofi.com
14, Espace Henri Vallée, 69007 LYON , France

-

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**Wire Instructions.pdf**

**Sanofi-MMAS Executed Agreement.pdf**
378 KB

# EXHIBIT 25

# ADDENDUM TO SAF CONFIDENTIAL SETTLEMENT AGREEMENT

Pursuant to Section X(B) of the SAF Confidential Settlement Agreement and Release (the "Settlement Agreement") and between MMAS Research, LLC and Steven Trubow (collectively "MMAS") and Sanofi Winthrop Industrie as successor to Sanofi-Aventis France whose business was transferred to it on July, 1 2023, as consequence of an internal reorganization ("SWI") (collectively the "Parties"), effective September 17, 2024, this Addendum is effective as of the last date signed below for all parties.  The Settlement Agreement, including all definitions and terms contained therein, is hereby incorporated by reference.

## RECITATIONS

WHEREAS, on September 17, 2024, the parties entered into the Settlement Agreement.

WHEREAS, the Parties have mutually agreed to modify the Settlement Agreement to include an indemnification clause to Section X of the Settlement Agreement.

NOW, THEREFORE, on consideration of the above Recitations, which are hereby acknowledged to be true and correct and made part of this Addendum, it is agreed that the below indemnification clause is added to the Section X of the Settlement Agreement as follows:

**J.** **Indemnification.**  MMAS and its successors agree to indemnify and hold SWI harmless against any and all claims asserted by Donald E. Morisky, Philip Morisky, Marty Morisky, Susan Morisky, Morisky Medication Adherence Research, LLC ("MMAR LLC") (collectively "Morisky"), or any successors, agents or licensees of Donald E. Morisky, Philip Morisky, Marty Morisky, Susan Morisky, MMAR LLC or its Affiliates, regarding use of the Morisky Widget in any manner.  In the event that a Morisky Claim is asserted against SWI, Sanofi shall control the defense and resolution of the Morisky Claim and SWI shall have the right but not the obligation to hire counsel of its choice.

IN WITNESS WHEREOF, the Parties have caused this Addendum to the Settlement Agreement to be signed below by their respective duly authorized representatives.

MMAS

By: _____

Name: Steven Trubow

Title: CEO

MMAS Research LLC

Date: 12/7/2024 _____

SWI

By: _____

Name: Susan A. Manardo

Title: Vice President Head of North American Litigation & Investigations

Date: 12/3/2024 _____

# EXHIBIT 26

# ADDENDUM TO SAF CONFIDENTIAL SETTLEMENT AGREEMENT

Pursuant to Section X(B) of the SAF Confidential Settlement Agreement and Release (the "Settlement Agreement") and between MMAS Research, LLC and Steven Trubow (collectively "MMAS") and Sanofi Winthrop Industrie as successor to Sanofi-Aventis France whose business was transferred to it on July, 1 2023, as consequence of an internal reorganization ("SWI") (collectively the "Parties"), effective September 17, 2024, this Addendum is effective as of the last date signed below for all parties. The Settlement Agreement, including all definitions and terms contained therein, is hereby incorporated by reference.

## RECITATIONS

WHEREAS, on September 17, 2024, the parties entered into the Settlement Agreement.

WHEREAS, the Parties have mutually agreed to modify the Settlement Agreement to include an indemnification clause to Section X of the Settlement Agreement.

NOW, THEREFORE, on consideration of the above Recitations, which are hereby acknowledged to be true and correct and made part of this Addendum, it is agreed that the below indemnification clause is added to the Section X of the Settlement Agreement as follows:

**J.** **Indemnification.** MMAS and its successors agree to indemnify and hold SWI harmless against any and all claims asserted by Donald E. Morisky, Philip Morisky, Marty Morisky, Susan Morisky, Morisky Medication Adherence Research, LLC ("MMAR LLC") (collectively "Morisky"), or any successors, agents or licensees of Donald E. Morisky, Philip Morisky, Marty Morisky, Susan Morisky, MMAR LLC or its Affiliates, regarding use of the Morisky Widget in any manner. In the event that a Morisky Claim is asserted against SWI, Sanofi shall control the defense and resolution of the Morisky Claim and SWI shall have the right but not the obligation to hire counsel of its choice.

IN WITNESS WHEREOF, the Parties have caused this Addendum to the Settlement Agreement to be signed below by their respective duly authorized representatives.

MMAS

By: _____

Name: Steven Trubow

Title: CEO

MMAS Research LLC

Date: 12/7/2024

SWI

By: _____

Name: Susan A. Manardo

Title: Vice President Head of North American Litigation & Investigations

Date: 12/3/2024