UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

MMAS RESEARCH LLC,
A Washington Limited Liability
Company, et al.,


                    Plaintiffs,        Civil Action
                                       No. 24-12108-DJC
V.
                                       October 23, 2025
THE CHILDREN'S HOSPITAL CORPORATION,
et al.,                                1:59 p.m.



                    Defendants.
_____



                    TRANSCRIPT OF MOTION HEARING

                BEFORE THE HONORABLE DENISE J. CASPER

                  UNITED STATES DISTRICT COURT

                 JOHN J. MOAKLEY U.S. COURTHOUSE

                      1 COURTHOUSE WAY

                     BOSTON, MA   02210




                 DEBRA M. KANE, RMR, CRR, FCRR
                    Official Court Reporter
                 John J. Moakley U.S. Courthouse
                 1 Courthouse Way, Room 5204
                      Boston, MA   02210
                  debrakane0711@gmail.com

APPEARANCES:

FOR THE PLAINTIFFS:

RONALD D. COLEMAN, ESQ.
50 Park Place, Suite 1105
Newark, NJ 07102
973-264-9611

ANDREW NEIL HARTZELL, ESQ.
Freeman Mathis & Gary, LLP
One Boston Place
201 Washington Street
Suite 2200
Boston, MA 02108
617-963-5966
nhartzell@fmglaw.com

FOR THE DEFENDANTS:

THEODORE J. FOLKMAN, ESQ.
TAYLOR M. MAKSON, ESQ.
Rubin & Rudman LLP
53 State Street, 15th Floor
Boston, MA 02109
617-330-7135
tfolkman@rubinrudman.com

F. CHRISTOPHER AUSTIN, ESQ.
Lex Tecnica, Ltd.
10161 Park Run Drive
Suite 150
Las Vegas, NV 89145
702-610-9094
chris@lextecnica.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on October 23, 2025.)

THE CLERK:  All rise.

(The Court entered the courtroom.)

THE CLERK:  Court is in session.  Please be seated.

Civil action 24-12108, MMAS Research v. The Children's Hospital Corporation, et al.

Would counsel please state your name for the record.

MR. COLEMAN:  For the plaintiffs, Ronald Coleman, Coleman Law Firm, Newark, New Jersey.

MR. HARTZELL:  Neil Hartzell, local counsel for the plaintiffs, your Honor.

THE COURT:  Good afternoon to you both.

MR. AUSTIN:  And for defendant Donald Morisky and MMAR, LLC, or Morisky Medication Adherence Research, LLC, Chris Austin with the firm of Lex Tecnica out of Las Vegas, Nevada.

THE COURT:  Good afternoon to you as well.

MS. MAKSON:  Good afternoon.  On behalf of The Children's Hospital Corporation, Taylor Makson, joined by Ted Folkman.

THE COURT:  Good afternoon.

Counsel, I know we're here on the Morisky defendants' motion to dismiss. I've had a chance to read the motion papers on either side.

I know, also, counsel, just as a matter of housekeeping, there was a motion to withdraw by counsel on the MMAS side, counsel, but I understand that present counsel remains. Is that where we are?

MR. HARTZELL: Your Honor, I'm not quite sure there needed to be a motion, I think it just be a notice. I appeared as local counsel before --

THE COURT: Right. So I am going to allow that motion. I'm assuming there's no opposition at all given the substitution, and I know there was a note made that counsel had talked to counsel for the opposing party.

So, Ms. Hourihan, that's Docket 74.

Counsel, I'm prepared to hear argument on the motion to dismiss.

MR. AUSTIN: Very good. Thank you, your Honor.

I think just as a real quick just summary of just where we're heading on this, I think it's important to understand that this is a claim, as far as I can see from the complaint and from their opposition, that alleges contacts that would subject my client, Dr. Morisky, and Morisky Medication Adherence Research, LLC, known as MMAR, LLC, to personal jurisdiction in this court.

Both parties have conceded that there is no general jurisdiction over either of these two defendants.  The only issue is whether there is subject matter jurisdiction that is specific to this particular case.  And we argue that there is not.

As you know, in order for personal jurisdiction to attach under the doctrine of specific jurisdiction, they would have to have a contact that arises directly -- or that the claim arises directly from the contacts that are alleged.  The contact just be a purposeful availment of this particular jurisdiction such that it is foreseeable that the defendants would be hailed into court against their will, if necessary.

THE COURT:  And, counsel, I notice from the papers both parties jumped over the long-arm statute analysis, which I think the 1st Circuit of late has said that I need to engage in in addition to the due process analysis.  Probably this is a better question for the plaintiffs, but, as I view it, it looks like only 3(a) of the long-arm statute would conceivably apply, right, that a court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from that person's transacting any business in the Commonwealth.

