++UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MMAS RESEARCH, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION, et al.,<br><br>Defendants | Civ. A. No. 1:24-cv-12108-DJC |

**MEMORANDUM IN SUPPORT OF THE CHILDREN'S HOSPITAL CORPORATION'S
MOTION FOR SUMMARY JUDGMENT**

PRELIMINARY STATEMENT

From the beginning of this case, the Hospital has argued that even if MMAS Research could prove a breach of contract, it could never prove any damages, given the nature of the alleged breaches. Docket No. 26 at 23-24). The time for MMAS Research to show its cards has come. It has taken no discovery. It has produced no documents relevant to damages. Its 30(b)(6) designee acknowledged that it is unable to quantify its damages without more discovery. (Statement of Undisputed Material Facts ¶ 16). And in any event, as this memorandum shows, no damages to MMAS Research could flow from the breaches of contract it alleges. MMAS Research cannot identify even one customer or business opportunity it lost because of anything the Hospital did. It cannot identify even one person who read the online study description that it claims caused its business to fail. MMAS Research may have *pleaded* a damages theory sufficiently (Docket No. 64 at 9-11), but it can produce no evidence that anything the Hospital is accused of doing injured, or even could have injured, MMAS Research. Because there is no

1

evidence of damages or causation, the Hospital is entitled to judgment as a matter of law. No reasonable jury could find damages on this record.

FACTS

Dr. Jacob Hartz is a young pediatric cardiologist at Boston Children's Hospital. (SUMF ¶ 1). He was studying ways of improving the adherence of adolescents taking anti-cholesterol drugs to their medication schedule. (SUMF ¶ 2). He decided to use an eight-question scale called the Morisky Medication Adherence Scale, or MMAS, both to decide which patients were eligible to take part in his study and to measure the effectiveness of the interventions he was studying once the study got underway. (SUMF ¶ 3). He signed a license agreement on the Hospital's behalf with MMAS Research LLC, which claimed to own the copyright for the assessment. (SUMF ¶ 4) The Hospital paid a $5,000 fee. (SUMF ¶ 4).

The original version of the MMAS was called the MMAS-4. It is not relevant here. The assessment's creator, Dr. Donald Morisky, later created the MMAS-8, an eight-question assessment that MMAS Research calls the "traditional" MMAS-8. (SUMF ¶ 5). It had seven yes/no questions, such as "Do you sometimes forget to take your <health condition> pills?" (Docket No. 24 ¶ 57. The traditional MMAS-8 also had an eighth question (hence its name) that asked: "How often do you have difficulty remembering to take all your medications?" and had five possible answers, from "Never/Rarely" to "All the time," each with its own score, from 4 to 0. (*Id.*).

The main idea behind the MMAS-8 is that patients want to answer "yes" to questions their doctors ask them. So they may tend to answer yes if asked, "are you taking your medicine every day?" whether or not the answer is true. For six of the first seven questions, the MMAS-8 reverses that, so that a "no" answer indicates the patient is taking the medicine as scheduled.

2

Scoring the MMAS-8 simply meant adding up the number of answers indicating that a patient was taking his or her medicine as prescribed, and adding the score for the last question. (Hartz Dec ¶ 16).

A third version of the MMAS is called the "Morisky Widget." The Widget is software, hosted in the cloud, that a user can use as a text editor to create customized versions of the assessment and to score the assessment. (SUMF ¶ 7). Its source code includes the text of the MMAS-4 as well as the traditional MMAS-8, which a user can use as the base for his or her own customized questions. In addition to providing a single numerical score based on a patient's answers, it also could provide two sub-scores. (Docket No. 24 at ¶¶ 63, 64, 66). The first tallied the number of answers to a subset of the questions meant to measure whether the patient was *intentionally* not taking his or her medicine as prescribed. (*Id.*). The second tallied the number of answers to a subset of the questions meant to measure whether the patient was *unintentionally* not taking his or her medicine as prescribed. (*Id.*). The Widget also had the final multiple-choice question. Docket No. 24 at ¶ 63).

