UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MMAS RESEARCH, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION, et al.,<br><br>Defendants | Civ. A. No. 1:24-cv-12108-DJC |

## <u>STATEMENT OF MATERIAL FACTS</u>

The movant, The Children's Hospital Corporation, states that the following facts are material and undisputed.

1. Dr. Jacob Hartz is a pediatric cardiologist at Boston Children's Hospital. Declaration to Dr. Jacob Hartz, Hartz Dec. ¶ 1.

2. Dr. Hartz was the principal investigator on a study sponsored by BCH, "The Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence to Statins in Adolescents with Familiar Hypocholesterolemia." (Later, the title was changed to add the words "and hypertension" at the end). He was studying ways of improving the adherence of adolescents taking anti-cholesterol drugs to their medication schedule. Hartz Dec. ¶ 2.

3. In his study, Dr. Hartz used an eight-question scale called the Morisky Medication Adherence Scale, or MMAS, both to decide which patients were eligible to take part in the study and to measure the effectiveness of the interventions he was studying. Hartz Dec. ¶ 3.

1

4. Dr. Hartz signed a license agreement on the Hospital's behalf with MMAS Research LLC, which claimed to own the copyright for the MMAS assessment. The Hospital paid $5,000. Hartz Dec. ¶ 5; Docket No. 24-1 at Ex 8.

5. Dr. Donald Morisky created the "traditional" MMAS-8, an eight-question assessment. Docket No. 24 ¶ 49; Docket No. 24-1 at Ex. 21.

6. Scoring the MMAS-8 requires adding up the number of answers indicating that a patient was taking his or her medicine as prescribed, and adding the score for the last question. Hartz Dec. ¶ 16.

7. The "Morisky Widget" is a third version of the MMAS. The Widget is software, hosted in the cloud, that a user can use as a text editor to create customized versions of the assessment and to score the assessment. Deposition Transcript of Steven Trubow attached as Ex. 1: Tr. 39:18 – 40:2.

8. The Widget provides a single numerical score based on a patient's answers as well as two sub-scores. The first tallied the number of answers to a subset of the questions meant to measure whether the patient was *intentionally* not taking his or her medicine as prescribed. The second tallied the number of answers to a subset of the questions meant to measure whether the patient was *unintentionally* not taking his or her medicine as prescribed. The Widget also had the final multiple-choice question. Docket No. 24 ¶¶ 63, 64, 66.

9. After Mr. Trubow traveled to Boston to "train" Dr. Hartz and a staff member, Dr. Hartz and his team created an internal document that listed the questions from the Widget. Hartz Dec. ¶¶ 7-8; Docket No. 24-1 at Ex. 24. The internal document also contained some "notes to self," namely, instructions to the people administering the assessment for the

purpose of screening adolescents for participation in the study. Dr. Hartz and his team also created a separate document which only contained the questions, to present to potential participants. Hartz Dec. ¶ 11.

10. Dr. Hartz scored each answer indicating non-adherence as a "1." Even though the final question had five possible answers, Dr. Hartz assigned a score of "1" to the bolded answer and 0 for all other answers. Dr. Hartz determined the criteria that an adolescent who had two or more responses for medication nonadherence eligible for the study. Hartz Dec. ¶¶ 10, 16; Docket No. 24-1 at Ex. 24.

11. Dr. Hartz and his staff administered the test using the paper form at least nine times. The questions from the paper form may have been shown to some adolescents, but the scoring and instructions were not disclosed. Hartz Dec. ¶¶ 11, 14.

12. Due to COVID, the study did not enroll enough participants for the study to proceed; it enrolled only nine. The study never proceeded beyond the enrollment phase. Hartz Dec. ¶ 13.

13. Dr. Hartz published a description of the study on clinicaltrials.gov, an "online database of clinical research studies and information about their results." Declaration of Taylor M. Makson ("Makson Dec") Ex. 1; Docket No. 24-1 at Ex. 12; Hartz Dec. ¶ 12.

14. There is no evidence that anyone, other than Mr. Trubow himself or people working for him, ever read the study description on clinicaltrials.gov. Ex. 1: 103:10 – 104:23.

15. There is no evidence that the Hospital's use, or as MMAS Research claims, misuse of the MMAS harmed any of the adolescents to whom the Hospital administered the questionnaire. Ex. 1: 94:3-6.

16. MMAS Research produced no documents relating to damages in discovery, despite its counsel's representation to the Court, at a conference to discuss the possibility of a motion for sanctions on account of its discovery failures, that it had produced all the documents that related to its damages claim. Docket No. 136 at 7:6-8:22. MMAS Research acknowledged that it cannot quantify its damages without more discovery. Ex. 1: 98:15 – 99:2.

17. Mr. Trubow and Dr. Morisky, and their entities, were engaged in litigation against each other by at least July 2019. Docket No. 24-1 at Ex. 4, p. 1.

18. MMAS Research attributes the entire loss of revenue to the Hospital's publication of the study description, and also to Dr. Hartz's publication of an article in 2025 that he claims was defamatory. Ex. 1: 123:18 – 23.

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION

By its attorneys,

*/s/Theodore J. Folkman*

Theodore J. Folkman (BBO No. 647642)
Taylor M. Makson (BBO No. 697476)
Elizabeth L. Gardon (BBO No. 711867)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
tmakson@rubinrudman.com
egardon@rubinrudman.com

Dated: July 10, 2026

4