Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


MMAS RESEARCH, LLC,

    Plaintiff,             Civ. A. No.

vs.                    1:24-cv-12108-DJC

THE CHILDREN'S HOSPITAL

CORPORATION, et al.,

    Defendants.

_____/



REMOTE VIDEOCONFERENCE DEPOSITION OF

STEVEN TRUBOW

June 22, 2026 at 6:00 a.m.






Reported by:

Anne E. Vosburgh, Certified Shorthand Reporter #10804 and

#6804, Registered Professional Reporter, Certified

Realtime Reporter, Certified Court Reporter #25001522

Job No. 1543345



Page 2

-oOo-

On June 22, 2026, commencing at approximately 6:00 a.m., the remote videoconference deposition of STEVEN TRUBOW was held before and stenographically reported by Anne E. Vosburgh, Certified Shorthand Reporter No. 6804, Registered Professional Reporter, Certified Realtime Reporter, Certified Court Reporter No. 25001522, Notary Public, LiveNote Reporter, and Closed Captioner.

All attorneys participating in this deposition acknowledge and agree not to object to the use of this transcript on the basis that the reporter is not physically present in the deposition room and will be reporting remotely, and that in lieu of an official oath administered in person, by swearing remotely, the Witness verbally declares their testimony in this matter to be truthful under penalty of perjury.

Page 4

INDEX

---------- EXAMINATIONS ----------

WITNESS: STEVEN TRUBOW

Examination by Mr. Folkman            11

---- REQUESTS FOR DOCUMENTS/INFORMATION ---
PAGE   LINE
Production request made by Counsel      41    22

Page 3

REMOTE APPEARANCES:

APPEARING FOR PLAINTIFF, MMAS RESEARCH LLC
    PATRICIA RAY LAW OFFICES
    5 Old Mill Road
    Freeport, Pennsylvania 16229
    (215) 908-6810
    BY: PATRICIA L. RAY, ESQ.
        raypatricia@yahoo.com

APPEARING FOR DEFENDANT, THE CHILDREN'S
HOSPITAL CORPORATION:
    RUBIN RUDMAN LLP
    53 State Street, 15th Floor
    Boston, Massachusetts 02109
    (617) 330-7000
    BY: THEODORE J. FOLKMAN, ESQ.
        tfolkman@rubinrudman.com
    BY: ELIZABETH L. GARDON, ESQ.
        egardon@rubinrudman.com

ALSO PRESENT:
    Miguel Banuelos, Videographer

Page 5

---------- MARKED EXHIBITS ----------

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition of MMAS Research | 13 |
| Exhibit 2 | Source code document, 1 page | 28 |
| Exhibit 3 | Source code document, 24 pages | 34 |
| Exhibit 4 | Graphical User Interface, 1 page (previously marked Exhibit 27) | 36 |
| Exhibit 5 | Source code document, 10 pages | 45 |
| Exhibit 6 | Plaintiff's Responses to Defendant's First Set of Interrogatories | 56 |
| Exhibit 7 | Document titled "Morisky Widget MMAS Retroactive and Perpetual License," 5 pages | 66 |
| Exhibit 8 | Email thread, 7 pages (previously marked Exhibit 20) | 69 |
| Exhibit 9 | Enrollment Protocol Form/Template, 1 page (previously marked Exhibit 24) | 76 |
| Exhibit 10 | Clinicaltrials.gov and redline, 24 pages | 139 |
| Exhibit 11 | Declaration of Steven Trubow dated 11/18/2024, 14 pages | 152 |



2  (Pages 2 to 5)

Page 6

EXHIBITS (Continued):

Exhibit 12   02/24/2020 PennORS Article        169
        "Consider Alternatives to the
        Morisky Medication Adherence
        Scale (MMAS-4 and MMAS-8),"
        2 pages
Exhibit 13   Editorial titled "Drug         171
        Compliance and the Morisky
        Adherence Scale," 3 pages
Exhibit 14   Article, "Pay up or retract?      174
        Survey creator's demands for
        money rile some health
        researchers," six pages
Exhibit 15   Authors Alliance article by      177
        Dave Hansen, 11/07/2025,
        12 pages
Exhibit 16   Plaintiff's Responses to       183
        Defendants' Second Set of
        Interrogatories, 10 pages
Exhibit 17   JMIR Research Protocols        191
        article, "The Use of Mobile
        Health Technology and
        Behavioral Economics"
            (EXHIBITS ATTACHED)

Page 7

---------------
PROCEEDINGS
---------------

Remote Videoconference Deposition of
STEVEN TRUBOW
June 22, 2026, 6:00 a.m.
-oOo-

THE VIDEOGRAPHER: We are now on the record. This begins video number 1 in the deposition of Steven Trubow of MMAS Research, LLC, in the matter of MMAS Research, LLC vs. The Children's Hospital Corporation, et al.

Today is June 22, 2026, and the time is 6:08 a.m. This deposition is being taken virtually at the request of Rubin and Rudman LLP.

The videographer is Miguel Banuelos of Magna Legal Services, and the court reporter is Anne Vosburgh of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent.

MR. FOLKMAN: Good morning. This

Page 8

is Theodore Folkman of Rubin and Rudman for The Children's Hospital Corporation.

MS. GARDON: Good morning. This is Elizabeth Gardon, also on behalf of The Children's Corporation.

MS. RAY: Hello. This is Patricia Ray, counsel for Plaintiff, MMAS.

THE WITNESS: This is Steven Trubow representing Steve Trubow and representing MMAS.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness.

---
STEVEN TRUBOW,
(Having been called to testify, was sworn to tell the truth, the whole truth, and nothing but the truth.)
---

THE REPORTER: Thank you.
Counsel, you may proceed.
---
MR. FOLKMAN: Thank you.
Patricia, I think you said you had some comments you wanted to make before we started, so I will give you the floor to do

Page 9

that.

MS. RAY: Just a few beginning comments.

First of all, I mentioned my thanks for your cooperation in making this a remote deposition. I know you had originally requested an in-person one, and we wanted to thank you for your arrangements.

I also wanted to mention that the operative complaint -- the operative docket in this matter is now the First Amended Complaint, and we wouldn't expect the deposition to cover anything from the Second Amended Complaint, which was not allowed by the judge.

And so I would be looking for sorting that out. I don't know what's going to happen. So that's something that I might comment on and Mr. Trubow might comment on in the questioning.

And also, it is two separate depositions. And -- well, I don't know if it's separate. So I didn't know how you were going to handle the fact that it is a deposition of Mr. Trubow, a deposition of



Page 10

MMAS, and I was just going to be listening to see if we had any issues in that way.

MR. FOLKMAN: So --

MS. RAY: In the meantime -- what?

MR. FOLKMAN: I'm sorry. On that issue, Patricia, I had said previously that as long as you were willing, my intention was to take a single deposition combining both, since Mr. Trubow is, as I understand it, the only 30(b)(6) designee.

If you prefer, I'm happy to take Mr. Trubow's deposition today and to take the 30(b)(6) deposition tomorrow. But I assume you don't prefer that.

MS. RAY: No. It's just that I thought you might want to know that we were concerned that he understood how he was answering. That's all.

You can do it together. If he needs to answer on behalf of himself and the company, maybe just clarify that for him? Can you do that?

MR. FOLKMAN: Let's see how it goes, all right?

MS. RAY: Okay. Yeah. And to

Page 11

close that, for now, let's -- I'm looking forward to a successful way to record the facts on the record for this case. And thank you for setting this up and let's go.

MR. FOLKMAN: Thank you.

---

EXAMINATION

BY MR. FOLKMAN:

Q. All right.

Mr. Trubow, I would like to know if you have testified at a deposition before today?

A. Yes, I have.

Q. Okay. So I'm not going to spend 20 minutes giving you a lot of instructions that you've probably already heard when you've done this before.

Just a few points.

Since we're doing this remotely, it's especially important that you and I don't talk over each other. That's really for the benefit of the court reporter so that she can make a good record.

So I'll do my best. And if you could please do your best.

Page 12

Secondly, I'd just remind you to verbalize your answers. Nods -- even though you're being videoed, nods of the head, shakes of the head, saying uh-huh or huh-uh, that won't come across in the transcript. So if you could try to do that, I'd appreciate it, okay?

A. Okay.

Q. Since we're doing this remotely, I'd like you please to confirm for me that you're not going to be communicating with anybody else, electronically or otherwise, while I'm asking you questions; in other words, that there's no one in the room with you, that you're not texting with anybody, including your lawyers and so forth.

Is that fair?

A. Yes. There's no one here with me at all. And on my phone, I don't have any other devices in front of me at all.

Q. Great.

And if you do need to take a break, please just let us know. If there's a question pending, I'd ask you to answer it, but otherwise we can break whenever you need, okay?

A. Thank you.

Page 13

MR. FOLKMAN: All right.

I'd like to show you the first document, which we're going to mark as Exhibit 1.

(Notice of Deposition of MMAS Research, marked as Exhibit 1.)

BY MR. FOLKMAN:

Q. And let's just take a moment to make sure, since this is the first exhibit, that you're able to see what I am showing you.

Can you see the document marked Exhibit 1 on your screen?

A. I can see it.

Q. Okay. And we're going to scroll through it. I don't know if you took the opportunity to print out the documents that we emailed to you a couple of times.

Do you have this document in paper with you or not?

A. I -- yesterday, I got a document as well as, for the first time, I saw all of the exhibits. I didn't see that until yesterday at about 4:00 in the afternoon.

So, yes, I've seen that document.

Q. Okay. So you recognize this as the

MAGNA
LEGAL SERVICES

Page 14

Notice of Deposition of MMAS Research?
   A.   Yes, sir.
   Q.   And you understand that there's a list of topics that I have asked to question a witness about?
   A.   Yeah.  Let me look at the topics, please.
   Q.   Sure.  We're going to scroll through them.
      You can see Topics 1, 2, and 3 there.  And I'll ask Ms. Gardon to slowly scroll down.
      If you need us to stop or scroll slower, just let me know, okay?
   A.   Can you go down to three?  I've read one and two.
      Just hold it there, please.
      Just hold on one second.
      So am I free to make comments on any of these?
   Q.   Well, since you've been deposed already, I didn't give you this instruction.  But just so that we're all on the same page, my job is to ask questions and your job is to answer questions, okay?

Page 15

   A.   Okay.  So --
   Q.   I haven't asked a question yet.
   A.   I understand.  I've read these.
   Q.   Okay.  Have you been designated --
   A.   Thank you.
   Q.   Have you been designated by MMAS Research to testify on these topics?
      MS. RAY:  Yes.
BY MR. FOLKMAN:
   Q.   Mr. Trubow, is that your answer?
   A.   Can you repeat that question, please?
   Q.   Sure.
      Have you been designated by MMAS Research to testify on the topics shown in Exhibit 1, which is the Notice of Deposition of MMAS Research?
   A.   I can testify, but I'm not really clear what that means.
   Q.   Okay.  Without telling me anything you and your lawyer have discussed, did you speak with your lawyer in preparation for today's testimony?
   A.   Can you repeat that slowly, please?
   Q.   Sure.

Page 16

      Without telling me anything that you and your lawyer discussed, did you have a discussion with your lawyer about your testimony today?
   A.   Yes, I've had a discussion with my lawyer about my testimony today.
   Q.   And do you understand that you've been designated by MMAS Research to testify on the topics listed in this Notice of Deposition?
   A.   I'm not really sure about that.  I'm not sure how to answer that, sir.
   Q.   Okay.  Is there something about my question you're not understanding?
   A.   No.  It's some of the topics that I'm not sure about.
   Q.   Which topics are you unsure about?
   A.   Can you go back up to Number 3, 4, and 5, please, of those?
   Q.   Sure.
   A.   Okay.  Number 4:  "The contents of the unredacted source code of the Morisky Widget."
      Five:  "The operation and functions of the Morisky Widget."
      "Six:  Agreements between you" --

Page 17

      I guess MMAS Research "and any other party concerning the ownership of the copyrights in the MMAS-4, the MMAS-8, or the Morisky Widget."
      Can you go down -- skip Number 7.
      Go down to Number 8.  Let's see.  That's okay.
      The value -- number 9.
      Keep going.
      Number 10.
      It's not beneficial to me --
Number 11 is not beneficial to me personally.  I'm not really sure of the semantics of the word "beneficial," so I have a problem with Number 11 as well.
      Again, the word "beneficial," to me personally, you know, contractually, I have a problem with the way Number 12 is phrased.
      The way Number 13 is phrased, I have problems with that.
      Number 14, you know, I wouldn't know what to say.  I have problems with that.
      Number 15, I'm not prepared at all to deal with that.
      Number 16, quite frankly, would

MAGNA
LEGAL SERVICES

Page 18

not be in the First Amended Complaint and would really deal with the Second Amended Complaint.

Number 17 is the article, I think. Let's see. Yes. That's the article that was in the Seconded Amended Complaint. So, no, I'm not able to address that topic.

So do you want to keep going?

Q. Yes.

A. Thank you.

Number 18, I have no problem with.

19, I have no problem with.

Oh, and Number 20 is a question about the Second Amended Complaint.

I didn't see this list yesterday, to be honest with you. I just saw all the exhibits. And I didn't look at those.

"The factual basis for the allegations" -- again, the Second Amended Complaint, I don't -- I can't answer those questions. I'm not prepared to answer those questions.

I'm not prepared to answer Question 22.

Number 23, "The basis for responses

Page 19

to the interrogatories served," yes, I can answer those, definitely.

I can definitely speak to Number 24.

Thank you.

Q. Okay. So you've indicated that you have problems with the wordings of various topics shown on Exhibit 1 and that you don't think you're prepared to testify about some of them.

My question to you is, are you -- and again, I don't mean to drag this on, but I do need to know that you've been designated by MMAS Research as its representative to answer questions on these topics.

Is that true or is that not true, or do you not know?

A. No. MMAS Research has not designated me to answer those topics that I, you know, stated that I'm not prepared to answer to. Not at all.

Q. So what you're telling me is that you are not designated as its witness on Topics 4, 5, 6, 9, 11, 12, 13, 14, 15, 16, 17, 20, 21, and 22; is that correct?

Page 20

A. Yeah. I -- you know, again, the list -- I'm not looking at the full list, but I will take your word on it.

Q. Okay. Well, let's proceed and see how we do.

Mr. Trubow, are you the sole member of MMAS Research, LLC?

A. I am a manager of MMAS Research, LLC.

Q. My question was are you the sole member of MMAS Research, LLC?

A. Am I the sole member?

Q. I'm asking, are you the sole member?

A. No, I'm not.

Q. Who are the other members?

A. The other members are Mr. Rodney Watkins. He's a certified public accountant. He's the chief financial officer of MMAS Research. He's listed on the Washington Secretary of State -- the website that manages the LLC.

Aaron Trubow, T-r-u-b-o-w, is the registered agent as well as a manager of MMAS Research, LLC.

Page 21

Q. When I say "members," I mean owners.

Are these gentlemen, Mr. Watkins and Mr. Aaron Trubow --

A. I'm not prepared to talk about the ownership of MMAS Research. I'm only prepared to tell you what is published on the Washington State Secretary of State website.

It's an active LLC. We filed the annual report in December of 2025, and you're welcome to go to the website. It lists the management, members -- the governors, they call them. But there is no ownership information that is published.

Q. Are you telling me that you're not going to answer my question, who are the owners of MMAS Research, LLC?

A. I'm not really prepared. I don't have the ownership agreements or any of that information available to me right now.

Q. You don't know who they are; is that what you're telling me?

A. I know that we have three managers, but I can't tell you which one owns and which one doesn't and -- you know. That, I'm not

MAGNA
LEGAL SERVICES

Page 22

prepared to answer.

Q.   And just to be clear, you're not prepared to answer because you don't know or because of some other reason?

A.   No.  I'm not prepared to answer because I didn't -- you know, I don't have the documents to make a statement under oath, all right?

Q.   You're an owner of MMAS, LLC, aren't you?

A.   I am an owner -- I'm speaking on behalf of Steven Trubow and not speaking on behalf of MMAS Research.  I am an individual owner of MMAS Research.

Q.   What's your own personal knowledge, not speaking on behalf of the company, but just speaking on behalf of yourself.  What's your own personal knowledge about who the other owners are?

A.   My own personal knowledge is that MMAS Research has been an active Washington LLC for 10 years, since December of 2016.

That at that time, it was originally begun by Donald Morisky and Steven Trubow.  We were 50/50 percent owners, okay?

Page 23

That has changed over the 10 years, and I'm not really up to date.  I don't have the precise ownership arrangements in my wallet or at hand.  So that's --

Q.   You know that --

A.   That's -- I'm sorry to interrupt you.

Q.   No, I'm sorry.  I thought you were done.

You know that Dr. Morisky is no longer an owner, don't you?

A.   Excuse me?

Q.   You know that Dr. Morisky is no longer an owner, don't you?

A.   Yes, I do.

Q.   And did you sell any of your interests to anybody else?

A.   Again, I'm not -- you know, buying, selling, owning.  This conversation, I just -- I'd rather, you know -- I don't have -- I can't engage in this conversation with any confidence that, you know, I might be saying something that isn't true.

Q.   Okay.  Is there anybody else who is associated with MMAS Research other than you

Page 24

who is knowledgeable about MMAS Research's dealings with Boston Children's Hospital?

A.   Mr. Dustin Machi, M-a-c-h-i.

Q.   Anybody else?

A.   Specific to your question?

Q.   Yes.

A.   Dr. Donald Morisky.

Q.   So I'm asking now about people who are still associated with MMAS Research, LLC.

A.   Oh, still associated.  That would only be Mr. Dustin Machi and then a couple of lawyers, but I don't think that's pertinent.

Q.   Mr. Machi is the gentleman who wrote the Morisky Widget source code, isn't he?

A.   Yes.

Q.   And let me ask:  You, yourself, are not a coder, are you?

A.   Yes.  I worked at Apple Computer, Inc. and Hewlett-Packard and for Intel.  And I've been a coder for approximately 50 years.

Q.   Judging from the paperwork that I've seen filed with the Copyright Office, Mr. Machi was the sole author of the widget code.

Page 25

Is that true?

A.   Yes, that's correct.  Mr. Machi was the sole author of the MMAS widget source code.

Q.   And Dr. Morisky, back when he was associated with MMAS Research, brought the medical expertise; is that fair?

A.   No.  I don't know how to answer that question.

MS. RAY:  I think that's a bit general.

Can you explain what you mean by that for him to give you a correct answer?

MR. FOLKMAN:  Sure.

MS. RAY:  I think "medical expertise" is kind of tough to grasp.

MR. FOLKMAN:  Sure.  I'll rephrase it.

BY MR. FOLKMAN:

Q.   Mr. Trubow, you're not a medical doctor, are you?

A.   No.

Q.   Do you have any credentials in the health sciences?

A.   Yeah.  I mean, I have some credentials.

MAGNA
LEGAL SERVICES

Page 26

Q. Do you have a degree in a relevant field?

A. No, not an academic degree, no.

Q. Have you taken courses in the medical sciences or the health sciences?

A. Yes, sir.

Q. And what courses are those?

A. I've taken courses in psychology. I've taken courses in physiology, both at the undergrad and graduate levels.

I've worked in public health settings for HRSA, for the Department of Health and Human Services, for the Centers for Medicaid and Medicare Services, on grants in federally qualified health centers, and in hospitals.

Q. So you said that Mr. Machi was knowledgeable about MMAS's dealings with Boston Children's Hospital.

Did you speak with Mr. Machi in preparing to testify today?

A. Not at all, no. He doesn't know about it.

Q. Okay. Who else other than you at MMAS Research is knowledgeable about your

Page 27

claims -- and by "you," I mean MMAS Research -- by MMAS Research's claims against the hospital?

A. Only Rodney Watkins, but just peripherally. He doesn't -- he knows from the -- what the complaint is. He doesn't have any background.

Q. Okay. Did you speak with Mr. Watkins to prepare for today's testimony?

A. Mr. Watkins knows what's going on, but we didn't -- I mean, he didn't help in the preparation at all.

Q. Okay. What did you do to prepare to testify today?

A. Well, I -- as I told you, I didn't get those tabs, all those exhibits, until yesterday at 4:00 p.m. So all I did was look over them. And then I talked to Ms. Ray for about 20 minutes. And then I went to bed at 6:30 or 7:00.

Q. Okay.

A. So I have not prepared at all for this today.

Q. Are you telling me that you have not seen the document I showed you first,

Page 28

Exhibit 1, until yesterday afternoon?

