UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MMAS RESEARCH, LLC,

       Plaintiff,

    vs.

THE CHILDREN'S HOSPITAL
CORPORATION, et al.,

       Defendants

Civ. A. No. 1:24-cv-12108-DJC

## DECLARATION OF JACOB C. HARTZ, MD

I, Jacob C. Hartz, make the following declaration:

1. I am a pediatric cardiologist and Assistant Professor of Pediatrics at the Wake Forest University School of Medicine in Charlotte. I received my medical degree from the University of New Mexico School of Medicine in 2010 and completed my internship and residency in pediatrics at the Duke Children's Hospital and Health Center. From 2014 to 2017, I had a fellowship in pediatric cardiology at Children's National Medical Center in Washington, DC. I completed a fellowship in preventive cardiology at Boston Children's Hospital in 2018, at which point I became a staff cardiologist at Boston Children's Hospital. From 2021 to 2024, I was the Director of Preventive Cardiology at BCH. I am board-certified in pediatrics and pediatric cardiology.

2. I was the principal investigator on a study sponsored by BCH, "The Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence to Statins in Adolescents with Familiar Hypocholesterolemia." (Later, the title was changed to add the words "and hypertension" at the end). The purpose of the study was to understand whether providing

1

monetary incentives would improve adolescents' adherence to their prescriptions for cholesterol-reducing medicines called statins and blood-pressure lowering medications.

3.      I decided to use a scale known as the Morisky Medication Adherence Scale ("MMAS") to measure whether the adolescents enrolled in the study were adhering to their medication schedules and to decide which adolescents to enroll in the study. At the time, I had no knowledge or understanding of (1) the distinctions, if any, between the "MMAS-8" and the "Morisky Widget," (2) the disputes between Dr. Morisky, who I understand was the original creator of the MMAS, and Steven Trubow, or (3) the many lawsuits that MMAS Research, LLC, an entity controlled either by Dr. Morisky or by Mr. Trubow, had filed against other medical and research institutions. If I had known then what I know now, I certainly would have found some alternative to the MMAS, if one had been available.

4.      My general understanding of how the MMAS worked was that for most of the seven "yes/no" questions, a "no" answer means that the patient is taking his medication as prescribed, but that for one question, this is reversed: a "yes" answer means that the patient is taking his medication as prescribed. I had no understanding, until long after this lawsuit was filed, that the "Morisky Widget," a software-based version of the MMAS, also categorized some of the questions as indications of *intentional* nonadherence to a medication schedule and others as indications of *unintentional* nonadherence. That was of no interest to me for purposes of my study.

5.      I reached out to MMAS Research LLC for permission to use the MMAS, because I believed that MMAS Research was the owner of the copyright that had to be licensed in order for the Hospital to use the MMAS. I inadvisedly signed a license agreement Mr. Trubow sent me on behalf of BCH, without showing it to the Hospital's counsel. Again, if I had known then what

I know now, I never would have signed the contract. The document attached as Exhibit 8 to the First Amended Complaint is a true copy of the license that I signed, although I note that it is not the signed version.

6.      Among other things, the license required the inclusion of certain text attributing the ownership of the MMAS Widget to MMAS Research, LLC in certain publications. The text was required whenever the publication contained "Morisky Widget MMAS descriptions or results." Mr. Trubow and I never discussed what "descriptions" means, so I do not know what he thought it meant. To me, the natural reading was that the attribution text would have to be included if the publication were describing the details of the MMAS, not simply mentioning the use of the MMAS. Otherwise, I believe the contract would have used a word like "mention" or "discussion."

7.      Some time after I signed the contract, Mr. Trubow traveled to Boston to "train" me and a staffer in my office, Hannah Palfrey, in the use of the Morisky Widget. I do not have a very clear memory of the training. I recall in very general terms that I was shown how to log in to the software and how to edit the eight questions of the MMAS so that they were tailored to the study's needs.

