UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MMAS RESEARCH, LLC,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION, et al.,<br><br>　　　　Defendants | Civ. A. No. 1:24-cv-12108-DJC |

**THE CHILDREN'S HOSPITAL CORPORATION'S OPPOSITION TO
THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

PRELIMINARY STATEMENT

The Hospital licensed software called the Morisky Widget from MMAS Research, so that

Dr. Jacob Hartz could use an eight-question assessment called the MMAS in a study he was

conducting. The Hospital administered the assessment to prospective study participants a few

times, but the study was unsuccessful and never proceeded past the enrollment phase. MMAS

Research sued the Hospital, Dr. Hartz, and others, asserting a variety of claims, but after motions

to dismiss, the case boils down to a claim for breach of contract against the Hospital.

MMAS Research seeks partial summary judgment on the issue of breach. The Hospital

acknowledges that if the contract is enforceable, Dr. Hartz and his team did not comply with one

of its requirements—Dr. Hartz scored the assessments by doing the simple addition by hand

rather than inputting the assessments into the Widget software, as the contract required. Another

alleged breach—the use of a paper version of the assessment rather than an online version—is

disputed, because Dr. Hartz avers that he had MMAS Research's permission to use the paper

version. No evidence or legal theory support any of the other alleged breaches. In any event,

1

5186330_1

there is a dispute about whether MMAS Research owns the copyright that it purported to license to the Hospital. If it did not, then the contract is the product of mutual mistake and cannot be enforced.

The Court should deny MMAS Research's motion and, under Fed. R. Civ. P. 56(f)(1), grant summary judgment for the Hospital on the alleged breaches supported by no evidence or arguments.

FACTS

Dr. Jacob Hartz was a pediatric cardiologist at Boston Children's Hospital. (Docket No. 148, First Hartz Decl. ¶ 1). He was studying ways of improving the adherence of adolescents taking anti-cholesterol drugs to their medication schedule. (Docket No. 148 ¶ 2). He decided to use an eight-question scale called the Morisky Medication Adherence Scale, or MMAS, both to decide which patients were eligible to take part in his study and to measure the effectiveness of the interventions he was studying once the study got underway. (Docket No. 148 ¶ 3). He signed a license agreement on the Hospital's behalf with MMAS Research LLC, which claimed to own the copyright for the assessment. (Docket No. 148 ¶ 4). The Hospital paid $5,000 under the contract. (Docket No. 148 ¶ 4).

The original version of the MMAS was called the MMAS-4. It is not relevant here. The assessment's creator, Dr. Donald Morisky, later created the MMAS-8, an eight-question assessment that MMAS Research calls the "traditional" MMAS-8. (Am. Compl., Docket No. 24 ¶ 49; Docket No. 24-1 at Ex. 21). It had seven yes/no questions, such as "Do you sometimes forget to take your <health condition> pills?" (Docket No. 24 ¶ 57). The traditional MMAS-8 also had an eighth question (hence its name) that asked: "How often do you have difficulty

2

5186330_1

remembering to take all your medications?" and had five possible answers, from "Never/Rarely" to "All the time," each with its own score, from 4 to 0. (*Id.*).

The main idea behind the MMAS-8 is that patients want to answer "yes" to questions their doctors ask them. So they may tend to answer yes if asked, "are you taking your medicine every day?" whether or not the answer is true. For six of the first seven questions, the MMAS-8 reverses that, so that a "no" answer indicates the patient is taking the medicine as scheduled. Scoring the MMAS-8 simply meant adding up the number of answers indicating that a patient was taking his or her medicine as prescribed, and adding the score for the last question. (Docket No. 148 ¶ 16).

