MMAS RESEARCH, LLC,

Plaintiff,

vs.

THE CHILDREN'S HOSPITAL
CORPORATION, et al.,

Defendants

Civ. A. No. 1:24-cv-12108-DJC

## THE HOSPITAL'S REPLY IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

A. <u>The 2025 article is irrelevant.</u>

The Amended Complaint does not say anything about the 2025 article, nor could it: the lawsuit began in 2024, and the Amended Complaint was filed in 2024. The article is irrelevant.

After the article was published, MMAS Research moved for leave to amend its complaint to assert claims about the article. (Docket No. 98). The magistrate judge denied the motion. (Docket No. 130). MMAS Research could have asked the Court to review the magistrate judge's decision, but it did not. The alleged breach relating to the article thus was not pleaded and is not part of this case. *See* Fed. R. Civ. P. 15(d) (leave of court required to plead "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented"). Both Mr. Trubow (Docket No. 147-1 at 18:4-7) and his counsel (Docket No. 147-1 at 9:9-15) insisted that the 2025 article was part of the proposed second amended complaint and, because the Court denied the motion for leave to amend, that it was not part of the case. "Let me just say this," Mr. Trubow testified when speaking about his damages estimate in his answers to interrogatories:

1

"This actual damages estimate is only based on the First Amended Complaint. It has nothing to do with Dr. Hartz's 2025 article." (*Id.* at 103:3-6).

In any case, MMAS Research has not offered any evidence to show that the Hospital published the article or is responsible for its contents. In fact, Dr. Hartz and his co-authors, not the Hospital, published the article. (Second Hartz Decl. ¶ 5). And as was the case with the clinicaltrials.gov study description, MMAS Research has not identified a single person (other than Mr. Trubow and his family and advisors) who read the article. Mr. Trubow testified that he recalled conversations with "two or three dozen" people about the article, and that he had "people calling me that I hadn't talked to in 15 years," including representatives of "the Department of Defense, the Department of Justice," "the House Judiciary Committee," and "Novo Nordisk." who had read the article and were surprised that Mr. Trubow had "sued the US government" (the article says no such thing). (Docket No. 147-1 at 166:18-168:1). But he refused to identify any of them. (*Id.* at 168:9-169:8).

B.  <u>There is no evidence anyone read the offending study description or article.</u>

The Hospital has asserted that there is no evidence that anyone read the materials that, according to MMAS Research, caused its injury. According to MMAS Research (Mem. at 8):

> BCH's argument is a syllogism with a suppressed premise: no witness has been identified who read the study description or the article; therefore no one read them; therefore no damage. The middle step holds only if MMAS Research had a fair opportunity to find those witnesses. It did not.

That is plainly wrong. Mr. Trubow claimed to have plenty of evidence that people read the material. He testified that he had documents showing communications he had received from people who had read the clinicaltrials.gov study description and were "shocked when they read

[it]."[1] He testified that he had not provided those documents to his counsel. And he testified that he was "not prepared to answer [the] question" whether he could identify who had read the study description. (Docket No. 147-1 at 103:10-106:1). As shown above, he also refused to identify any of the many people, including government officials and representatives of pharmaceutical companies, who, according to him, had read the 2025 article. The only party that has been deprived of an opportunity to discover the facts here is the Hospital.

MMAS Research also suggests that surely *someone* read the study description, given that it has been online for years. It points to the large number of studies registered on the clinicaltrials.gov website. If anything, that large number makes it less likely, not more likely, that anyone read an obscure study description concerning a failed study that never went anywhere. Regardless, it is not enough for a member of the public, taken at random, to have read the study description. To be relevant to damages, the reader would have to be someone who would have done business with MMAS Research but for what he or she read, or someone who relayed the contents of the study description to such a person. There is no evidence of causation here. Mr. Trubow claimed that there were many such readers and that he had evidence of who they were, but he refused to identify them. MMAS Research has provided no evidence of even a single reader, even after what it characterizes as years of continuous publication.