So let's assume for the moment that that's what I'm focused on.  I just wanted you to respond to that as well.

MR. AUSTIN:  I think that is a correct assessment,

your Honor.

I think that falls in line with the historical precedent in the 1st Circuit under the specific jurisdictional analysis as to the first two prongs, right, as to whether or not there is a claim -- the claim arises from the contact and whether the contact was a contact that was purposely availing of this jurisdiction.

The two contacts that are alleged that -- as far as we can see from the complaint, one is a letter drafted by me, April 21, 2022.  The other is --

THE COURT:  Is this sort of the cease and desist letter?

MR. AUSTIN:  It wasn't a cease and desist letter.  Maybe it would be helpful to just kind of give a little bit of the timeline --

THE COURT:  Sure.

MR. AUSTIN:  -- of events here.

These are parties that have been involved in multiple litigations nationwide commencing back when they kind of divorced from each other as both of them were in business together.

I think it's important to understand that the underlying copyright at issue here, which is the Morisky Medication Adherence Scale eight-question test or questionnaire, was authored by Dr. Morisky years and years ago.

He then obtained a copyright registration for that MMAS eight-part test, also known as the MMAS-8.  I hate to give you all these acronyms with "MMA" in them, but that's the way it goes.

That copyright was registered in 2018 but reflects a publication date dating back to 2006.

In -- during this -- certainly around that period of time, Dr. Morisky was a professor at UCLA where he was the chair of the UCLA public health department and responsible largely for managing a lot of the PhD applicants going through the process there.

He could not in that course very efficiently manage the massive licensing that was taking place of his copyrighted work.  There is another similar copyrighted work that predates that one called the Morisky Medication Adherence Scale 4-part test, it's not at issue in this litigation, but just for your awareness, that was part of what he was doing.

In order to accommodate that workload, he partnered with Steven Trubow, and Steven Trubow and he formed a company called MMAS, LLC, the plaintiff in this action.

So that kind of gives you the background from where this all started from.

The purpose of the original meeting with Steven Trubow was Steven Trubow represented that he had the ability, through licensees and vendors, through vendors really, to produce an

electronic version or electronic system that would display the MMAS so that it could be more easily utilized by practitioners and patients.

And just for your benefit, I know it's in the briefing so I don't want to spend much of this, but the purpose of the Morisky Medication Adherence Scale is to allow practitioners and people doing -- study scientists to assess whether or not the person they're giving this medication to is taking it. Because if they're not taking it, your study is going to be flawed. Or, if they're not taking it, their likelihood of having a good outcome from some terminal illness is going to be hindered. So the point of this is a psychological analysis to help the practitioner so they can set out to see if the study is going to be well done; and, two, to make sure if the patient is adhering, if he is not, get an assessment so you can know what kind of intervention may be appropriate. For example, you might just do counseling or you might do phone calls and texts, whatever, to remind them to take medication.

These are medications that are medications for terminal or -- meaning, life-enduring ailments, like diabetes, typically, or hypertension, right. So that you must take them on a routine, prescribed basis in order to get the benefit of them. And there have been numerous other studies that have found that patients unnecessarily suffer and die prematurely just because they do not take the medications as prescribed.

So this is to effect a remedy for them.

To prove its effectiveness, there have been studies on the MMAS' effectiveness worldwide.  And I don't think plaintiffs will counter my representation, that in the literature and in the articles worldwide, there have been thousands written, the Morisky Medication Adherence Scale 8-part test is the gold standard for assessing whether or not somebody will adhere to the medication.

So, as a result of this, frequently used for testing medications to confirm that the participants in the study took the medication if they're not immediately observed taking the medication as well.

I think that may have some bearing on the particular study that was done, although I personally do not know the details of the study that was done by Boston Children's Hospital.  But that gives you a background of what was going on.

Sometime in 2017, Dr. Morisky retired from UCLA and started to put his financial affairs in order to see what was going on with the business and was stunned to find out that, according to his accountant reports, hundreds of thousands of dollars that should have been remitted to him were not.  That created a dispute between him and Mr. Trubow --

THE COURT:  And then they settled that.

MR. AUSTIN:  Ultimately, they settled that.  There

were lawsuits that were filed. There was what's -- the lawsuit in Washington was settled pursuant to a court Rule 2A provision which allows for a preliminary settlement agreement to be held binding and final if it is otherwise never converted to a final settlement agreement. So that's what we refer to the document in this case, we refer to the CR 2A agreement, that's what we're talking about. It's the settlement agreement of the first bout of litigation that took place commencing in around 2019 -- let's see. 2019 is when, I believe, this litigation between the parties commenced. The CR 2A was executed --

THE COURT: -- at the end of the 2020.