The license agreement had three potentially relevant provisions. First, it required the Hospital and its staff to use the Widget rather than the traditional MMAS-8:

> BCH can use the Morisky Widget … to administer Morisky Widget MMAS tests. With Licensor approval, BCH can use MMAS paper or electronic questionnaires but all scoring and coding must be done in the Morisky Widget.

(Docket No. 24-1 at Ex. 8). Second, it required the Hospital to include specified attribution language in certain publications:

> The MMAS required citations and licensing statement provided in Appendix 1 must be included in all manuscripts, web postings or other publication containing Morisky Widget MMAS descriptions or results.

3

(Docket No. 24-1 at Ex. 8). Third, the contract had the following termination provision, which MMAS Research has claimed is relevant but which the Hospital believes has no relevance:[1]

> In case of scientific, administrative or intellectual property misconduct in using the Morisky Widget, MMAS reserves the right to withdraw permission for us [sic] and to pursue all legal remedies.

(Docket No. 24-1 at Ex. 8).

After Dr. Hartz and his team used the Widget, under Mr. Trubow's supervision at a "training" session held in Boston, to customize the version of the questions to be used in their study, they created a paper document that listed the questions. (SUMF ¶ 9). The paper version also contained some "notes to self," namely, instructions to the people administering the assessment for the purpose of screening adolescents for participation in the study. (SUMF ¶ 9). First, in the column for recording the answers, it put the answer indicating nonadherence in boldface text, to help the scorer add up the score correctly. (Docket No. 24-1 at Ex. 24). Second, at the bottom, it had instructions for scoring: "How many answers did they give that are in **BOLD UPPERCASE? ___ (> 2 → ELIGIBLE)**." (*Id.*). Dr. Hartz's version assigned a score of 1 to all answers to the first seven questions indicating nonadherence, and a score of 0 to all answers indicating adherence. (SUMF ¶ 10, Docket No. 24-1 at Ex. 24). Dr. Hartz's version of the final question did not assign different scores to each of the five answers: it assigned a score of 1 to the answer in bold (for adolescents who had difficulty remembering to take their medication **"ALL THE TIME"**), and a score of 0 to all other answers. (Docket No. 24-1 at Ex. 24).

---

[1] It is not relevant because it is a termination clause that gives MMAS Research the power to terminate in certain circumstances. It is not a promise by the Hospital to do or not to do anything. The Hospital will address this clause in more detail in is opposition to MMAS Research's motion for summary judgment.

5165992_1

Dr. Hartz and his team created a second document that contained only the questions, not the scoring criterion or the note on how to score the assessment. (SUMF ¶ 9). The questions were of course disclosed at least orally to all prospective study participants, and some may have seen the second document. (SUMF ¶ 9). But the first document, and the instructions and scoring criterion it contained, were never disclosed to anyone. (SUMF ¶¶ 9, 11).

The criterion ("">2 → ELIGIBLE"") was created by Dr. Hartz for purposes of the study. (SUMF ¶ 10). It indicated that Dr. Hartz wanted to enroll adolescents whose answers to two of the questions indicated that they were not adhering to their medication schedules. (*Id.*).

Dr. Hartz and his staff administered the test using the paper form at least nine times. (SUMF ¶ 11). Due to COVID, the study had trouble enrolling participants—it enrolled only nine—and it never proceeded beyond the enrollment phase. (SUMF ¶ 12).

Dr. Hartz also published a description of the study on clinicaltrials.gov, an ""online database of clinical research studies and information about their results."" (SUMF ¶ 13). The clinicaltrials.gov website has information about nearly 600,000 clinical studies today, and had between 325,000 and 360,000 clinical studies in mid-2020, when Dr. Hartz first published the study description. *See* National Library of Medicine, *Trends and Charts on Registered Studies,* https://clinicaltrials.gov/about-site/trends-charts (visited on Jul. 6, 2026).[2]

The Hartz study description mentioned the MMAS several times. The first version, dated July 1, 2020, did not give any credit or attribution to the MMAS. (Makson Dec., Ex. 2) The fifth version, dated July 7, 2022, credited MMAS Research LLC but did not contain the text from Appendix 1 of the license agreement. (Makson Dec. Ex. 3) The sixth version, dated January 10,

---

[2] The Court can take judicial notice of these figures. Fed. R. Evid. 201(b); *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 732 (""It is well established that records, reports, and other documents on file with administrative agencies … are judicially noticeable."").