A. Yes, I did. Yes, that is true.

Q. Okay. Did you consult any documents to help you prepare for today other than the documents I sent you? In other words, did you look anything up?

A. No. No, I have not. Not at all.

Q. Okay. I want to talk with you about how the widget works a little bit.

The widget has condition-specific templates as part of the source code that are stored as .txt, or text files. Is that true?

A. Can I just ask you to say that question very slowly?

Q. Sure.

In the source code for the Morisky Widget, there are condition-specific templates that are stored as text files, right?

A. No, that's incorrect.

Q. All right.

MR. FOLKMAN: I'm going to show you a document here that we're going to mark as Exhibit 2.

(Source code document, 1 page, marked as Exhibit 2.)

Page 29

BY MR. FOLKMAN:

Q. And I'm going to represent to you, Mr. Trubow, that the file name of this document in the repository of code that your lawyer sent me was MMAS-8-cholesterol-English.txt, okay?

And I'd ask Ms. Gardon to please just scroll down in this document before I ask you a question about it.

Okay. So have you had a chance to take a look at this one-page document?

A. Yes, I have.

Q. Okay. I don't want to get caught up in terminology.

When I said there are condition-specific templates stored as text files, this is the kind of document I was talking about. Maybe you call it something different.

What do you call this kind of document?

A. Would you say the last thing, what --

Q. What do you call this document?

A. This document is not in the Morisky Widget source code at all. This is the

Page 30

first time I've ever seen this document.  There are no such documents in there.

I would refer you to the First Amended Complaint.  There is an exhibit which shows, not a template, but a graphical user interface, which is in the source code which was used with Boston Children's Hospital.

And what it allows you to do, it has the MMAS-8 questions, the flat, generic questions, and then underneath it, with Dr. Hartz and the other clinician, we created what you have on the screen for me.

But there are no templates of that in there.  That was created.  And then it was printed out on a piece of paper, which I'm looking at now.  I have never seen that document before today.

Q.  If I tell you that this is a document that your lawyers provided to me as part of the source code, would that surprise you?

A.  I'm not -- like I said, I've never seen this document until today.

Q.  Have you ever reviewed or looked at the source code for the widget?

Page 31

A.  The source code of the widget is about 60 megabytes of source code.  There are databases in there.  There's all kind of things in there.

I have looked at it over the years. Again, we're talking -- it's nine years old. But it's not like reading the USA Today.  I mean, it's source code.

So, yes, I have looked at the source code, but I haven't done it for about five years.

Q.  Okay.  In the source code that I have, there's sort of a folder tree or a file tree.

Do you understand what I mean when I say that?

A.  Sort of.

Q.  There are -- there's a top-level folder, which I have as Morisky.master.  And then under that there are several folders, for example, bin, b-i-n, or media, or models, or tests, etc.

Do you understand what I'm saying?

A.  Yes, I do.

Q.  So there's a folder called "Test

Page 32

Library" that has dozens of tests in it in various languages, each of which is a text file and each of which, with a couple of generic exceptions, relates to a particular medical condition, such as diabetes or cancer or COPD or asthma.

Is that true?

A.  My answer is this:  The source code has several parts.  One of them is a database. I think what you're referring to is the database.

What I'm referring to is the Morisky Widget application itself, not a database.  The Morisky Widget application has an editor, a graphical user interface, that was used to create all of the tests that you referred to.

It -- we license hundreds of pharmaceutical companies, hospitals, clinics, all over the world in over 80 languages.  And once those are created by MMAS and the licensee, as in the case of Boston Children's Hospital, it is stored in a library, so that when Dr. Hartz on the widget goes to administer this document that's on the screen

Page 33

to a patient, it calls -- the application calls it up from the database.

That's the best I can do, sir.

Q.  Okay.  Is it your belief that these questions that we're seeing in Exhibit 2 in this text file that you produced to me are the questions that Dr. Hartz and his colleagues themselves created at that training that you held with them in Boston?

A.  Yes.  Except I created it with them.

Q.  Yes.

A.  I was in Boston in 2019, and I created it with Dr. Hartz and his associate in the Morisky Widget application.  And then he had access to it up until the time he last used the widget.

Q.  If I told you that the source code contained a script that reads these text files or text files such as the one we're looking at in Exhibit 2, and then created a JSON file, a J-S-O-N file, would you know what I'm talking about?

A.  No.  Again, this would be a question that would be pertinent for Dr. Machi.

**MAGNA**
LEGAL SERVICES

Page 34

Q.  Okay.  So you're not really prepared to testify --

A.  Not at all.  No.

Q.  Let me finish the question.

You're not really prepared to testify about the technical workings, how the widget actually works; is that fair?

A.  Only as I've told you before, that there's an application, the widget application, and there's a database.  They're not one homogenous source code.  It's divided into parts.

That's all I can tell you.

Q.  Okay.

MR. FOLKMAN:  Let me ask you to look at the next document, which I'll mark as Exhibit 3.

(Source code document, 24 pages, marked as Exhibit 3.)

BY MR. FOLKMAN:

Q.  And I'm going to represent to you, Mr. Trubow, that this is a document that was contained in what your lawyers produced to me as the source code.  And its file name was MMAS-8-cholesterol.json.

Page 35

I'll ask Ms. Gardon to scroll down this.  And I'm going to ask you if you've ever seen this document before.

And I should say that it has a lot of stuff in other languages, so I'm going to ask her to scroll down to the English portion, please.

So taking a quick look at this, Mr. Trubow, have you ever seen Exhibit 3 before?

A.  Say that last part again?

Q.  Have you ever seen this document before?

A.  No.  I've never seen this document before today.

Q.  Okay.  Now, the widget has a user interface for editing text, correct?

A.  Yes.  It's a little bit -- yes.  It has a user interface for editing.

Q.  And that interface, as I understand it, does not operate on the text files that we've been looking at or the JSON file that we looked at, but instead on test definitions that are stored in the database; is that right?

A.  That graphical interface creates

Page 36

files.  And now the language may have some JSON objects.  But that graphical user interface always has either the MMAS-8 or the MMAS-4.

They are two editable tests.  The MMAS-8 and the MMAS-4 are in the test editor.

MR. FOLKMAN:  So we're going to mark this next document as Exhibit 4.

(Graphical User Interface, 1 page (previously marked Exhibit 27), marked as Exhibit 4.)

BY MR. FOLKMAN:

Q.  And this is what was Exhibit 27 to the First Amended Complaint.

And my question to you is:  Is the screen that you're looking at now, Exhibit 4, is this the graphical user interface that you're talking about?

A.  Yes.  This is the graphical user interface.

This is the actual graphical user interface that I used with Dr. Hartz in Boston to create that first document that you showed me.  This is part of the widget application.

Q.  How did this image come to be?  Did you take a screenshot or a photograph when you

Page 37

were with Dr. Hartz?

A.  No.  This is -- no, not at all. This was taken from the Morisky Widget.  This is a screenshot from the Morisky Widget.

Q.  So after you returned home, and when you were getting ready to sue the hospital, you went into the widget, called up this screen, and took a screenshot of it.

Is that true?

A.  No.  I don't remember.  I don't know that.  I'm telling you where this came from.  In other words, if you wanted to subpoena this document, we could bring the Morisky Widget in to court and we could show you this live, not as a screenshot.

But you could look at the Morisky Widget under the Boston Children's Hospital account.  And you could see it.  And you could re-edit it.  This is dynamic.  It's not in a database.  It's a graphical user interface.  You could change it. You could completely change it around.

Dr. Hartz could have gone in and changed it any time he wanted on his own, without me.

MAGNA
LEGAL SERVICES

Page 38

Q. Is it true that you don't know how this image came to be? In other words, you don't know how you made it, or when you copied it, or sort of how it came to exist?

A. Can you repeat that, please?

Q. Sure. Let me ask it a different way.

When did you create this image, Exhibit 27?

A. This was created by Dr. Hartz and I and the other clinician in Boston in 2019. That was when it was created.

It hasn't changed since.

Q. I'm asking about the image itself. In other words, you had to do something --

A. I have no idea, sir.

Q. Okay. Let me ask about sort of how the widget operates in another respect.

Was the widget stored locally on the hospital's computer or did the hospital access the widget remotely?

A. The way the widget operates is Dustin Machi sets up a login and an authorization.

So when I went to Boston the first

Page 39

time, I met with Dr. Hartz and his associate, and Dr. Machi provided a login and an authorization for each of those two clinicians.

And then I also logged into the Boston Children's Hospital site.

So there is a record in the widget of everything that Dr. Hartz did from 2019 until the last time he used it, how many tests he gave, this document. It's all there.

I mean, it hasn't -- there's no screenshots or documents -- or files. It is what it is.

Q. So what I'm getting at is, when Dr. Hartz logged in, was he logging in to an MMAS Research computer or was the software --

A. No. He was logging in to www.morisky.org.

Q. Okay. So he was logging in to an application that was not installed locally on his computers, but instead was kept -- I don't know if you kept it in the cloud or on your own servers, but, in other words, computers that were under MMAS Research's control.

Is that true?

A. Yes. It was on Amazon Web Services

Page 40

and it was under MMAS Research's control. Yes, sir.

Q. Okay. So then MMAS Research knows, doesn't it, exactly how many times the hospital used the widget, right?

A. Yes. We know exactly when the hospital used the widget.

Q. Okay. How many times did the hospital use the widget?

A. The hospital gave -- and this, again, I'm giving you this not from memory, but recently I did look at the widget records which we have on an Excel sheet, which for Dr. Hartz would be approximately four years old.

But Dr. Hartz -- or BCH only scored 13 tests in the Morisky Widget. In other words, this template was used to do an assessment only 13 times.

Now, I think probably about nine of those, or 10 of those, were done in the training in Boston.

So what I could probably give you is an estimate that between 2019 and once the training was over, Dr. Hartz or Boston Children's Hospital never scored and coded any

Page 41

tests in the Morisky Widget at all.

Q. Okay.

A. Using the three-tier Morisky Widget scoring and coding.

Q. Okay. Did you provide that spreadsheet that you just referred to to your lawyers in this case?

A. Did I provide that what?

Q. The spreadsheet that you just mentioned that shows the widget.

A. I think I've shown it to Ms. Ray before.

MR. FOLKMAN: Okay.

Patricia, if you have that, I'd love to see it. I don't believe that it's been produced.

MS. RAY: It's hard for me to think that it hasn't been, but --

MR. FOLKMAN: We'll double-check that, okay? But I don't think it has.

MS. RAY: Okay.

BY MR. FOLKMAN:

Q. Mr. Trubow, let me ask you about how the widget scores things.

If we were to look back at the JSON

MAGNA
LEGAL SERVICES

Page 42

file -- and I'm not going to put it up on the screen. I'm just going to ask you if this is your understanding, and then if we need to look back, we can.

Each possible answer yes or no to each question has a score that's defined, right?

A. Well, that would be true, sir, for Questions 1 through 7.

But Question 8 is not a general question. It's a Likert Scale with five answers.

Q. Yes.

A. Is it okay to answer you that way?

Q. Yes. And that's a helpful clarification. It's exactly right.

For each of the yes/no questions, there's a score that's given to a yes answer and a score that's given to a no answer for each question, right?

A. Yeah. Let me just make sure you understand.

For Questions 1, 2, 3, 4, 6, and 7, if the patient answers yes, they get zero. If the patient answers no, they get one.

Page 43

For Question Number 5, if the patient answers yes, they get one. If the patient answers no, they get zero.

That is the -- and then Question 8, the patient can get either zero, .25, .5, .75, or 1. So they can get those.

Q. Right.

A. So that's for Question 8.

Let me add one other thing so you understand that.

That is the flat scoring for the MMAS-8. That is not how the widget scores. That is how you score the 2006 MMAS-8. We call it "flat scoring."

The widget scores a three-tier scoring system.

Q. Yes. So let me ask you some questions about this.

I think what you're referring to is that the widget takes Questions 1, 2, 5, and 6 and categorizes them as intentional.

And Questions 3, 4, and 7, and categorizes them as unintentional; is that right?

A. No, that's not right.

Page 44

Q. That's not right?

A. No.

Q. Okay. Why don't you describe for me then the difference between intentional and unintentional questions as the widget categorizes them.

A. The intentional are 2, 3, 6, and 7.

Q. Ah, I think I understand the problem. I think that in the coding --

A. The unintentional -- do you want me to finish or do you understand what I'm saying?

Q. I'm sorry. I thought you were done. But let me just say what I think is going on.

In the code, the questions are numbered 0 through 7, not 1 through 8.

A. Oh, I see. I'm sorry. Go ahead.

Q. Now, there's a script called scoring.js.

Are you familiar with that script?

A. No.

Q. All right.

MR. FOLKMAN: Let us take a look at Tab H, another document, which we will mark as Exhibit 5.

Page 45

(Source code document, 10 pages, marked as Exhibit 5.)

BY MR. FOLKMAN:

Q. All right.

Have you seen Exhibit 5, which I'm going to represent to you is a document in the source code called scoring.js?

And my question is just have you seen it before.

A. You want me to answer?

Q. Yeah. I'm just asking, have you seen it before?

A. I haven't seen this particular one, but I'm the one who did this. I'm the one that came up with the unintentional/intentional scoring for the MMAS-8 and MMAS-4. I created it.

So, yes, this is correct.

Q. Okay. Let me ask you a question about that.

What was your sort of credential to allow you to do that? In other words, how did you have the background to come up with a refinement of Dr. Morisky's original assessment that added these intentional and unintentional

MAGNA
LEGAL SERVICES

Page 46

categories?

A. You want to know my credentials?

Q. Well, I'm just wondering -- you know, just to put it this way. You know, I'm a lawyer. I wouldn't feel competent to do that, even if I knew a lot about -- about the Morisky assessment.

Why did you have the knowledge to allow you to do that in a scientifically valid way?

A. I'll be glad to give you that answer.

Q. Go ahead.

A. Okay. I worked at Apple for -- on and off from 1986 to 2004. And in that period, I began to, in the 1990s, work on something called machine learning and predictive analytic risk assessment, which was the grandfather of AI.

And in 2002 -- or in October of 2002, Mr. Jobs lent me out to the Asian -- Asian APEC, Asian Pacific Economic Conference, and I provided a video surveillance system which was based on risk assessment and protected President George Bush and 19 foreign

Page 47

leaders.

And I'll be sure to send you a link.

And I ran a team of 40 international engineers in Cabo San Lucas. And I used the same kind of risk assessment that I developed here.

I then worked at DARPA for six years as an analyst doing IED detection.

I can give you more. I developed a project over -- for the United Arab Emirates over the Straits of Hormuz, where I did the same thing.

If I can also send you a picture from the widget, you will see this intentional and unintentional scoring laid out on a continuum where low adherence is tertiary and moderate adherence is secondary.

And this is very much different than a flat MMAS-8 form with flat scoring. This is a much different thing. It's not as you phrased it at one time, "just the MMAS-8 questions on a computer screen." That's not what it is.

Q. All right.

Page 48

A. And I had the credentials, 25 years of developing software for the Department of Justice, the Department of Defense, Apple Computer, HP, Intel, that I'm glad to provide you, sir.

Q. Okay. Let's talk about how the scoring actually works.

A. Okay.

Q. As I understand it, what the scoring.js file does is it reads each question, it reads each answer, and it takes the score that is defined to go with that answer, it adds the scores together, and it arrives at what you're describing as the flat score for the test.

Is that the first part of what scoring.js does?

A. Yes. In other words, for each question you get two scores. You get a raw adherence score, which is for the flat scoring. And then you get what we call the -- you know, "the payload," which is why the patient is nonadherent, either intentionally or unintentionally. That is correct.

Q. All right. Let's talk about that.

Page 49

The scoring.js file also separately counts the answers to the questions that are in the intentional bucket. So in the numbering that I was using, that's Questions 1, 2, 5, and 6. And it adds those scores together and just gives a total for intentional, right?

A. Yeah. The total is for intentional nonadherence.

Q. Okay.

A. Yes, that's correct.

Q. And then it also takes the answers to Questions 0, 3, 4, and 7, which are the questions in the unintentional bucket, and it adds those answers, those scores together, right?

A. Right.

Q. So basically what the scoring.js script is doing is, Number 1, it's taking all the questions, adding up the scores that are predefined and just giving you the results of the addition.

That's the raw score, right?

A. Go ahead.

Q. Is what I said correct?

A. No. The raw score is just the yes,

Page 50

no, and the Likert Scale. That's the raw score.

And then there's a second tier where you're doing intentional, and the third tier where you're doing unintentional. And, yes, if you add intentional and unintentional together, their sum will be the raw score.

But what that does, sir, is it raises the specificity and the sensitivity of the test. And the MMAS-8 raw score has 38 percent true positive, and the MMAS-8 specificity is about 70 percent.

So by doing the three-tier scoring and coding, we can -- and using the condition and medication-specific questions, we can get the sensitivity up to 93 percent.

Q. Okay.

A. So that's it.

Q. All I'm trying to get at is to see if we can agree that what the scoring is, is just addition. It's just adding up the yeses and the nos in accordance with the scheme that you described earlier, which is to say that sometimes the answers are given a 0 if they're yes and sometimes they're given a 1 if they're

Page 51

yes, right?

A. No. The scoring is not just simply 0, 1, and then the Likert scale. That's not it at all.

It's a three-tier scoring and coding system. It's totally different than the MMAS-8 or MMAS-4 flat scoring and coding.

And I'll be glad to give you a brief on that in fine detail, but it is totally night and day different.

Q. The difference, sir -- isn't it true that the difference is that the widget creates two additional numbers, an additional -- excuse me -- an intentional score and an unintentional score, right?

A. The widget creates -- no, the widget -- the patient answers the question, and then the widget, from the answer the patient gives, calculates three scores.

Q. Right.

A. A flat score --

Q. Yes.

A. -- an intentional score, and an unintentional score.

Q. Right. And each of those -- and

Page 52

then we'll move on.

Each of those is simply the sum. It's just that the scoring.js program or script, it's just creating three sums. It's adding up all the questions and then --

A. I see the mistake.

Q. Hold on. Let me finish my question.

A. Okay. I'm sorry.

Q. That's okay.

First it's adding up all the answers and giving a score, which is the raw score. Then it's adding up some of the questions and creating a score for intentional. And then it's adding up the other questions and it's creating a score for unintentional.

That's what it does, right, the scoring.js script?

A. All right. Can I answer you?

Q. Yes.

A. Everything you said is correct as far as the internal working of the widget scoring and coding. But what you're missing is -- and I'll ask Pat when we send him the Excel document that he wants --

Page 53

MS. RAY: Okay.

A. -- there's another graphical user interface. It's what Dr. Hartz sees once he gives his test. And what he sees is three scores: The raw score, the unintentional, and the intentional.

Then he sees a continuum, this risk-assessment continuum, which shows where that is plotted.

So if you have a patient with low adherence, zero to less than six, he then can go deep into that and find out why, why is the low adherence there.

In other words, he can say, oh, it's intentional. They're not taking their medication because they're sick from it. Or they're not taking their medication because they can't afford it. Or they're against taking their medication.

That is what Dr. Morisky and I wanted to create. It's an original work. It's expressive. It's not a flat form. It's -- it's not a derivative, sir.

BY MR. FOLKMAN:

Q. All right. Let's move on to a

MAGNA
LEGAL SERVICES

Page 54

different topic.

MS. RAY: Okay. If we're going to move on, can we give Mr. Trubow a little break?

MR. FOLKMAN: Sure.

Would you like a break now, Mr. Trubow?

THE WITNESS: I want to send him -- I want to send him -- as he showed Exhibit 17, I want to show him the graphical interface that goes with the test editor so he can see exactly that it's more than just scoring and coding of a form.

It's, you know, basically a diagnosis of medication-taking behavior, not a simple measure, like a ruler. This is a diagnostic assessment of medication-taking behavior. That's the difference.

Thank you, Patricia.

MR. FOLKMAN: All right. Let's take five minutes, okay?

THE VIDEOGRAPHER: Going off the record, 7:11 a.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the

Page 55

record, 7:21 a.m. Go ahead.

MR. FOLKMAN: Thank you.

BY MR. FOLKMAN:

Q. Mr. Trubow, I know that while we were on the break, you were able to, with the help of the court reporter, improve the volume on your speakers.

Are you able to hear me better now?

A. Oh, I can hear you loud and clear, sir.

Q. Perfect. Okay.

Let me turn to another topic. I want to talk about breaches of contract.

Do you agree with me that if, after signing the contract with you or with MMAS Research, Dr. Hartz had found some other assessment of medical adherence, not the MMAS-4, not the MMAS-8, but something entirely unrelated and had decided to use that instead, that he could have gone ahead and done that without breaching his contract with MMAS Research?