8.      My staff and I created a paper form that contained the eight questions we were going to ask prospective study participants in order to screen them for eligibility. The document attached as Exhibit 24 to the First Amended complaint is a true copy of that document. The document was for our internal use, so that we could recall the questions and to record prospective participants' answers.

3

9. The paper form did not include the instructions that I understand form part of the MMAS-8. My staff and I did not make use of those instructions when we asked the questions of prospective study participants. I did not think it relevant or important to my study or its goals.

10. At the bottom of the form was a line of text that was for the use of me and my staff. It indicated that we would treat two or more answers indicating nonadherence as the cutoff for study eligibility. I set that cutoff for purposes of the study, and I have no knowledge of whether the MMAS itself has any particular cutoffs for any particular purposes. I set the cutoff at 2 in order to try to ensure that we could enroll enough patients in the study. The form sets the cutoff at 2 or more, while the study description I published on the clinicaltrials.gov website sets the cutoff at 6 or more. There is no substantive difference. The difference is just semantic. There are eight questions. The form we created treats an answer indicating non-adherence as a "1", while in the study description, I treated an answer indicating adherence as a "1."

11. We created a second paper document, which contained only the questions without any bold-face type and without the instructions or scoring criterion. A true copy of the that document is attached as Exhibit 1. We did sometimes show this document to prospective study participants.

12. On clinicaltrials.gov, we explained our methods in our description of the study. It is necessary, when conducting a study such as this, to disclose such methods, so that other researchers can evaluate the study and even replicate it. But because I determined the cut-off score on my own, I did not and do not believe that I was disclosing any information created by or belonging to MMAS Research by writing about it on clinicaltrials.gov.

13. The study took place during COVID, and we had trouble recruiting prospective participants. In fact, because of this recruitment problem, the study never proceeded to its

conclusion. We did not enroll enough participants to proceed. In fact, we only enrolled nine participants, although I understand that the clinicaltrials.gov website gives an erroneous figure of eleven.

14.     I do not recall precisely how many times my colleagues and I administered our questionnaire to prospective participants. In documents I have reviewed, including an email I wrote to Mr. Trubow, I have seen references to four administrations. But in the end we enrolled 9 study participants, and so I know we administered the questionnaire at least 9 times.

15.     I am uncertain whether my colleagues or I ever logged into the "Morisky Widget" after we used it to create the questionnaire at the "training" with Mr. Trubow. If we did, it could only have been a handful of times.

16.     We scored the questionnaires that we did administer simply by adding up the number of answers indicating non-adherence. I understand that that basic addition is also what the "Morisky Widget" does for tests scored using the software. We did not distinguish between questions indicating intentional nonadherence and questions indicating unintentional nonadherence, although I now understand that the "Morisky Widget" adds those answers and provides sub-scores for intentional and unintentional nonadherence, too, when the Widget is used to score tests. But that was not of any interest to us in connection with the study. I note that the eighth question in the assessment is a multiple choice question rather than a yes/no question. I have read that Dr. Morisky's intention was that each of the five possible answers should have a different score (4, 3, 2, 1, and 0). For the purposes of my study, I decided that that question should be scored "1" if the answer indicated that the respondent always had difficulty remembering to take his or her medication, and "0" otherwise.

17.     I became aware, too late, that Mr. Trubow and Dr. Morisky were squabbling about who had the right to license the MMAS to researchers such as me, and I faced competing demands from them and their entities and representatives for attribution and credit. I did change the attribution language on the study description on the clinicaltrials.gov website, and my goal was to try to fulfil whatever obligations I and the Hospital had and not to get the Hospital or myself involved in any legal disputes. Unfortunately, my effort was unsuccessful.

18.     I never spoke with Mr. Trubow after the "training" session in Boston. Our only communications after the "training" were via email.

19.     Mr. Trubow never told me, orally or in writing, that MMAS Research LLC was terminating its contract with BCH.

20.     The last administration of the MMAS for our study was on or about January 9, 2024.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 9, 2026.

_/s/Jacob C. Hartz_____
Jacob C. Hartz