A third version of the MMAS is called the "Morisky Widget." The Widget is software, hosted in the cloud, that a user can use as a text editor to create customized versions of the assessment and to score the assessment. (Trubow Tr. at 39:18-40:2, Docket No. 147-1). Its source code includes the text of the MMAS-4 as well as the traditional MMAS-8, which a user can use as the base for his or her own customized questions. In addition to providing a single numerical score based on a patient's answers, it also could provide two sub-scores. (Docket No. 24 at ¶¶ 63, 64, 66). The first tallied the number of answers to a subset of the questions meant to measure whether the patient was *intentionally* not taking his or her medicine as prescribed. (*Id.*). The second tallied the number of answers to a subset of the questions meant to measure whether the patient was *unintentionally* not taking his or her medicine as prescribed. (*Id.*). The Widget also had the final multiple-choice question. (Docket No. 24 at ¶ 63).

The license agreement had three potentially relevant provisions. First, it required the Hospital and its staff to use the Widget rather than the traditional MMAS-8:

> BCH can use the Morisky Widget … to administer Morisky Widget MMAS tests. With Licensor approval, BCH can use MMAS paper or electronic questionnaires but all scoring and coding must be done in the Morisky Widget.

(Docket No. 24-1 at Ex. 8). Second, it required the Hospital to include specified attribution language in certain publications:

> The MMAS required citations and licensing statement provided in Appendix 1 must be included in all manuscripts, web postings or other publication containing Morisky Widget MMAS descriptions or results.

(Docket No. 24-1 at Ex. 8). Third, the contract had the following termination provision, which MMAS Research has claimed is relevant but which the Hospital believes has no relevance:

> In case of scientific, administrative or intellectual property misconduct in using the Morisky Widget, MMAS reserves the right to withdraw permission for us [sic] and to pursue all legal remedies.

(Docket No. 24-1 at Ex. 8).

After Dr. Hartz and his team used the Widget, at a "training" session Mr. Trubow held in Boston, to customize the version of the questions to be used in their study, they created a paper document that listed the questions. (Docket No. 148 ¶ 8; Docket No. 24-1 at Ex. 24). The paper version also contained some notes to self, i.e., instructions to the people administering the assessment for the purpose of screening adolescents for participation in the study. (Docket No. 148 ¶ 10; Docket No. 24-1 at Ex. 24). First, in the column for recording the answers, the paper version put the answer indicating nonadherence in boldface text, to help the scorer add up the score correctly.  (Docket No. 24-1 at Ex. 24). Second, at the bottom, it had instructions for scoring: "How many answers did they give that are in **BOLD UPPERCASE? ___ (> 2 →**

**ELIGIBLE)**." (*Id.*). Dr. Hartz's version assigned a score of 1 to all answers to the first seven questions indicating nonadherence, and a score of 0 to all answers indicating adherence. (Docket No. 24-1 at Ex. 24). Dr. Hartz's version of the final question did not assign different scores to

each of the five answers: it assigned a score of 1 to the answer in bold (for adolescents who had difficulty remembering to take their medication **"ALL THE TIME"**), and a score of 0 to all other answers. (Docket No. 24-1 at Ex. 24).

Dr. Hartz and his team created a second document that contained only the questions, not the scoring criterion or the note on how to score the assessment. (Docket No. 148 ¶ 11). The questions were of course disclosed at least orally to all prospective study participants, and some may have seen the second document. (Id.). But the first document, and the instructions and scoring criterion it contained, were never disclosed to anyone outside of Dr. Hartz's team. (Second Hartz Decl. ¶ 2).

The criterion (">2 → ELIGIBLE") was created by Dr. Hartz—not by MMAS Research—for purposes of the study. (Docket No. 148 ¶¶ 10, 16; Docket No. 24-1 at Ex. 24). It indicated that Dr. Hartz wanted to enroll adolescents whose answers to two or more of the questions indicated that they were not adhering to their medication schedules. (*Id.*).

Dr. Hartz and his staff administered the test using the paper form at least nine times. (Docket No. 148 ¶¶ 11, 14).[1] Due to COVID, the study had trouble enrolling participants—it enrolled only nine—and it never proceeded beyond the enrollment phase. (Docket No. 148 ¶ 13).