C. <u>MMAS Research was not diligent, cannot show good cause, and cannot put off the inevitable by invoking Rule 56(d).</u>

Rule 56(d) allows the Court to defer consideration of a summary judgment "if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). But relief under Rule 56(d) is only

---

[1] Mr. Trubow's account of what these unnamed people told him they thought when they read the study description is inadmissible hearsay.

available, in cases where the nonmovant claims discovery is incomplete, if the nonmovant meets five requirements: authoritativeness, timeliness, good cause, utility, and materiality. *See Resolution Trust Corp. v. N. Bridge Assocs.,* 2 F.3d 1198, 1203 (1st Cir. 1994). The nonmovant must also "have exercised due diligence … in pursuing discovery before the summary judgment initiative surfaces." *Id.*; *see also Universitas Educ., LLC v. Granderson,* 2025 U.S. Dist. LEXIS 52430, at *45 (D. Mass. Mar. 21, 2025).

It is undisputed, as the Hospital asserted in ¶ 16 of its statement of undisputed material facts, that MMAS Research cannot quantify any damages without discovery. But that does not mean that it has suffered any damages, nor does it mean that MMAS Research is now entitled to take the discovery it failed to take before the discovery period expired. The Hospital is not asserting that damages exist. The Hospital's assertion is that there are no damages, that there could be no damages given the facts, and that in addition, even MMAS Research admits that if there were any damages, it cannot quantify them.

The Court has already found that MMAS Research's "extended indifference" to the jointly-proposed discovery schedule is "incompatible with the showing of diligence required" to extend the time to take discovery. MMAS Research:

> sought no discovery, sought no stay of discovery, and sought no extension of discovery until after the time for discovery had already expired. It did not serve any document requests, interrogatories, or subpoenas, nor did it notice any depositions. Instead, MMAS Research ignored its own obligations, failing to respond to the Hospital's discovery requests, which resulted in the Hospital filing three separate, unopposed motions to compel.

(Docket No. 138). So MMAS Research can hardly make the showing of "due diligence … in pursuing discovery" that is a prerequisite to relief under Rule 56(d).

5181363_1

MMAS Research also must show "utility," i.e., that more discovery could make a difference. The Hospital's motion is directed solely to damages. The Hospital has no information that is relevant to MMAS Research's supposed damages:

- Mr. Trubow acknowledged that the number of times the Hospital administered the MMAS assessment is irrelevant to the company's damages claim. (Docket No. 147-1 at 137:13-25).

- Whatever the Hospital disclosed in the clinicaltrials.gov study description is publicly available on the clinicaltrials.gov website, including all prior versions of the description.

- Assuming MMAS Research wanted to try to rebut Dr. Hartz's declaration, which avers that coding and scoring criteria were never disclosed to patients, MMAS Research has never explained how such a disclosure could have led to an injury to MMAS Research.

In short, this is not a Rule 56(d) case. Not only is it fair to MMAS Research to decide the Hospital's motion now, fairness to the Hospital requires that the Court should decide the case at last.

D. <u>MMAS Research had the deposition transcript.</u>

MMAS Research's claim that it "has not received [the] transcript" of Mr. Trubow's 30(b)(6) deposition (Docket No. 152 ¶ 19) is false. The transcript is Exhibit 1 to the Hospital's statement of undisputed material facts (Docket No. 147-1) and was served via ECF when filed.

Mr. Trubow complains that he has "not had the review and correction that Federal Rule of Civil Procedure 30(e) affords" (Docket No. 152 ¶ 19), but that rule applies only when the deponent or the party requests such an opportunity "before the deposition is completed," Fed. R.

5

Civ. P. 30(e)(1), which did not happen (before or after the deposition was completed). And when the reporter asked Mr. Trubow's counsel if she wanted to order a copy of the transcript, she declined:

> THE REPORTER: Patricia, did you want a transcript?
>
> MS. RAY: I'll let Steve handle that.