MR. AUSTIN: It was December 6, 2020. And then, thereafter, further allegations by both sides that the other side was not complying with the agreement.

The lawsuit was filed on September 24th of 2021, that is currently set to go to trial in Washington federal court the 17th of November, next month.

Now, after that litigation was filed -- I think this is pertinent, because the two -- so that gives you kind of a flare of the whole overarching relationship between the parties.

Dr. Morisky kind of divorced from MMAS in 2019. I think it was July is when he resigned from MMAS. And then, shortly thereafter, he revoked any licenses he had given MMAS for the use of his intellectual property.

In 2019, December, later that year, MMAS registered what it called the MMAS Research Widget Code, which is -- I happen to have a copy of it.  I didn't see it in the pleadings, but it is referred to ubiquitously in the pleadings.  If I may, I'd like to provide a copy to you as a certification of that copyright.

THE COURT:  You can provide it to the other side.

MR. AUSTIN:  Yes.

(Pause.)

MR. AUSTIN:  What I'll call your attention to is two things on this registration.  If you look at the name of the registration, it is MMAS Research Widget Code.  It is for a software program.  The deposit, which I'm not going to provide to the Court today, but it is available, I just don't think it's really necessary for this proceeding, is 3,000 lines of code.  Highly redacted.  It's impossible to assess what the lines of codes do because there are black lines going through diagonally that cover about 50 percent or more of the content of the page.

The other thing I wanted to bring out is if you look down at the limitation of copyright claim, you'll see that there are previous registrations in year dates of registration of copyrights that limit the scope of this copyright, the -- what I'm going to refer to as the Widget Code copyright.

The first one listed that was registered in 2016 is

the MMAS-4 registered in the favor of Dr. Morisky.

And the second one that's listed, ending in 2533, is the registration for the MMAS-8, also registered to Dr. Morisky.

The MMAS-8 registration is of record in this case. It's attached to the complaint as one of the numerous exhibits. I believe it is ECF 26 or 24-1 or something along those lines.

The important part of that -- the reason I raise that to the Court's attention is the MMAS-8, as far as Dr. Morisky is concerned, is itself not part of the Widget Code registration, such that the Widget Code is only a vehicle for displaying on a computer screen the prior registered MMAS-8. The Widget Code registration that I just handed you engenders no rights whatsoever to Dr. Morisky or MMAS in the MMAS questionnaire.  Such that anybody who uses the MMAS questionnaire without the authorization from Dr. Morisky would be in potential violation of copyright law and subject to an infringement action by Dr. Morisky for infringing his registered MMAS questionnaire, even if they obtained that copy through Morisky -- or through the Widget Code, if it was displayed, because all rights to use it in the Widget Code were revoked.

THE COURT:  So, counsel, I remember some of this argument from the prior motion to dismiss that involved the co-defendant here, but here in regards to -- I think you were

about to talk about relatedness --

MR. AUSTIN:  Yes.

THE COURT:  -- in regards to, as the plaintiffs allege, the reaching into the jurisdiction both through the Austin letter and other contact with the Massachusetts-based recipient here, the hospital.  Do you want to talk about that?

MR. AUSTIN:  I will, thank you.  Thank you for bearing with me just to give a little bit of the background information.

THE COURT:  Right.

MR. AUSTIN:  I appreciate that you have a great understanding --

THE COURT:  I wouldn't say a great understanding, but I do have memory of it.  I do have memory of the prior allegations, and I did read the papers here.

MR. AUSTIN:  I do appreciate that.  I just recognize that this is a lengthy history, so I wanted to make sure.

So getting to the relatedness.  The key issue here is the two contacts that are alleged to subject my clients to jurisdiction are, one, my letter, which was drafted during the litigation after the filing of the litigation in Washington in April of 2022, while that litigation was under way.  That letter is attached as an exhibit to the complaint.  I'm sure your Honor has looked at it.  But for a brief summary, that letter simply states the following:

One, it's to the colleagues of Dr. Morisky.  It's not the licensees, it's not to anybody that's identified as somebody who is involved in an activity.  It is to the colleagues of Dr. Morisky.

Dr. Hartz is a colleague of Dr. Morisky.  Dr. Hartz is the Boston Children's Hospital doctor that was responsible for licensing the MMAS widget in this case.

And Dr. Hartz's relationship with Dr. Morisky predates this dispute.  In fact, it predates all of the litigation in this case and goes back to a time before Dr. Morisky divorced himself from or resigned from MMAS LLC.

I think that's an important fact to be aware of as you go forward, because the letter that was -- I wrote, at the direction of my clients, was to counter a barrage of emails and notifications that my clients' colleagues were receiving from Mr. Trubow regarding the state of the litigation in Washington, what was happening and Trubow's allegations that we did not have any rights.