5165992_1

2023, gave the following credit: "MMAS-8 with permission from Dr Donald Morisky as written below." (Makson Dec. Ex. 4) It also noted: "The MMAS-8 Scale, content, name, and trademarks are protected by US copyright and trademark laws. Permission for use of the scale and its coding is required. A license agreement is available from MMAR, LLC." *Id.*

The study description also explained that the scientists would use the "Morisky Medication Adherence Scale (MMAS)" to determine an adolescent's "baseline adherence level;" that they will use it again after 60 days, and again 60 days after the end of the incentives provided in the study for adherence; that the MMAS was "validated;" and that an MMAS score "cannot be converted to the proportion of pills taken." *Id.* That is all it says about the MMAS. *Id.* It does not mention the Widget, nor does it describe the Widget or the MMAS or mention any of the things that distinguish the Widget from the traditional MMAS-8 (e.g., intentional versus unintentional nonadherence sub-scores; the use of software to edit and score the test). *Id.*

There is no evidence that anyone, other than Mr. Trubow himself, or people working for him, ever read the study description on clinicaltrials.gov. (SUMF ¶ 14). Mr. Trubow, MMAS Research's 30(b)(6) designee, testified that he has "correspondence from [his] licensees that were shocked when they read" the clinicaltrials.gov study description, but that he "never provided those documents to [his] counsel." (Ex. 1 at 105:6-22). He failed or refused to identify anyone who had read the study description. (SUMF ¶ 14)

There is no evidence that the Hospital's use, or as MMAS Research claims, misuse of the MMAS harmed any of the adolescents to whom the Hospital administered the questionnaire. (SUMF ¶ 15)

6

MMAS Research produced no documents relating to damages in discovery,[3] despite its counsel's representation to the Court, at a conference to discuss the possibility of a motion for sanctions on account of its discovery failures, that it had produced all the documents that related to its damages claim.

> THE COURT: … So I'll hear from the hospital defendants on what they are—what there position is relative to any outstanding discovery.
>
> MR. FOLKMAN: Sure. Thank you, your Honor. There's a lot of outstanding discovery. What I actually think I need in order to take the deposition … I do need documents, if there are any, that relate to the damages that the plaintiff says flow from the breach of contract. … If I get either the documents themselves or a statement from counsel that says either we have produced all the documents that relate to damages from the breach of contract or that there are none, that would be enough for me to take that deposition. …
>
> THE COURT: Okay. So just to—on that—on that point, so, I mean, it's plaintiff's case. If they're not producing documents on damages, perhaps—
>
> MR. FOLKMAN: I don't disagree with you, but they haven't said that. …
>
> THE COURT: Well, what I read them to be saying there … is that they have produced some documents on damages. So, Miss Ray, is that all you have on damages? And can you—are you prepared to put that in writing for Mr. Folkman?
>
> MS. RAY: Yes.
>
> THE COURT: That's all you have on damages?
>
> MS. RAY: Yes.
>
> THE COURT: So that represents the totality of the damages in the case?
>
> MS. RAY: Yes, it does.

(Docket No. 136 at 7:6-8:22).

---

[3] Its production was scanty on all issues. It did produce the source code for the Widget, and a draft of instructions for use of an API that allows the integration of the widget with other software applications. But aside from that, it only produced 17 PDFs. Seven were email threads with the Hospital. One was the $5,000 invoice for the payment of the licensing fee. One was an unsigned copy of the contract with the Hospital. Five related to the assignment and registration of the copyright for the Widget. Two related to the settlement of some litigation between Dr. Morisky and Mr. Trubow. The last was a declaration that Dr. Morisky's son, Phillip Morisky, submitted in another lawsuit in June 2025.

5165992_1

MMAS Research produced no financial statements or financial documents of any kind, no documents relating to any lost revenue or lost opportunities, and no documents relating to anyone's reaction to, or even awareness of, anything the Hospital had published on the clinicaltrials.gov website about the MMAS. (SUMF ¶ 16).