A. Yes. Yes.

Q. And do you agree with me that if he had simply gone and used the MMAS-8, which is

Page 56

the version that you say is not good for the reasons that you've discussed, could he have done that without breaching his license agreement with you?

A. I don't think I can comment on that.

Q. Why not?

A. Because that's what the Court is going to comment on, not me.

Q. Are you saying you don't have a view one way or the other?

A. No.

Q. No, you're not saying, or no, you don't have a view?

A. You know, I'm not going to speculate. I don't know.

Q. Okay. It's not a question you're prepared to answer today. Is that fair?

A. Correct.

Q. Okay.

MR. FOLKMAN: Let's take a look at the next exhibit, which I believe is Number 6.

(Plaintiff's Responses to Defendant's First Set of

Page 57

Interrogatories, marked as Exhibit 6.)

BY MR. FOLKMAN:

Q. These are MMAS's responses to the hospital's first set of interrogatories.

Do you recall seeing these?

A. Yes, sir.

Q. And if we skip to the end, you signed this, right?

A. Yes, sir.

Q. I'd like to take a look at Interrogatory Number 1, which asks you to identify every instance in which you assert, that is, MMAS Research asserts, that BCH breached the license.

Do you see that question?

A. Yes, sir.

Q. And then there's some lawyers' objections, and then we get to the response on the next page, and you see that there's a bullet list of five items?

A. Yes.

Q. And my question to you is, are these five bullets here in the response to Interrogatory 1, is that a complete list of

MAGNA
LEGAL SERVICES

Page 58

what MMAS Research says are the breaches of contract in this case?

A. Can you go back up to the top, to the objections, please?

Q. Sure.

A. Thank you.

MS. RAY: Give him a minute to review, okay?

MR. FOLKMAN: Yeah. Of course.

BY MR. FOLKMAN:

Q. Take your time and tell me when you're ready to answer.

And I'll ask Ms. Gardon to scroll down very slowly so you have time to read it.

A. Okay. I'm ready whenever you are, sir.

Q. Okay. So my question is, is this list of five bullet point items a complete list of what MMAS Research asserts are the breaches of contract in this case?

A. No.

Q. Okay. What other breaches of contract does MMAS Research assert?

A. Well, it does assert the ones that are listed here. And as I told you in the

Page 59

objection, we're investigating additional breaches that will be forthcoming.

Q. When will that be?

A. You know, without having my lawyer and I sit down, I can't tell you. These are part of the case.

Q. You understand, don't you, that the discovery in our case is over?

A. Again, I don't want -- I'm not prepared to answer that, you know.

Q. What sort of investigation is MMAS Research undertaking to come up with additional breaches of contract?

A. I'm not free to discuss that either.

Q. Well, I'd ask you to reconsider and answer my question.

A. I can tell you this, sir, that there have been additional breaches of the contract, of the license, since the First Amended Complaint was filed.

Q. Great. What are they?

A. I'm not at liberty. I'm not prepared to discuss those with you today.

MR. FOLKMAN: Patricia, do you want

Page 60

to take a moment and talk with your client? I don't understand why he won't answer my question.

THE WITNESS: Yeah. Would it be all right if I talked to her and then we come back?

MS. RAY: Yeah. We can talk.

MR. FOLKMAN: Great. Let's go off the record.

THE WITNESS: Okay. We'll step away and then we'll be right back. Thank you, sir.

THE VIDEOGRAPHER: Going off the record, 7:27 a.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record, 7:30 a.m.

Go ahead.

MR. FOLKMAN: Thank you.

BY MR. FOLKMAN:

Q. All right.

Mr. Trubow, my question to you was: Other than the five bulleted points that we see in the response to Interrogatory Number 1, what other breaches of the contract does

Page 61

MMAS Research say the hospital committed?

A. So I can't give you a confirmation that these are actual breaches. But you asked me further, what are we investigating.

Can I answer that question?

Q. Let me ask you my question first, and then we'll get to that question.

So what other breaches did the hospital commit?

A. Possibly after the First Amended Complaint was filed, the hospital breached the part of the license which said that they had to copy an acknowledgment whenever MMAS-8 results were discussed in a publication.

Q. And is that a reference --

A. They breached the contract by not supplying that acknowledgment.

Q. And is that a reference to Dr. Hartz's article, which was the subject of the proposed Second Amended Complaint?

A. Can you repeat that, please?

Q. Sure.

Are you referring to Dr. Hartz's article, which was the subject of the proposed Second Amended Complaint?

MAGNA
LEGAL SERVICES

Page 62

A. No. The license and the current cause of action are not against Dr. Hartz. This is an article that was published by the affiliated Boston Children's Hospital, and this strictly refers to the license of Boston Children's Hospital. And this additional breach is for Boston Children's Hospital.

Q. What article are you talking about?

A. I'm talking about the article that Boston Children's Hospital, Harvard, and the National Institute of Health had authors on that was, I guess, in August 2025 or June 2025.

Q. And was Dr. Hartz one of those authors?

A. Yes, sir.

Q. So this is the same -- this is the same article that you had proposed to bring claims regarding in the Second Amended Complaint, isn't it?

There's not another article that I don't know about?

A. Yeah, but, I mean, it doesn't have anything to do with the Second Amended Complaint.

Q. I'm just trying to identify the

Page 63

article. That's the article, right?

A. This is the article, but it doesn't have anything to do with the Second Amended Complaint.

Q. Okay.

A. There is no Second Amended Complaint.

Q. Okay. Aside from your claim that there was a breach of contract because of an improper attribution in that article, are there any other breaches of contract that MMAS Research says the hospital committed that are not included in the answer to Interrogatory Number 1?

A. At this time, no.

Q. Okay. Now, you were going to tell me about the things that you are investigating. So please tell me what you are investigating now.

MS. RAY: I think he just told you.

MR. FOLKMAN: Well, no. When we started, I asked what breaches of contract he said the hospital had committed.

And he said: Well, you asked me about my investigation. Do you want me to

Page 64

answer that?

And I said: Well, no, let's start with the breaches.

BY MR. FOLKMAN:

Q. So is there anything else that you're investigating that you haven't already told me about, Mr. Trubow?

A. No. We're still investigating the article and the potential breaches.

Q. Okay. And the potential breach with respect to that article is the improper attribution language, right?

A. Well, there are a couple other issues we are looking at, sir.

Q. What are those issues?

A. Well, we're looking at the way the attribution was done for MMAS Research. There's some problems that we're looking at the way that attribution was done rather than just supplying the acknowledgment that was supposed to be there, which was not. The way they did the attribution is what's being investigated.

Q. Okay. And how are you investigating? What are you doing?

A. I mean, the people that are

Page 65

investigating are lawyers, sir. I'm not here to speak for them.

Q. You, yourself --

A. I do all I can.

Q. You, yourself, or nobody at MMAS other than your lawyers is doing any investigation; is that true?

A. Not at this point, just the lawyers on that article, yes, sir.

Q. Okay. Let's talk about the first bullet point in your answer to Interrogatory Number 1, which is "Unauthorized Administration (July 2022)."

Do you see that text up on the screen?

A. Yes, sir.

Q. All right.

What provision of the contract do you say was violated with respect to this first bullet point?

And it's not a trick question. I think it's an easy answer. We can put the license -- or the license agreement up on the screen, if you like.

But can you answer that question

Page 66

without seeing the document?

A. Yeah. You're going to have to put the license on the screen, sir, so I can see the entire license.

Q. All right.

A. And find out what exactly it is.

MR. FOLKMAN: Sure. So we will mark that as Exhibit 7 and we will put it up on the screen.

(Document titled "Morisky Widget MMAS Retroactive and Perpetual License," 5 pages, marked as Exhibit 7.)

BY MR. FOLKMAN:

Q. All right. Do you need us to scroll through this slowly, or how would you like to look at it?

A. Well, just go to the top. I'll tell you when to scroll it.

Okay. You can go down past -- stop in Section 1. Just stop there.

Okay. Go on. Keep going.

Stop for a second.

And before I answer that first question, I want to just point you to your last

Page 67

question about additional breaches, the submitting of a manuscript, okay, of that article in 2025.

I never received any manuscript. All right?

Would you go down and scroll down further?

All right. Here we go.

Hold on. Let me see Section 3 and Section 4.

Q. I think, sir, that Section 3 is really the answer to the question, because it requires that scoring and coding be done in the widget; is that right?

A. No. I'm looking at this. To actually administer a test, okay, and then "with licensor approval, BCH can use MMAS paper or electronic questionnaires."

I never gave any approval to Dr. Hartz or BCH to administer approximately 200 of those Morisky Widget condition and specific tests.

And those were scored with a derivative scoring and coding system designed by Dr. Hartz. He did not use the widget to

Page 68

score them. He did not use Dr. Morisky's flat scoring and coding.

He created a derivative scoring and coding system that he put on clinicaltrials.gov.

Q. Okay.

A. So in order to answer that first one that you pointed to, it really goes down to Section 3.

And then there's an email from Dr. Hartz in the First Amended Complaint where he apologizes, and he writes and he says: Oh, I'm sorry. I breached the contract.

I mean, that's in there in the First Amended Complaint.

Q. Yeah. So we're going to look at that email.

Did you have the sense that he thought maybe he had gotten himself in over his head in some legal hot water and was just trying to get out?

A. I don't want to comment on that, but I'm just answering your question.

If you look at Section 3, "Duties of BCH," I never gave him approval.

Page 69

Q. Yeah.

A. Even after he wrote me the email, I didn't give him approval.

Q. So it's really Section 3 that is the section of the contract that you say was violated by that first bullet point, Unauthorized Administration in July of '22?

A. Yes, sir.

Q. Now let's take a look at the next exhibit, which we'll mark as Exhibit 8. And this is some emails, including, I think, the email that you were just referring to.

(Email thread, 7 pages (previously marked Exhibit 20), marked as Exhibit 8.)

BY MR. FOLKMAN:

Q. Okay. So I'm showing you Exhibit 8, which was Exhibit 20 to the First Amended Complaint.

And you see that this is an email from Dr. Hartz to you dated July 6, 2022?

A. Uh-huh.

Q. I'm sorry. Could you say yes or no?

A. Yes.

MAGNA
LEGAL SERVICES

Page 70

Q.  Is this the email you were just referring to?

A.  Let me read the whole thing.

Q.  Sure.

A.  Sure, yeah.  You know, the first paragraph and then the second paragraph are addressing -- this is addressing two issues.

It's addressing the unauthorized administration of Morisky Widget MMAS-8 tests outside of the widget, and scoring and coding them outside the widget.

It's also addressing the clinicaltrials.gov website where they're not giving us the attribution that are also required in the contract.

And Dr. Hartz says here:

"Although the citation was included in our references, we have now added you as a 'collaborator' because this appears to be the best place to signal your role."

And then consequently, he went to clinicaltrials.gov and he put us up there as a collaborator.

So there are two breaches that he

Page 71

is addressing here.

Q.  So my question was:  This is the email that you were referring to earlier?

A.  Yes, sir.  Yes, it is.

Q.  Okay.

And do you see that Dr. Hartz writes:  "We have administered four tests"?

A.  Excuse me?

Q.  He says:  "We have administered four tests"?

A.  Yes.  He says they were administered from memory.  In other words, they are just out of his head.

Q.  You said a few minutes ago that you thought the hospital had improperly administered 200 tests?

A.  Excuse me?

Q.  A few minutes ago, you said you thought the hospital had administered 200 tests improperly?

A.  Well, you've got to read this:

"The last MMAS will be administered within the next two years once we have completed the enrollment."

The protocol was to give this

Page 72

so-called screener that he's talking about, the one that's answering a positive consistent with lowered adherence at least with one question, to enough patients to generate a cohort.  Once the cohort is established, then they would give the regular test.

But what's happening here is this is an unauthorized administration of a Morisky Widget MMAS-8 test to a population to possibly enroll them.  That's what this is. This is not the actual patient cohort.

So what we estimated based on other conversations we had with not only Dr. Hartz, but some of the other people from BCH, was that this enrollment period was beginning now, in July of 2022, and would continue for about two years.

Q.  Is this document the only document that is evidence of -- that the hospital mis-administered tests?

A.  I'm not prepared to answer that.  I don't have access to my -- my folders now.

Q.  Well, I'm asking you whether MMAS Research has any evidence other than this email that the hospital mis-administered tests?

Page 73

A.  Excuse me?

Q.  I'm asking whether MMAS Research has any evidence aside from this email that the hospital mis-administered tests.

A.  That the hospital what?

Q.  Mis-administered tests?

A.  Mis-administrated the tests?

Q.  Yeah.  So --

A.  Yeah.  There is evidence on clinicaltrials.gov where they had the protocol. And those were done under the MMAR license and Donald Morisky --

Q.  Okay.

A.  -- with this very test that he describes in this email.

Q.  Okay.  So aside from this email and the clinicaltrials.gov publication that you're referring to, are there any other documents or evidence showing that the hospital mis-administered tests, or let me use your language --

A.  I'm not prepared to answer that because, again, I don't have access to all my files or the knowledge about what's in all my files.  So I can't answer that.

MAGNA
LEGAL SERVICES

Page 74

Q. What did you do to prepare yourself to testify about the hospital's breaches of contract?
A. For today?
Q. Yes.
A. I answered the interrogatory to the best of my ability. Now I'm commenting on the interrogatory to the best of my ability. That's all I've done.
Q. Fair to say that, sitting here today, aside from this email from Dr. Hartz that we're looking at, Exhibit 7, and aside from the clinicaltrials.gov study description, you cannot point me to any other evidence that the hospital engaged in unauthorized administration --
MS. RAY: Objection. He already answered that in the negative. He already said he's got other evidence -- he's got this specific evidence. This is it. This is enough.
But he's got other stuff, and you want him to pinpoint the other stuff.
MR. FOLKMAN: Yeah. I want him to pinpoint the other stuff. That's right.

Page 75

And if he can do it, great. If he can't, that's fine. I just need to know.
A. I can't do it. I'm not prepared to do it. It would take hours for me to do it, and I don't have time to sit here and go through my files until I find it.
But, yes, I think there is other evidence. And when we find it, we'll definitely let you know.
BY MR. FOLKMAN:
Q. Okay. Other than this email and the clinicaltrials.gov study description, do you have any evidence of the number of tests that were administered?
And here I'm not talking about your estimate based on what you understood was going to be the course of the study, but rather direct evidence that a certain number of tests were administered?
A. Yeah. There's one other place where there's direct evidence of the number of MMAS tests that were administered.
Q. And what place is that?
A. That's what I need to get -- to find. But I know there is evidence of that.

Page 76

I would think that it might be in that article that was published in 2025.
Q. Okay. Sitting here today, the answer to my question is you can't say?
MS. RAY: Well, he's -- I mean, you're acting like he has no evidence. He's told --
A. Why don't you put the article up on the screen and I'll pinpoint it to you, all right? And I'll show you evidence.
BY MR. FOLKMAN:
Q. Okay. Let's --
A. Put the article up there. I'll show it to you. Let's take time.
Q. Let's move on.
Do you have any evidence of how Dr. Hartz actually administered the tests? And what I'm getting at here --
MR. FOLKMAN: Let's take a look, please, at the next exhibit, which we'll mark as Number 10 -- Number 9.
(Enrollment Protocol Form/Template, 1 page (previously marked Exhibit 24), marked as Exhibit 9.)

Page 77

BY MR. FOLKMAN:
Q. And I'd like you to -- it was Exhibit 24 to the First Amended Complaint.
All right. You've seen this document before, sir, Exhibit 9, which was Exhibit 24?
A. Is there any way you could -- could you scroll down so I could see the bottom of it?
Okay. Now let me see the top of it.
Now let me see the top. Okay.
Q. So are we on the same page that this is the form that the hospital created that you say they improperly used to administer the test?
A. That I'm saying the hospital improperly what?
Q. Improperly used to administer the test. And it was improper because they didn't have your permission to use a paper test, and because the scoring in their --
A. There are a couple of things. And I don't want you to have to change the exhibit, but there are no instructions to the patients,

20 (Pages 74 to 77)

MAGNA
LEGAL SERVICES

Page 78

which are part of the MMAS-8 from 2006 and the Morisky Widget MMAS-8 test that Dr. Hartz and I created in the widget.

The instructions are completely gone. As a matter of fact, there's nothing on there to let you know what this test is.

This is a form that Dr. Hartz created.

Now, if you'll go to the bottom of this test, please. And there -- stop.

You'll note how many answers did they give that are in bold uppercase? Are you able to see the bold uppercase answers for Number 1 through 8?

So if they checked more than two of the bold uppercase answers, they are eligible to be enrolled in the study.

Now, what I'm telling you is as a person who has been trained in quantitative methods and statistics and who has spent close to 30 years doing this, that there's a probability that they had to give quite a few of these to come to a number where they felt they had a study sample to do the actual study. So that's kind of the way I look at it.

Page 79

This is Steve Trubow. This isn't MMAS Research talking. This is Steve Trubow. And this says a lot to me. There are no instructions. It doesn't tell you what the test is. But at the bottom, this scoring and coding is not even in the widget. It doesn't exist. It's not even in the MMAS-8. It doesn't exist.

So that's my comment.

Q. Mr. Trubow, do you know how Mr. -- or, excuse me, how Dr. Hartz used this form? In other words, whether he gave it to patients to fill in or showed it to patients?

A. Yes. This protocol is on clinicaltrials.gov. And this is evidence of a breach of contract. This protocol, this screener, is on clinicaltrials.gov.

Q. Yeah. I think you're misunderstanding my question. My question isn't did he use it. We know he used it.

My question is when he used it, did he hold a clipboard and write down what the patients were saying? Did he give it to the patients for them to fill out? Did he show it to the patients?

Page 80

Do you have any knowledge about that?

A. What we have knowledge of is that he -- and we need to go to the clinicaltrials.gov, to the section -- it's in the First Amended Complaint.

But we know that he used this test to achieve the result that would determine if they could be enrolled in the study.

This is what he used to determine enrollment. It's called "Enrollment Protocol." All right?

Q. Is --

A. Now, I agree. It might not have been this. He might have just, you know, done some other test. But it actually has language that refers to, you know, a number of questions that they answer in the affirmative or whatever.

So that's all I can answer.

Q. Is the answer to my question, no, you don't actually know whether he filled it in himself or whether he gave it to patients to fill it in?

A. Well, according to his email, he

Page 81

said he gave it from memory.

Q. So he may not have used the form at all.

A. So obviously, you know, this isn't the test that he and I created. We don't have this "greater than 2 - eligible." I mean, that's not on the template that we looked at earlier.

So I'm -- you know, I'm --

Q. Let's talk about --

A. -- I really can't give you more than I have, sir. How he gave it, what he gave, or who he gave it to, because it would be speculation.

Q. Right.

A. I'm not going to speculate.

Q. I don't want you to speculate.

Let's look at your second bullet point in the answers to the first interrogatories, which is "Breach of Attribution/Notification Requirements."

And here you're saying that the hospital did not update the clinicaltrials.gov listing at your request in July of 2022 with the language that the contract requires; is

MAGNA
LEGAL SERVICES

Page 82

that right?

A. That's correct.

Q. Then your third -- well, let's stick with this for a minute. If we look at the contract itself, which was Exhibit 7 -- we're going to put the contract up. Give us a second.

All right. So I'm showing you a contract. And I'd like you to look at the first page of the contract in the "Trademark & Copyright" section.

Let me scroll up.

So the language in that last section says:

"The MMAS required citations and licensing statement provided in Appendix 1 must be included in all manuscripts, web postings, or other publication containing Morisky Widget MMAS descriptions or results."

Yes?

A. Yeah. I read that. Yes.

Q. Okay. Do you agree with me that the article, or the posting, rather, on clinicaltrials.gov did not contain any MMAS

Page 83

results?

A. Maybe not results, but -- and, again, I have to look at the clinical trial, but it has description. I mean, it says "descriptions or results."

Q. Yeah. So you're getting to my next question, which is what does "descriptions" mean to you here?

A. Again, you know, that's -- I can't really do that. I mean, it can go from just putting MMAS-8 Morisky Widget -- I mean, that's a description. That's -- that's something.

Can you scroll down though to another part of the contract?

Q. Not yet. Not yet. Please stick with my questions.

A. Okay. Go ahead.

Q. What you're telling me is that MMAS Research's view is that any mention of the Morisky Widget is a description for purposes of this provision of the contract in Section 1 that we're looking at; is that right?