Dr. Hartz also published a description of the study on clinicaltrials.gov, an "online database of clinical research studies and information about their results." (Docket No. 149-1; Docket No. 24-1 at Ex. 12; Docket No. 148 ¶ 12). The Hartz study description mentioned the MMAS several times:

---

[1] MMAS Research suggests the Hospital is hiding the ball about the number of times it administered the MMAS. If MMAS Research had asked in discovery, the Hospital would have disclosed that it administered the assessment approximately 35 times in total, i.e., to patients who were enrolled in the study and patients who were not enrolled.

5

- It states that investigators "will test the subject's adherence prior to the use of incentives (using the Morisky Medication Adherence Scale and the Wellth Mobile Application)." (Docket No. 149-4 at 5).

- It states that investigators will "test the subject's adherence (using the Morisky Medication Adherence Scale and Wellth App) during the 60 days following discontinuation of the incentives"). (*Id.* at 6).

- Aim 1.1 of the study states that the investigators will "determine the baseline adherence level … using the Morisky Mediation Adherence Scale (MMAS)." (*Id.* at 7).

- Aim 1.2 states that "Patients who are found to have a low adherence according to the MMAS in Aim 1.1 will be enrolled into an intervention …" (*Id.*).

- Aim 1.3 states that investigators will "determine adherence 60 days after the incentives have been discontinued using the tracking features in the Wellth App and the MMAS." (*Id.*).

- It repeats that adherence will be measured "through the Morisky Medication Adherence Scale (MMAS)" and states that the MMAS is "validated." It notes that the investigators "will simply measure changes in MMAS score throughout the study," because "the score of the MMAS cannot be converted to the proportion of prescribed pills taken." (*Id.* at 8).

- It states that the MMAS will be taken "at the screening visit, after the 60-day intervention, and 60 days after the intervention ends." (*Id.*).

- It repeats the timing of the administration of the MMAS. (*Id.* at 10).

6

5186330_1

- It states that a "Morisky Medication Adherence Scale score of ≤ 6" is a criterion for inclusion in the study. (*Id.* at 11).[2]

- It includes the disputed attribution statement, which varied over time as Dr. Hartz faced competing demands (*Id.* at 19).[3]

ARGUMENT

## A. Standard of decision.

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas de P.R. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011) (citation and internal quotation marks omitted). A fact is "material" if "its existence or nonexistence has the potential to change the outcome of the suit." *Id.* The Court must view the record in the light most favorable to the non-moving party and resolve all reasonable inferences in its favor. *See Ameen v. Amphenol Printed Circuits, Inc.,* 777 F.3d 63, 68 (1st Cir. 2015). But the non-moving party cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation" to try to defeat the motion. *Cherkaoui v. City of Quincy,* 877 F.3d 14, 18 (1st Cir. 2017) (citation and internal quotation marks omitted). It must instead point to "competent evidence" and "specific facts." *Tropigas,* 637 F.3d at 56.

---

[2] Because the MMAS has eight questions, this criterion (a score of less than or equal to 6 showing adherence) is substantively the same as the criterion shown on the assessment document Dr. Hartz created for internal use (a score of greater than or equal to 2 showing nonadherence). (First Hartz Decl. ¶ 10).

[3] The first version, dated July 1, 2020, did not give any credit or attribution to the MMAS. (Docket No. 149-2). The fifth version, dated July 7, 2022, credited MMAS Research LLC but did not contain the text from Appendix 1 of the license agreement. (Docket No. 149-3). The sixth version, dated January 10, 2023, gave the following credit: "MMAS-8 with permission from Dr Donald Morisky as written below." (Docket No. 149-4). It also noted: "The MMAS-8 Scale, content, name, and trademarks are protected by US copyright and trademark laws. Permission for use of the scale and its coding is required. A license agreement is available from MMAR, LLC." *Id.*

7

**B.        MMAS Research has not established the breaches it alleges.**

If the contract is enforceable, then Dr. Hartz and his team did not comply with one of its requirements when they scored the assessments manually rather than by using the Widget. Using the Widget to do simple arithmetic may be trivial and pointless, but it is what the contract requires, and parties are free to make trivial and pointless contracts. But the contract is not enforceable, or at least its enforceability is disputed, for reasons given in Section D, below.