(Docket No. 147-1 at 219:9-12). In any case, Mr. Trubow has submitted a declaration with MMAS Research's opposition to the motion for summary judgment. So he has had the chance to correct anything that needs correcting. Remarkably, Mr. Trubow's declaration points to no errors or omissions in his testimony. Nor does MMAS Research's memorandum of law point to any errors or omissions.

E. <u>The Court should disregard Mr. Watkins's declaration, which in any case undercuts the damages claim.</u>

MMAS Research has submitted a declaration by its CPA, Rodney Watkins. (Docket No. 153). Mr. Watkins was not disclosed in its initial disclosures. (Docket No. 102-1). Mr. Watkins's declaration attaches copies of MMAS Research's tax returns. Neither tax returns nor any other financial documents were disclosed among the categories of documents listed in the initial disclosures. (Id.). The Hospital requested "all documents concerning damages that you suffered as a result of BCH's alleged breach of contract" (Docket No. 116-3 at ¶ 6), and although the Court granted its motion to compel an answer to that request (Docket No. 121), MMAS Research did not produce the tax returns or any other financial documents. In a conference in preparation for a motion for sanctions, MMAS Research's counsel represented to the Court that her client had produced all documents relating to damages. (The colloquy is reproduced on page 7 of the Hospital's main memorandum, Docket No. 146). Where a defendant has "prepared and filed a summary judgment motion premised on evidence submitted before the discovery deadline," and

where the plaintiff "oppose[s] the motion with affidavits obtained after that deadline" from witnesses not disclosed in the initial disclosure, "the prejudice to defendants [is] real." *Harriman v. Hancock County,* 627 F.3d 22, 31 (1st Cir. 2010) (affirming decision to disregard affidavits). On this record, the Court should not consider Mr. Watkins's evidence.

In any case, the tax returns are completely at odds with Mr. Trubow's testimony and seriously undercut any case for damages. Mr. Trubow testified that MMAS Research's 2021 licensing revenue was $651,000, that it was "maybe $400,000" in 2022, and that it was "way, way down" by 2023 or 2024, and "now down to zero. Zero." (Docket No. 147-1 at 123:2-23). In fact, the total gross receipts in 2021 were only $115,500, according to the tax returns Mr. Watkins belatedly provides. Gross receipts (which include all revenue, including licensing revenue) were up 77% in 2022, to approximately $205,000. They were down about 24% in 2023, to $158,000. They were down another 25% in 2024, to $121,500 in 2024, the year MMAS Research filed this lawsuit. Then they were up 88%, to $229,536, in 2025. (Docket No. 153 ¶ 6). Mr. Watkins presents no figures for 2026, so the only evidence that licensing revenue has dropped to zero is Mr. Trubow's testimony. Mr. Watkins's declaration suggests the revenue attributable to licensing the Widget might be lower than the total revenue, though he does not say by how much. (Docket No. 153 ¶ 7). It is very hard to see how the figures from the tax returns could possibly support a claim for damages, and Mr. Watkins disclaims any opinion about damages. (Docket No. 153 at ¶ 5).

Nor is it enough to say that an as-yet-unidentified expert will opine about the measure of damages. Even if it were proper for the expert to consider the untimely tax returns, MMAS Research has produced no other documents concerning its finances or alleged damages. The tax

returns, standing alone, provide no basis for determining whether MMAS Research suffered any injury caused by the Hospital's conduct, and, if it did, in what amount.

Respectfully submitted,

THE CHILDREN'S HOSPITAL CORPORATION

By its attorneys:

*/s/ Theodore J. Folkman*

Theodore J. Folkman (BBO No. 647642)
Taylor M. Makson (BBO No. 697476)
Elizabeth L. Gardon (BBO No. 711867)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
tmakson@rubinrudman.com
egardon@rubinrudman.com

Dated: July 27, 2026