THE COURT:  Yeah, but my memory -- but correct me if this is incorrect -- the Washington litigation basically involves the parties around the divorce, not -- not the licensees, including the hospital.

MR. AUSTIN:  It does not, no.

THE COURT:  Okay.

MR. AUSTIN:  The litigation is -- primarily you're

right.  It's primarily focused on who has the rights.  We are alleging copyright infringement against Mr. Trubow and MMAS. We are alleging breach of contract and related claims.

So the letter clarifies our position in the litigation and seeks to counter what we believe were false representations of the litigation and of the claims in the litigation so that we could correct the bad information that was being given to Dr. Morisky's colleagues with the correct information.

In addition, after also identifying and discussing the nature of the claims and the status of the litigation in Washington, the letter then goes on and says, It is our position -- as I just laid out to the Court -- that Dr. Morisky is the sole and exclusive owner of the MMAS-8, and if you purport to use it, even if it is licensed to you by somebody else, you will be in violation of Dr. Morisky's sole and exclusive rights to that copyright and subject yourself to potential copyright infringement action.

THE COURT:  Right.  So I didn't, counsel, mean to use "cease and desist" in any sort of derogatory way, but that was how I understood the letter.

MR. AUSTIN:  Okay.

The reason I say that, I've written a lot of cease and desist letters but I've rarely written one to dear colleagues.

When that letter was sent out, there was nobody we knew or had identified who was currently infringing amongst the

colleagues.  It was to put them on notice and inform them of the status of this litigation.  That was the point of the letter.

So we don't think of it as a cease and desist letter, that's why I responded the way I did.

THE COURT:  Okay.

MR. AUSTIN:  The other alleged interference, or the other alleged conduct that plaintiffs claim caused us to be subject to jurisdiction, is a much later email communication by MMAR's principal officer, Phillip Morisky, who is managing Dr. Morisky's separate company MMAR.  In fact, Dr. Morisky has withdrawn and I think resigned -- I don't think he even has ownership interest in that company anymore.  He is completely retired and has had nothing to do whatsoever with any of the contacts, which was represented in the declaration we submitted.

The only person who contacted Dr. Hartz after the part -- after Dr. Morisky and MMAS split has been Phillip Morisky on behalf of MMAR.  And in that --

THE COURT:  Right.  But the motion to dismiss is on behalf of both defendants.

MR. AUSTIN:  It is.  It's on behalf of Dr. Morisky because he's literally had no contact whatsoever.  He's not operating the business.  He's not involved at all.  He's retired, living in Las Vegas, and he does nothing with the

company at all.  I do not have any contact with him -- rarely, occasionally do, but at this point he's completely out of this.

And just to be frank as well, it's public record in other cases, Dr. Morisky is suffering from Alzheimer's, so he'd be hard-pressed to remember events that took place yesterday. Although he does have a fair ability to recall things that took place 20 years ago.  It's amazing how the brain works.

So, in any event, he's not involved.  That's why we've said it's absurd to assert jurisdiction over him.  He neither wrote the letter, he didn't send the letter, nor did he send the email.  He's had nothing to do with any of the contacts. And they don't allege an identification of a person who made -- who sent the email.  They have no evidence of that.  They just assume, and they say that in their complaint, that there was a contact coming from Dr. Morisky.  There is no evidence.  It's implausible to suggest that it would come from Dr. Morisky since he's not been with the company.  And at this point, since we have provided a declaration from Phillip Morisky confirming that he is the one that had the email confirmation, I think the burden now is on them to prove that would not be the case, it would be somebody else.

I don't think it matters to plaintiff, and I'll let them speak to that.  I think they are seeking to get jurisdiction over Morisky Medication Adherence Research LLC, but we think there is nothing that would warrant jurisdiction

over an 80-year-old ailing, retired UCLA professor who has nothing to do with any of the allegations in this case.

THE COURT:  Thank you.

MR. AUSTIN:  So now getting to the why we don't think -- there's two bases for why we don't think either of these contacts are sufficient:

The Austin letter, number one.  At best, if you view it as a cease and desist letter, under Red Wing which we've cited, it does not qualify as a contact that can give you jurisdiction.  It's also privileged --

THE COURT:  But isn't -- doesn't it talk about additional contacts, which I assumed is what the plaintiffs were talking about, that it's not just the letter, but also the --

MR. AUSTIN:  -- the email.

THE COURT:  -- the email as well.

MR. AUSTIN:  Right.  So I'm going -- I was going to go through them separately.  I think with regard to the Austin letter, I think you have a hard challenge to try and say the Austin letter has anything to do with this.  The Austin letter was sent out months, if not a year, before the alleged breach took place in 2023.  The Austin letter goes out in '22.