Mr. Trubow testified that the company's licensing revenue was $651,000 in 2021, "maybe $400,000" in 2022, and declined to zero by 2025. (Ex. 1 at 123:2-23, 125:16-21; (Docket No. 24-1 at Ex. 4). The figures for 2021 and 2022 are overstated by an unknown amount, even on Mr. Trubow's version of the facts: he testified that the figures he gave were the licensing revenue *both* for MMAS Research LLC *and* for Dr. Morisky, who by that time had been adverse to the company and engaged in litigation against it. (SUMF ¶ 17). In any event, apparently MMAS Research attributes that entire loss of revenue to the Hospital's publication of the study description, and also to Dr. Hartz's publication of an article in 2025 that he claims was defamatory. (SUMF ¶ 18) The Court, however, denied MMAS Research's motion for leave to add claims relating to the 2025 article to this lawsuit. (Docket No. 130 at 14-18).

ARGUMENT

**A. Standard of decision.**

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas de P.R. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011) (citation and internal quotation marks omitted). A fact is "material" if "its existence or nonexistence has the potential to change the outcome of the suit." *Id.* The Court must view the record in the light most favorable to the non-moving party and resolve all reasonable inferences in its favor. *See Ameen v. Amphenol Printed Circuits, Inc.,* 777 F.3d 63, 68 (1st Cir. 2015). But

8

the non-moving party cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation" to try to defeat the motion. *Cherkaoui v. City of Quincy,* 877 F.3d 14, 18 (1st Cir. 2017) (citation and internal quotation marks omitted). It must instead point to "competent evidence" and "specific facts." *Tropigas,* 637 F.3d at 56.

**B.  Nothing the Hospital did injured MMAS Research.**

Damage resulting from the breach is an element of a claim for breach of contract. *Bose Corp. v. Ejaz,* 732 F.3d 17, 21 (1st Cir. 2013). That means that a plaintiff facing a summary judgment motion cannot simply say, "you breached the contract and we will prove damages at trial." The plaintiff must offer some evidence that it was injured. *See Hasseltine House, LLC v. Jewish Fam. & Children's Servs., Inc.,* 106 Mass. App. Ct. 30, 36-37 (2025). And the damages must *result from* the breach. *See Brooks v. AIG Sunamerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007). It is not enough to say that a defendant breached the contract and the plaintiff's revenue decreased. The plaintiff has to prove that it suffered harm *because of* the breach. *Id*. It is worth illustrating the weakness of MMAS Research's damages case by pointing to its treatment of damages in its own motion for summary judgment.[4] MMAS Research made it clear it was not seeking summary judgment on the *amount* of the damages, but it understood that it at least had to show that it had incurred *some* damages to win summary judgment on liability. So it asserted, as an undisputed fact, that "Plaintiff has sustained reputational and business injury flowing from BCH's conduct." (Docket No. 142-2 at 5). In support, it cited paragraph 18 of Mr. Trubow's declaration, which says: "As a result of BCH's conduct described above, MMAS Research has sustained reputational and business injury." (Docket No. 142-1 at 8). The empty recital of an

---

[4] MMAS Research filed its own summary judgment motion first, contrary to the requirements of Judge Hedges's standing order on motion practice. The Hospital understands that MMAS Research does not agree that summary judgment motions have been referred to Judge Hedges for a report and recommendation.

9

element of a claim, at the summary judgment stage, is not evidence; it is precisely the kind of conclusory statement that courts say is insufficient. *See Clarendon Nat'l Ins. Co. v. Phila. Indem. Ins. Co.,* 954 F.3d 397, 404 (1st Cir. 2020) (at summary judgment, a party "cannot rely on conclusory allegations").

MMAS Research points to five supposed breaches of contract (Ex. 1 at 63:8-15; Makson Dec. Ex. 5, Ans. To Int. 1).[5] In summary:

1.  The Hospital administered the MMAS either using a paper document or "from memory," rather than using the Widget.

2.  The Hospital did not include the attribution language the contract required in the clinicaltrials.gov study description.