A. I -- you know, I'm not going to -- I'm not prepared to answer that question and define what "description" means, sir.

Page 84

Q. Okay. Let's look at the third bullet point in your Answers to Interrogatories, which is "Intellectual Property Misconduct."

And you say that:

"On January 10, 2023, BCH inaccurately represented on clinicaltrials.gov that permission was granted by 'MMAR, LLC,' and 'Donald Morisky' individually. This misattribution and the failure to identify MMAS Research LLC as the sole licensor constitutes a material breach of the administrative and IP provisions of the license."

Okay?

A. Okay. I read it.

Q. So my question is how does this differ from the second bullet point?

In other words, is there any additional provision of the contract that you say was breached in this third bullet point other than the bit that we looked at before that says that you have to attribute in accordance with Appendix 1?

Page 85

A. Can you put the license up, please.

Q. Sure.

A. Okay. And go down to "Terms of Use."

Q. You're looking at Section 3? Maybe scroll to Section 3.

A. Yeah, up there. Or maybe even all the way to the top.

Okay. Stop.

Go down.

Yeah. There are some parts in here that it addresses, okay. In other words, the original clinicaltrials.gov, the tests that Dr. Hartz created with me that he then either gave from memory or whatever was my intellectual property.

MMAS is speaking now. It was our intellectual property. It says here quite -- that we will not grant any unauthorized use of the MMAS or other Morisky intellectual property, in whole or in part.

And by continuing to use my intellectual property in 2023, 2024, 2025, and 2026, it's still up there.

This is a breach of -- if you'll go

MAGNA
LEGAL SERVICES

Page 86

down to -- this one: "In case of scientific, administrative, or intellectual property misconduct" -- will you scroll down, please -- "we reserve the right to pursue all legal remedies."

That is what we are doing in the First Amended Complaint.

Q. Okay. So my question is, looking at the third bullet point in the Answers to Interrogatories, which says that BCH had improperly stated that permission was granted by MMAR and Donald Morisky, what I'm asking you to do is to identify anything in the contract that that misattribution violated other than the requirement we've already looked at in bullet point number 2, which was the requirement that the work be attributed properly in accordance with Appendix 1 to the license.

A. It's a different breach. It's totally different.

Q. That's what I'm asking.

A. Yep. It's different.

Q. So what in the contract --

A. I'm not -- again, I'm a public

Page 87

health scientist and a system engineer. I'm not a lawyer. So I'll defer that to my lawyer. And that's the best I can do, sir.

Q. All right.

And it's no blame or anything, but that's a question that you're not prepared to answer today?

A. I'm not prepared to answer.

Q. Okay. Your fourth bullet point is "Creation of Unauthorized Derivative Works."

And this is your point about the unauthorized use of a paper screener without permission.

We've already talked about that, right?

A. I think so, yes.

Q. And the breach there is a breach of Section 3 of the contract, right?

A. Yes. I think so.

Q. Okay. And then finally, "Unauthorized Protocol Publication."

BCH published a study on -- or a study protocol on clinicaltrials.gov using the unauthorized preenrollment screener "further proliferating uncertified methods in violation

Page 88

of the license."

So are you saying that the use of the screener and then the publication of the screener are two separate breaches?

A. Again, I'm not really that good. But I would say that the Number 3, Intellectual Property Misconduct that you tried to group with Breach of Attribution/Notification Requirements, it actually groups with this last one, Number 5.

Q. Okay.

A. All right. I will say to you two things happened.

By August 2024, they had terminated my license without cause. They continued to use my intellectual property under the license of MMAR.

And MMAR had no right at all to take credit for that Morisky Widget test that you're talking about for that protocol.

Q. Do you know the last day or date on which the hospital or anybody at the hospital administered an assessment?

A. I think that that Excel spreadsheet won't show that. But, yes, I can go into the

Page 89

widget and I can come up with the actual test, the date, and the results. I have that.

Q. My question may have been a bad one.

I'm not asking you for the last date that they administered via the widget. I'm asking you for the last date on which they administered one of the unauthorized tests, the paper tests.

A. No. I don't have any of that information, no.

Q. You don't know any of the dates that they administered any of the tests, right?

A. Well, I do know that Dr. Hartz in 2022 said it would take two years.

Q. Yes, and that's all you know, right?

A. That's all I know. That's why we were seeking discovery.

Q. Okay.

A. Thank you.

Q. Let's talk about damages.

Your answer to Interrogatory Number 3 -- the question I asked was: "For each category of damages,

MAGNA
LEGAL SERVICES

Page 90

state the basis for your contention that BCH caused you to incur the damages."

And I just want to step back for a minute before we get into the weeds on this and talk about -- let's talk about the use of a paper test as opposed to scoring in the widget, okay?

Your view, as I understand it, is that the widget test is a superior test. Not only does it give you the raw or flat score, it also explains why the patient is not adherent to their medication regime, right?

A. You want to finish? Go ahead.

Q. Oh, sure. I can keep going.

And it's also your view that the -- well, let's stop there for a minute. And then I'll get my --

MS. RAY: Yeah. That sounds like a compound question.

Can you take it apart?

BY MR. FOLKMAN:

Q. Let me ask the question again. Let me ask it again.

Your view is that the widget is a

Page 91

superior test, right? By that, I mean superior to the MMAS-8 on paper.

A. Can I give you my answer?

Q. Yes.

A. My uninterrupted answer?

Q. Go for it.

A. All right. The Morisky Widget is a -- a diagnostic assessment of medication-taking behavior. It's expressive. It provides a risk assessment based on tertiary, secondary, and preventative risk. It uses a three-tier scoring and coding system. It has high sensitivity and high specificity.

The MMAS-8 2006 test, which was validated in 2008 in the Journal of Clinical Hypertension, that test, beginning in 2021, an editorial by Dr. Ortiz, a noted epidemiologist, found that the scoring and coding reported in that article was incorrect, that the MMAS-8 test has accuracy of only 38 percent true positive.

That means out of 100 people that take that test, 62 percent, 62 patients out of 100, are misdiagnosed for their medication adherence.

Page 92

There have been -- the editor of the Journal of Clinical Hypertension retracted that article out of the medical literature.

Across the scientific field, that test has now lost all credibility. There are publishers who refuse to publish papers.

Moreover, Boston Children's Hospital, in the article that they published in 2025, had the retraction notice as Footnote 47. Although in Footnote 46, it used the same article to validate this test.

So when you ask me if I believe the Morisky Widget is superior to the MMAS-8 test, of course.

Q. Okay.

A. Even a simpleton would say, well, one test has been discredited at the highest levels of the medical and scientific literature, while the Morisky Widget, the validation article, remains untouched.

So I think that's all I can say.

Q. All right.

Your answer is yes. That's fine.

And you say that -- and I'm not even going to get into the reasons why. But

Page 93

you say it's a better test.

The hospital, in your view, administered the wrong test. It administered an MMAS-8 that didn't have all the benefits of the MMAS widget, right?

A. No. The hospital administered my test, my intellectual property. The hospital scored and coded it outside of the widget. They scored and coded it with the flat scoring and coding that the Journal of Clinical Hypertension said is no more accurate than flipping a coin. So on these adolescents with a serious disease, they put them at risk --

Q. Okay.

A. -- of a misdiagnosis.

Q. Okay.

A. That's what I'm saying, sir.

Q. I understand and I appreciate that answer because you're focusing on the scoring and the coding. That's great.

So I understand that this could harm -- in your view, could harm the adolescents who were given the test, right?

A. Say that again?

Q. What you just described could harm

Page 94

the adolescents who were given the assessment, right?

A. There are definitely patient safety considerations here, yes, sir.

Q. Now, you don't know that any patients actually were harmed, do you?

A. No. That will be audited at some point, I hope.

Q. Okay. My big-picture question is what's it to you, or what's it to MMAS? I understand that someone else might have been injured. But why do you say, just in the big picture, that MMAS was researched [sic] by the fact that Dr. Hartz and the hospital used an improper method of scoring the test? What is it to you?

MS. RAY: Can we stop -- you are asking what it is to him personally, or what it is to MMAS, or is this just like his opinion?

BY MR. FOLKMAN:

Q. Well, let me --

How does it harm MMAS Research, LLC if the hospital uses an improper scoring method?

Page 95

MS. RAY: And uses it under the name of the Morisky Widget?

MR. FOLKMAN: Let me ask my question; okay, Patricia?

BY MR. FOLKMAN:

Q. How does it harm MMAS --

MS. RAY: I'm just trying to clarify so he can answer. I know you want an answer. I'm trying to clarify so you can ask him a question and he'll give you an answer. That's all.

MR. FOLKMAN: Well, let me try my question and we'll see how we do.

BY MR. FOLKMAN:

Q. How does it harm MMAS Research, LLC for Dr. Hartz to administer his assessment and then score it on paper rather than scoring it via the widget?

MS. RAY: Let me -- just one more thing. And this is in the context of the damages, right?

MR. FOLKMAN: Patricia, just let me ask my question.

MS. RAY: Okay. I just want to

Page 96

make sure he knows what he's answering, that's all.

BY MR. FOLKMAN:

Q. Do you understand my question, Mr. Trubow?

A. Yeah. I think I understand. I think I can answer the question.

Q. Great.

A. Okay. It harms MMAS Research because Boston Children's Hospital is scoring and coding a medication and condition-specific test that I personally created with Boston Children's Hospital using scoring and coding criteria which has basically been retracted from the medical literature and even noted in the article that they published.

They published an article. They said: This is how we scored and coded it, according to the Journal of Clinical Hypertension 2008 article.

Then, in the next breath, Footnote 47, they say: But this article was retracted from the medical literature.

They don't tell why. And then they have me on there claiming attribution.

Page 97

So the bottom line is -- is it's damning to me now because the truth is out. This is known across federal regulatory agencies, the Harvard Research Office of Integrity, the Boston Children's Office of Integrity.

It's a known fact that Boston Children's Hospital used the MMAS scoring and coding that has been retracted in the medical literature in 2023. They were still using it after it was retracted.

Q. Okay.

A. After it was deemed more -- less accurate than a coin toss. That reflects on me, MMAS Research. That reflects on my company.

Q. Are you saying that the harm is -- the harm that you suffered is really reputational?

A. Oh, you know, obviously, this again goes to the Second Amended Complaint, which had a lot of that in it. And the Court has not allowed me to discuss it, to go forward with that.

So I'll leave my answer as it is.

MAGNA
LEGAL SERVICES

Page 98

Q. Well, let me just be clear, because I want to understand your damages claim in the First Amended Complaint.

And what you said is, well, it harmed us because it reflects badly on us.

So what I'm asking is, is your claim for damages in the First Amendment Complaint really a claim for reputational damages?

A. No. If you read my objection, this is premature. A full calculation of damages requires expert testimony and the completion of discovery regarding the scope of defendants' unauthorized use.

Q. Are you saying that you are unable -- I've read that objection. Does that objection mean you are unable to quantify your damage without further discovery?

A. Can I hear the last part? After discovery?

Q. Sure.

Does this mean that you are unable -- that MMAS Research is unable to quantify its damages claim unless it has additional discovery?

Page 99

A. Right now, I would probably say yes. But, you know, I can't really give you a definitive one because there's going to be pending litigation on that. So I'm just -- I'm not prepared to answer that question, sir.

Q. Okay. Just to go back to what we were talking about, I understand that the hospital might be put in a bad light by using bad science. But if the hospital is the one misusing the science, how does that harm you?

A. Because the name "Morisky" is also on the widget as well as the Morisky Medication Adherence Scale 8.

The name MMAS Research, LLC was a company founded by my beloved partner in 2012 in California, which he moved to Washington State in 2016, and which we created the Morisky Widget, MMAS Research, in 2016 and 2017, and then licensed over 200 pharmaceutical companies, hospitals, and clinics around the world.

So for one of my pharmaceutical companies like Novartis Italy, where I'm running a breast cancer study right now in Italy that began in 2017, this causes me a

Page 100

great deal of harm to my reputation, along with --

Q. Didn't you --

A. -- other clients.

Q. Didn't you sue Novartis?

A. Excuse me?

Q. Didn't MMAS Research sue Novartis?

A. MMAS Research sued Novartis Germany and then withdrew the complaint.

Q. How do you feel your reputation is right now with Novartis?

A. Well, you know, I mean, I have licenses with Novartis Italy, Novartis South Korea, Novartis Argentina, Novartis Germany, Novartis UK. I have licenses with many Novartis affiliates.

As I said, Novartis Italy is currently using the Morisky Widget, which is based in Frankfurt. Germany. I get quarterly reports from them on intentional, unintentional, low adherence. I have a great relationship with that Novartis affiliate.

We did file a complaint against Novartis Germany. It has been withdrawn. It could be refiled.

Page 101

We currently have a regulatory complaint in front of the European Medical Association and the German Regulatory Agency against Novartis Germany.

All in all, I would say we have a very civil relationship. We don't have any litigation pending.

Q. This actually gets to a point I wanted to --

MS. RAY: I want to make an objection to you constantly saying "merely reputational," because reputational can be quantified in terms of future like lost sales or past lost sales.

So just characterizing thing as "merely reputational" I think is misleading him in his answer.

MR. FOLKMAN: Patricia, I'd appreciate it if, when you make an objection, you'd just say "objection" and "object to the form of the question," which is what is proper, okay?

MS. RAY: I will do that. But I wanted to clarify what the objection is so that you can reformulate your objection and

MAGNA
LEGAL SERVICES

Page 102

give something more specific.

I will make just objections after this.

MR. FOLKMAN: Thank you.

BY MR. FOLKMAN:

Q. All right. Let's jump ahead to what your counsel is talking about.

In your answer to Interrogatory Number 3, the first bullet point in the damages categories is:

"Actual damages (estimated at $1 million): Representing the fair market value of lost licensing opportunities and the diminished value of plaintiff's intellectual property resulting from BCH's unauthorized use, improper attribution, and the creation of derivative works."

Do you see that?

A. Yes.

Q. Okay. Let's talk first about improper attribution.

And I understand your claims on the clinicaltrials.gov website and in the later Dr. Hartz articles, the hospital does not

Page 103

attribute in the way that you think the contract required, right?

A. Let me just say this: This actual damages estimate is only based on the First Amended Complaint. It has nothing to do with Dr. Hartz's 2025 article.

Q. Okay. So it only has to do with the clinical trials.gov misattribution?

A. That is correct, sir.

Q. Can you name for me any person who is not associated with MMAS Research who actually read the clinicaltrials.gov posting?

A. I would say to you that clinicaltrials.gov is read by millions of researchers, scientists, university academics, medical students.

It is the most widely publicized research engine in the world. It is run by the National Institute of Health.

And I can tell you that we did not sell licenses worldwide. We -- it killed my business.

Q. So is that a long way of saying, no, you cannot identify any human being who is not associated --

Page 104

A. No, it's --

Q. Let me finish the question. Let me finish.

Is that your way of saying you cannot identify anybody who read that posting?

A. No. I'm not prepared to answer that question.

Q. I think I'm going to give you a chance to reflect on that and answer it.

MS. RAY: Well, objection.

MR. FOLKMAN: Okay.

MS. RAY: I'm going to add that I think he did answer it. But objection as to --

MR. FOLKMAN: I don't think he has.

MS. RAY: -- the nature of the question.

BY MR. FOLKMAN:

Q. The question is, can you identify any person who read that posting?

A. All right. Right now, sitting here today, I'm not prepared to answer that question. I can -- I mean, I -- I don't have my access to my emails, to my correspondences. I can't answer that question.

Page 105

Q. When you say you're not prepared to answer it, it leaves me a little bit confused about whether you know the answer and are unwilling to say it or whether you don't know the answer.

A. No. I have correspondence from my licensees that were shocked when they read that. Were shocked.

Q. So which licensees were those?

A. I don't have -- I don't have my correspondences in front of me. I get thousands of emails a month.

Q. That's a lot of emails.

Have you provided these documents to counsel?

A. I don't have that information available to me right now, sir.

Q. Have you provided those documents to your counsel, those emails that you received from your --

A. I never provided those documents to my counsel.

Q. I'm sorry. I didn't hear your answer?

A. I never provided those documents to

MAGNA
LEGAL SERVICES

Page 106

my counsel.

Q. Okay. Would you agree with me that if, hypothetically, no one actually read that posting on clinicaltrials.gov, then the posting could not have caused any decrease in the fair market value of MMAS Research, LLC?

MS. RAY: Objection to that. Presumptuous.

A. So you objected and now I can answer?

MR. FOLKMAN: You can answer.

MS. RAY: You can answer if you would like to.

A. Oh, yeah. I would love to answer.

This clinicaltrials.gov publication thread which started in 2023, continued in 2024. I think there was one even in 2025.

At the same time that this went on, the retraction from the medical literature, the Nevada case of adherence versus CVS Pharmacy, the MMAS-8 today has been totally discredited for all its scientific and medical merits. It is no longer a copyright-protectable work.

It is -- the only place they are using it is where they can't read English,

Page 107

where they can't read clinicaltrials.gov, or read the many organizations that have publicized the retraction and the removal of the copyright.

This has caused huge reputational harm to me. And the BCH continued to defend it in the face of overwhelming criticism around the world.

BY MR. FOLKMAN:

Q. Criticism of the hospital around the world?

A. Yes. I'm talking about the hospital continuing to publish it. Clinicaltrials.gov is not just BCH and American organizations. Every study around the world, whether it's funded by NIH or not, is registered there. It's the -- it's the -- I mean, it's the central repository.

So when you have a study like this that's lost all its research integrity and the results are putting patients at risk, it's just done horrible things not only to me, but to MMAR.

Q. You mean MMAS?

A. No. It's done -- MMAS and MMAR.

Page 108

Q. I see.

Let me ask you about a lawsuit that MMAS Research brought against Novartis, the Albert Einstein College of Medicine, the University of Naples Federico II, St. Olav's Hospital, Yale University, the University di Pavia, Maastricht University Medical Center.

Do you know the lawsuit that I'm referring to?

A. Yes.

Q. Didn't you sue St. Olav's Hospital as part of that lawsuit for misattribution of the widget?

A. It wasn't misattribution of the widget. That's not the breach of the St. Olav's license. That's not what the complaint says.

The complaint was against St. Olav because they participated in a study with another set of researchers, and that study was licensed by MMAR.

And the way MMAR -- again, Dr. Morisky is -- you know, has had Alzheimer's disease for the last six years.

So MMAR allowed St. Olav and the

Page 109

other researchers, which I think included Yale University and a bunch of others, to score and code the MMAS-8, not with the scoring and coding that BCH used, but a counterfeit scoring and coding.

So instead of getting 38 percent, it's down to 15. All right?

And, you know, that lawsuit also has been withdrawn. It's not currently there. We're working with St. Olav to try to settle it, to try to correct the scoring and coding, to try to alert the European medical agency that is auditing it.

We've given up litigating to try to save people's lives. This is the job of regulatory agencies.

We don't expect Boston Children's Hospital to cure this breach of contract by going out and informing the families of these adolescents that they put their children at risk. We don't expect that, sir.

But there are federal regulatory agencies and that's their job. So reputational damage will only be corrected through the

MAGNA
LEGAL SERVICES

Page 110

regulatory process. It will not be corrected through litigation.

Q. Did MMAS Research sue a hospital called the Charité in Berlin -- well, let me just stop there.

Did you sue the Charité?

And it's C-h-a-r-i-t-é.

A. Yes. Back in 2022, Dr. Morisky and I were co-plaintiffs suing Charité for copyright infringement.

Dr. Morisky, who by then had Alzheimer's, and he was pro se plaintiff at the time, his lawyer submitted a declaration, asked the Court to dismiss the case with prejudice against Charité.

And the judge took that into consideration and the judge dismissed it. He dismissed that case.

That case was later appealed to the Ninth Circuit. And the Ninth Circuit went to the trouble of correcting Dr. Morisky and correcting the judge, and told the judge that MMAS Research did have the right to bring the infringement and did have the ownership of the Morisky Widget. It was owed.

Page 111

Now, I need to tell you that there is a new complaint filed against Charité that is in the same federal district courtroom that the original Charité was. It's there right now.

Q. So --

A. And it's for a different study. It's called the secure study. And so there are two cases on Charité: One that was done back in 2022, and there is another one that is currently in the Central California District Court.

The difference is MMAS Research is bringing suit without Dr. Morisky.

Q. And is that latter case, the case that's pending now, is that the case that's also against the Mount Sinai Hospital and the Centro Nacional de Invest- --

A. Yes, you're correct. In New York, you have the same case, but it's against Mount Sinai and against Dr. Fuster, F-u-n-s-t-e-r [sic].