MMAS Research is not entitled to summary judgment on any of the other alleged breaches even if the contract is enforceable, and on some of them, the Court should not just deny its motion but award summary judgment to the Hospital under Fed. R. Civ. P. 56(f)(1).

1. **MMAS Research is not entitled to summary judgment on its claim that the Hospital failed to seek permission to use paper tests.**

The contract provides: "With licensor approval, BCH can use MMAS paper or electronic questionnaires." (Docket No. 24-1 at Ex. 8). At the training, Dr. Hartz told Mr. Trubow that he intended to use a paper screener, because it took too much time in the clinical setting to navigate to the website and log in to the software to make the use of the online tool practical. (Second Hartz Decl. ¶ 3). Mr. Trubow approved. *Id*. Dr. Hartz therefore had, and understood that he had, MMAS Research's approval to use the paper questionnaires. *Id.* For this reason, there is at least a dispute of fact about whether the Hospital had MMAS Research's permission to use a paper version of the test. The Hospital acknowledges that MMAS Research could confront Dr. Hartz at trial with the July 5 email regarding the use of paper tests. Maybe that would be a strong point on cross-examination, maybe not. But on summary judgment, the Court's job is not to weigh the strength of competing evidence. *See Ameen,* 777 F.3d at 68.

**2.   The Hospital did not impermissibly omit the attribution language.**

The contract provides: "The MMAS required citations and licensing statement provided in Appendix 1 must be included in all manuscripts, web postings or other publication containing Morisky Widget MMAS descriptions or results." (Docket No. 24-1 at Ex. 8). The Hospital does not dispute that the clinicaltrials.gov study description did not contain the attribution language set out in the contract. But it does dispute that it had any obligation to include it. MMAS Research asserts that the attribution language was required "in all publications **referencing** the tests." (SUMF ¶ 7). But that is not what the contract says. The contract requires the attribution in "all manuscripts, web postings or other publication[s] **containing Morisky Widget MMAS descriptions or results**." (Docket No. 24-1 at Ex. 8 (emphasis added)). Assuming that the study description was a "web posting or other publication," it did not contain "Morisky Widget MMAS descriptions or results," even though it obviously mentions or references the MMAS.

MMAS Research has not submitted the text of the clinicaltrials.gov study description in support of its motion or even said anything about what the study description contains. That is fatal, since it is MMAS Research's burden to "support [its] assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

Even if the Court considers evidence that MMAS Research failed to offer in support of its motion and looks at the text of the clinicaltrials.gov study description, it will see that the study description does not contain any "results." Mr. Trubow, at the 30(b)(6) deposition, conceded the point. (Docket No. 147-1 at 82:3-83:5).

Nor does it contain any "descriptions." As shown above, all the study description does is to say, several times, that the investigators would use the MMAS at various points in the study to measure adherence. It does not give any details about what the MMAS is or how it works, other

9

than to say that it is "validated." MMAS Research has no evidence to offer about what it thought the word "descriptions" means. (*Id.* at 83:18-25). Dr. Hartz's view was that a "description" was something that "describe[ed] the details of the MMAS." (First Hartz Decl. ¶ 6). But he did not discuss the point with Mr. Trubow. (*Id.*). In any event, Dr. Hartz's view is the only parol evidence of what the contract means, in case the Court finds that it is ambiguous.