And the Austin letter is privileged.  I mean, it's litigation privilege, correspondence from an attorney during the course of litigation for the purpose of talking about

litigation.  It would fall under any --

THE COURT:  But even though it's going to a third party?

MR. AUSTIN:  Yes, I think the caselaw is quite clear if you look at Sriberg v. Raymond, or even if you look at the Restatement Second on Torts that has been adopted by Massachusetts.  Even if the communication is to third parties, but it is with regard to and involving an active litigation and the third parties have a potential interest in the litigation, it is litigation privileged.

Attorneys all the time will publicly make statements that they're engaged in activities on behalf of a client, and those public statements cannot be used --

THE COURT:  What's your best case for that applying to a third party that's not involved in the litigation?

MR. AUSTIN:  If you give me just one second.

THE COURT:  Sure.

(Pause.)

MR. AUSTIN:  It's a good question.  I wish I had made -- I'm referring to Sriberg v. Raymond, 370 Massachusetts 105, pinpoint cite is 108 to 109, a 1976 case.  That case adopts the Restatement Second.  And my reading of that case indicates that where a communication to a prospective defendant relates -- so that's not what you're looking for, you're looking for third parties.  It's argued it should attach the

subject provision --

THE COURT:  Counsel, if it's in your papers, I can go back and look at it.

MR. AUSTIN:  I don't know that it is -- that particular thing is specifically in my papers because I did not discuss at length the litigation privilege.

THE COURT:  I guess, counsel, I'm -- I'm certainly prepared to be corrected on this.  I wouldn't think that it applies to a third party not involved in the litigation, but -- we can return to whether or not --

MR. AUSTIN:  I appreciate that.

THE COURT:  You can provide caselaw on that.

I think you were talking -- you were talking about the letter, but did you also want to talk about the email?

MR. AUSTIN:  I do.  Both -- and another basis as well.

In my pleading, I do reference that both the letter and the email communications are also privileged under the copyright enforcement privilege, because in both cases they are communications associated with trying to enforce a copyrighted right.  And there's -- if -- I'm referring to of course the Copyright Act, which I cite in my pleading, 17 U.S.C. 106 and 501.  It gives the legal owner an exclusive right to go forth and seek to enforce its copyrights.

The caselaw that then deals, which is Red Wing and others, that deal with if you're seeking to do that and enforce

your copyrights in this case, the underlying contact is an allegation that we reached out to Boston Children's Hospital and threatened them with litigation and that subjects us to jurisdiction.  The email, whether or not it does that, you could interpret it to do that, the email simply said, We know that you are utilizing the MMAS-8, that's what you report, Boston Children's Hospital, in the abstract talking about your study.  We see no license that has been granted to you from MMAR permitting you to use the MMAS-8, reaching out to you to see if we can resolve this issue.

That is enforcement of a copyright, and the result of that was that MMAR granted a free license retroactively to Boston Children's Hospital to use the MMAS-8.  And then of course as a condition of that, they are obligated to represent that they had a license from us, or they have a license from us to use that MMAS-8.

So that contact is privileged, we believe, under the right of a copyright holder to seek to reach out and enforce its copyrights.

In order to lose that privilege, that copyright holder would have to do a lot more than send a single communication followed up by an email in which all of that is percipient to a company that's operating out of Nevada and California at best.

And the same would apply, of course, to the Austin letter.  It also seeks to provide notice of our copyright

interests in order to dissuade people from violating our copyrights, even though at that moment when we're sending it out we have no idea if anybody we're sending it to is in fact violating the copyright.

And so for those both reasons we think that, number one, there's none of the minimum contacts required, there's no -- nothing arises that would subject us to this jurisdiction. We're not purposefully availing ourselves of this jurisdiction. The Austin letter is not sent to Massachusetts. It's not sent to anybody that is immediately aware that they're in Massachusetts.

The Austin letter was sent out as part of a bulk email to the colleagues of a list of contacts that Dr. Morisky provided with no awareness at the time that that email was being sent out as where any of those people currently reside, it's just an email address.

THE COURT: Isn't there something in the record or in the allegations here that as part of the settlement in the divorce between the parties that there was a listing of the various entities and where they were located, including the hospital?

MR. AUSTIN: There's two lists that are part of the CR 2A. One listing is Exhibit 3. Exhibit 3 lists potential infringing parties and grants a limited license to MMAS to go after infringements that are -- that are on those lists. I do

not believe Boston Children's Hospital was on that list.  It's my understanding they were not on that list.