3.  The Hospital did include language in the clinicaltrials.gov study description improperly attributing the Widget to Dr. Morisky's entity, MMAR, LLC.

4.  The paper document the Hospital created contained scoring and coding criteria that MMAS Research did not certify or approve of.

5.  The study published on clinicaltrials.gov included the unapproved coding and scoring criteria.

No harm could possibly have flowed from any of these, or from all of them taken together. No reasonable jury could find that MMAS Research suffered any injury caused by the Hospital.

---

[5] In his 30(b)(6) testimony, Mr. Trubow also testified that the Hospital had included an improper attribution statement in an article Dr. Hartz published in 2025, after the First Amended Complaint was filed. We discuss that point below.

5165992_1

**1. MMAS Research could not have been harmed by the way the Hospital administered the test.**

Dr. Hartz scored the assessments he and his team administered just by doing simple arithmetic. That is precisely what the Widget does when a user scores an assessment using the software. (Ex. 1 at 52:11-23). It is of course possible that Dr. Hartz or his staff made a mistake a computer would never make and failed to add up the numbers correctly and therefore excluded someone from participating in his study who met Dr. Hartz's criterion, or allowed someone to participate who did not meet it. But what is that to MMAS Research LLC? Any such mistake would affect only the study participant (there is no evidence any study participant was affected). It would not injure MMAS Research.

Dr. Hartz scored the answer to the multiple-choice question at the end of the assessment differently than the widget would have scored it. And Dr. Hartz made no use of the "intentional" and "unintentional" sub-scores. Maybe that was bad science, maybe not. But again, Dr. Hartz's decision to use the MMAS to arrive at a single score, for purposes of deciding who was or was not eligible for his study, has nothing to do with MMAS Research. The company cannot show that it was injured by Dr. Hartz's scientific choices, especially without any evidence that anyone knew or cared what Dr. Hartz had done.

Mr. Trubow testified vaguely about harm to MMAS Research's reputation with companies such as Novartis Italy. (Ex. 1 at 99:6-100:4). But he offered no admissible evidence of what Novartis or anyone else believed, and no evidence that any reputational harm led to any lost business. Nor could he. There is no evidence that how the Hospital administered the MMAS was disclosed to anybody. The only disclosure was the study description on the clinicaltrials.gov website, which says nothing about the paper form or any of the other conduct complained of by MMAS Research.

11

**2. There is no evidence that anyone read the clinicaltrials.gov study description or the 2025 article, so MMAS Research cannot prove that anything they contained caused it harm.**

Without any evidence that anyone read the study description Dr. Hartz posted, MMAS Research cannot prove that what the study description says caused it to suffer damages. Even if, contrary to the evidence, MMAS Research could identify anyone who read it, Mr. Trubow admitted that he could not identify anyone who would have done business with MMAS Research but for the study description. (Ex. 1 at 185:19-186:24).

Dr. Hartz and several co-authors published an article in 2025 that mentioned the MMAS and contained language about the ownership of the MMAS intellectual property that is objectionable to MMAS Research. MMAS Research sought leave to amend its complaint to add claims concerning the article, and the Court denied the motion. The Hospital's view is that the 2025 article forms no part of the basis of this lawsuit. Mr. Trubow, in his 30(b)(6) testimony, affirmatively distinguished the 2025 article from the First Amended Complaint. (Ex. 1 at 102:21-103:6). Regardless, at the 30(b)(6) deposition, Mr. Trubow said he was not prepared to identify anyone who had read the article. He added that "two or three dozen" people had discussed it with him (Ex. 1 at 166:18-23), including people from the Department of Defense and the Department of Justice, the counsel for the House Judiciary Committee, and someone from Novo Nordisk (Ex. 1 at 166:24 – 168:4). But he positively refused to identify any of them. (Ex. 1 at 168:9 – 169:8). And MMAS Research's initial disclosures identified no one from Novo Nordisk, the US government, or anywhere else who could testify that they had read the 2025 article and made any decisions about doing business with MMAS Research because of it. (Docket No. 102-1).

**3. An injury is not caused by a breach just because it followed the breach in time.**

Mr. Trubow admitted that MMAS Research's damages case is based on his assumption that one event caused another just because it preceded it in time.