Q. Okay.

A. Who is -- what?

Q. Sorry. Isn't one of the claims in

Page 112

that case a failure to attribute?

A. You know, without looking at those complaints, I can't tell you.

Q. What about JIMRO Company, the University of Tokyo, and other defendants? Did you sue them?

A. Yes. We sued them in I think August of 2025.

Q. And isn't one of the claims in that case a failure to attribute?

A. Well, again, I don't have that. Right now those cases are being served directly to the lawyers, except JIMRO, to the University of Tokyo, Kameda Hospital, Nihon Medical University, and Mitsubishi.

JIMRO is basically -- we're going to have to do letters rogatory.

So that complaint is being re-served right now to those four, to their U.S. lawyers.

Q. And it's --

A. I don't -- I don't have the complaint.

Q. Okay. It's fair to say that whenever MMAS Research or its lawyers write

Page 113

something in a complaint, that that is a statement of what MMAS Research believes to be true, right?

A. You know, I don't know the causes of action for any of these. You've asked me about 10 or 12 different cases and all I can do is confirm for you the status of the litigation, yes or no. That's it.

Q. So you can't tell me, for example, if MMAS Research sued the University of Wolverhampton for misattributing the MMAS?

A. No. I mean, the University of Wolverhampton has been settled -- we settled that outside of court. And I'm not under any -- I mean, I'm under a confidentiality clause. I can't even talk about that case, sir.

MS. RAY: Could we find a -- he's been going for about an hour.

MR. FOLKMAN: Yeah. We can take a break. Why don't I make this suggestion: Why don't we take a short break. And then we'll go to about 12:30 my time and then we'll take lunch.

How does that sound?

MAGNA

LEGAL SERVICES

Page 114

MS. RAY: You set the schedule that works for you and we'll go along with it.

MR. FOLKMAN: Great. So let's take five minutes and we'll finish up for lunch.

THE VIDEOGRAPHER: Going off the record. 8:39 a.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. 8:46 a.m.

Go ahead.

MR. FOLKMAN: All right. I just want the record to note that I see from the Zoom screen that Philip Morisky has joined the Zoom, as Mr. Austin suggested he might before we got on the record.

BY MR. FOLKMAN:

Q. Mr. Trubow, I was asking you about some other lawsuits.

MMAS Research sued Johnson & Johnson, Janssen, and MediNeos; is that right?

A. We filed a lawsuit against Johnson & Johnson and against IQVIA, which MediNeos is an affiliate of IQVIA.

And that lawsuit was withdrawn

Page 115

against Johnson & Johnson very shortly after we filed it.

Q. Wasn't there a claim in that lawsuit that there had been a misattribution of the widget?

A. Again, I don't have that complaint in front of me and I couldn't tell you.

Q. How is it that MMAS Research knows which of the misattributions caused its damages?

In other words, how can MMAS Research distinguish between the damages it suffered to its business because some other institution misattributed the widget and the hospital misattributed the widget?

A. Well, that's a fair question, sir. So let me give you my answer.

When -- let's say the University of Wolverhampton, as an example, published an article in a -- what we call a tier 2 publication that's published in Prague about a study.

And Boston Children's Hospital, which puts it on clinicaltrials.gov, which is like -- you know, the difference between

Page 116

comparing Grand Central Station to a railroad terminal in Kearney Nebraska.

That's the difference. You're putting me on the front page of, you know, the biggest place there is.

Then, again, Boston Children's Hospital, Jacob Hartz, they're affiliated with Harvard Medical School.

Now, let's take it a step further. That article that was later published not only has BCH and Harvard Medical School, but has the National Institute of Health, has the US Government.

And then, sir, it has the statement that all of the authors are being sued by MMAS Research.

Q. Isn't that true?

A. No. Let me finish, sir.

Q. Oh, I thought you were done. I'm sorry.

A. Can I finish my answer, please?

Q. Yes. Sorry. I thought you were done.

A. No, I'm not done. I'm giving you an answer about damages, both pre-- post --

Page 117

this part I'm giving you now is post that. I gave you the reason for the objection.

So in that article in 2025, the authors wrote: All of the authors of this article are being sued by MMAS Research and Steve Trubow for whatever.

Now, sir, when -- you know, you want to know the difference between Wolverhampton and BCH? It's pretty obvious that, you know, my reputation is in the toilet, sir.

Q. Are you saying that your reputation is in the toilet because now people know that you sued the hospital and Dr. Hartz?

A. I'm saying it's in the toilet because you announced that I sued the U.S. Government, the National Institute of Health, in that article.

Bring up the article, sir. Bring it up so that we can look at that. Because you're asking me specifically about that. Let's look at the article.

Q. Hasn't MMAS Research filed approximately two dozen lawsuits in the last several years?

MAGNA
LEGAL SERVICES

Page 118

A.  There's only one lawsuit filed against BCH, sir.

Q.  No.  I'm asking against other institutions.

A.  To answer your question, sir, we signed a CR2A agreement with Donald Morisky, Susan Morisky, Philip Morisky, and MMAR.

In that agreement, there is an Exhibit 3.  There are 406 infringers on that list.  There's an Exhibit 4 with 200 perpetual licensees.

There was an agreement, an infringement authorization agreement, that covered Exhibit 3 and Exhibit 4.  It was signed by Donald Morisky and Christopher Austin in January 25, 2021.

And so those lawsuits, many of them, were with Donald Morisky and Steve -- and MMAS Research.

Donald Morisky as an individual, MMAS Research as an individual.

Then, once there was a split, in other words, the CR2A as the Austin letter told BCH:  If you use the widget, we're going to sue you for copyright infringement.

Page 119

Well, a lot of those licensees did the same thing you did, except they didn't put it on clinicaltrials.gov, sir.  But they signed a license with Donald Morisky and now they're being sued for it, just as you are.

Q.  Is the answer to my question yes, MMAS Research has filed approximately two dozen lawsuits over the last several years?

A.  No.  The answer to the question is MMAS Research and Donald Morisky filed lawsuits.  And then MMAS Research filed its own lawsuits.

That's the answer to your question, sir.

Q.  And if you say that your reputation, or the company's reputation was injured by the fact that clinicaltrials.gov now says that the hospital and Dr. Hartz were sued, why doesn't the existence of those several lawsuits that MMAS Research filed -- why isn't that a cause of the reputational damage that MMAS Research has suffered?

MS. RAY:  Objection.  Very unclear and very -- where is this going?

MR. FOLKMAN:  Well, I'll tell you

Page 120

exactly where it's going -- well, I'm not going to tell you.  It should be obvious.

BY MR. FOLKMAN:

Q.  But, Mr. Trubow, my question is, why is it that the fact that MMAS Research has filed all these lawsuits isn't the cause of your damage, and the fact that the hospital says "MMAS Research sued us" is the cause of your damage?

MS. RAY:  Objection.  How is he going to answer that?

MR. FOLKMAN:  I don't know how you can answer that because it's a question that maybe doesn't have an answer.

MS. RAY:  That is not a question.  Maybe you just want to make that statement.

MR. FOLKMAN:  Well, no.  I want to ask.

Let me ask it one more time.

BY MR. FOLKMAN:

Q.  Why is it that the fact that MMAS Research has filed many lawsuits against institutions isn't the cause of the company's damage, but the fact that the hospital said "MMAS Research has sued us" is the cause of the

Page 121

damage?

A.  Can you -- you know, you just used that question again.  Can you bring up the article, please?

Q.  Can you answer my question or can you not answer my question?

A.  Yes.  The answer to your question is that article, the authors included the United States Government.  That's why.  None of those other lawsuits did.  Novartis with Germany -- the Government of Germany say:  Hey, you know, Japan, JIMRO, no.  Wolverhampton, the UK, no.

Only Boston Children's Hospital published an article with an author from the National Institute of Health that said:  Steve Trubow and MMAS Research are suing all of the authors.

That's what the article says, sir.

Q.  Okay.

A.  And I'm not suing all of the authors.  But, you know, some people take it literally.

Q.  So that's actually a very good point.  You sued three of the four authors,

MAGNA
LEGAL SERVICES

Page 122

right?  And that's a fair point.

A.  Sir, it says "all of the authors." It did not say -- it didn't say "three of the four."  It didn't say "two of the four."  It said "all of the four."  It said "National Institute of Health authors."

Q.  And is that the reason that it was harmful, that it said "all" instead of "three"?

A.  I'm saying to you, sir, that when it's announced in a tier 1 journal by Harvard Medical School, the Boston Children's Hospital, and the National Institute of Health that this company is suing the authors, it can cause reputational damage.

Q.  All right.

A.  That's all I'm saying.

Whether you agree or disagree -- I can't tell you about all the other cases.  All I can do is I'm doing a deposition for this case.

Q.  Okay.  Let me ask you about the fair market value of lost licensing opportunities, which is one of the things that you've identified in your statement -- in the answer to Interrogatory Number 3 of your

Page 123

damages.

How much licensing revenue did MMAS Research have in 2020?

A.  You know, I can give you 2021.

Q.  You have no estimate of 2020?

A.  No.  Only because we've been putting this together for some other things, I can tell you that our licensing revenue went from about $651,000 in 2021 and then it just spiraled.

And by 2023, 2024, it was way, way down.

Q.  Okay.  What was it in 2022?

A.  What?

Q.  What was it in 2022?

A.  Probably somewhere, you know, under that, maybe $400,000.

Q.  Okay.  And what was it in 2023?

A.  It just went down each year, all right?  And by the time the clinicaltrials.gov piece or Today, it's -- once that article came out in 2025, the licensing revenue is now down to zero.  Zero.

Q.  Didn't you tell me -- just to make sure we're all on the same page, didn't you

Page 124

tell me a little while back that the 2025 article isn't what this case is about; that's what the Second Amended Complaint would have been about?

A.  I -- you know, going to your question, you asked me about licensing revenue.

Q.  Well, can you stick with my question?  My question is --

A.  No.

Q.  -- didn't you tell me a little while ago that the 2025 article isn't what this case is about, it's what -- this case is about, it's what the Second Amended Complaint would have been about?

A.  No.  I'm telling you that in the objection on damages, it told you that we're getting more information.  In other words, the breach of your contract, the cause of action, will include the 2025 article.  It will include it.  All right?

Q.  All right.

So your licensing revenue has dropped from $650,000 to zero.

A.  Yes.

Q.  What -- now, you filed lawsuits --

Page 125

that is, MMAS Research has filed lawsuits between 2021 and 2025 in addition to the lawsuit that it filed against the hospital, right?

A.  Again, the ones that we filed in 2021 -- beginning in January 2021 until approximately October of 2022, were all done with MMAS and MMAR.

Q.  Sure.  That's fine.

A.  Only in 2023, 2024, 2025, are those lawsuits between MMAS Research by itself.

Now, if you want to -- so the revenue in 2021, 2022, was based on the CR2A and the combination of the two, Morisky and MMA -- or Morisky individual and MMAS Research.

Q.  Let me make sure I'm clear on that.

Are you saying that the $650,000 figure you gave me for 2021 and the $400,000 figure you gave me for 2022 represented the combined revenue in those years for MMAS and MMAR?

A.  Yes -- well, not MMAR, but Donald Morisky, the individual, yes, I am.

Q.  Okay.

A.  That is correct.

MAGNA
LEGAL SERVICES

Page 126

Q.  And for 2023, that's when that changed?

A.  Yes.  In 2023, Donald Morisky began actively terminating the licenses of the Morisky Widget licenses.  And yours was one of the ones -- that's when the Austin letter went out in April of 2022.

By 2023, we had over 150 licenses terminated.  All right?  We were no longer -- our revenue just dropped out after that.  And -- let me put this --

Q.  Yeah.

A.  Those licenses that were terminated, you were the only one -- the only one -- that took a new license from MMAR and Donald Morisky and put it on clinicaltrials.gov.  None of the other ones did it.

Q.  Who --

A.  Many of them didn't say anything to me at all.

Q.  What was --

A.  A few of them asked for refunds.  A few asked for refunds, sent me the Austin letter, sent me -- and said:  What's going on?

Page 127

What is this?

At one point, sir -- and let me finish this.  At one point you wrote in the motion to dismiss that Chris Austin sent you -- sent Dr. Hartz a letter, and you confirmed it went to Dr. Hartz.

And then you wrote MMAS did nothing to help Dr. Hartz.  MMAS did not reach out and do anything.

Sir, I did not know that he sent that letter to Dr. Hartz.  I did not know that you were terminating my license and putting it so the whole world could see it on clinicaltrials.gov.

Q.  What was MMAS Research's licensing revenue in 2023?

A.  You know, I don't have it off the top of my head, but it's way down from 2022.

Q.  Can you give me an estimate at all?

A.  In 2024, it gets even lower.

Q.  Can you --

A.  In 2025, it bottomed out.

Q.  Well, you've already told me in 2025 it was zero, right?

A.  Yeah.  Basically, yes.

Page 128

Q.  Let's pause on that.  Is it basically zero or is it zero?

A.  In 2025, the only way -- the only revenue we made were settlements for litigation and -- yeah.  There's no new licensing.

Morisky.org was taken down in 2023.  We could not afford to keep the widget up.  Morisky.org has not been in existence since you did that on clinicaltrials.gov.  We had to take it down.  We couldn't afford it.

Q.  What was the --

A.  We couldn't afford it.

Q.  What was the --

A.  The only thing we could do is move it to Frankfurt, Germany, and use it to maintain the clinical trial work we were doing.

I don't just do lawsuits every day.  I spend my time helping people that are sick.

Q.  How much was the settlement revenue in 2025?

A.  It's part of the -- it was submitted in the Second Amended Complaint.  You need to look it up.

Q.  How much was the settlement revenue --

Page 129

A.  It's $115,000 or something like that. It's in the Second Amended Complaint.

It's in the correspondence that MMAR had with Sanofi where they said -- talked about your motion to dismiss was going to establish that they owned the copyright, blah, blah, blah, blah, blah, blah.

Q.  Of the --

A.  As a matter of fact, you were going to do a cross-complaint against them, if I recall.

Q.  Of the $650,000 in licensing revenue in 2021, how much of that was settlements from litigation?

A.  Well, those settlements were licenses.  Those were retroactive licenses.  So I would say to you, 98 percent of it, or 100 percent of it.

Now, the lawyers took -- the joint representation lawyers, all of these were done with lawyers that represented Donald Morisky and MMAS Research.  Mr. Austin or -- there were no other lawyers involved, okay?

Q.  Okay.

A.  These were done by an authorization

MAGNA
LEGAL SERVICES

Page 130

infringement agreement that Mr. Austin and Donald Morisky signed. And it allowed me or any other lawyer that I selected to represent Donald Morisky.

The only thing that was set in stone was the percentage of how the revenue would go. But it was me that had to do the work. I had to go to Japan. I had to go to Europe. I had to rescore and recode those same tests that you used the flat MMAS-8 scoring on that put the patients at risk.

That's what the purpose of the settlement was. It wasn't just to get paid. It was to correct the scientific and medical mistakes that these licensees made.

Q. How much of the license -- of the $400,000 in licensing revenue in 2022 was from settlements or retroactive license agreements that came after you had made a claim on an institution?

A. They were very similar.

Q. 98 to 100 percent?

A. They were all licensing, yeah. Same thing. There were some new --

Q. Okay.

Page 131

A. There were some new ones. We were doing clinical trials for -- we were doing clinical trials for four or five pharmaceutical companies that overlap the years '21 and '22.

So there was licensing revenue. Not new licensing, but existing licensing revenue to service those accounts.

So I would say 2021, it's probably 80/20. 2022, it's probably 60 settlement/40 servicing.

We did the Ozempic study, the SURE study, which ran from 2017 to about 2022, maybe the last one -- article was 2023.

So that was one of the largest drug -- revolutionary drugs of my lifetime. I did the Morisky Widget scoring and coding for that study for Novo Nordisk.

So revenue -- that was one of the main revenue-generators. And now Novo Nordisk and MMAS Research do not have a relationship anymore. It's been blown up by clinicaltrials.gov and this article.

Q. So you know that someone at Novo Nordisk read that article, the clinicaltrials.gov article?

Page 132

A. Someone at Novo Nordisk read that article. I know that Chris Austin sent letters to Novo Nordisk and communicated with them and tried to get them to stop using the widget.

Novo Nordisk knows all about this. They know all about the Boston case. I never sued Novo Nordisk ever. I continued to work with them.

Q. Who at Novo Nordisk read the clinicaltrials.gov?

A. I don't know who the names are.

Q. Can you give me any estimates for the licensing revenue in 2023 or 2024?

A. Not -- I gave you the best estimates that I could.

Q. You haven't given me any estimates for those two years, and I'm just asking whether you can do better than --

A. I can tell you they're less than 2022. 2023 is less than 2022. 2024 is less than 2023. And 2025 is zeroed out.

Q. Okay. One of your claims is that the hospital created improper derivative works. And by that I mean the exhibit that we already saw the coding and scoring sheet that you found

Page 133

objectionable.

Do you recall that?

A. Yeah. Could you put the license up and I'll show you the specific language?

Q. Oh, yeah, sure. We can do that. I mean, I think we've already done that. I was going to ask you about damages, not about breach.

Is that okay?

A. Oh, okay. Yes.

Q. My question --

A. I misunderstood you.

Q. That's okay.

My question is, assuming that the creation of that form and the use of that form with patients was a breach of the license, can you tell me how that diminishes MMAS Research's licensing opportunities?

A. Well, now that was in the article, in the 2025 article, you know, no one is going to use the MMAS-8, whether it's Morisky Widget, MMAS-8, MMAS-4.

Now what they're doing is they just call it an "eight-item questionnaire." Because once the Nevada court ruled that the MMAS-8 was

MAGNA
LEGAL SERVICES

Page 134

not copyright-protectable, anyone can use it. You don't need a license from MMAR.

And, as a matter of fact, you can change the words, anything. It's in the public domain now, okay?

So once that article comes out and it's just -- you know, it's -- that's it.

So reputation-wise, I -- you know, I don't plan to sell Morisky Widget licenses anymore. No one is going to buy them.

Q. Help me understand something you just said. You said that once -- well, once the 2025 article came out, you're saying that because -- what? Because people then knew that the MMAS-8 couldn't be copyrighted due to the Nevada Court's decision?

A. No. I'm saying to you the retract -- the reference 46 and 47, okay? Because NIH, Harvard Medical School, two of the top research -- I mean, NIH is everything. And they're telling you that this MMAS-8 was retracted from the medical literature. The validation article was retracted.

That not only killed it for Donald Morisky. It killed it for Morisky

Page 135

MMAS Research. It killed the Morisky widget.

Q. I'm confused. Isn't it true that the MMAS-8 validation article was withdrawn?

A. Yes.

Q. And haven't you pleaded that in your complaint? That's one of your points, right?

A. It's not in the amended complaint.

Q. How can that be -- how can saying that the MMAS-8 validation article has been withdrawn be the cause of your damages?

Help me understand that.

A. I'm going to tell you. Because in the article, besides the suing all the authors, then it says there are two attributions given. One is the attribution for the Morisky Widget MMAS-8. The other is the attribution for the MMAS-8.

That's line 46. So if you examine 46, it puts both Donald Morisky's 2008 article, and then it attributes another article from -- it says: "Morisky Widget, Steve Trubow, see full text."

And that is not what it says in the license. But what that does is it sets up the

Page 136

reader. Okay. This is the validation for the MMAS-8 and the Morisky Widget MMAS-8.

Then they put 47 in. And 47 says the same article that they just quoted in 46 as the validation for this whole study has been retracted.

Now, what that does is it's like hitting Donald Morisky in the head and MMAS Research in the head with a 500-pound hammer. It's over now.

And this is the US Government, sir.

MS. RAY: Ted, could we take a little break?

THE WITNESS: It bottomed out by revenue. It bottomed out by revenue.

MS. RAY: When he finishes this, could we take a break?

MR. FOLKMAN: Yeah. Why don't we take lunch and come back in a half hour, 45 minutes?

What would you like?

THE WITNESS: Sounds good. Thank you.

MR. FOLKMAN: Patricia, how long?

MS. RAY: 45.

Page 137

MR. FOLKMAN: All right. We will see you at 1:00 Eastern.

THE VIDEOGRAPHER: Going off the record, 9:16 a.m.

----------------------
AFTERNOON SESSION
----------------------

THE VIDEOGRAPHER: Back on the record. 10:00 a.m.

Go ahead.

MR. FOLKMAN: Thank you.