But the contract is not ambiguous. The Court should construe the word "descriptions" in its "usual and ordinary sense," and construe the contract in a "reasonable and practical way." *Gen. Hosp. Corp. v. Esoterix Genetic Labs., LLC,* 16 F.4th 304, 308 (1st Cir. 2021). A "description" is "a delineation or explanation of something by an account setting forth the subject's characteristics or qualities." *Black's Law Dict.* 456 (7th ed. 1999). All the study description does is to explain that Dr. Hartz planned to use the MMAS assessment in his study. It does not even mention the Widget, let alone any of the distinctive characteristics of the Widget (the computerized scoring, the intentional and unintentional nonadherence subscores), or for that matter, any of the characteristics of the traditional MMAS (e.g., the reversal of "yes" and "no" answers). If the parties had intended to require the attribution language whenever the MMAS or the Morisky Widget was *mentioned,* they would have said so.

All the parol evidence of intent favors the Hospital, and if the contract is unambiguous, its interpretation is a question of law for the Court, *see Gen. Hosp. Corp.,* 16 F.4th at 308. So the Court should deny MMAS Research's motion on this breach.

### 3. The Hospital did not impermissibly disclose any scoring or coding criteria on the clinicaltrials.gov website.

The contract provides: "Coding and scoring criteria of the MMAS are trade secrets of MMAS and as such can never be divulged in any publication, presentation, or website without

10

5186330_1

written permission from MMAS." (Docket No. 24-1 at Ex. 8). The Hospital did not disclose any "coding or scoring criteria of the MMAS" on the clinicaltrials.gov website.

The only evidence that MMAS Research provides on this point is paragraph 12 of Mr. Trubow's declaration (Docket No. 142-1 at 6), which states: "BCH published MMAS-8 scoring and coding information in connection with the … study on the … ClinicalTrials.gov website without MMAS Research's written permission." That is a textbook example of a conclusory statement about the content of a writing that is inadmissible in evidence when the writing itself is available. *See* Fed. R. Evid. 1002. That point alone is dispositive, since it is MMAS Research's burden, in making this motion, to show with admissible evidence that it is entitled to judgment. But even looking at the written evidence, the only criterion disclosed in the study description is that a "Morisky Medication Adherence Scale score of $\leq 6$" was the cutoff for study participation. The undisputed evidence, though, is that Dr. Hartz decided on his own what the cutoff would be. (Docket No. 148 ¶ 10). In other words, he disclosed his own idea, not anything that MMAS Research licensed the Hospital to use. That cannot be a breach of the license agreement.

### 4. The Hospital did not disclose any scoring or coding criteria via its paper version of the assessment.

While the Hospital did use a paper version of the test when screening prospective study participants for eligibility, there is no evidence that the Hospital ever showed or disclosed the form that contained the eligibility criteria it was using, or the instructions for scoring, to anyone. The document was for "internal use." (Docket No. 148 ¶ 8). It was never disclosed to anyone. (Second Hartz Decl. ¶ 2). In any case, the questionnaire for internal use is not a "publication, presentation, or website." Dr. Hartz and his team created another document, which was sometimes shown to participants, but which omitted the materials to which MMAS Research objects. (Docket No. 148 ¶ 11 & Ex. 1). Mr. Trubow acknowledged that he had no evidence of

11

5186330_1

"how [Dr. Hartz] gave [the assessment], what he gave, or who he gave it to," and that he could only speculate. (Docket No. 147-1 at 79:18 – 81:16). Thus, the Court should deny the motion to the extent it asserts that the Hospital disclosed anything via its paper form.

### 5.    The Hospital did not breach the termination clause of the contract.

The contract provides: "In case of scientific, administrative or intellectual properly (sic) misconduct in using the MORISKY Widget diagnostic assessments, MMAS reserves the right to withdraw permission for use and to pursue all legal remedies." (Docket No. 24-1 at Ex. 8). The Hospital cannot have breached this provision, because it is not a promise to do or not to do anything. Instead, it is a termination clause that gives MMAS Research the power—if it chooses to exercise it—to terminate the license (i.e., to "withdraw permission for use" of the Widget) and to "pursue all legal remedies."