The other list is a list of licensees that had previously signed agreements with MMAS and/or Dr. Morisky.  In the pleading, plaintiff indicates that they're just Widget licensees, but in the actual CR 2A, if you look at it, it identifies these licensees as a list of all the licensees that the company had.  And in almost all cases, Dr. Morisky was also a part of those licenses because the parties used to understand that you needed both Dr. Morisky and MMAS to sign as the licensor since MMAS was the holder of the code but Dr. Morisky was the holder of the MMAS-8.

So in every one of those cases, those licensees are also Dr. Morisky's licensees.  And nothing prohibits him from contacting them, and there's nothing in the CR 2A that prohibited Dr. Morisky from contacting any licensee.

The CR 2A contemplated that all of the business associated with licensing the Morisky Medication Adherence Scales would be transferred to Dr. Morisky and that MMAS, who had ceased doing that business altogether, after a transition period.

THE COURT:  Right.  And I think, counsel -- I mean, some of what you're saying I think goes to the merits, but here where we're talking about relatedness and minimum contacts, isn't it -- as alleged, isn't the plaintiffs' claims arising

out of these -- isn't it arising and related to these contacts?

MR. AUSTIN:  I do not think it is.  There's no -- we're not reaching out to anybody on Exhibit -- we didn't reach out to anybody on Exhibit 3 at all.  And we did not reach out to anybody on Exhibit 2 with an understanding we were reaching out to somebody on Exhibit 2.

Please understand, too, the agreement that was signed with Boston Children's Hospital, I think it's important to understand that agreement was executed originally in 2019.  The alleged breach that we're talking about took place in 2023.  My client has never had any contact with Boston Children's Hospital related to that license, and there is no allegation in the complaint that my client was ever aware of that license or of what it permitted or didn't permit.

As is indicated by Phillip Morisky, when he contacted Boston Children's Hospital, he had no idea that anything he's asking of them, to sign a license with us, was going to bar them from also having a license from the Widget.  It had historically been the case that you could license both.

And so there is no indication that we're going in thinking we're interfering with some existing relationship with some existing contract.  We're simply saying in order to use the MMAS-8, which is registered to Dr. Morisky with a copyright registration, you need a license.  And that -- that is, we believe the kind of cease and desist, if you want to use that

language, that's covered by Red Wing, that is permissible.

Because in that context, you're right, it's a third-party -- the third-party as to litigation in Washington, but not as to this litigation.  And we never needed to assert any claims because it was immediately resolved.  There was no further interaction.

So we just don't think it meets any of the criteria under -- either the long-arm statute or as interpreted by Massachusetts law applying the Second Restatement.  We don't believe that any of the specific jurisdictional facts work here.  There's been no -- the claims do not arise from these interactions.

There's also allegations that Boston Children's Hospital wasn't completely complying with us before there was any communication from Phillip Morisky, before the email.

And we don't that think because of the litigation privilege and the right to enforce your copyrights that purposeful availment can be found here.

And then, finally, as a catch-all, of course don't we think it's reasonable to hail these parties all the way in here when this -- these contacts are so *de minimis* and the parties are already engaged in significant litigation in Washington to resolve the underlying issue of who owns the MMAS copyright.

Thank you, your Honor.

THE COURT:  Thank you.

Counsel, I'll hear opposition.

MR. COLEMAN:  Thank you, your Honor.

That was a very interesting motion to dismiss the complaint or maybe a summary judgment motion argument.  With respect to jurisdiction, however, I don't quite understand it.

The allegations are that on April 21, 2022, Mr. Austin sent a letter which was received by Boston Children's Hospital making it very clear that they would be deemed as infringing a copyright held by his clients if they proceeded with the license between my client and Boston Children's Hospital.  As a result, Boston Children's Hospital breached its contract.

THE COURT:  And so, counsel, I guess the sequence -- maybe you can clarify the sequence of events here.  To the extent -- as I understand it, one of the claims that you have against these defendants is interference, right, interference with that contract?

MR. COLEMAN:  Yes, your Honor.

THE COURT:  So when -- when was -- remind me when the contract was breached?  Meaning, I thought your brother was suggesting that this contact was too far in front of the alleged breach.

MR. COLEMAN:  Well, no, the contract was I believe executed in 2019.

THE COURT:  Okay.

MR. COLEMAN:  It was still in place.

THE COURT:  It was still active.  It was still in place in 2022.

MR. COLEMAN:  Right.

THE COURT:  At the time of this letter.

MR. COLEMAN:  Right.  This was not a matter of prospective economic advantage.  This was an active contract.  This was a license.

That's a pretty much flat-footed direction of activity into the forum.  It meets both Massachusetts law, which is coextensive, to address your Honor's earlier question, coextensive with the due process concerns of the Constitution.