5165992_1

Q. How is it that you're able to estimate the amount of the damages if you aren't able to provide any specifics about lost licensees or customers?

A. Only because I had general revenue in '21 and '22, were up there. And then it fell off in—and when you put this up in 2023, it falls off.

(Ex. 1 at 187:13-20).  But that kind of reasoning is a fallacy. Proof that one event followed another is not proof that the first event caused the second event. [6] *See, e.g., Railway Exp. Agc'y, Inc. v. Finn,* 124 F.2d 892, 894 (1st Cir. 1942) (explaining fallacy).

### 4.    The problem is not just quantifying damages, it is that no damages exist.

A plaintiff need not prove its damages with "mathematical accuracy." *Rombola v. Cosindas,* 351 Mass. 382, 385 (1966). But that just means a plaintiff can proceed in the face of uncertainty about the *amount* of a loss, not a failure of proof that a loss occurred at all. *See Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562 (1931) ("[T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount"). MMAS Research cannot clear that basic hurdle.

MMAS Research points to "the fair market value of lost licensing opportunities and the diminished value of [it]s intellectual property" as the first item of its damages. (Makson Dec. Ex. 5 (Ans. to Int. 3)). At the 30(b)(6) deposition, Mr. Trubow claimed that "when [the Hospital] put

---

[6] One could point to several other things going on in MMAS Research's business that could well have caused its supposed loss. First are the several lawsuits MMAS Research brought against institutions, alleging that other institutions allegedly misattributed the Widget, presumably injuring the company. Second are the published warnings from universities, scientists, and others against using the MMAS, on account of Dr. Morisky and Mr. Trubow's litigiousness Makson Dec. Exs. 7-10. Dr. Hartz points out that he would never have signed the license agreement if he had known then what he knows now. Hartz Dec. ¶ 5. But this is a summary judgment motion, and so we focus on the absence of any evidence of causation rather than alternate but highly plausible explanations for MMAS Research's poor business results.

13

that stuff on clinicaltrials.gov, we [had] a general loss of revenue from medical institutions and pharmaceutical researchers who otherwise would have bought authorized licenses." (Ex. 1 at 186:1-7). But he refused to "go into any specifics," asserting that "we're still investigating it," and he admitted he had no specifics to give. (Ex. 1 at 186:10-19). The revenue figures he did provide were estimates, and they commingled MMAS Research's licensing revenue with Dr. Morisky's personal revenue — even though Dr. Morisky was by then adverse to the company and litigating against it. (SUMF ¶ 17). Testimony like this cannot stave off summary judgment. *See Young v. Wells Fargo Bank, N.A.,* 828 F.3d 26, 32-33 (1st Cir. 2016) (plaintiff's "vague and conclusory" assertions of damages could not withstand summary judgment).

MMAS Research also points to diminished "brand equity." (Makson Dec. Ex. 6, Ans. to Int. 10). Asked to explain, Mr. Trubow could say only that his reputation had suffered among people who read the clinicaltrials.gov study description, and that institutions that read it were inspired to "do the same thing" the Hospital had done. (Ex. 1 at 212:16-25). But again, there is no evidence that anyone read the study description.

This, then, is not a case in which damages exist but resist precise calculation before trial. There is no lost customer, no lost license, and no lost sale. There is nothing but a drop in revenue that Mr. Trubow attributes to the Hospital just because it happened after the alleged breaches. No reasonable jury could find any damages on this evidence.

CONCLUSION

There is no evidence that anything the Hospital or Dr. Hartz did or did not do harmed MMAS Research in any way. The Court should grant this motion and enter judgment for the Hospital.

14

Respectfully submitted,

THE CHILDREN'S HOSPITAL CORPORATION

By its attorneys:

*/s/ Theodore J. Folkman*

Theodore J. Folkman (BBO No. 647642)
Taylor M. Makson (BBO No. 697476)
Elizabeth L. Gardon (BBO No. 711867)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
tmakson@rubinrudman.com
egardon@rubinrudman.com

Dated: July 10, 2026

15

5165992_1