BY MR. FOLKMAN:

Q. Mr. Trubow, does the amount of damages that MMAS suffered depend in any way on the number of tests that the hospital wrongly administered?

In other words, does it matter from a damages perspective whether the hospital administered four paper tests that were scored outside of the widget or whether it administered 400 tests that were scored outside of the widget?

A. I think that's fair to assume that we're not going to be asking for damages based on a per-test, yes.

MAGNA
LEGAL SERVICES

Page 138

Q. Okay. So given the theories that you've talked about, there's a no material difference based on the number of tests that were --

A. No. And I mean, again, we don't know how many tests they gave.

Q. There's no issue -- you're not saying that the fact that the hospital published the scoring criteria that it used is itself a basis for a damages claim, are you?

A. I mean, I would have to look at that clinicaltrials.gov piece on the protocol. I don't recall exactly what that showed. This was 2024 on clinicaltrials.gov. I'm not sure it was on the 2023 one. I know it was on 2024.

Q. Well, let's take a look then. I'm going to show you what I think is the August 2024 version of the clinicaltrials.gov posting. And then I'll give you a chance to look at it and then I'll ask the question again, all right? By the way, do you know how far -- before we get into this document, you see it says "No longer looking for participants."

Page 139

Do you see that?

A. Let's see...

Q. In the red box there?

A. Yes. In other words, they're not recruiting --

Q. Right.

A. -- in 8/21/2024.

Q. Do you know how far this study got in its process? In other words, do you know whether they recruited a cohort that was sufficient? Do you know whether they actually did anything?

A. That was one of the reasons that we wanted to do discovery. I have no idea.

Q. Okay.

MR. FOLKMAN: And we'll mark this as Exhibit 10.

(Clinicaltrials.gov and redline, 24 pages, marked as Exhibit 10.)

BY MR. FOLKMAN:

Q. I'm going to ask Ms. Gardon to scroll down. Tell us when you want to stop. And take a look for whatever it is that's relevant to you in terms of answering my question about whether the disclosure of the

Page 140

scoring criteria in some way plays into your damages claim. And by the way, I'll just say that this bit that you see at the top here is because the version that I downloaded shows the redlines from the prior version. So I just want to make sure you understand what you're seeing. The -- clinicaltrials.gov makes that available.

A. Okay. Can you go slowly because I need to see that top part that you just went over, just the beginning. Hold on. Yeah. Let me just look at this slowly. So where it says "Study Completion," "Estimated" is crossed out, "Actual" is put in, that's something that you did or was that actually on clinicaltrials.gov?

Q. No. So I'm going to represent to you that this is what I downloaded from clinicaltrials.gov.

A. So there is something now that's got "Estimated" crossed out and "Actual" put in?

Page 141

Q. I'm just going to represent to you what I did. I believe this is the redline that the clinicaltrials.gov provided between the 8/19/24 version, and the 1/24/24 version, which is the prior version.

A. Okay. So keep going. And just go back up to the sole -- the responsible party's part. Yeah. Right there. Stop.

Q. So this is the misattribution information --

A. So I just want to make sure -- this is a little different than what I saw. I hadn't seen this, this staff cardiologist and instructor. So I assume instructor is at Harvard. Staff cardiologist is at BCH. All right? All right. Keep going. Thank you very much. I'm sorry, but I hadn't seen the redline before. You can go down.

Q. I think let's just pause here because I think we're coming to the first mention of the MMAS.

MAGNA
LEGAL SERVICES

Page 142

A. It's in one of the "Aims." We're getting closer.

Q. Yeah. Take a look --

A. Stop right there.

Q. Stop there.

Do you see that paragraph in Aim 1.1 that says --

A. Yeah. That's what I'm looking at.

Yeah. So Aim 1 -- Aim 1.2:

"Patients who are found to have low adherence according to the MMAS."

So what that is, that is the screener. And that screener was scored and coded using the MMAS-8 flat scoring. It was not scored and coded in the widget because we know how many they scored and coded and went, okay?

Let me read the next one. Okay.

Then what's going to happen is they're going to do the enrollment of the low-adherent patients. And they're going to do it -- they're doing an app, okay? Tracking features in the app and the MMAS.

Now, this is what I don't know -- I want to get rid of that.

Page 143

I don't really know how many times they're giving the MMAS-8 to the enrolled party, all right? So when you say the number of tests and this and that, I don't really know that. All right?

And then the other issue of damages, which we are investigating, is that this just wasn't an observational study. This was an interventional study. And it was an interventional study to validate an application that is commercially sold in the United States.

So this is a problem, because what they've done is they're selling the Wellth App. And we know for a fact that they used this study as validation of this commercial application, all right?

We also know that that validation was false. It wasn't correct.

Q. Do you know -- do you know -- well, first of all, do you know if the study was completed?

A. Excuse me?

Q. Do you know whether the study was completed?

A. Whether the study was completed?

Page 144

Q. Yes. In other words, whether -- obviously, the study is over, but did it actually -- you know, did they --

A. Yes, sir, yeah. According to that article in 2025, it was completed, yes.

Q. And do you --

A. That's what that article was for. That was a post-study article.

Q. And do you know whether the study was successful?

A. I don't know that, okay? But I know it was completed. It says on clinicaltrials.gov that it was completed.

Q. Yeah. Maybe "completed" is not the word I'm looking for.

A. Yeah. Yeah. So --

Q. I guess what I'm asking is do you know --

A. So let me go on.

Q. Okay.

A. So let's go to -- go down lower. Although this is valuable. Let me see. Hold on. Right there. I need to read this real quickly.

Do you see where it says:

Page 145

"The second function of the Wellth Application is to document whether a patient takes the prescribed medication within the correct period of time. The Wellth Application determines adherence by having the patient take a photograph of the correct dose of medication out of the bottle."

Okay. Good. You can go on. Thank you.

Keep going.

Okay. Now, get to "adherence will be measured." Yeah, I need that paragraph. Right there.

Okay. So this is in 2024. It says:

"Investigators will use validated Morisky Medication Adherence Scale" -- so it was invalidated; this is not correct -- "to assess baseline adherence."

Now, what they used to mine the screener is different than they're saying here, all right? Here they're using the

MAGNA
LEGAL SERVICES

Page 146

MMAS-8 scale.  They're not using that screener.

Now, one of the things that we wanted to know in discovery was that the widget MMAS-8 that we went through today in detail with medication and condition-specific.  Because that will affect the damages and the breach right here.  We don't know, all right?

So if you'll keep going.

Q.  Let me pause you on that.

How would the use of condition-specific versus noncondition-specific assessments affect the damages of breach?

A.  Because even though, like -- and, again, you and I -- you know, you and I have a history on this.

So when you say:  Did you take your medication yesterday?  All right?  Which is question number 5.  Did you take your pill yesterday, whatever the generic question is, and you change that to:  Did you take your cholesterol medication?  All right?

In other words, you're using my intellectual property to get a more valid response.  All right?  That's misuse of my

Page 147

intellectual property.

And then the scoring and coding is a separate issue.

So, you know -- and, again, when you say "Use the validated MMAS-8 scale" -- MMAS scale; it doesn't say "8" -- you know, you're probably -- I don't think you're referring to the widget, you know, to assess baseline adherence.

This is very important, because baseline adherence is at the beginning.  Then you're going to be, you know, going through the actual protocol.

So what we know -- what I know for sure -- forget about my question.  I know that your baseline was wrong for 68 out of 100 patients, give or take.

Q.  If they're doing bad science, who cares?  Like, why is that damage to you?

People do bad science all the time.

A.  Well, you know, I can't explain scientific and medical things and equate them to legal damages.  And I apologize for it, sir.

But let's just go on, because this isn't what I need, what we were originally

Page 148

looking for.  I think it's probably in another one.

Keep going.

Q.  All right.  Hang on.  Hang on.

Let me stick with my question because I'm not sure you answered it.

My question was -- I'll just read it back:

"If they're doing bad science, who cares?  Why is that damage to you?  People do bad science all the time."

A.  If they're doing bad science with something unrelated to my intellectual property, that's fine.  But it's related to my intellectual property.  All right?

Q.  And your intellectual property --

A.  I created an original work with Donald Morisky.  He contributed the MMAS-8, a static scale that never changes.  It's always the same.  It's a form.  I took that form, and I made it something much, much different.

That's -- and so that's where it comes in.  And I'm sorry I can't be more specific, but I'm trying to get to the part that we originally asked for, which shows you

Page 149

the derivative screener on clinicaltrials.gov.

Q.  Sure.

And just to follow up, what I'm asking you is your intellectual -- well, first of all, your intellectual property, a claim for that is no longer in the case.

Are we in agreement on that?

In other words, the copyright claim is out, the trade secret claim is out, and you're not actually claiming -- is that right?  You're not actually claiming damages --

A.  No, no.  These have to do with the material breach of the license.

Q.  Right.  And just to let me get the question out:  You're not actually claiming that the misuse of your intellectual property is part of the damages analysis for the breach of contract, are you?

A.  You know -- I don't know why that popped up.  Hold on.

You know, I'm not really sure -- we're still looking at the cause of action only for the breach of contract.  We are currently not claiming any copyright, any trademark, any trade secrets at all.

Page 150

Q.  Right.  And so the upshot of that is -- and I just want to make sure that I have this because you've been talking about it.

The misuse of your intellectual property, which is the wording differences between the generic MMAS-8 and the MMAS widget, that's not what this case is about, right?

A.  No.  If you look at the license, okay, it says "in case of administrative, scientific, or intellectual."

So, yes, this is a breach of the contract for scientific misuse.  You need to look at the license.  It's clearly in there.  This is scientific misuse of the Morisky Widget.

If you can put the license up, it would help.

Q.  Well, I know the language you're referring to.  I'm not asking about breach right now.  Really I'm asking about damages.

A.  Yeah.  Well, they're damages connected to the scientific breach of the license.  That's what we are investigating.  And, you know, we're going to go forward with that at some point.  I don't know when.

Page 151

Hopefully we can get more information from the Boston Children's Hospital.  We are going to make an attempt to do that.

Q.  Okay.  I want to read you something from an affidavit that you filed in this case to make sure I understand something.

We -- you -- I had written -- well, here's what you said:

"Defendants' wrote that common sense shows that the source code could not contain the text of all possible questions it could output because there must be an almost infinite number of combinations of medications/conditions for which they are prescribed and dosages."

And then you went on:

"Defendants' misinformation" --

A.  Can you put that up on the screen so I can see it?

Q.  Sure.

MR. FOLKMAN:  Will you let me share?  Give me one second.

Give us a second.  We'll put it up.

Page 152

(Off-the-record discussion held.)

BY MR. FOLKMAN:

Q.  All right.  Here it comes.

So this, Mr. Trubow, is an affidavit that you filed November 18, 2024, okay?

A.  And was this in BCH's case?

Q.  Yes.  Okay?

A.  So is this in the First Amended Complaint?

Q.  This is part of your opposition to our motion to dismiss.

A.  Okay.  Thank you.

MR. FOLKMAN:  And we'll mark this as Exhibit 11.

(Declaration of Steven Trubow dated 11/18/2024, 14 pages, marked as Exhibit 11.)

BY MR. FOLKMAN:

Q.  So you see in paragraph 24 you're talking about something that I had written, which I think turned out to be mistaken.

I had said:  Well, it can't be the case that all of the medical conditions are included in the source code.  That's just

Page 153

common sense.

And in paragraph 25, you write:

"Defendants' misinformation and outlandish speculation in the memorandum that the text of the Morisky Widget MMAS-8 medication and condition-specific questions are not found in the MMAS Research Widget Code is misleading and false."

Do you see that?

A.  Yes.

Q.  The reason I'm asking you about this is because when we talked at the beginning of the morning today about that text file, you said to me:  That's not part of the source code.  That's what the hospital created.

And I actually want you to have a look at what you wrote in your affidavit and tell me whether -- which of these is correct.  Because it seems to me that what you're saying in the affidavit is that, yes, the condition-specific questions were in the source code.

A.  Yeah.  Well, this morning I also told you that the source code is just not one

MAGNA
LEGAL SERVICES

Page 154

holistic package. The source code has graphical user interfaces that are part of the Morisky Widget application.

Then there's a database, okay? And then you showed me the database. You showed me ones in Italian and the Netherlands. Those were exactly what I'm saying.

So I said:

"Defendants' misinformation and outlandish speculation that the text of the Morisky Widget MMAS-8 medication and condition-specific questions are not found in the Morisky Widget code is misleading and false."

And it was. Because not only was the screener -- or whatever you want to call it -- of course that was in the database, as well as the graphical user interface is like an important part of the source code of the widget application. All right?

So this is a correct statement. I made correct statements this morning.

I never said that file wasn't in the source code. I simply said that file that you call the source code, which is

Page 155

56 megabytes, includes all kinds of folders and sections that are different.

Q. I think we have to go back and just take a look at this again.

Can you put up -- was it Exhibit 1, the text file?

We're going to go back to the text file. We're going to go back and look at Exhibit 2.

So I'd like you to look at the questions, please.

MR. FOLKMAN: If you can scroll down, Liz.

BY MR. FOLKMAN:

Q. Just have a look at Q0 through Q7. You don't need to read them out loud, but just have a quick look and familiarize yourself, okay?

A. Yes.

Q. And now I want you to look at the JSON file, which I believe was marked as Exhibit 3, and we're going to scroll down to the English portion of that.

By the way, the JSON file I think is what you're calling the database; is that

Page 156

right?

A. I'm not sure, okay? But okay, yeah. Okay, yeah, it's JSON.

Q. So let's scroll to the English, and do you see there's a question there:

"Do you sometimes forget to take your prescription cholesterol medication?"

Do you see that?

A. Yes, I see that.

Q. And you see there's a question below that:

"People sometimes" --

A. Yep. Yep. I see that.

Q. And so these are the same questions, aren't they, as the questions that were in the text file we just looked at?

A. Yes.

Q. And these, by the way, are not identical, are they, to the questions that were on the screener that the hospital used?

A. Except that the instructions -- if you go to the top of the first file that you showed me?

Q. Yes.

Page 157

A. There were no instructions. There were no instructions.

Q. Sure. Let me make sure you heard me.

I'm saying that the questions in this text file and in this JSON file, they are not identical to the questions that were in the hospital --

A. They are not what?

Q. Identical to the questions that were in the hospital's screener on paper. Isn't that true?

A. What are the differences? Show me the differences.

Q. Sure.

So if we take a look at -- take a look at this question:

"Have you ever cut back or stopped taking your prescription cholesterol without telling your doctor because you felt worse when you took it?"

Do you see that?

A. Uh-huh.

Q. I'm sorry. Can you say yes or no?

A. Yes, I see that. Sorry.

MAGNA
LEGAL SERVICES

Page 158

Q.  All right.  And if we look at the document that we marked --

MR. FOLKMAN:  Have we marked Exhibit 24 from the First Amended Complaint -- or 27?  I'm sorry.

(Off-the-record discussion held.)

BY MR. FOLKMAN:

Q.  If we look at Exhibit 4, this is the document you were talking about as the UI, right?

A.  "Have you ever cut back or stopped using your prescription cholesterol without telling your doctor because you felt worse when you took it?"

Q.  Right.  So that's the same, right?

A.  Okay.

Q.  That's what you did with the hospital, right?

A.  Yep.

Q.  And now, if you look at the screener itself, the one that the hospital actually used, which is Exhibit 8, do you see that it says:

"Have you ever cut back or stopped taking your prescription

Page 159

cholesterol" --

A.  Wait.  I need to see it on my screen.

Q.  Sure.

A.  I'm sorry.

Q.  That's okay.

There we go.  If you look at -- sorry, this is Exhibit 9.  Apologies.

If you look at Question 3 there, you see:

"Have you ever cut back or stopped taking your prescription cholesterol medication without telling your doctor because you felt worse when you took it?"

Do you see that?

A.  Yeah.

Q.  Do you see there's a word that's been added there?

A.  Which word has been added?

Q.  "Medication."

In other words, "prescription cholesterol medication" instead of "prescription cholesterol"?

A.  So it just said "prescription

Page 160

cholesterol" in the --

Q.  Yeah.  Let's take a look at it.

A.  So, you know, I think you made the point.  I mean, yeah, there may be a word.  Also, there are no instructions and they've changed the scoring and coding.

Q.  Sure.

A.  So, you know, I mean, that's okay.  I agree with everything you've said.

Q.  Okay.  So how does the fact that the instructions were not printed on the printed form, Exhibit 9 that we were just looking at, how does that affect your damages, if at all?

A.  Oh, I mean, the instructions are critical.  You know, when you give a form to someone, the instructions say: Hey, there's no right or wrong answer.  Relax.  This -- you know, you've -- we just want to know what you feel about your medication experience.

The instructions to the form are critical to the validity.  I mean, you know, this again is scientific misuse of my intellectual property.

Q.  Do you know whether the hospital

Page 161

actually gave the form to the patients to fill out?

A.  What?

Q.  Are you saying that you know that the hospital gave the form to the patients to fill out?

A.  Yeah.  Dr. Hartz wrote that he gave at least four of these.  Yes, I know that.

Q.  He said that he administered four tests, right?  What I'm asking you is a little bit different.  I'm asking you, do you know whether the hospital gave this piece of paper, Exhibit 9, to the patients so that the patients --

A.  No.  I don't know that.  I know that he didn't use the widget to do it, which it was -- he needed permission to give it outside the widget.

We know he gave it outside the widget.  We know we didn't give him permission.  So if we get a chance to depose Dr. Hartz, then I can answer your questions.

Q.  Do you know what Dr. Hartz or the other clinicians said to the patients when they asked them these questions?

MAGNA
LEGAL SERVICES

Page 162

A.  When we get a chance to depose Dr. Hartz, then I can answer this question.

Q.  So for all you know, Dr. Hartz might have read the instructions to the patient?

A.  When we get a chance to depose Dr. Hartz, we will be able to answer your question.

Q.  And you don't know right now, right?

A.  When we get a chance to depose Dr. Hartz, we'll answer your question.

That's why we need to get a chance to depose Dr. Hartz.

Q.  By the way, do you agree with me that the difference -- leaving aside the instructions, if we're just focusing on the text of the questions themselves, the differences between the MMAS-8 that Dr. Morisky created and the widget, the differences are just a word here or a word there.

So, for example, "prescription cholesterol medication" might be substituted for "medication."

Do you agree with me?

Page 163

A.  Do I agree with you?  Absolutely not.  It's called specificity.

In other words, when you say:  Did you forget to take your medication?  Well, the patient may be taking six medications.

So when you say:  Did you forget to take your cholesterol medication, that raises the specificity of the scale.

I mean, this is, you know, Science 101 for me.

Q.  Yeah.

A.  For a lawyer or, you know, a cook in a diner, you wouldn't understand this.

So, yes, by adding the medication and/or condition or both, it is a total transformation of the specificity which leads to higher sensitivity, which validates the scale.

Q.  So I'm not --

A.  That's why Dr. Morisky did it.

Q.  So I'm not trying to quibble with you about whether it was an important change or an unimportant change.

What I'm suggesting is it was a change that was made just by changing a few

Page 164

words in a question.  In other words, it wasn't --

A.  By changing a few words out, by adding a few words in, it's night and day.

Q.  Yeah.

A.  It's not just a matter of simply adding a word.  That's not what the widget does.  And the MMAS-8 is a generic form.

If you go into the Copyright Office and you look at the deposit of the MMAS-8, you will see a static form.  It does not change.

You cannot add words to it and still make it the MMAS-8.  That's not how it works.

Q.  Is it still your testimony after we took a look at those paragraphs from your affidavit that the text file that we looked at the beginning, Exhibit 2, was what you and Dr. Hartz created?

A.  No.  Only that Exhibit 27 is what I agree.

I created one with instructions that had "cholesterol medication" in those questions.  And the instructions were geared for that patient cohort.

Page 165

Q.  Okay.  Have any patients contacted MMAS Research to complain in any way about the hospital's use of -- or misuse of the assessment or to suggest that they might have some claims against MMAS Research?

A.  I'm not prepared to do that.

MS. RAY:  Objection.

A.  I'm not prepared to do that.

MS. RAY:  Objection.

BY MR. FOLKMAN:

Q.  Okay.  Let me ask it again because I'm not sure what the basis of the objection is and I want to make sure I understand what you're saying, Mr. Trubow.

Have any patients contacted MMAS Research to complain in any way about the hospital's use or misuse of the assessment?

A.  I'm not prepared to answer that question.

Q.  Are you saying that you're not willing to answer it or you're saying that you don't know the answer?

A.  I don't have the correspondence.  I don't have those documents in front of me that would be that.  I mean, I just -- you know,

MAGNA
LEGAL SERVICES

Page 166

I can't provide an informed answer at this time.