"A breach of contract is a failure to perform for which legal excuse is lacking." *Realty Dev. Co. v. Wakefield Ready-Mixed Concrete Co.,* 327 Mass. 535, 537 (1951). This contract language contains no obligation the Hospital had to perform. Not only does MMAS Research fail to explain how the Hospital could have breached such a provision, it fails to offer any evidence that it exercised its purported power to terminate, and the undisputed evidence is that it never did exercise that purported power. (Second Hartz Decl. ¶ 4). The Court should therefore deny MMAS Research's motion on breach of the termination provision and grant summary judgment to the Hospital.

5186330_1

### 6.  The Hospital did not transfer any rights to anyone.

The contract provided: "The Morisky Widget agreed to in this license are nontransferable from the BCH." (Docket No. 24-1 at Ex. 8). MMAS Research claims that the Hospital breached the contract by stating, in the clinicaltrials.gov study description, that the MMAS-8 was "used with permission from Dr. Donald Morisky" and that rights could be obtained from MMAR, LLC. (Docket No. 24 ¶ 95).

MMAS Research confuses attribution with transfer. The right that the contract gave the Hospital was a license to use a work to which MMAS Research claims it owned the copyright. The only sensible reading of the provision is that it prevents assignment or sublicensing of the rights the Hospital obtained under the contract. MMAS Research's memorandum argues that the Hospital transferred "the licensed Widget tests" and that it "replaced the licensed Morisky Widget MMAS-8 condition- and medication-specific tests with an MMAR LLC license." (Docket No. 142 at 5, 10-11). But all MMAS Research accuses the Hospital of doing is misattributing the Widget on the clinicaltrials.gov website. There is no evidence that the Hospital assigned or transferred anything to anyone—not the license to use the supposedly copyrighted work, not the data the Hospital gathered when it administered the tests, not anything else. It cites no authority for the proposition that misattributing ownership of a copyright in a licensed work is a transfer of any rights, nor has our research found any case that even entertains such a theory.

### C.  The Court should grant summary judgment to the Hospital on most of the alleged breaches.

Under Fed. R. Civ. P. 56(f)(1), the Court can grant summary judgment to the non-moving party, provided the moving party has notice and a reasonable time to respond. Two of the alleged breaches—manually scoring the assessment results, and using paper tests without permission—have at least an arguable basis. The rest, for the reasons given above, lack any arguable basis in

5186330_1

law or fact. MMAS Research is wrong to claim that any reference to the Widget triggers the attribution requirement; there is no evidence of disclosures of scoring and coding criteria contrary to the contract; the termination provision is not a provision that could be breached; there is no evidence that the Hospital transferred anything to anyone. Because these theories fail as a matter of law or are unsupported by any admissible evidence, the Court should decide them now, at summary judgment.

### D. Because MMAS Research's ownership of the Widget copyright is disputed, there is a dispute about whether the contract is the product of mutual mistake.

MMAS Research asserts that the Hospital "has always conceded … that MMAS Research owns the Widget copyright." (Mem. at 15). The ellipsis makes the quotation deceptive. In fact, the Hospital "has always conceded, **for purposes of its motion to dismiss only**, that MMAS Research owns the Widget copyright." (Docket No. 103 at 5-6). The contract is a license of the "copyright and trademark protected Morisky Widget MMAS." (Docket No. 24-1 at Ex. 8). The Hospital entered into the license agreement because it thought MMAS Research LLC was the owner of the relevant copyright. MMAS Research asserts, as the very first undisputed material fact, that it is the owner of the copyright.