THE COURT:  And do you agree for the long-arm statute that the provision I recited in regards to transacting business would be the most appropriate --

MR. COLEMAN:  I do, your Honor, yes.

I do want to address a few other things.

THE COURT:  Sure.

Can I just back up?

MR. COLEMAN:  Sure.

THE COURT:  There is some caselaw that talks about sort of the letter -- and again, not trying to mischaracterize the letter -- that a cease desist letter by itself might not be sufficient.  What do you say to that in regards to the other allegations?

MR. COLEMAN:  There are a lot of cases like that.

Because, like Mr. Austin, I do a lot of intellectual property work.  And it's very common to send letters that there -- that the sender attorney has concerns about whether the letter could trigger a declaratory judgment claim by the recipient.  And that is in the context which those cases have typically come up.

Sending a cease and desist letter absent any other relationship, absent any other contacts, is often, not always -- I don't know whether it's the majority, I think, frankly, judges tend to look at the totality of the circumstances -- deemed not sufficient to establish jurisdiction both for purposes of personal jurisdiction and for purposes of case in controversy.

Here, however, there are a couple of things.  One of them is that this is in the context of an existing contract.  It's not out of the blue.  That does make a difference.  And moreover, this is not a matter of infringement.  This is a matter -- our claim is not for infringement.  Our claim is for interference with contract.  Our claim is that the letter was a proximate cause for the damage suffered and the damage was the breach of contract.  That is a long distance from getting a letter from across the country that says, If you keep infringing, we're going to sue you.  Now does that amount to personal jurisdiction?

THE COURT:  Counsel, I thought you were also relying

on this other contact, the email?

MR. COLEMAN:  The email, your Honor, we allege was -- certainly the letter was from the corporate defendant, that's not being denied.  We have no information in front of us regarding the knowledge or lack of knowledge of the defendant, Dr. Morisky, himself.  You know, we haven't litigated that issue.

This is a jurisdiction motion, but we do believe that that is -- yes, we rely on that -- we rely on that as well.

We have heard a lot about a litigation privilege, which I have always associated with defamation claims, and I suppose it could be extended in some contexts to a third-party interference claim.  But, first of all, I don't believe we heard about it or read about it in the papers.  It's the first time we're hearing about it.  And I'm not aware of this application in the context of establishing jurisdiction.

We're not, again, saying that the tort is -- for purposes of this motion -- that the tort is premised on the tortious nature of the statement, but, rather, that the statement was made.  Is the fact that there is a reference to litigation a magic bullet that prevents anything else in that communication from being tortious?  I don't think so.  That letter from Mr. Austin had at least two components:  One was to give it the complete benefit of the doubt neutrally and in non-charged fashion to apprise the recipients, including one in

this district, Massachusetts -- I'm sorry, Boston Children's Hospital, to apprise its recipients of pending litigation. And the second one was to threaten them. The threat worked. The threat worked. The contract was breached. That's why we're here.

There are many interesting issues in this case. There are many interesting personalities. There are many regrettable incidents, but none of it goes to jurisdiction.

And we would submit, your Honor, that the idea that the existence of ongoing litigation in Washington could be used to leverage an interference with contract in Massachusetts is a perverse way of understanding the concept of privilege.

On the contrary, we would suggest that as a matter of policy, if the Court were to stretch that concept in a way that counsel suggests, that would be, I think, contrary to public policy.

Also we heard about a copyright privilege, also I think which was not addressed in the papers. I have also never heard of the idea that a -- the use of a copyright claim in correspondence that is -- that has potential in every other respect to constitute an interference with contract, it insulates that -- that correspondence from being interference. I don't think that's the case. I don't think copyright law purports to award that kind of power to a copyright claimant.

And by the way, we're litigating the issue of whether

or not the copyright is what this defendant says it is.  We believe that those are rights that we hold.  The 9th Circuit Court of Appeals in dictum suggested that indeed it is a right that our client holds.  So I don't think that works either.

This is a very straightforward situation.  The presentation here, understandably, was an attempt to cast doubt on the validity of the claims.

We didn't come here prepared to argue the validity of the claims.  We came here to talk about jurisdiction.

This is a classic case of tortious interference with contract, and moreover, with respect to the Gestalt factors, especially given that this litigation is inevitably going to require the involvement of these defendants for discovery and even with respect to the liability of Boston Children's Hospital, what was relied on, what they were told.  There's every reason in the world to maintain their involvement in this case.

THE COURT:  Thank you.

MR. COLEMAN:  Thank you.

THE COURT:  Counsel, brief rebuttal if you want it.

MR. AUSTIN:  Yes, thank you, your Honor.

I'll start kind of reverse.