Q. Okay. Can you identify anybody -- we talked earlier about can you identify anybody that read the clinicaltrials.gov posting. I want to ask you the same question about the 2025 article.

Can you identify any person who is not you or someone associated with MMAS Research who read the 2025 article?

A. Again, same answer. I just -- I don't -- my memory, I'm 76 years old and I have a pretty good memory. But, I mean, I have -- I don't know exactly the correspondence. I have some verbal recollections, but I'm not prepared to answer that question.

Q. Well, let me ask about your verbal recollection.

What do you recollect?

A. Oh, I recollect conversations with two or three dozen -- I mean, lots of people about that 2023 article.

I mean, as an individual, as Steve Trubow, I had people calling me that I

Page 167

hadn't talked to in 15 years, saying: You sued the US Government?

I mean, you know, I had people from the Department of Defense, the Department of Justice. At one time --

Q. Okay.

A. Let me finish. Don't interrupt me, please.

Q. Okay.

A. I did -- I worked for the Department of Justice and did some work for the House Judiciary Committee over two years. I was one of seven national experts in the prevention of gang and youth violence.

And the counsel for that committee reached out to me -- he's a personal friend of mine -- and he was shocked.

So I mean, that was one. There were many others. That one was timely because I happened to see him, personally see him on another event at that time after that article came out. And he happened to see it because he reads the literature. And so that's an example.

I told you, from Novo Nordisk, we

Page 168

had a long conversation about it. And, you know, I'm not privy to give you names and dates and when, but, yeah, I talked about that article. People brought that to my attention.

And, you know, it's -- it's definitely changed my life.

Q. All right.

A. Because --

Q. What is the name of the person at Novo Nordisk that you had this discussion with?

A. I'm not -- I'm not at liberty to give any of that out to you. Sorry.

Q. What is the name of the person with the House Judiciary Committee that you had the discussion with?

A. I'm not in a position to give anyone's name to you today.

Q. What about the Department of Justice?

A. I'm not in a position to give any names to you today.

Q. So no matter what I ask you, you're not going to tell me the names of any of these people that you had discussions with today?

A. No. I'm just telling you that

Page 169

I had conversations about that article with my sister, with members of my immediate family, with colleagues that I've been working with for the last 30 years.

That's all I'm going to say, sir.

Q. Will you identify any of those colleagues?

A. That's all I'm going to say, sir.

Q. Okay.

MR. FOLKMAN: Let me show you a new exhibit which we're going to mark as Exhibit 12.

(02/24/2020 PennORS Article "Consider Alternatives to the Morisky Medication Adherence Scale (MMAS-4 and MMAS-8)," 2 pages, marked as Exhibit 12.)

BY MR. FOLKMAN:

Q. Have you seen Exhibit 12 before?

A. Oh, I'm very well aware of that. Yes, sir.

Q. Yeah.

A. Firestone. Mr. Firestone. Yeah. I've seen that.

Q. So this an article in which the

MAGNA
LEGAL SERVICES

Page 170

Office of Research Services at the University of Pennsylvania is recommending that people do not do business or enter into licenses with MMAS Research, LLC, with Mr. Morisky, or with you.

Is that true?

A. Yeah. This is referring to MMAS Research when Dr. Morisky and I were partners.

Q. Yeah.

A. Yes, that is correct.

And it's still there. It's still online today.

Q. Yeah.

And has this -- has this notice from Penn's ORS affected --

A. Excuse me?

Q. Has this notice from Penn's Office of Research Services negatively impacted MMAS Research, LLC's business?

A. You know, I can't speak for Donald Morisky. All right?

Q. I'm asking you about MMAS Research, the entity. Has it affected --

A. Yes, it has.

Page 171

Q. Negatively, right?

A. What?

Q. Negatively, right?

A. Yes.

Q. And how much in licensing revenue has been lost due to the existence of this article?

A. I mean, I -- I can't -- I don't know the people that read it and decided not to call me. I mean, I have no idea.

Q. Yeah.

A. This isn't the first one of these. There are other ones. So -- but, you know, I mean, I know it impacted it. But I don't know if -- I can't quantify it.

MR. FOLKMAN: Take a look, please, at the next document, which we'll mark as Exhibit 13.

(Editorial titled "Drug Compliance and the Morisky Adherence Scale," 3 pages, marked as Exhibit 13.)

BY MR. FOLKMAN:

Q. Are you familiar with this editorial from Ovid, O-v-i-d, Beta in the Journal of Clinical Pharmacy and Therapeutics?

Page 172

A. I mean, I'm going to have to look at it.

Q. Yeah.

A. I'm not being -- again, I read the medical literature every day, so you need to let me read the article.

Q. Yeah. Let me blow that up a little.

A. I can't read that text.

Q. We're going to blow it up for you.

A. Thank you.

Yeah. Okay. So I read that.

Q. Is this --

A. Can I see the title of the article and where it appeared and when --

Q. Sure.

A. -- like you showed me on the Pennsylvania one?

Q. Yes.

A. I had never seen this before.

Q. You have never seen this before?

A. Journal of Clinical Pharmacy -- February 2021, okay.

Q. Can I say I'm a little bit surprised that you've never seen this before.

Page 173

Are you sure?

A. I've never saw it.

Q. Okay.

A. Why would I see it?

It's an editorial. And this is not a -- this isn't the New England Journal of Medicine. This isn't a tier 1 -- I mean, I don't search for these and -- again, you know, again -- now, the University of Pennsylvania one I had seen before. I never saw -- I never saw this until today.

Q. Okay. Let me just read you a bit from the abstract. It says:

"We were surprised when a team of our authors were threatened with legal action for citing the Morisky Adherence Scale and explaining how some authors had obtained their adherence scores."

And then below, it says:

"We report that using and citing the Morisky Adherence Scale in any detail is a risky business. Prior approval is required unless one is prepared to pay up retrospectively."

Do you see that?

MAGNA
LEGAL SERVICES

Page 174

A. Yeah, I see it.

Q. Do you know whether this publication had any adverse effect on MMAS's business?

A. No. What I'd like to do is let's take the statement that you just read before you asked me that question. Can I respond to that question?

Q. I'd like you to stick with my questions, please, if you would.

A. So I'll say I don't know what impact it had at all.

MR. FOLKMAN: Let's take a look at the next document, which is going to be Exhibit 14.

(Article, "Pay up or retract? Survey creator's demands for money rile some health researchers," six pages, marked as Exhibit 14.)

BY MR. FOLKMAN:

Q. Have you seen this article before?

A. Yes.

And what's the date? I can't bring it up.

Q. We'll blow it up for you a little

Page 175

bit.

A. Yeah, just so I can see the date.

Q. It's 12 September 2017.

A. Nine years old? Nine years old? Is that right?

Q. Yeah.

A. I mean -- no, I mean, I don't know any -- I've never seen this article before, and even if I had, I probably wouldn't remember nine years.

Q. Do you know -- I take it then, since you don't know if you've seen it, you're not sure if it had a negative impact on MMAS Research's business?

A. No. It certainly didn't in 2017, because this was the MMAS-8 scale.

And at the time in January 1, 2017, Donald Morisky published a mandate worldwide that Dr. Hartz received that said there is no more MMAS-8 license. There is no more MMAS-8 scale.

The only way Dr. Morisky would license the MMAS-8 to Boston Children's Hospital or anyone else in the world was through the Morisky Widget.

Page 176

Q. I take it that you don't know --

A. This didn't have any impact on MMAS Research. It didn't hurt our business. Because in 2017, we licensed a hundred of the biggest pharmaceutical companies, hospitals, universities in the world.

Q. Will you accept my representation that all of these things that we've been looking at are still up on the web?

A. Are still on the web?

Q. Yes.

A. I don't know. I don't know if they are.

Q. Okay. Fair enough. That's fair. You haven't, looked.

You don't know who read any of these articles in 2026, do you?

A. Excuse me?

Q. You don't know who read any of these articles we've just looked at in 2026, do you?

A. I don't know who wrote -- the Pennsylvania one, I know it was Mr. Firestone. We were in litigation with him. All right?

Q. Well, I think you misheard me.

Page 177

I wasn't asking about who wrote them. I was asking who read them.

You don't know who, if anybody, read any of the articles we've just looked at?

A. No. I don't know. Of course not. I didn't even read it myself.

Q. Right. And you don't know how many people read any of them at any point in time?

A. No. I don't have a clue.

Q. All right. We'll show you one more, please.

MR. FOLKMAN: This will be Exhibit 15.

(Authors Alliance article by Dave Hansen, 11/07/2025, 12 pages, marked as Exhibit 15.)

BY MR. FOLKMAN:

Q. So have you seen Exhibit 15 before?

A. I mean, I need to read the whole article. All right?

Q. Well, sure.

A. I need to see the article. I've read something from the Authors Alliance before, but I don't know what it is.

Q. You may or may not have seen this;

MAGNA
LEGAL SERVICES

Page 178

is that fair?

A. I have read this article, yes, sir.

Q. Okay. And did this article have a negative impact on MMAS Research's business?

A. It would depend on the reader. It would depend on each reader.

Q. Okay. And what do you mean by that?

A. Can you do a search for "Morisky Widget" and tell me how many times the widget is mentioned in this article?

Q. Well, I'm -- no.

A. Or scroll the article and I'll be able to see it myself.

Q. Sure. We'll scroll through so you can take a look.

A. Yeah. Keep going.

Yeah. Keep going.

Stop. Stop right there.

Yeah, now, this is interesting because I'm pulled into this, but this isn't about Steve Trubow or MMAS Research, all right?

As a matter of fact, you know, they say:

"Steve Trubow, together with

Page 179

companies known as MMAS Research (controlled by Trubow)" --

Well, that's correct.

And then all of a sudden, it's "MMAR (doing business as Adherence), which seems to be controlled by" -- blah, blah, blah -- "has made claims to own the MMAS at various points in time."

So what this article does is -- because this article says that the MMAS-4 and the MMAS-8 according to the Nevada District Court are not copyright-protectable. So I guess it depends if the reader goes: Whoa. Well, what about MMAS Research and Trubow?

It doesn't say -- you don't see "widget," all right? It's not there.

So I don't really -- I can't answer your question. It's a good question.

Did this article impact my bottom line? Did it damage my business? And I honestly, sir, can't give you an honest answer because I don't see "Morisky Widget." They're just putting me in the same boat as MMAR. And that boat is sinking, according to this article.

Page 180

Q. Do you think that -- I mean, my reaction when I read this is to say that it's a warning to researchers against doing business with any of you guys because you're fighting with each other, you're suing people, and it's just not worth the hassle.

Does that seem like a fair reading to you?

A. It doesn't. If you still keep reading, going to the bottom, MMAS Research versus Karolinska Institute -- stop right here. All right?

The MMAS Research versus Karolinska Institute was settled, all right?

The NYU was settled, all right -- not settled. It's still in litigation.

The University of Pennsylvania is not in litigation.

There's your JIMRO and all those. That is still in litigation.

Icahn School of Medicine, that's still going.

Duke University was -- I mean, that was like -- that was one which was MMAS and Donald Morisky individually. Nothing to do

Page 181

with MMAR adherence or this.

Same thing with University of Edinburgh, same thing with Charité, that was me and Don.

Keep going so I can see more. Because this is what you did earlier.

Kantar Health, that was in 2018.

Stop. This University College London, that's the only one that's active. All the rest of them are gone.

King's College was settled -- I mean, that was six years ago.

This Karolinska and the University of Oslo, that was in 2019.

Maastricht -- Brigham and Women's Hospital, Dana-Farber, and Harvard Medical School, that one was filed in Boston and then withdrawn probably three weeks after, and it's going to be refiled again.

But -- oh, and there you are.

Oh, this Einstein -- this one, here's the Novartis one you did.

None of those are pending. That's all gone. That litigation is gone.

So this was helpful because

Page 182

I wondered what you were doing today.

Oh, the Regents of the University of California. That one is an outstanding one. The Regents of the University of California was settled in May of 2019. It was signed by MMAS Research. It was signed by Donald Morisky of MMAS Research.

So -- and then here's Adherence vs. CVS. Look at that. There it is.

So, yeah, I don't know who read it. I never read the whole article. I just knew that they wrote an article.

Q. Okay.

A. And they wrote an article about the Nevada thing. So I appreciate you showing me this. Again, I haven't talked to anyone else who read it other than you.

Q. Yeah. Do you think that from an institution's point of view, you might look at this and say: Holy cow, this is a litigious company. We're not going anywhere near them. Would that be a reasonable thing --

A. Yeah. I would agree with you. I don't think it's going to help you. Yes. Yes.

Q. Okay.

Page 183

A. You bet.

Q. All right.

Let us go through some more of your interrogatory answers.

I'd like to pull up as a new exhibit the answers to the second set of interrogatories. We'll call this Exhibit 16.

(Plaintiff's Responses to Defendants' Second Set of Interrogatories, 10 pages, marked as Exhibit 16.)

BY MR. FOLKMAN:

Q. And I'd like to direct your attention to the answer to Interrogatory Number 14.

So the question that was asked was: "If you contend that you lost any business, identify the customer, licensee, or other person whose business you lost" -- and then some additional information.

And if I look at your substantive response, it begins by saying:

"Plaintiff has identified a general loss of revenue from medical institutions and pharmaceutical

Page 184

researchers who would have otherwise sought authorized licenses had BCH not publicly undermined plaintiff's rights. Specific entities will be identified following expert market analysis."

So my question -- my first question to you is, can you identify any licensees that did not happen because of anything that BCH did or didn't do?

A. You know, I'm sorry to make you do this, but I can't see the page where you did that long reading.

Q. Oh.

A. All I can see is the top of the page.

Q. Sure.

A. So I need you to -- I need you to start over --

Q. Sure.

A. -- so I can read what you read to me.

Q. So here's Question Number 14: "If you contend" -- can you see that Interrogatory Number 14?

A. I see "If you" -- yes. Go ahead.

Page 185

Q. "If you contend that you have lost any business because of any acts or omissions of BCH, identify the customer, licensee, or other person whose business you lost" --

And then it goes on from there.

Do you see that?

A. Yeah. Yes.

Q. Okay. And then we're going down to the Substantive Response.

It begins by saying you've identified "a general loss of revenue from medical institutions and pharmaceutical researchers who would otherwise have sought authorized licenses had BCH not publicly undermined plaintiff's rights."

Do you see that?

A. No. I'm looking now where it says "Substantive Response."

Q. Go down to the first bullet point.

A. Where do you want me to look at?

Q. The first bullet point that says --

A. "Lost Licensees/Customers."

Q. Yes.

A. "Plaintiff has identified a general loss of revenue" --

MAGNA
LEGAL SERVICES

Page 186

Yeah. I would say I've identified what I told you before, that when 2023, when you put that stuff on clinicaltrials.gov, we have a general loss of revenue from medical institutions and pharmaceutical researchers who otherwise would have bought authorized licenses had BCH not publicly undermined my rights.

Q. Right.

A. I stand by that. I'm not going to go into any specifics until -- we're still investigating it. And it's just the way it's written. I agree with that.

Q. Okay. So let me ask you. You say you're not going to go into any specifics.

Do you have any specifics? Can you identify anybody who was --

A. Not at this time.

Q. -- a potential licensee?

MS. RAY: Objection. He's been answering this question over and over again.

MR. FOLKMAN: Well, the answer I think was pretty clear that time. He says no, he can't. Fine.

Page 187

BY MR. FOLKMAN:

Q. Do you see below that:

"Estimated damages: Approximately $1 million."

Do you see that?

A. Uh-huh.

Q. Can you say yes or no?

A. Can I what?

Q. Can you say yes or no, please? I'm sorry. You said uh-huh, and I was just reminding --

A. Yes, I see it. Yes.

Q. How is it that you're able to estimate the amount of the damages if you aren't able to provide any specifics about lost licensees or customers?

A. Only because I had general revenue in '21 and '22, were up there. And then it fell off in -- and when you put this up in 2023, it falls off.

And then when you again put it up in 2024, it fell off again.

And now this 1 million is more like 10 million, okay? With that article.

Q. Well, did you ever have $10 million

Page 188

of --

A. Yeah. Well, when we get to the June 2025 article, I'm at zero.

Q. Okay.

A. So that's all I can do, sir, is give you exactly what we said, that what we're going to show you is a general loss of revenue from medical institutions and pharmaceutical researchers who would have sought licenses had you not undermined my rights on clinicaltrials.gov and then literally put in front of the whole world in science and medicine at the highest level that I had sued -- that I had sued the Boston Children's Hospital, Harvard Medical School, and the United States Government.

And we will determine the damages, the breach of contract, and the damages for that article.

Q. Can I just ask you -- I'm still confused about something you're saying.

Are you saying -- I thought you would have said that the misuse of -- or the misattribution of the widget, or the misadministration of the widget was relevant to

Page 189

damages. But you seem to be focused on the fact that the hospital said that you sued as something that's relevant to the damages.

First of all, it's true that you sued the hospital, isn't it?

A. Let me answer your question. It's a very good question.

In 2023 and 2024, the point is, on clinicaltrials.gov, you misused the Morisky Widget. You breached the contract, and you misused it scientifically.

In 2025, the article -- referring to the statement, you said: Yes, if Dr. Hartz or whoever was writing had written, "MMAS Research sued Boston Children's Hospital and this author," blah, blah, blah, we wouldn't be having this conversation.

But it said the statement -- and I asked you to bring it up. It doesn't say that. It says "the authors."

The authors include the National Institute of Health.

Now, if you think a pharmaceutical company is going to hire me after it says that I sued the National Institute of Health, then

MAGNA
LEGAL SERVICES

Page 190

we're never going to agree on anything.

Q. Yeah, all right.

Okay. I'm going to -- I'm going to pull up the article. Give me a second, here.

A. Thank you. I really appreciate that and the question.

Q. It's Exhibit 20 to the Second Amended Complaint.

Give us a second to pull it up.

A. I can open up the article, too, if you don't have it. I've got it.

Q. We have the article here. Just give us a second.

A. Do you want me to open it?

Q. No. We're going to show it to you.

A. Thank you very much.

(Off-the-record discussion held.)

BY MR. FOLKMAN:

Q. Here it comes.

Do you want to see the top of the article so that you can satisfy yourself that we're looking at the right thing?

A. Yeah. It should be on the -- it's in there. All you need to look for is Steve Trubow or MMAS Research. I'll show you.

Page 191

Q. So I'm going to take you through it. I just want you to tell me, is this the right article?

A. Yes. That is the right article.

MR. FOLKMAN: This, by the way, will be Exhibit 17.

(JMIR Research Protocols article, "The Use of Mobile Health Technology and Behavioral Economics", marked as Exhibit 17.)

BY MR. FOLKMAN:

Q. Now, we're going to look at page 4 of Exhibit 17. And we're going to look at the section that says "Recruitment."

And you see the sentence that says:

"If the participant was interested, the clinician determined the patient's eligibility based on self-reported adherence."

Do you see that?

A. Uh-huh.

Q. Can you say yes or no, please? I'm sorry to keep bugging you about that.

Mr. Trubow, do you see where I'm

Page 192

looking?

A. Yeah. I see. It's very informative. It says "We estimated the 20 patients" -- yeah.

Q. And you see there's a reference --

A. But I'm looking for -- where's the reference to the lawsuit?

Q. Bear with me.

A. Okay.

Q. Do you see Footnotes 46 and 47? Do you see that reference there?

A. Yeah.

Q. Okay. Now, let's scroll down to Footnotes 46 and 47. So this is part of --

A. I'm very familiar with those.

Q. This is part of what you're complaining about, right?

A. Oh, no. I mean, I'm very familiar with this.

Q. Yeah. And this is part of your damages, right?

A. Oh, no. It's more than just damages, okay?

Q. Let's go to --

A. Yeah.

Page 193

Q. Let's go to --

A. This is a long discussion. No, but let's look at it since you brought it up. Let's look at 46. And 46 is Donald Morisky, Ang Wood. This is the 2008 Journal of Clinical Hypertension article.

All right? Now, this is where it's interesting.

Then there's another article, all right? It's Berlowitz, Foy, Kazis, Bolin, Morisky.

And then there's a comma, "Morisky Widget MMAS Steve Trubow."

That's how they gave me attribution, not what was in the license. That's my attribution.

And I didn't have anything to do with that article. That article has nothing to do with anything.

If you hit "FREE Full Text," there's no MMAS Steve Trubow there. This is counterfeit. This is phony. This is a failure of research integrity.