But who owns the copyright is hotly contested. Dr. Morisky, the original creator of the MMAS, and MMAS Research, which is now controlled by Mr. Trubow, have been suing each other over it for years. The main lawsuit is pending in the Western District of Washington. In that lawsuit, Dr. Morisky asserts that MMAS Research and Mr. Trubow breached a contract by "Failing and refusing to acknowledge that Dr. Morisky is the exclusive owner of the Morisky Copyrights, including the Morisky Widget Copyright." (Second Makson Decl. Ex. 1 at ¶ 134). The case is pending, but it may never be tried, because in April 2026, the court directed entry of a default on account of MMAS Research's "failure to participate in discovery" and its failure to

14

"pay sanctions" that the court had previously imposed. (Second Makson Decl. Ex. 2). The judgment has not yet entered, but the proposed judgment Dr. Morisky has submitted includes a declaration that Dr. Morisky and his successors-in-interest are the sole owners of the Morisky Widget copyright. (Makson Decl. Ex. 3 at 23). Even if the Court denies the motion for default judgment, the issue will still have to be tried on the merits. Whatever happens in Washington, one thing is clear: the ownership of the Widget copyright is disputed.

The Hospital has asserted mutual mistake as an affirmative defense. (Docket No. 69 at 16). The law on mutual mistake is straightforward:

> Where there has been a mistake between the parties as to the subject matter of a contract, there has been no meeting of the minds, and the contract is voidable at the election of the party adversely affected. The mistake must be shared by both parties, and must relate to an essential element of the agreement. The mistake must involve a fact capable of ascertainment at the time the contract was entered into, and not a mere expectation or opinion about future events.

*La Fleur v. C.C. Pierce Co.,* 398 Mass. 254, 257-58 (1986) (citations and internal quotation marks omitted). The mistake must also satisfy the "sine qua non test": the mistake must be about a fact so basic that the parties would not have made the contract had they known the truth. *See Browning-Ferris Indus. v. Casella Waste Mgmt. of Mass.,* 79 Mass. App. Ct. 300, 314 n.9 (2011).

There is apparently no Massachusetts case in which the mistake the parties made was about whether the licensor owned the rights it was licensing. In *Uptown Grill, LLC v. Camellia Grill Holdings, Inc.,* 920 F.3d 243, 250 (5th Cir. 2019), the court addressed the issue in dicta. It recognized that where the parties to a trademark license had made a "mutual mistake as to a material, basic assumption upon which the License Agreement was made; that [the licensor] had rights to license," the contract is voidable.[4]

---

[4] The court, using the language of the civil law, called the contract "relatively null." "Relatively null" is the equivalent of "voidable" in the common law. *See, Sanare Energy Partners, LLC v. Petroquest Energy, LLC (In re Petroquest Energy, Inc.),* 54 F.4th 299, 305-06 (5th Cir. 2022).

The evidence is that the Hospital, through Dr. Hartz, would never have entered into a contract with MMAS Research if it had known that MMAS Research did not own the Widget copyright. (Second Hartz Decl. ¶ 1). And if MMAS Research had lacked the rights it was purporting to license, then it, too, entered into the agreement on a mistaken assumption. The ownership of the copyright was the essence of the parties' agreement. So if the facts are as it may turn out they are following a decision in the Washington lawsuit, the Hospital would have a very strong defense of mutual mistake. Thus MMAS Research cannot possibly show that the material facts are undisputed or that it is entitled to judgment as a matter of law.

## **CONCLUSION**

For these reasons, the Court should deny MMAS Research's motion for summary judgment. It should also grant summary judgment to the Hospital on breach as to all breaches alleged except the claim that the Hospital breached the contract by failing to score the assessment using the Widget and the claim that it used paper tests without permission.

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION

By its attorneys:

*/s/ Theodore J. Folkman*

Theodore J. Folkman (BBO No. 647642)
Taylor M. Makson (BBO No. 697476)
Elizabeth L. Gardon (BBO No. 711867)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
tmakson@rubinrudman.com
egardon@rubinrudman.com

Date: July 27, 2026

16

5186330_1