The copyright issue was clearly laid out in the briefing.  I cite to the statute.  I inform the Court that there's an absolute right for copyright holders to enforce

their copyrights. And that right alone, the exercise of that right alone does not subject them to jurisdiction, otherwise it would have an undue chilling effect on anybody who holds a copyright to seek to put people on notice that you're infringing our copyright.

THE COURT: But any cases in which that's used to defeat personal jurisdiction?

MR. AUSTIN: That's an interesting question. I have not found a case that goes specifically to that nexus aside from saying that the underlying contact cannot give rise to the claim. So, therefore, you can't use it as a contact that is purposeful availment of the jurisdiction. That's the analysis. It's a logical analysis based on -- for the same reason litigation privilege. If I am privileged to send out that letter to inform others as to the status of this case, then that letter cannot form the basis for jurisdiction in every jurisdiction it was sent.

I think it's important, there's no allegation in the complaint that that letter was sent just to Dr. Hartz. He was part of many who it was sent to. As I understand, a mass email was sent out to all of the colleagues to give them a heads-up of what's going on --

THE COURT: I understand that. But I guess here where I just -- I just have to decide personal jurisdiction as to this case --

MR. AUSTIN:  I appreciate that.  And I think in looking at it, that's the first issue, is that I don't see -- I think -- may go more if you want to the Gestalt factors, to the reasonableness, to hail somebody into court for sending out a letter years prior to the alleged breach.

THE COURT:  But the breach -- yeah, but the breach is -- the breach claim is only between the hospital and the plaintiff.  It's the interference claim that's against your client, so that's why I think there's a different frame for it.  But I understand the argument.

MR. AUSTIN:  I see what you're saying, but I also think there has to be a plausibility process here as part of reasonableness.

If you're starting a contract that dates back to 2019, my client's not involved, has no awareness of that contract.  The mere fact that there is a settlement agreement that lists all the licensees that the two parties have had is not an indication that any of those licensees are currently in contract with anybody.  It's just a listing of all the licensees that they've ever had.

THE COURT:  Right.  I guess what I'm trying to say is that that may prove to be right as to the merits, but in terms of personal jurisdiction, it's sort of a slightly different thing.

MR. AUSTIN:  It is, except that in order to give rise

to the claim, there has to be a reasonable intent on the part of the defendant that defendant is going to interfere with an existing contract, that defendant has to, therefore, be aware of it.  And that's my point here, is there's -- that letter was not sent out -- on its face, it's not sent out with any intent to cause any contract to be breached.  It's information in a notice.  That's what it is on its face.  And it's given generically, it's not specifically identifying any particular party.

To say that that can subject somebody to jurisdiction would be the same as saying I posted it on the website, somebody saw it and because they saw it on my website they are, therefore -- they were chilled and they decided to breach their contract.  And when I posted it on my website, I had no idea who they were or that they were in a contract with somebody. I'm just saying, look, I have these rights, beware, don't infringe them to anyone out there that may be -- that may be of interest in this.

I don't see the distinction between that conduct and what was done here.  The sending out of a generic letter making that announcement -- that letter, by the way, was also posted on the website by my clients for the same purpose, generally providing information in case they didn't have every email or the emails had changed for some colleagues that Dr. Morisky had obtained over the 40 years that he had been involved in this.

So I just I don't think it can qualify -- whether or not Boston Children's Hospital took it to mean we better stop doing this, that's not a causation. The letter is not causing that. It's just providing information. That they then decide to go a different route with it, that's a decision they can make. We don't know what their contract is. In order for us to purposefully avail ourselves of the jurisdiction or to have this claim arise out of our conduct, we have to be the causative fact, and we're not, not for that letter.

THE COURT: Thank you.

Thank you, counsel.

MR. AUSTIN: Thank you.

THE COURT: Counsel, I appreciate the arguments on either side. I want to give it some more thought.

I don't think -- and, counsel, again, your memories may be better than mine in terms of what was in the papers, but I don't recall a focus on the litigation privilege or the copyright privilege.

To the extent that the Morisky defendants want to point my attention to any cases that deal with application of those privileges as to third parties and for the purposes of personal jurisdiction, you can file a supplement with those case cites within five days, which would be by the 28th. And then plaintiff can respond to it, otherwise I'll base it on what's before me.

Counsel, I do want to give it some further thought. I'll wait the -- I'll wait the five days to see if anything is filed and then, if there is, I'll wait to see if there's any response. The response will also be limited to no more than five pages, but, otherwise, I'll go back to the papers and we'll go from there.

Thank you.

MR. AUSTIN:  Thank you so much, your Honor.

THE CLERK:  All rise.

(Court adjourned at 2:51 p.m.)

- - - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Debra M. Kane                    March 9, 2026
Debra M. Kane                       Date
Court Reporter