Then we go to 47. And 47 is very interesting because it's the same thing they

MAGNA
LEGAL SERVICES

Page 194

quoted in 46 to validate the MMAS-8.

But notice what it says: "Predictive validity retracted in Journal of Clinical Hypertension, 2023."

This is -- when you put it up in 2024, it's a validated MMAS-8. And you don't explain it. The authors say: The instrument we used was validated by reference 46. And the reason we used it is because it was validated.

But then in 47, they announce: Hey, that article was retracted in 2023 -- in 47.

But you know something? You don't tell why it was retracted. It was retracted because it misses 68 out of 100 -- or 62 out of 100 patients.

And guess what? You just reported using it on up to 400 patients. I mean, that's a problem.

Q. So what is it -- when you --

A. Go ahead.

Q. When you imagine someone who is reading this article, reading Footnotes 46 and 47, and then coming to the conclusion not to do business with MMAS Research, LLC, what is it

Page 195

that you imagine that that person is thinking?

A. What is it what? The end.

Q. When you imagine that someone is reading these footnotes and then deciding: Well, based on Footnotes 46 and 47, I am not doing business with MMAS Research --

A. No, no, no. You're not getting this. All right? The people that read this that want to do business with you, this is in a tier 1 -- well, let's go to the quote.

And now I'm going to open up -- because you're not showing me what we were going to look at. I'm going to open up the article -- give me a second -- and then I'll show you exactly --

Q. Mr. Trubow? Mr. Trubow?

A. I'm going to answer your damages question, all right? Just give me a second, all right?

Obviously, it's not in 46 and 47. I can get it real quick. Just give me two seconds.

All right. I'm opening it. I will give you this and then you can go to it on the screen, make it big enough so I can see it.

Page 196

Okay. Same article.

Okay. If you'll go to the Acknowledgments section --

Q. Yeah, we're going to get there.

A. It's right under the Conclusion section. Can you do that?

Q. Hang on. We're going to get there next.

A. No problem. I'm coming back to you.

I want you to put the Acknowledgment section up instead of --

Q. Hang on. Stop. Stop. Mr. Trubow --

A. Yeah.

Q. So just to remind you, your job is not to direct us. Our job is to ask you questions, okay?

A. All right.

Q. I'm going to get to the acknowledgments in a moment.

My question for you is, do Footnotes 46 and 47 themselves justify your damages claim or are you telling me that you have to look at the acknowledgments to see --

Page 197

A. No. I am telling you that 46, when they click on "FREE Full Text" and they see that, you know, that there is no MMAS Research, Steve Trubow, it makes me look like an idiot.

And I wouldn't do business with someone -- you know, I'm in this literature all day long. And when I click on one of these citations and I see that it's phony, it's no different than a lawyer using a citation in a brief that is just total BS.

That's what this is.

Q. Why do you think --

A. This is --

Q. Why do you think --

A. This -- this --

Q. Go ahead.

A. No. I'm just answering your question.

This -- the person that's reading this reference, 46, when they click on "FREE Full Text," they don't go -- they may go to that Berlowitz, Roy -- there's no Steve Trubow MMAS Research there. He's not connected to that.

That's like saying that he plays

MAGNA
LEGAL SERVICES

Page 198

for the Boston Celtics. He's not on the roster. So if he's trying to get a job as a basketball player, that's not the way to do it.

Q. Why is it that you think that the footnote reflects badly on you instead of reflecting badly on the authors who made a mistake in their citation?

A. Do that question again, please? I can't --

Q. Sure.

Why do you think the footnote reflects badly on you instead of reflecting badly on the authors who made a mistake in their citation?

A. Oh, it's going to reflect badly on the authors when you show me the acknowledgment.

I'm answering your damages question.

Q. Yeah. Well --

A. Your damages question said: How does 46 make it so that someone reading 46 is not going to do business with MMAS Research?

I answered that.

Q. And then my follow-up question,

Page 199

sir, was: Why is it do you think that Footnote 46 reflects badly on you or MMAS Research instead of reflecting badly on the authors who --

A. It is going to reflect badly on them for the Office of Research Integrity. It is, all right? It will certainly reflect badly on them. I guarantee you that.

Q. Let go up to the Acknowledgment section, which is right above the footnotes.

So I want to read you this. It says:

"Boston Children's Hospital and the authors personally have been named as defendants in a lawsuit brought by MMAS Research, LLC, which is ongoing, that concerns the attribution of the Morisky Medication Adherence Scale, MMAS."

Do you see that?

A. Uh-huh.

Q. Okay. Now, first of all, Boston Children's Hospital was named as a defendant in a lawsuit brought by MMAS Research, LLC, right?

A. Uh-huh.

Page 200

Q. Can you say yes or no, please?

A. Excuse me?

Q. Can you say yes or no, please, instead of saying "uh-huh," so we can get a good transcript?

A. Yeah. So for some reason over lunch we lost the volume. I mean, are you doing something different? Because I could hear you clear as a bell.

Q. I'm going to hold the microphone super close to my face and see if that helps.

A. Would you start again, please?

Q. Sure.

It's true, isn't it, that MMAS Research, LLC did sue Boston Children's Hospital?

A. Yes.

Q. Now, let's look at the authors. Let's go to the first page of the study.

You see the list of authors there. We have Jacob Hartz, right?

A. Yes.

Q. Hannah Chiert, C-h-i-e-r-t?

A. Yes.

Q. You understand, by the way that --

Page 201

[audio interference] --

Sarah de Ferranti, right?

A. Uh-huh.

Q. And Tiffany Powell-Wiley, correct?

A. That's correct.

Q. Okay. Those are the authors, right?

A. Uh-huh.

Q. Yes? I'm going to keep bugging you.

A. Yes, yes, yes, yes, yes.

Q. So the National Institutes of Health is not an author of this article, is it?

A. Say that again?

Q. The National Institutes of Health is not an author of this article, is it?

A. If you look at Tiffany Powell-Wiley at 3 and 4, she's an employee of the National Heart Lung and Blood Institute, which is the National Institute of Health, and she's an employee of the Institutional Research Program of the National Institute of Minority Health and Health Disparities.

Now, I don't know -- I've been doing this a long time, but those affiliations

MAGNA
LEGAL SERVICES

Page 202

make those institutions responsible for the work of their employees that are authors.

I'd also like to add in my answer that I did sue BCH. I sued Jacob Hartz. And I sued Hannah before she changed her name -- or Sarah, one of the two, all right?

Q. You sued both of them, right?

A. Right. I sued those two. All right?

Q. Yes.

A. So it is correct to say, sir, that MMAS Research sued Boston Children's Hospital and two of the authors.

But in the statement that says "sued the authors personally" -- I never sued Tiffany Powell-Wiley, ever. I never sued the National Institutes of Health, ever.

And many people, including federal regulatory agencies, including the National Institutes of Health, recognize that that statement needs investigation.

And the National Institute of Health is investigating right now.

Tiffany Powell-Wiley is the subject of an investigation by the National Institute

Page 203

of Health for this article.

Q. Is that an investigation that you commenced or asked to commence?

A. All I'm doing is just commenting -- you asked me. I'm telling you now.

Q. Okay.

A. I'm not going to speak to any other -- I'm not going to go into it. I'm just telling you, that statement does not state the truth. It's inaccurate. It's an inaccurate statement.

And that has caused me damages that -- you know, they rejected the Second Amended Complaint. I'm not going to sue the National Institute of Health. I'm not going to sue the U.S. Government.

I have a suit against Boston Children's Hospital for breach of contract. This is administrative misconduct. It's not intellectual misconduct, you know. That ship has sailed and gone. It's not -- it is scientific misconduct. We've already discussed that. But it's administrative misconduct in the license.

Q. So let's --

Page 204

A. And those damages will be computed and attached.

Q. So a couple things I want to just clear up.

Do you agree with me that you sued three of the four people named? You sued Dr. Hartz, Ms. Chiert, and Dr. de Ferranti.

Do you agree with that?

A. Yes, and they dismissed the complaint, the breach of contract, everything. They're not part of the complaint anymore.

When this was written --

Q. Correct.

A. When this was published, I think that the motion to dismiss had been granted to them. I'm not really sure.

Q. I think you're right. I think you're correct.

A. This was published after the motion to dismiss?

Q. I believe so.

A. Well, that's a problem for you, not me, okay? It would have been better if it had been published before, because then at least I would be suing two of the authors.

Page 205

Now, this statement -- I'm not suing Jacob Hartz right now. I'm not suing anyone except BCH. Not Harvard Medical School.

MS. RAY: Ted, can we find a way to break and give him a break?

MR. FOLKMAN: Sure. Why don't we take a five-minute break.

MS. RAY: Thank you.

THE VIDEOGRAPHER: Going off the record. 11:24 a.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. 11:30 a.m.

Go ahead.

BY MR. FOLKMAN:

Q. So Mr. Trubow, is it your testimony that someone reading this article would think that you had sued the United States Government?

A. Yes. It is my position that, reading this article, someone could get the idea that I -- that MMAS Research is suing the U.S. Government.

Q. Okay. Now, you were 100 percent correct to point out that there was an error in the Acknowledgment section insofar as it

MAGNA
LEGAL SERVICES

Page 206

suggested that MMAS Research had sued all four authors rather than three of the authors.

And the one who was not sued was Tiffany Powell-Wiley, right?

A. Can you just refresh me on the first complaint, the original complaint, and the first amended complaint?

Did that name three individuals? I thought it just named Dr. Hartz and Hannah. I never knew it had -- did both complaints name the third author, Sarah?

Q. So the original complaint -- I'm just going to tell you; I don't know that it matters much -- named the hospital, Dr. Hartz, Hannah Palfrey, and Dr. de Ferranti, as well as Dr. Morisky and MMAR, LLC.

The First Amended Complaint omitted Dr. de Ferranti but not Hannah, okay?

A. Okay. So the way I look at it, the operative complaint that we're on right now, the First Amended Complaint, never named Sarah de Ferranti. And the Court removed Jacob Hartz and Hannah from the First Amended Complaint.

Q. So your point is that statement was

Page 207

false or misleading because it identified -- it said: We've been sued, without saying: And by the way, we want a dismissal of the claims against us?

A. It should have just named Jacob Hartz, Hannah Palfrey, Sarah, were sued. It doesn't matter what the motion to dismiss is. I did sue all three of those people in the original complaint.

Q. Right.

A. That would have been accurate. But when you put all of the authors, and that includes Tiffany Powell-Wiley, MD, MPH, National Institute of Health, that just -- you know, that made my life miserable. I mean, miserable.

And truthfully, I've worked for the Department of Defense, the Department of Justice. I worked for Steve jobs at Apple for 20 years. You know, I've been blessed. I've had a great career.

But -- you know, people know who I am. And when they read that or heard about that, I mean, it's a killer for me.

Q. So your testimony is that someone

Page 208

read -- it wouldn't have been such a big deal if it just said that you sued Dr. Hartz, Ms. Chiert, and Dr. de Ferranti, but the fact that it listed Dr. Powell-Wiley is what caused it to be harmful to you and to MMAS?

A. Yeah, because -- you know, I sued Boston Children's Hospital, and that's all they should have wrote. But they wrote, "and he sued the authors personally."

Well, you can't sue Tiffany Powell-Wiley as an individual. You have to sue the National Institutes of Health, the U.S. Government.

You can't sue the U.S. Government.

If I had -- if I had amended the Second Amended Complaint and I would have included Tiffany Powell-Wiley, the government has sovereign immunity.

I can't sue the U.S. Government. Forget about it. I mean, it's preposterous.

And then the other part is the 46 and 47.

Q. Can we -- before we go back --

A. I'm sorry.

Q. That's okay.

Page 209

A. I'm sorry.

Q. That's okay.

Did anybody say to you: I can't believe you've sued Tiffany Powell-Wiley or the U.S. Government?

A. Yes, sir, yes. Yeah.

Q. Who said that to you?

A. My -- Rodney Watkins, CPA, said: Did you sue the U.S. Government?

That's what he said.

Q. Did anybody --

A. My lawyers, several people -- my family members, my former colleagues, a lot of people --

Q. Okay.

A. -- said: Steve, you can't sue the U.S. Government. You're going to lose.

Q. So let's --

A. You could barely sue Boston Children's Hospital, you know?

Q. Let's leave aside your family members and let's leave aside your lawyers and let's leave aside Mr. Watkins, who works for MMAS, okay?

A. Yes.

**MAGNA**
LEGAL SERVICES

Page 210

Q.   Who else said to you --

A.   You know, I'm not going to go into naming people, okay?  I'm not going to do that, all right?  You know, I'll get people to give you affidavits or come testify at the trial.

Q.   Who are those people?  Who are those people?

A.   I'll be glad to do that, but I don't have that in front of me.  I didn't have this article.  I had to dig for that.

Q.   You're telling me that you have people who you would bring to trial to testify to say that the fact that you said that you -- the fact that the article said that you had sued Tiffany Powell-Wiley was a big deal?

A.   No.  What I'm going to do is, I'm going to reach out to the licensees that read it.

Q.   Who are those licensees?

A.   I'm going to ask them:  Hey, would you -- you know.  The defense is interested in finding people that read this article.  And they want to know what kind of impression they got.  But I can't tell you that now.

Q.   You see.  So that's work you

Page 211

haven't done yet but you're going to do it before the trial?

A.   Or I may do it next week, you know.

Q.   Okay.

A.   Maybe we can settle this thing.  So I would go out and do it for that.

Q.   What do you mean?  I don't understand that.

A.   Maybe there's a possibility that Patricia Ray and you can have a conversation and we can settle this thing.  And then I -- I don't have to go to that trouble.

But we will try to help do that in a settlement discussion.

Q.   Do what?

A.   Bring in some of my colleagues that read this thing.

Q.   The folks that you would go out next week or wherever to go find?

A.   Yeah.

Q.   Okay.

A.   I'll let Patricia do it with you.

Q.   I'd like you to look at -- this is the answer to the Second Set of Interrogatories, which was Exhibit 16, and I'd

Page 212

like to look at your answer to Interrogatory Number 10.

And in particular, I want to point out the sentence that reads:

"This harm resulted in lost licensing opportunities and diminished brand equity."

And my question to you is:
I understood -- we've talked a lot about lost licensing opportunities.  My question is, what do you mean by "diminished brand equity"?

A.   Yes.  So this question is based on my substantive response.

So what are you asking about, please?

Q.   In your response where you talk about diminished brand equity as one of your harms, what do you mean?

A.   I mean that when people saw in clinicaltrials.gov that my MMAS Research brand, that I was removed from the study and I was replaced by MMAR, it encouraged Johnson & Johnson and 15 of those other lawsuits that I was suing, for them to do the same thing.  That's what that means.

Page 213

And then the article -- let me finish mine.  The article ended my brand.  I mean, no one is going to do business with someone that sues the federal government over a study.  No one.  Forget about it.  The brand is dead.

I have a different company now. It's called --

Q.   What company is that?

A.   -- Safety Healthcare.

I don't even use MMAS Research scientifically.  I have a different application, a different website.

Q.   By the way, did you ask any government agency to initiate an investigation into Dr. Tiffany Powell-Wiley?

A.   All I'm saying to you is we've been in discussion with NIH, and that doesn't have anything to do with the litigation.

Q.   Can you answer my question, please?

A.   What?

Q.   Can you answer my question, please?

A.   I can't hear you.

MS. RAY:  Objection.  Objection. Does it relate to this case?

**MAGNA**
LEGAL SERVICES

Page 214

MR. FOLKMAN: I think it relates to this case.

THE WITNESS: It has nothing to do with the case.

BY MR. FOLKMAN:

Q. So your lawyer is going to tell you -- I mean, I hope your lawyer will tell you that she can object to a question but you still have to answer it unless it's privileged.

So my question is: Did you initiate or ask a government agency to initiate an investigation into Dr. Tiffany Powell-Wiley?

A. I'm not prepared to answer that.

Q. Okay.

You did ask the government to initiate investigations into Dr. Hartz, Ms. Chiert, and Dr. de Ferranti, didn't you?

A. Repeat the question?

Q. Sure.

You did ask the government to initiate an investigation into the other authors, right?

A. I'm not prepared to answer that the way you phrased the question.

Q. Well, didn't you email me your

Page 215

letters to the government?

A. Yeah, I did. And what the complaint is, it's not a complaint directed at individuals. It's an institutional complaint that's talking about research integrity and falsification of data and patient safety. It doesn't have anything to do with litigation, okay? Nothing.

Q. Well, let me ask you about that. I think you said it was not directed at an individual.

I'm just going to read to you from what you wrote me:

"The attached master complaint" --

And this is an email that you wrote to Harvard Medical School NIH. And it says:

"The attached master complaint provides definitive forensic evidence regarding an active peer-reviewed pediatric protocol coauthored by HMS faculty member Dr. Jacob Hartz, MD MPH, and division chief Dr. Sarah de Ferranti, MD MPH."

A. So can I just tell you what happened now? You are correct. I know what

Page 216

you're citing.

We got a letter back from the federal Office of Research Integrity. They told us to take it to Harvard Medical School, to that Office of Research Integrity, which we didn't copy you on, although I'm sure you can get it -- and we sent it to Harvard, all right?

And it wasn't just the BCH study. It was another study that Dana-Farber was doing. So you have two studies in the complaint that went back to Harvard.

Harvard never responded, so we separated the two out. We told Harvard we were going to escalate it back to the federal government because ORI directed us to Harvard. Harvard is not going to deal with it.

We also sent it to BCH. We gave them the opportunity to fix it.

This has nothing to do with individuals. This has something to fix, the patient safety dangers that study did, the falsification of data.

Q. Yeah.

A. This is totally scientific. But because it's a breach of the contract for

Page 217

scientific integrity, I thought it was important to discuss it with you today.

Q. So I'm looking at an email that you sent to me on May 27, 2026 --

A. Right.

Q. -- with an attachment. The attachment is the master complaint. It has a section called Targeted Subjects and Institutional Affiliations. And it says:

"This complaint targets the primary investigators and contributing authors of the published study protocol."

And then it says:

"The specific individuals named in their official capacities are" -- and it lists "Dr. Jacob Hartz, Hannah Chiert, Dr. Sarah de Ferranti, and Tiffany Powell-Wiley."

Do you want me to show that to you or will you just accept --

A. No, that's correct. I accept that, yes.

Q. So the fact is, you did submit individual complaints against each of the authors, correct?

MAGNA
LEGAL SERVICES

Page 218

A.  I assume, yeah, May 17th.

Q.  Okay.

A.  But since that time, that's been amended and changed.  Okay?

Q.  Okay.

MR. FOLKMAN:  Give us a minute.  We may be very close to being done.  And I hate to say that and then, you know, not be close, but I think we're close.

So give us five minutes and I'll be back, all right?

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Going off the record, 11:46 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record.  11:51.

MR. FOLKMAN:  So Mr. Trubow, I have no more questions.  Thank you for your time.

If your lawyer has questions, she will ask them now.  Otherwise we will conclude.

MS. RAY:  No.  I think we're good.  I think we've said a lot.

MR. FOLKMAN:  All right.

Page 219

MS. RAY:  We'll close when you close.

MR. FOLKMAN:  All right.  So thank you very much everybody.

Does Magna have our transcript order?

THE VIDEOGRAPHER:  Going off the record.  11:51 a.m.

THE REPORTER:  Patricia, did you want a transcript?

MS. RAY:  I'll let Steve handle that.

(Proceeding concluded, 11:23 a.m. Pacific.)

---

Page 220

C E R T I F I C A T E

I, ANNE E. VOSBURGH, Certified Shorthand Reporter, Registered Professional Reporter, Certified Realtime Reporter hereby certify:

That STEVEN TRUBOW, via remote videoconference, agreed to testify truthfully, under penalty of perjury; that all counsel stipulated to the remote swearing and waive objection, notwithstanding the location of reporter or witness during testimony; and that this transcript is a true and correct record of testimony given.

I further certify that I am not related to any of the parties and am in no way financially interested in the outcome of this matter.

_____

ANNE E. VOSBURGH, CSR, RPR, CRR
Notary Public - Exp. July 20, 2029

Page 221

E R R A T A

Deponent:  STEVEN TRUBOW, June 22, 2026

Reason Codes:

1.  To clarify testimony.

2.  To change/correct testimony.

3.  Transcription error

| Page/Line | Now Reads | Should Read | Reason |
|---|---|---|---|
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |
| ____/____ | _____ | _____ | _____ |

_____    _____

Signature of Deponent        Date

MAGNA
LEGAL SERVICES